UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

APR 3 0 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

KEVIN P. CHAVOUS and
DAVID A. CATANIA, individually
and in their capacity as MEMBERS of
the COUNCIL OF THE
DISTRICT OF COLUMBIA
One Judiciary Square
441 Fourth Street, N.W.
Washington, D.C. 20001

and

THE COMMITTEE OF INTERNS
AND RESIDENTS
1925 K Street, N.W.
Suite 410
Washington, D.C. 20006

Plaintiffs,

v.

DISTRICT OF COLUMBIA
FINANCIAL RESPONSIBILITY
AND MANAGEMENT ASSISTANCE
AUTHORITY
serve: Alice M. Rivlin, Chair
~~One Thomas Circle~~ 441 4th St. NW,
~~Suite 900~~
5th floor
Washington, D.C. 20001

and

GREATER SOUTHEAST COMMUNITY
HOSPITAL CORPORATION I
serve: Ana Raley, Chief Executive Officer
1310 Southern Avenue, S.E.
Washington, D.C. 20032

and

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NUMBER 1:01CV00921

JUDGE: Richard W. Roberts

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 04/30/2001

```
                                              )
THE DISTRICT OF COLUMBIA                       )
serve:  secretary to the Deputy Corporation   )
of the Civil Division                         )
and the Office of the Mayor                   )
One Judiciary Square                          )
441 Fourth Street, N.W.                       )
Washington, D.C.  20001,                      )
                                              )
                          Defendants.         )
                                              )
                                              )
```

## Complaint for Declaratory Judgment and Injunctive Relief

Plaintiffs Kevin P. Chavous ("Councilmember Chavous") and David A. Catania

(Councilmember Catania), individually and in their capacity as members of the Council

of the District of Columbia, by counsel, bring this action seeking declaratory and

injunctive relief to redress the statutory and constitutional violations arising out of efforts

by the Defendant District of Columbia Financial Responsibility and Management

Assistance Authority to privatize D.C. General Hospital.

## Jurisdiction and Venue

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

the District of Columbia Financial Responsibility and Management Assistance Act of

1995, Pub.L. 104-8 (HR 1345) § 105 (codified at D.C. Code §§ 47-391.1, *et seq.*).

2.    Venue is proper in this Court under 28 U.S.C. § 1391.

## Parties

3.    Plaintiffs are competent adults over the age of eighteen years.

4.    Plaintiffs are citizens of the United States.

5.    Plaintiffs are citizens and residents of the District of Columbia.

6.  Plaintiffs Kevin P. Chavous and David A. Catania are members of the Council of the District of Columbia ("D.C. Council") and bring this action in both their individual and official capacities.

7.  The Committee of Interns and Residents is a national union affiliated with the Service Employees International Union, the largest union of health care workers in the United States.  The Committee of Interns and Residents represents interns and residents at D.C. General Hospital.

8.  Defendant District of Columbia Financial Responsibility and Management Assistance Authority (the "Control Board") is an entity within the government of the District of Columbia, established in 1995 with the passage of the District of Columbia Financial Responsibility and Management Assistance Act (the "Act"), consisting of five members appointed by the President of the United States.

9.  Defendant Greater Southeast Community Hospital Corporation I is a Delaware corporation doing business in the District of Columbia.

10. Defendant District of Columbia is a municipal corporation with responsibility for oversight of the agency of the District of Columbia Department of Health.

### Factual Background

11.    In 1973, Congress passed the District of Columbia Self-Government and Governmental Reorganization Act ("Home Rule Act"), which granted greater rights of self-determination to District citizens and set forth the structural framework of the District government in the District Charter.  Pub.L. 93-198, 87 Stat. 774 (Dec. 24, 1973). The D.C. Council is the legislative branch of the District of Columbia government, and all legislative powers of the District of Columbia government are vested in it.

12.     As part of its statutory authority under the Home Rule Act, the D.C. Council established the District of Columbia Health and Hospitals Public Benefit Corporation ("PBC"), codified at D.C. Code §§ 32-261.1 and 32-262.1 through 262.20, *et seq*. The PBC was established as a non-profit public benefit corporation to provide comprehensive community-centered health care for the benefit of District of Columbia residents. The health care functions performed by the D.C. General Hospital and the community clinics of the Commissions of Public Health of the Department of Human Services were transferred to the PBC. D.C. Code § 32-261.1.

13.     In 1995, Congress passed the District of Columbia Financial Responsibility and Management Assistance Act of 1995, which created the Control Board. Provisions governing the Control Board are codified at D.C. Code §§ 47-391.1, *et seq*. As set forth in Section 47.392(a), the Control Board may submit recommendations to the D.C. Council and, under subsection (b), the D.C. Council then has 90 days in which to approve or reject those recommendations. These recommendations are sometimes referred to as "Section 207 Recommendations" in reference to the Section number in the Control Board's enabling act. The Control Board's powers, as set forth in Section 47-392.7, include the authority to issue orders to the Mayor and departments of agencies of the District of Columbia government, but does not authorize it to give orders to the D.C. Council or act in the stead of the D.C. Council.

14.     As part of the appropriations for the District of Columbia for the fiscal year ending September 30, 2001, Congress allocated $90,000,000 "for the purpose of restructuring the delivery of health services in the District of Columbia." H.R. 5633, 106th Cong., 2d Sess. (2000). The appropriations act further provided that, "such

restructuring shall be pursuant to a restructuring plan approved by the Mayor of the District of Columbia, the [D.C. Council], the [Control Board], and the Board of Directors of the [PBC]." *Id.*

15.    On November 3, 2000, Councilmembers Chavous and Catania, along with D.C. Council member Sandy Allen, submitted a proposal to develop a comprehensive urban healthcare campus on the grounds of D.C. General Hospital to address the health care needs of the residents of the District of Columbia.

16.    On December 4, 2000, the Control Board issued a Resolution, Recommendations and Orders Concerning the Public Benefit Corporation ("Control Board Resolution"), purportedly pursuant to its authority under Section 47-391.7(a). A copy of the Control Board Resolution is attached hereto as Exhibit A. The "Recommendations" set out in the Control Board Resolution were as follows:

1.    The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council, pursuant to its satutory authority under the Home Rule Act, repeal D.C. Act 13-454, "District of Columbia Health and Hospitals Public Benefit Corporation Emergency Amendment Act of 2000;"

2.    The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council, pursuant to its statutory authority under the Home Rule Act, repeal D.C. Act 11-389, codified at Title 32 of the D.C. Code, §§ 261.1 and 262.1 through 262.20, *et. seq.*;

3.    The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council work with the Mayor to prepare and approve a plan to establish an alternative publicly-financed health care delivery system in the District of Columbia that a) is consistent with the current multi-year financial plan and budget for the District of Columbia, b) provides for equivalent volumes and types of services as currently provided by the PBC to uninsured District residents, and c) ensures that the services meet standards of quality and accessibility;

4.  The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council, pursuant to its statutory authority under the Home Rule Act, approve and/or enact legislation, regulations, and reprogrammings, and take any and all other actions necessary to authorize and implement an alternative publicly-financed health care delivery system;

5.  The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council, pursuant to its statutory authority under the Home Rule Act, act to approve the restructuring plan required by Public Law 106-522, which plan is to be submitted to by the Mayor to the Committees on Government Reform of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committees on Appropriations of the House of Representatives and the Senate; and,

6.  All of the above Recommendations must be enacted by the Council and approved by the Mayor within 90 calendar days of the adoption of these Recommendations and Orders by the Authority.

7.  If the Council and the Mayor fail to adopt these Recommendations, pursuant to Section 207 of Public Law 104-8, the Authority will enact and implement them in accordance with the provisions of Section 207 after consultation with the appropriate Committees of Congress.

17.     The Control Board Resolution was distributed to the Members of the D.C. Council on December 6, 2000.

18.     On December 15, 2000, a Request for Proposal ("RFP") was issued by the Control Board seeking to "obtain the services of one qualified health care provider or team of qualified health care providers to provide comprehensive, integrated and coordinated health care services to the uninsured population of the District of Columbia". A copy of the RFP is attached hereto as Exhibit B. The stated closing date for response to the RFP was January 10, 2001, but was later extended.

19.     The RFP included an "Anticipated Proposal Schedule" setting forth dates for the events that were to take place prior to the implementation of the selected contract. Those events, as listed in the RFP, included submission of the contract to both the Mayor and the D.C. Council for review prior to the contract being finalized.

20.     On January 30, 2001 Greater Southeast Community Hospital Corporation I ("Greater Southeast") presented its proposal to the Control Board. A second proposal was submitted by Urban Healthcare Associates, LLC on February 5, 2001. The committee designated to assist with the RFP process recommended the acceptance of the proposal submitted by Greater Southeast.

21.     Once Greater Southeast was recommended, the Control Board moved forward in negotiating a contract with Greater Southeast, refusing to allow the Council or its representatives to participate any further in the contracting process. It was not until last week that the D.C. Council was even made aware of the terms of the contract.

22.     On March 6, 2001, the D.C. Council unanimously adopted Resolution 14-55, titled the "Sense of the Council on the District of Columbia Health and Hospitals Public Benefit Corporation and D.C. General Hospital Emergency Resolution of 2001." A copy of Resolution 14-55 is attached as Exhibit C. In that Resolution, the D.C. Council expressed its many concerns regarding the proposal submitted by Greater Southeast and the impact that a contract arising out of that proposal would have on the health care services in the District of Columbia.

23.     On April 12, 2001, the D.C. Council approved a Fiscal Year 2001 supplemental Appropriation Act which, *inter alia*, provided $21 million in additional funding in order to fund the PBC through the end of the fiscal year.

24.    Greater Southeast submitted a written contract to the Control Board on April 12, 2001.  A copy of the contract was transmitted to Mayor Williams on April 13, 2001.  A copy of the transmittal letter to Mayor Williams is attached as Exhibit D.

25.    Alice Rivlin, Chairman of the Control Board, wrote to Mayor Williams on April 18, 2001, regarding the contract submitted by Greater Southeast.  In that letter, Ms. Rivlin stated that "it is essential that this proposed contract and the enabling legislation are approved before May 1, 2001."  A copy of that letter is attached as Exhibit E.

26.    Mayor Williams provided a copy of the contract submitted by Greater Southeast to the D.C. Council on April 23, 2001. On that same date, Mayor Williams submitted to Linda Cropp, Chairman of the D.C. Council, proposed legislation entitled the "Health Care Privatization Emergency Amendment Act of 2001" providing for, *inter alia*, the abolishment of the PBC and providing the Mayor with the authority to contract for the delivery of medical services to the District of Columbia's uninsured residents.  A copy of that submission is attached as Exhibit F.

27.    The D.C. Council rejected the contract submitted by Greater Southeast by unanimous vote on April 27, 2001.

28.    Upon information and belief, the Control Board ignored the Council's vote that the contract be rejected and executed the contract with Greater Southeast on April 30, 2001.

29.    The effective date of the contract is May 1, 2001, at which time Greater Southeast will immediately begin the privatization of public health in the District of Columbia.

**Count One**
**The Control Board Unlawfully Exceeded the**
**Scope of its Statutory Authority**

30. Paragraphs 1 through 29 are incorporated by reference.

31. The Control Board violated Section 47-392.7(a) in issuing the Control Board Resolution.

32. While Section 47-392.7(a) gives the Control Board the authority to submit recommendations to the D.C. Council, it does not allow the Control Board to issue orders to the D.C. Council. While titled "Recommendations," the Control Board Resolution actually contained orders to the D.C. Council to perform certain specific actions, including repeal of existing legislation, while also ordering the D.C. Council, in a very broad and non-specific directive, to prepare and approve an as yet undetermined plan for an alternative publicly financed health care delivery system.

33. Section 47-392.7 provides that the D.C. Council shall have 90 days in which to adopt or reject the recommendations of the Control Board.

34. The Control Board Resolution, however, in paragraph (6) of the "Recommendations," stated that all of the recommendations "must be enacted by the Council and approved by the Mayor within 90 calendar days of the adoption of these Recommendations and Orders by the Authority." In paragraph (7) of the Recommendations, the Control Board further states that, if the D.C. Council and the Mayor fail to act as directed by the Control Board, the Control Board would "enact and implement" the recommendations.

35. The Control Board does not have the statutory authority to order the D.C. Council to enact or repeal legislation, nor does it have the authority to enact or repeal legislation by itself. As such, the Control Board exceeded its statutory authority,

violating Section 47-392.7, in issuing the Control Board Resolution. The Control Board

Resolution, therefore, must be declared null and void ab initio and any actions the

Control Board purports to taken pursuant to it enjoined.

36. Further, the Control Board lacks the statutory authority to enter into this

contract without the approval of the D.C. Council. Congress amended the Home Rule

Act in 1995 to require that any contract involving expenditures in excess of $1,000,000

during a 12-month period be submitted to the D.C. Council by the Mayor and approved

by the D.C. Council. Pub.L. 104-8 (HR 1345) § 304(a)(3)(codified at D.C. Code § 1-

1130). The Control Board lacks the statutory authority to enter into a multi-year, $85

million contract such as that proposed by Greater Southeast. Not only has the D.C.

Council not approved the contract submitted by Greater Southeast, the D.C. Council

unanimously rejected the contract when the Mayor submitted it to them.

37. The Control Board lacks any statutory authority for entering into or

implementing the contract submitted by Greater Southeast. Any attempts by the Control

Board to enter into or implement the contract exceed its statutory authority. As such, the

Control Board must be enjoined from doing so.

38. As conceded by the Control Board, in the April 23, 2001, letter from

Chairman Alice Rivlin to Mayor Williams, legislation to, *inter alia*, repeal the PBC and

reorganize the Department of Health would have to be enacted by the D.C. Council prior

to the implementation of the Greater Southeast contract.

39. Any attempt by the Control Board to enact the legislation necessary for the

implementation of the Greater Southeast contract would exceed the Control Board's

statutory authority. As such, the Control Board must be enjoined from doing so.

40. Permitting the Control Board to enter into and implement the contract with Greater Southeast would result in immediate and substantial harm.  If Greater Southeast begins the privatization of D.C. General as contemplated in its contract, irreparable harm will begin immediately.  Councilmembers Chavous and Catania will have their statutory right to approve or reject the contract ignored.  The constituents of Councilmembers Chavous and Catania will suffer the loss of available and affordable medical care.

41. Permitting the Control Board to enter into and implement the contract with Greater Southeast would also result in irreparable harm to the resident physician members of the Committee of Interns and Residents currently practicing at D.C. General. The privatization of D.C. General, as contemplated in the Greater Southeast contract will interrupt the three year contract currently in place between the District of Columbia and the members of the Committee of Interns and Residents, interrupting and potentially discontinuing the interns' and residents' graduate medical education.  D.C. General operates the only publicly funded graduate medical program within the District of Columbia.  The contract with Greater Southeast will terminate publicly funded support of medical education in the areas of general dentistry, surgery, pediatrics, and subspecialties such as cardiology, neurology and gastrointerology.  The patient population currently served by these interns and residents will suffer irreparable harm if these programs are discontinued.

**Count Two**
**The Actions of the Control Board**
**<u>Are Unconstitutional</u>**

42. Paragraphs 1 through 41 are incorporated by reference.

43. Councilmembers Chavous and Catania have a constitutionally protected right to cast unimpeded votes on issues of public importance. *Brewer v. D.C. Financial Responsibility and Mgt. Assistance Auth.*, 953 F. Supp. 406, 408 (D.D.C.), *aff'd.*, 132 F.3d 1480 (D.C. Cir. 1997). The quality and availability of health care services to the citizens of the District of Columbia is clearly such an issue.

44. The Control Board, through its Control Board Resolution and in its attempts to enter into and implement the contract with Greater Southeast, has violated the constitutionally protected rights of the Plaintiffs.

45. The actions of the Control Board, made up of Executive Branch appointees, in abrogating the rights and duties of the D.C. Council, a legislative body, violate the Separation of Powers required under the Constitution.

46. Because the actions taken and intended by the Control Board are unconstitutional, the Control Board Resolution must be declared null and void ab initio and the Defendants must be enjoined from entering into and implementing the Greater Southeast contract.

### Count Three
### Defendants Greater Southeast and The District of Columbia
### Must be Enjoined from Acting to Enter into or Implement
### The Greater Southeast Contract

47. Paragraphs 1 through 46 are incorporated by reference.

48. For the reasons stated above, the Greater Southeast contract is unlawful and must not be implemented. As such, Greater Southeast and the District of Columbia, acting by and through the District of Columbia Department of Health, must be enjoined from acting in furtherance of that contract.

## Relief Sought

WHEREFORE, for the reasons stated above, Plaintiffs respectfully demand judgment and relief as follows:

(1) that the Court enter judgment declaring that the actions of the Control Board entering into the Privatization Agreement and enacting the enabling legislation were *ultra vires* and violated the constitutional rights of Councilmembers Catania and Chavous, making the contract illegal and, therefore, void;

(2) that the Court issue a temporary restraining order and preliminary injunction precluding the Defendants from taking any action to implement the contract with Greater Southeast;

(3) that the Court award Plaintiffs all costs and reasonable attorneys' fees and expenses arising from this action; and

(4) that the Court award Plaintiffs such other and further relief, as appropriate.

Dated: 4/30/01                    By: _____
                                  Elizabeth B. Sandza, Esq. (DC Bar #415283)
                                  John M. Collins, Esq. (D.C. Bar #440356)
                                  David M. Ross (D.C. Bar #461733)
                                  LeBoeuf, Lamb, Greene & MacRae, LLP
                                  1875 Connecticut Avenue, NW
                                  Washington, DC  20009-5728
                                  (202) 986-8000
                                  Counsel for Plaintiffs

# EXHIBITS



# COUNCIL OF THE DISTRICT OF COLUMBIA
### 441 4th Street, N.W.
### Washington, D.C. 20001

**URGENT**

**MEMORANDUM**

**To:**       Members of the Council

**From:**     Phyllis Jones, Secretary to the Council

**Date:**     December 6, 2000

RECEIVED

'00  DEC  7  A12:45

OFFICE OF
THE GENERAL COUNSEL

**Subject:**  Section 207, Resolution, Orders and Recommendations on the Public Benefit
Corporation, (Sec. 207, 13-1)

Notice is given that the attached Resolution, Orders and Recommendations on
the Public Benefit Corporation from the Authority was received in the Office of
the Secretary on December 5, 2000. Copies are available in Room 714, the
Legislative Services Division.

TITLE:   "Resolution, Orders and Recommendations on the Public Benefit
         Corporation", (Sec. 207, 13-1)

INTRODUCED BY:  Chairman Cropp

Retained by the Council with comments from the Committee on Human Services.

cc:  General Counsel
     Legislative Services Division

FILED

APR 3 0 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

01 0921

**District of Columbia Financial Responsibility
and Management Assistance Authority**
Washington, D.C.

RECEIVED

December 5, 2000          '00 DEC -5 P10 :42

**By Hand Delivery**

The Honorable Linda Cropp
Chairperson
Council of the District of Columbia
One Judiciary Square
441 – 4th Street, N.W., 7th Floor
Washington, D.C. 20001

The Honorable Anthony Williams
Mayor, District of Columbia
One Judiciary Square
441 – 4th Street, N.W., 11th Floor
Washington, D.C. 20001

Re:   Resolution, Recommendations and Orders
      on the Public Benefit Corporation

Dear Chairperson Cropp and Mayor Williams:

This letter is to transmit the enclosed Resolution, Recommendations and Orders concerning the D.C. Health and Hospitals Public Benefit Corporation.

Please note that the District of Columbia Financial Responsibility and Management Assistance Authority transmits the Resolution, Recommendations and Orders to the Mayor and Council of the District of Columbia pursuant to its authority under Section 207 of Public Law 104-8, as amended. Specifically, the document contains Recommendations to the Council pursuant to Section 207(a) – (c) and Orders to the Mayor, the Director of the D.C. Department of Health and the Chief Financial Officer of the District of Columbia pursuant to Section 207(d).

If you have any questions, please feel free to contact me at (202) 504-3400.

Sincerely,

Francis S. Smith
Executive Director

Cc:   John Koskinen, CA
      Dr. Natwar Gandhi, CFO

District of Columbia Financial Responsibility
and Management Assistance Authority
Washington, D.C.

("AUTHORITY")

## RESOLUTION, RECOMMENDATIONS
## AND ORDERS CONCERNING
## THE PUBLIC BENEFIT CORPORATION

**WHEREAS,** the mission of the District of Columbia Health and Hospitals Public Benefit Corporation (the "PBC"), including D.C. General Hospital ("D.C. General"), is to provide comprehensive community-centered health care to residents of the District of Columbia;

**WHEREAS,** the PBC and D.C. General are operating in a manner inconsistent with the multiyear financial plan and budget of the District of Columbia in that the PBC and DC General are generating, and are projected to continue to generate, operating deficits in excess of $64 million in Fiscal Year ("FY") 2001;

**WHEREAS,** the Chief Financial Officer of the District of Columbia (the "CFO") found that:

> "At its current rate of spending, PBC will exhaust its $45.3 million FY 2001 subsidy by the middle of March 2001. If money is set aside to maintain PBC's clinics throughout the fiscal year, D.C. General Hospital will be forced to close even sooner, perhaps by as early as two months from today. In either case, [the CFO] will be unable to redirect funds from any source to continue PBC operations unless a plan to restructure PBC is approved by Congress." (The CFO's Nov. 14, 2000 Memorandum attached as Exhibit A);

**WHEREAS,** the CFO also projects that the PBC is currently deficit spending in excess of $6 million per month over its authorized appropriation and at this rate of spending will require in excess of $64 million in FY 2001 and in subsequent years may well require subsidies in excess of its legally appropriated funding level;

**WHEREAS,** there is now agreement by all concerned parties that the continued expenditure of funds at this rate by the PBC and D.C. General will necessitate the closure of the PBC and D.C. General and loss of the health care services provided by them to the residents of the District of Columbia;

**WHEREAS,** a delay in addressing these spending pressures could affect the ability of the District government to adhere to the overall FY 2001 District of Columbia Budget and Financial Plan;

**WHEREAS,** the District of Columbia Appropriations Act, 2001, Pub. L. 106-522 requires:

"That no appropriated amounts and no amounts from or guaranteed by the District of Columbia government (including the District of Columbia Financial Responsibility and Management Assistance Authority) may be made available to the [PBC] (through reprogramming, transfers, loans, or any other mechanism) which are not otherwise provided for under this heading until a restructuring plan for D.C. General Hospital has been approved by the Mayor of the District of Columbia, the Council of the District of Columbia, the Authority, the Chief Financial Officer of the District of Columbia, and the Chair of the Board of Directors of the [PBC] ...." (Pub. L. 106-522, H.R. 5633, 106th Cong., 2[d] Sess., pg. 17 (Nov. 22, 2000)).

**WHEREAS,** the District of Columbia Appropriations Act, 2001, Pub. L. 106-522 further requires:

"That notwithstanding any other provision of law, to augment the District of Columbia subsidy for the District of Columbia Health and Hospitals Public Benefit Corporation (PBC), the District may transfer from other non-Federal funds appropriated under this Act to the Human Support Services appropriation under this Act an amount not to exceed $90,000,000 for the purpose of restructuring the delivery of health services in the District: *Provided further*, That such restructuring shall be pursuant to a restructuring plan approved by the Mayor, the Council, the Authority, and the Board of Directors of the PBC: Provided further, That—

(1) the restructuring plan reduces personnel levels of D.C. General Hospital and of the PBC consistent with the reduction in force set forth in the August 25, 2000, resolution of the Board of Directors of the PBC regarding personnel structure, by reducing personnel by at least 500 full-time equivalent employees, without replacement by contract personnel;

(2) no transferred funds are expended until 10 calendar days after the restructuring plan has received final approval and a copy evidencing final approval has been submitted by the Mayor to the Committee on Government Reform of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committees on Appropriations of the House of Representatives and the Senate; and

(3) the plan includes a certification that the plan does not request and does not rely upon any current or future request for additional appropriation of Federal funds." (Pub. L. 106-522, H.R. 5633, 106th Cong., 2[d] Sess., pg. 13 (Nov. 22, 2000)).

WHEREAS, the Mayor of the District of Columbia (the "Mayor"), the Council of the District of Columbia (the "Council"), and the Authority (collectively referred to as the "Parties") are jointly and diligently working to restructure and privatize certain services currently provided by the PBC and D.C. General by March 1, 2001, just in advance of the deadline for the exhaustion of the PBC's subsidy identified by the CFO;

WHEREAS, the process leading up to the restructuring and privatization of health care delivery by the PBC and D.C. General Hospital involves a complex contract bidding procedure which could easily be delayed past the subsidy exhaustion deadline identified by the CFO;

WHEREAS, the Authority anticipates that such a delay is possible, even likely, and deems it prudent to plan to act immediately to assure the uninterrupted delivery of health care services in the interim, while allowing the restructuring and privatization process to continue; and,

WHEREAS, in order to be able to act to assure the uninterrupted delivery of health care services in conformity with Federal and District law, including the FY 2001 D.C. Appropriations Act, the federal Anti-deficiency Act, and federal appropriations law, the Authority must act now to preserve its options in the event that the PBC restructuring and privatization process is not successfully completed prior to the exhaustion of the PBC's subsidy.

## NOW, THEREFORE BE IT RESOLVED THAT:

## RECOMMENDATIONS

1.    The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council, pursuant to its statutory authority under the Home Rule Act, repeal D.C. Act 13-454, "District of Columbia Health and Hospitals Public Benefit Corporation Emergency Amendment Act of 2000" (attached hereto as Exhibit B);

2. The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council, pursuant to its statutory authority under the Home Rule Act, repeal D. C. Act 11-389, codified at Title 32 of the D.C. Code, §§ 261.1 and 262.1 through 262.20, et. seq.;

3. The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council work with the Mayor to prepare and approve a plan to establish an alternative publicly-financed health care delivery system in the District of Columbia that a) is consistent with the current multi-year financial plan and budget for the District of Columbia, b) provides for equivalent volumes and types of services as currently provided by the PBC to uninsured District residents, and c) ensures that the services meet standards of quality and accessibility;

3

4.    The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council, pursuant to its statutory authority under the Home Rule Act, approve and/or enact legislation, regulations, and reprogrammings, and take any and all other actions necessary to authorize and implement an alternative publicly-financed health care delivery system;

5.    The Authority recommends, pursuant to Section 207 of Public Law 104-8, that the Council, pursuant to its statutory authority under the Home Rule Act, act to approve the restructuring plan required by Public Law 106-522, which plan is to be submitted to by the Mayor to the Committees on Government Reform of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Committees on Appropriations of the House of Representatives and the Senate; and,

6.    All of the above Recommendations must be enacted by the Council and approved by the Mayor within 90 calendar days of the adoption of these Recommendations and Orders by the Authority.

7.    If the Council and the Mayor fail to adopt these Recommendations, pursuant to Section 207 of Public Law 104-8, the Authority will enact and implement them in accordance with the provisions of Section 207 after consultation with the appropriate Committees of Congress.

## ORDERS

It is further ORDERED, that, during the pendency of these Recommendations before the Council and the Mayor and until further Order of the Authority, the Authority:

1.    Directs the Mayor to, exercising authority under Title 1, Chapter 2 of the District of Columbia Code, immediately prepare and submit a Reorganization Order to the Council by December 19, 2000, establishing an alternative publicly-financed health care delivery system in the District of Columbia consistent with the Recommendations issued hereunder and is a) consistent with the current multi-year financial plan and budget for the District of Columbia, b) provides for equivalent volumes and types of services currently provided by the PBC to uninsured District residents, and c) ensures that the services meet standards of quality and accessibility;

2.    Directs the Mayor and the PBC to eliminate 500 full-time equivalent employees ("FTEs") in accordance with the FY 2001 D.C. Appropriations Act, P.L. 106-522, and identify those health care services to be reduced and those to be eliminated to achieve the 500 FTE reduction (with supporting utilization data for the services to be reduced or eliminated and for the services to be retained). The Mayor and the PBC must: a) submit to the Authority by December 19, 2000, the 500 FTE positions identified for elimination, b) begin implementation of the personnel reductions and elimination of services by January 19, 2001, and c) complete implementation of the elimination of 500 FTE and reduction and elimination of services previously identified, by January 31, 2001;

3.      Directs the PBC to comply with all appropriation law requirements and be vigilant in not violating the strictures of the Anti-deficiency Act, 31 U.S.C. 1341, et. seq.;

4.      Directs the Mayor to authorize and approve contracts, personnel actions, expenditures, regulations, and reprogramming of funds, and take any and all other actions necessary to implement an alternative publicly-financed health care delivery system, including establishing by the dates identified in Order No. 2 above, a mechanism to secure services currently provided by the PBC and implementing changes that may be required with regard to emergency medical services and transportation.

5.      Directs the CFO to identify to the Authority, the Mayor and the Council, by December 19, 2000, the funding resources and available sources needed to implement these Recommendations and Orders and the cost of the contracts necessitated by the final restructuring and privatization process, consistent with the FY 2001 D.C. Appropriations Act, P.L. 106-522.

Adopted this 4th day of December, 2000.

Alice M. Rivlin
Chair

EXHIBIT
A

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Office of the Chief Financial Officer

Natwar M. Gandhi
Chief Financial Officer



# 30470
NOV 14 2000

## MEMORANDUM

TO:       The Honorable Anthony A. Williams
Mayor
District of Columbia

The Honorable Linda W. Cropp
Chairman
Council of the District of Columbia

Dr. Alice M. Rivlin
Chairman
District of Columbia Financial Responsibility
and Management Assistance Authority

Julius W. Hobson, Jr.
Chairman
Public Benefit Corporation

FROM:    Natwar M. Gandhi
Chief Financial Officer

DATE:    November 14, 2000

RE:      Urgent Need for Action in Regard to PBC

---

At our November 3, 2000 retreat I expressed my concern that unless decisive action is taken soon, the Public Benefit Corporation (PBC) will run out of cash. It is with the greatest urgency that I write to you now to reiterate that concern about the need for prompt action.

At its current rate of spending, PBC will exhaust its $45.3 million FY 2001 subsidy by the middle of March 2001. If money is set aside to maintain PBC's clinics throughout the fiscal year, D.C. General Hospital will be forced to close even sooner, perhaps by as early as two months from today. In either case, I will be unable to redirect funds from any source to continue PBC operations unless a plan to restructure PBC is approved by Congress.



Urgent Need for Action in Regard to PBC
November 14, 2000
Page 2

Because as many as 60 days would be needed to make alternative care arrangements for patients who would be affected if the hospital shuts its doors, a decision on how to proceed must be made immediately.  Unfortunately, our options are limited.  Fiscal constraints imposed by Congress are complicated by the need to act during the post-election recess period.

Under the FY 2001 appropriations act, Congress imposed conditions on any inter-appropriation transfer of funds to PBC.  These conditions require the District to have an agreed upon restructuring plan for PBC that eliminates, at a minimum, 500 full time equivalent positions at PBC; does not contemplate any additional expenditure of federal funds; and provides Congress with 10 days prior notice of any inter-appropriation transfer of funds.

No such plan has yet been formulated.  Congress is expected to be in recess until December 5, 2000.  It is anticipated that Congress will adjourn again shortly thereafter until late January or early February 2001, past the point at which PBC's cash would be exhausted.  **It is therefore imperative that any plan to restructure PBC be in place for Congress to consider upon its return from recess on December 5.**

I also believe it would be prudent to formulate a contingency plan for closure of D.C. General Hospital in the event a plan to restructure PBC cannot be agreed upon in a timely manner.

In conclusion, decisive action must be taken now to ensure adequate, continued delivery of public health care services in the District.

# EXHIBIT B

**ENROLLED ORIGINAL**

AN ACT

D.C. ACT 13-454

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

*Codification
District of
Columbia
Code
2001 Supp.*

To amend, on an emergency basis, the Health and Hospitals Public Benefit Corporation Act of 1996 to ensure that changes that would eliminate or decrease the services formally provided by the District of Columbia General Hospital and the components of the Commission on Public Health at the time of the transfer of management and control of the hospital and those components to the District of Columbia Health and Hospitals Public Benefit Corporation be submitted to the Council for a 45-day period of review; and to amend An Act Making appropriations for the government of the District of Columbia and other activities chargeable in whole or in part against the revenues of such District for the fiscal year ending June 30, 1938, and for other purposes to repeal a provision that gives the Mayor supervision of the D.C. General Hospital to resolve a potential conflict in statutory authority.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "District of Columbia Health and Hospitals Public Benefit Corporation Emergency Amendment Act of 2000".

Sec. 2.  The Health and Hospitals Public Benefit Corporation Act of 1996 is amended by adding a new section 207a to read as follows:
     "Sec. 207a.  Council approval.
     " Notwithstanding any other law, any proposed action by the Public Benefit Corporation to (1) transition D.C. General Hospital from a full-service, acute-care hospital to a community-access hospital; or (2) remove or terminate the operation of the Level-1 trauma center currently located at D.C. General Hospital, shall be submitted to the Council for a 45-day period of review, excluding Saturdays, Sundays, legal holidays, and days of Council recess. If the Council does not approve or disapprove the proposed action, in whole or in part, by resolution within this 45-day review period, the proposed action shall be deemed approved.".

Sec. 3. Section 1 of An Act Making appropriations for the government of the District of Columbia and other activities chargeable in whole or in part against the revenues of such District

1

ENROLLED ORIGINAL

for the fiscal year ending June 30, 1938, and for other purposes is amended by striking the paragraph that states the following:

"For the following hospital and sanatoria, which, on or after July 1, 1937, shall be under the direction and control of the Health Department of the District of Columbia and subject to the supervision of the Board of Commissioners:".

Sec. 4.  Fiscal impact statement.

This act shall have no fiscal impact because it is only a technical amendment clarifying the existing law.

Sec. 5.  Effective date.

This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto) and approval by the Financial Responsibility and Management Assistance Authority as provided in section 203(a) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, approved April 17, 1995 (109 Stat. 116; D.C. Code § 47-392.3(a)), and shall remain in effect for no longer than 90 days, as provided for emergency acts of the Council of the District of Columbia in section 412(a) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 788; D.C. Code § 1-229(a)).

Chairman
Council of the District of Columbia

Mayor
District of Columbia

APPROVED:  October 24, 2000

2

December 15, 2000

Dear Prospective Bidder:

The Mayor, the Council of the District of Columbia, the District of Columbia Financial Responsibility and Management Assistance Authority ("Authority"), and the Board of Directors of the Health and Hospital Public Benefit Corporation ("PBC") are working together to ensure that the Government of the District of Columbia provides quality health care services to low income and uninsured residents served by the PBC.

In order to achieve this goal, the Government of the District of Columbia is inviting and encouraging the broadest participation in a request for proposal process by qualified providers to assist us in providing accessible and high quality care. The attached Request for Proposal No. DCFRA 00-R-039 ("RFP") is intended to obtain through a competitive process a qualified provider or team of providers to deliver comprehensive, integrated and coordinated health care services to low income and uninsured District residents.

We are committed to constructing a relationship with a private provider that is based upon mutual accountability, adherence to sound business practices, and an unwavering commitment to high quality health care services for District residents.

Additional information regarding the RFP is enclosed, including directions for obtaining responses to any questions you may have about this process. We welcome your consideration.

Sincerely,


Alice M. Rivlin, Chair
The District of Columbia Financial
Responsibility and Management
Assistance Authority


Linda W. Cropp, Chairman
Council of the District of Columbia


Anthony A. Williams, Mayor
District of Columbia


Julius Hobson, Jr., Chairman
District of Columbia Health
and Hospitals
Public Benefit Corporation

FILED
APR 3 0 2001

Enclosure

District of Columbia Financial Responsibility
and Management Assistance Authority
Washington, D.C.

**ISSUANCE DATE:**                    **DECEMBER 15, 2000**
**CLOSING DATE:**                     **JANUARY 10, 2000**

**SUBJECT:    REQUEST FOR PROPOSAL NO. DCFRA 00-R-039 FOR
COMPREHENSIVE, INTEGRATED AND COORDINATED HEALTH CARE
SERVICES FOR THE UNINSURED POPULATION OF THE DISTRICT OF
COLUMBIA**

TO WHOM IT MAY CONCERN:

The District of Columbia Financial Responsibility and Management Assistance Authority
("Authority") is seeking proposals from qualified healthcare providers ("Offerors") in response
to Request for Proposal No. DCFRA 00-R-039 to obtain the services of one qualified health care
provider or team of qualified health care providers ("Contractors ") to provide comprehensive,
integrated and coordinated health care services to the uninsured population of the District of
Columbia.  The selected Contractor will be required to provide primary healthcare, specialty
healthcare, inpatient services, emergency/urgent care and public school healthcare.  In addition,
the selected Contractor must demonstrate that it can:

- ◆ Provide an integrated health care delivery system;
- ◆ Supply an appropriate number and mix of health care facilities, professionals and other personnel;
- ◆ Deliver health care services in geographic locations that are reasonably accessible to the uninsured population and/or make other arrangements that will ensure timely access to needed services;
- ◆ Meet appropriate licensure, certification and/or national accreditation standards;
- ◆ Demonstrate an effective and appropriate quality assurance/improvement program;
- ◆ Deliver services in a high quality, cost-effective manner;
- ◆ Demonstrate excellent customer services/patient services capabilities including appropriate mechanisms for measuring and raising patient satisfaction and for identifying and resolving patient complaints and grievances;
- ◆ Demonstrate experience in providing health care services effectively to low income populations with diverse cultural backgrounds;
- ◆ Establish linkages between uninsured persons and primary care providers to the maximum extent possible with the aim of preventing illness, improving health status and ensuring the timely delivery of appropriate health care services
- ◆ Assist the Department of Health in enrolling eligible persons in Medicaid, Medicare, CHIP or other programs that offer health care coverage;

◆ Supply the Authority with timely, accurate and sufficiently detailed data, reports and analyses regarding uninsured patients and the health care services they receive; and data regarding patient identities, demographic characteristics, place of residence, costs, utilization and other information in computer readable files and

◆ Build the capacity to enroll uninsured persons in a prepaid, high quality, integrated delivery system that will link individuals into a primary care system that emphasizes prevention, meets routine care needs and coordinates with a supportive network of emergency, specialty and hospital resources.

This Request for Proposal ("RFP") consists of this cover letter and pages 3 through pages *60*.

This RFP does not obligate the Authority to award a contract. The Authority will not pay any cost incurred by any Offeror in the preparation and submission of a proposal pursuant to this RFP. The Closing Date for submission of a proposal in response to this RFP is 01/16/2001.

Your firm is invited to submit a proposal for the above work, including the fees you propose for the specified health care services and for related administrative services. If your firm submits a proposal, it must immediately inform the Authority if you discover a conflict of interest that might preclude you from undertaking this project.

All Offerors who have contacted the Authority to request the RFP will be mailed a solicitation package via U.S. mail on or about the issuance date. Other Offerors who contact the Authority to request the RFP after the issuance date will be mailed a solicitation package via U.S. Mail within two (2) business days of request.

For a proposal to be responsive, an Offeror must submit an original and twenty (20) copies of each proposal. In addition to submitting paper copies, Offerors should submit the proposal on a diskette in Microsoft Office or compatible applications. The proposal must be received no later than 2:00 P.M. (Eastern Standard Time), on the Closing Date indicated above. The proposal (and any modifications thereto) must be submitted in a sealed envelope marked with the name and address of the Offeror marked "Proposal in Response to Solicitation No. DCFRA 00-R-039" and addressed to:

District of Columbia Financial Responsibility and
Management Assistance Authority
441 Fourth Street, NW Suite 570N
Washington, DC 20001
Attn: Alex Peacock, Senior Procurement Manager

The Authority will hold a pre-bid conference on 12/20/2000. Your organization is limited to no more than two participants at the pre-bid conference. In order to reserve a spot to attend, you must submit a letter with the names of the persons who will be attending from your organization. The letter must be faxed to the attention of Mr. Alex Peacock at (202) 504-3431 no later than 12:00 noon on 12/19/2000. The pre-bid conference will be held as follows:

2

| | |
|---|---|
| Date: | December 20, 2000 |
| Time: | 10:00 AM |
| Location: | District of Columbia Government |
| | 441 4th Street, N.W. |
| | Conference Room, 1030S |
| | Washington, D. C. 20001 |

In addition, the Authority will provide a tour of one or more of the existing District health care facilities that are currently used to provide health care to the District's uninsured population. This facilities tour will be held on 12/21/2000 beginning at 10:00 a.m. and starting at the following location

D.C. General Hospital
1900 Mass. Ave. S.E.
Washington, D.C. 20001

Any questions regarding this RFP must be directed in writing to Mr. Alex Peacock by not later than 12:00 noon on 12/22/2000, at the Authority address listed above or by facsimile at (202) 504-3431.

Sincerely,

Francis S. Smith
Contracting Officer

3

## SECTION I.    INFORMATION AND INSTRUCTIONS CONCERNING RFP NO. DCFRA 00-R-039

### 1. INSTRUCTIONS TO OFFERORS

Offerors must follow the instructions contained herein and must supply all information as required. Failure to comply with these instructions may serve to disqualify a proposal.

Offerors must set forth full, truthful, and complete information required by this RFP (including any Appendices). Making false statements in proposals is punishable by criminal penalties as provided in 22 D.C. Code 22-2514.

### 2. ACCEPTANCE PERIOD

The Authority reserves the right to reject any proposal as non-responsive if it offers less than one hundred and eighty days (180) for acceptance (less than a 180-day validity period) by the Authority.

### 3. EXPLANATIONS TO PROSPECTIVE OFFERORS

Any prospective Offeror desiring any explanation or interpretation of this RFP must make its request in writing directed to Mr. Alex Peacock, Senior Procurement Manager, at the following address:

> District of Columbia Financial Responsibility and
> Management Assistance Authority
> 441 Fourth Street, NW Suite 570N
> Washington, D.C. 20001
> Telephone: (202) 504-3400
> FAX:  (202) 504-3431

Any information given to a prospective Offeror concerning this RFP will be furnished to all other prospective Offerors as an amendment to the RFP if in the Authority's judgement, that information is necessary in submitting offers or if the lack of that information would be prejudicial to any other prospective Offerors. Oral explanations and/or instructions given by persons other than as indicated herein will not be binding on the Authority.

### 4. EXAMINATION OF RFP

Offerors are expected to examine this RFP and all instructions and appendices to this RFP. Failure to do so will be at the Offeror's risk.

## 5. PROPOSAL IDENTIFICATION

The original and twenty (20) copies of a proposal must be submitted in a sealed envelope conspicuously marked "Proposal in Response to Solicitation No. DCFRA 00-R-039". The technical proposal must be bound separately from the cost proposal and each must be properly marked to identify the RFP number and the subject of the solicitation. Faxed proposals will not be accepted and will be disqualified.

## 6. SUBMISSION OF PROPOSALS

To be considered, proposals must be received at the Authority no later than 2:00 PM on 01/16/2001. Offerors mailing proposals should allow sufficient time to guarantee timely receipt of their proposals.

Proposals must be delivered to the DCFRA offices. Receipt by or delivery to the Auhority's office building will not be sufficient to meet the deadline. Proposals received after the submission deadline will be disqualified and not reviewed or accepted. Disqualified proposals will not be returned to the Offeror.

Each individual Offeror or consortium of Offerors shall submit only one proposal in which an Offeror is identified as the Prime Contractor. If an Offeror submits more than one response, the Authority will evaluate only the first proposal received. A proposal submitted by a consortium of Offerors must identify one party as the prime contractor and all other parties as subcontractors. The Authority will conduct business only through the prime contractor. Nothing herein precludes an individual Offeror from membership in multiple consortia.

To be considered responsive, Offerors must submit a complete response to the RFP using the format specified in Section III of this RFP. There are two (2) components to a complete proposal—the technical proposal and the cost proposal. Offerors may include appendices to each of these components if the total submission including appendices does not exceed 125 pages. Twenty (20) copies of the technical and cost proposal must be submitted in sealed envelopes and clearly marked with the identification number of the RFP, the Offeror's name and address, and the due date and time for receipt of proposals. The technical and cost proposals must be submitted separately and Offerors may not include or indicate pricing in the technical proposal. All pages in the technical and cost proposals must be numbered either consecutively from beginning to end or consecutively by sections. All pages in the technical proposal must have a font size of no less than 12.

Both the technical and cost proposals of the successful Offeror must remain valid for the greater of one hundred eighty days or through the effective date of the operational contract resulting from this RFP whichever is greater.

The contents of the proposal of the successful Offeror will become contractual obligations on the part of the Offeror if a contract is entered into with the Offeror as a result of this RFP.

5

## 7. LATE PROPOSAL

A. Any proposal received by the DCFRA after the exact date and time specified in this solicitation will not be accepted, except as delineated below:

    1. It was sent by registered or certified mail not later than the fifth calendar day prior to the date specified for receipt of offers (e.g. an offer submitted in response to this RFP requiring receipt of offers by the 10th of the month must have been mailed by the 5th or earlier); or

    2. It was sent by mail and it is determined by the Authority that the late receipt was due solely to mishandling by the Authority after receipt at the Authority; or

    3. It is the only proposal received by the Authority.

B. Any modification of a proposal, except a modification resulting from the Contracting Officer's request for "best and final" offers, is subject to the conditions in sub-paragraphs A.1., A.2. and A.3. above.

C. Any modification resulting from the Contracting Officer's request for "best and final" offers that is received after the time and date specified in the request for "best and final" offers will not be considered unless the late receipt is due solely to mishandling by the Authority after timely receipt.

D. The only acceptable evidence to establish:

    1. The date of mailing of a late proposal or modification is to send the proposal or modification either by registered or certified mail with a postmark on the wrapper or on the original receipt from the U.S. Postal Service. If neither postmark shows a legible date, the proposal or the modification shall be deemed to have been mailed late. (The term "postmark" means a printed, stamped, or otherwise placed impression that it is readily identifiable without further action as having been supplied and affixed on the date of mailing by employees of the U.S. Postal Service); and

    2. The time of receipt of a proposal at the Authority is the time-date stamp by the Authority on the proposal wrapper or other documentary evidence of receipt maintained by the Authority.

E. Notwithstanding subparagraphs A., B., C and D. of this provision, a late modification of an otherwise accepted proposal, which makes its terms more favorable to the Authority, may be considered at any time it is received and may be accepted.

F. A proposal may be withdrawn in writing by an Offeror or its authorized representative, provided it is withdrawn prior to the RFP closing date.

## 8. FAILURE TO SUBMIT AN OFFER

Recipients of this RFP who do not respond with an offer should not return this RFP. Instead, they should advise the Authority by letter or by postcard whether they want to receive future solicitations for similar requirements.

It is also requested that such recipients advise the Authority of the reason for not submitting a proposal in response to this RFP. If a recipient does not submit an offer and does not notify the Authority that it wishes to receive future solicitations, the recipient may be removed from the Authority's applicable Offerors' Mailing List.

## 9. REJECTION OF PROPOSALS

The Authority reserves the right to reject any and all proposals received in response to this RFP. Additionally, the Authority reserves the right to waive any informality or irregularity in proposals received if it is determined by the Authority that the best interest of the Authority will be served by doing so. Offerors may be excluded from any further consideration for failure to comply with the specifications of this RFP.

## 10. ANTICIPATED PROPOSAL SCHEDULE

| | |
|---|---|
| ♦ Proposal Issued | 12/15/2000 |
| ♦ Offeror's Conference | 12/20/2000 |
| ♦ Facility Tour | 12/21/2000 |
| ♦ Answers provided to Offerors | 12/27/2000 |
| ♦ Proposals Due | 01/16/2001 |
| ♦ Oral Presentations if needed | 01/22/2001 |
| ♦ Contractor Selected | 01/24/2001 |
| ♦ Letter Contract Executed if needed | 01/28/2001 |
| ♦ To Mayor | 01/31/2001 |
| ♦ To City Council | 02/01/2001 |
| ♦ Public Briefings | 02/08/2001 |
| ♦ Contract Finalized | 02/28/2001 |

♦ Readiness Review                        02/28/2001

♦ Program Start                           03/13/2001

## 11. PRE-BID CONFERENCE

A pre-bid conference will be held on 12/20/2000 at 10:00 AM at 441 4th Street, N.W. Conference Room 1030S, Washington, D.C., 20001. Attendance at the conference is not mandatory, however the Authority strongly encourages potential Offerors to attend. The pre-bid conference will be the only opportunity for oral questions and discussions related to the specifications, definitions or omissions in this RFP to be addressed verbally by the Authority and District officials.

Written questions may be submitted to the Contracting Officer up until 12:00 PM on 12/22/2000. Potential Offerors may also ask questions at the pre- bid conference. Questions asked at the pre-bid conference should also be submitted in writing to the Authority at the end of the pre-bid conference. Additional questions may be submitted to the Authority up until 12:00 PM on 12/22/2000 via our website at "dchealthrfp@dcfra.com". The Authority will record all questions asked during the conference. The Authority will provide official written responses to all questions submitted in writing and asked at the pre-bid conference. Answers provided at the pre-bid conference will not be considered official until verified in writing by the Authority. Official written responses will be posted on our website at www.dcfra.gov, mailed or faxed to every potential Offeror. The Authority will not be responsible for lost or misdirected mail or improper addresses or fax numbers.

## 12. PROTESTS

Any interested party may protest this solicitation, and the award, or proposed award hereunder. The protest must be filed in writing within ten (10) days after the basis of the protest is known (or should have been known) with the Authority's Executive Director, 441 Fourth Street NW, Suite 570N, Washington, D.C. 20001.

## 13. INCURRED EXPENSES

Costs incurred by any Offeror in preparing written proposals and/or in making oral presentations, if requested whether or not submitted and/or presented by an Offeror and/or whether or not received by the Authority, shall be the responsibility of the respective Offeror and shall not be reimbursed in any manner by the Authority.

## 14. ACKNOWLEDGMENT OF AMENDMENTS

Offerors must acknowledge receipt of any amendments to this RFP (i) by identifying the amendment number and date in the space provided on the amendment and (ii) by signing and returning the amendment. The Authority must receive the acknowledgment by the date and time specified for receipt of offers. An Offeror's failure to acknowledge receipt of an amendment

may result in rejection of the offer.

## 15. ERRORS AND OMISSIONS

Offerors will not be allowed to take advantage of errors or omissions in the RFP specifications.

## 16. WITHDRAWAL OF PROPOSALS

Offerors may withdraw and resubmit revised proposals or withdraw proposals completely at any time up to the proposal submission deadline. Withdrawal notices must be submitted in writing to the Contracting Officer and must clearly identify the proposal as being withdrawn. The Authority reserves the right to reject any such revisions with or without review.

## 17. DISCLOSURE OF PROPOSAL IDEAS

Proposals will be held in confidence by the Authority and except for the selected proposal will not be revealed to or discussed with competitors. All material submitted with a proposal becomes the property of the Authority and may be returned only at the Authority's option. Proposals submitted to the Authority may be reviewed and evaluated by any person (other than competing Offerors) at the discretion of the Authority. The Authority has the right to use any or all ideas presented in any proposal. Selection or rejection of proposal does not affect this right of the Authority to use any or all ideas presented in any proposal.

## 18. OFFEROR'S AFFIDAVIT

Each offeror is required to submit with its proposal an affidavit stating that neither it, nor its agents, nor any other party acting on its behalf, has paid or agreed to pay, directly or indirectly, to any person, firm, or corporation, any money or valuable consideration for assistance in procuring or attempting to procure, the contract herein referred to, and further agreeing that no such money or reward will be paid hereafter.

Each Offeror must certify that it is not currently under suspension or debarment by the District of Columbia, the Authority, any other municipal or local governmental unit of any state or territory of the United States, any state, or the federal government.

## 19. AUTHORIZATION TO SUBMIT PROPOSAL

An authorized officer and/or employee of the Offeror must sign the proposal. The signature represents a binding commitment by the Offeror to provide such services offered to the Authority should it be determined to be the most responsive Offeror.

## 20. CLARIFICATIONS AND REVISIONS

The Authority may ask Offerors to clarify in writing portions of their technical proposals at any time prior to award. If such clarification is requested, the Offeror will be given reasonable time in which to formulate a response.

## 21. ORAL PRESENTATIONS

At the Authority's discretion, Offerors who submit responses to this RFP may be required to make an oral presentation of their proposal for the purpose of explaining or clarifying any unusual or significant elements related to the proposal. Offerors shall not be permitted to alter or amend their proposals, or conduct negotiations during the oral presentation process. The Authority reserves the right to require and conduct oral presentations with only those Offerors who have submitted proposals determined by the Authority to have a reasonably high probability of being selected for award. The Authority may require essential personnel proposed by the Offeror to participate in oral presentations.

## 22. CANCELLATION OF THE RFP

The Authority may cancel this RFP, in whole or in part, at any time.

## 23. ACCEPTANCE OF TERMS AND CONDITIONS

By submitting a proposal in response to this RFP, an Offeror accepts the terms and conditions set forth in this RFP.

## 24. ECONOMY OF PREPARATION

Proposals should be prepared simply and economically, providing a straightforward, concise description of the Offeror's proposal to meet the requirements of this RFP. Elaborate brochures or other unnecessary presentations beyond those sufficient to present a complete response are not desired and may be construed as an indication of the Offeror's lack of cost consciousness. Elaborate artwork, expensive paper and bindings, and expensive visual presentation aids are neither necessary nor encouraged.

## 25. ELIGIBLE OFFERORS

To be eligible to bid on this RFP, respondents must be qualified health care providers or managed care organizations that can (a) demonstrate their ability to provide an integrated health care delivery system, (b) obtain the appropriate licensure, certification or accreditation as required by District of Columbia regulations, (c) develop and maintain a high quality delivery system and establish and maintain a well designed quality improvement program, (d) deliver excellent customer service, (e) provide a timely and reliable data system that allows for accurate tracking and trending of patient utilization and cost data (f) provide assurances of their financial strength and ability to undertake this project, and (g) meet all of the other requirements stated

10

above and elsewhere in this solicitation.  For purposes of this RFP, qualified health care providers include:

- Hospitals and Physician Hospital Organizations (PHOs)
- Health Maintenance Organizations (HMOs)
- Management Service Organizations (MSOs)
- Administrative Service Organizations (ASOs)
- Other entities with the ability to provide or arrange for the delivery of health care services.

The Authority would prefer to contract with one entity for these services.  However, the Authority will accept bids from multiple parties provided that the roles of the particular parties are clearly described and delineated, the necessary degree of coordination of responsibilities and activities among the parties is demonstrated in the RFP, and one of the parties is identified as the prime contractor.  The Authority will only negotiate with the prime contractor.

## 26. PRIME CONTRACTOR

The successful Offeror (the "Contractor") shall be responsible for all services as described in this RFP.  The Offeror selected for a contract award will be considered the prime contractor.  The prime contractor will be responsible for all assigned contract performance, including any subcontracted tasks and functions.  If subcontractors are to be used, the proposal must identify the subcontractors and must include specific designations of the scope of work that the subcontractors are to perform.  A proposal also must include copies of any agreements to be executed with any subcontractors in the event of a contract award.  The Contractor's performance shall be monitored by the Contracting Officer's Technical Representative ("COTR") designated in the contract.

## 27. LEGAL STATUS OF OFFEROR

Each proposal must show the name of the Offeror and whether it is a corporation, joint venture, or partnership (indicating the type of partnership).  Offerors must demonstrate evidence that they are eligible to enter into a contractual agreement and that their Articles of Incorporation, partnership or joint venture agreement are properly filed with the District of Columbia DC Recorder of Deeds or Superintendent of Corporation (Department of Consumer and Regulatory Affairs) of the District of Columbia, as applicable.

In the event the Offeror is a corporation not incorporated in the District of Columbia, the Offeror must show proof that it is registered as a foreign corporation with the District of Columbia Department of Consumer and Regulatory Affairs and that is it legally qualified to do business in the District of Columbia.

## 28. RESTRICTION ON DISCLOSURE AND USE OF DATA

Offerors who include proprietary data in their proposal that they do not want disclosed to the public or used by the Authority or the District except in the procurement process shall:

    A.  Mark the title page with the following legend:

        "This proposal includes proprietary data that shall not be disclosed outside the Authority and the District of Columbia government and shall not be duplicated, used, or disclosed in whole or in part for any purpose other than to evaluate the proposal. If, however, a contract is awarded to the Offeror as a result of or in connection with the submission of this data, the Authority and the District shall have the right to duplicate, use, or disclose the data to the extent consistent with the Authority and the District needs in the procurement process. This restriction does not limit the Authority's, or the District's right to use, without restriction, information contained in the data if it is obtained from another source. The data subject to this restriction is contained in sheets (insert numbers or other identification of sheets)."

    B.  Mark each sheet of data you wish to restrict with the following legend:

        "Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal."

## 29. RETENTION OF PROPOSALS

All proposal documents shall be retained by the Authority and will not be returned to the Offeror.

## 30. DUPLICATION OF COSTS

By submitting a proposal, an Offeror represents and certifies that any costs for the performance of the contract are not duplicative of any charges against any other Authority contract, District government contract, or any other District government source.

## 31. DUAL COMPENSATION

If a Contractor employee or, subcontractor is involved in two or more projects, at least one of which is supported by District funds, the Contractor, any Contractor employee or any subcontractor may not be compensated for more than 100 percent of expended time during any part of the period of dual involvement.

## 32. SIGNATURE OF OFFEROR

Each proposal must be signed by the person(s) legally authorized to sign contracts on behalf of the Offeror and must show the full business address and telephone and fax numbers of the Offeror.

## 33. TECHNICAL PROPOSAL AND COST PROPOSAL COMPONENTS OF FULL PROPOSAL

In making its proposal, the Offeror shall submit both a Technical Proposal and a Cost Proposal as separate components of its full Proposal. These components shall be separated from each other and shall conform to requirements stated elsewhere in this RFP.

## 34. CONTRACT TERM

The term of the contract commences upon execution of a contract by the authorized parties. The duration of the contract will be for an initial period of five years with renewal for up to two (2) additional two (2) year terms at the discretion of the Authority or its successor organization or designee.

## 35. CONTRACT AWARD

The Authority expects to award a contract to the Offeror whose proposal is considered, in the sole judgment of the Authority, to be most responsive to the objectives of this RFP. The Authority may make an award with or without an oral presentation and may or may not request a "best and final" offer from the Offeror. Therefore, all proposals should be fully responsive. The Authority reserves the right not to award a contract.

The Authority expects the contract to be awarded pursuant to this RFP to have an Initial Term that will begin with the date of the contract award and end on September 30, 2005 renewal for up to two (2) additional two (2) year terms at the discretion of the Authority or its successor organization or designee. The contract will include provisions allowing early termination for specified reasons.

The Authority reserves the right to obtain services outside the contract in the event the Contractor fails to deliver any or all of the services as requested and as required within the terms herein described.

## 36. CONTRACT TYPE

The contractor will be reimbursed using a flexible budget approach for both Administrative Services and Health Care Services. The contract type is known generally as a " Fixed Price Incentive Based Redetermination" contract. Each month during the term of the contract, the Contractor will receive a monthly, prepaid allotment of funds that will consist of (a) a Monthly Administrative Services Fee and (b) a Monthly Health Care Services Fee. These fees will be adjusted on an ongoing basis to reflect the performance of the Offeror against specified performance requirements, measured savings or excesses in the Health Care Services Budget and any other adjustments specified in Section II. The Offeror will not be required to submit patient bills for payment purposes but will be required to document the health care services delivered to eligible uninsured patients by means of monthly electronic submission of detailed, patient-specific data (i.e., "dummy" UB-92 and HCFA 1500 claims) and related reports and analyses. This information must be submitted on a monthly basis to the Authority in the formats and at the

level of detail required by the Authority. The Actual Cost of health care services provided to the Target Population will be priced and compared to the Total Health Care Services Budget component of the Total Budget, which shall consist of the Monthly Administrative Services Budget and the Monthly Health Care Services Budget, multiplied by the number of months in the contract period. Various financial rewards, penalties, efficiency, and program adjustments will be made based on the performance of the Contractor. Section II of this RFP provides a further explanation of the Cost Methodology to be used to establish and adjust the budgets during the contract periods.

## 37. AUTHORITY REPRESENTATIVES

Upon award, the Contracting Officer will advise the Contractor, in writing, of those persons from whom the Contractor may take direction and to whom the Contractor must submit reports, etc. A Contracting Officer's Technical Representative (COTR) will be designated and will assist the Contracting Officer in monitoring the performance of the Contractor. Neither the COTR, nor a Contract Administrator, nor anyone other than the Contracting Officer shall have authority to issue any modifications under the contract, either technical or otherwise, which may constitute a change to the terms, conditions, price or delivery schedule of the contract.

## 38. IDENTIFICATION NUMBER

The District of Columbia has implemented an automated program to create a vendor database. The system is the Data-Universal Numbering-System (D-U-N-S) which is a numbering system designed and maintained by the Dun and Bradstreet Corporation. All Offerors (except individuals) are required to submit their D-U-N-S number as part of their offers. Since D-U-N-S numbers are not assigned to individuals, individuals must submit their social security numbers with their proposals.

In order to ensure that you submit a valid D-U-N-S number, we encourage you to contact a Dun & Bradstreet Office. If a number has not been previously assigned to your firm, you must obtain one. Dun and Bradstreet will not charge you for the number assignment and does not require credit rating information. In order to receive a D-U-N-S number, please use a telephone directory to obtain the telephone number for a local Dun & Bradstreet office or call the Dun and Bradstreet Customer Service office at 1-800-999-3867, Ext. 7770.

## 39. ALTERNATE PROPOSALS

If an Offeror wishes to submit a proposal on terms that it believes to be more advantageous to the Authority, considering price and other factors, the Offeror may submit, in addition to a responsive proposal, an alternate proposal reflecting such advantages. However, the primary proposal must be directly responsive to this solicitation and must first be evaluated and determined by the Authority as being responsive before consideration is given to an Offeror's alternate proposal.

**40. READINESS REVIEW**

The Authority may require a readiness review if it determines such review will be in the best interest of the District of Columbia. The successful contractor must cooperate with this review and make available to the District any staff, documents and all other materials to facilitate the completion of the review process.

**41. OFFEROR'S LIBRARY**

The District will make available an Offeror's library containing additional information that may be of assistance to the Offerors. A list of the materials contained in the Offeror's library is found in Appendix A.

**42. CERTIFICATE OF NON-COLLUSION**

By submission of a proposal, the Offeror certifies in connection with this procurement that:

A. The price of the proposal has been arrived at without collusion with any other Offeror or with any competitor as potential competitor except those included as subcontractors;

B. Unless otherwise required by law, the price in the proposal has not been knowingly disclosed directly or indirectly to any other Offeror or to any competitor as potential competitor except those included as subcontractors

C. No attempt has been or will be made to induce a person or firm to submit or not to submit a separate proposal; and

D. The Offeror has reviewed the solicitation and assumes responsibility for all services being requested. The Authority assumes no responsibility for any omission of any type.

E. The person signing the proposal is fully informed regarding the accuracy of the statements contained in this Section 42 certification and that the statements are accurate.

**43. CONTRACT PROVISIONS**

The following provisions, among others, will be included in the contract awarded hereunder:

1.    **Representations and Certifications**

All Representations and Certifications included in the proposal and the RFP are incorporated as a part of this contract and will remain in effect and in full force for the duration of the contract.

2.    **Organizational Conflicts of Interest**

15

Section 1:

As an independent contractor of the Authority, the Contractor's primary responsibility and allegiance is to the Authority. Therefore, the Contractor shall take special care to avoid even the appearance of a conflict of interest in its dealings with the Authority. The Contractor shall provide the Authority with a list of past professional relationships with any of the principal contractors, subcontractors, and consultants that participated in the Project.

Section 2:

An organizational conflict of interest exists when the nature of the work to be performed under an Authority Contract may:

      A. result in an unfair competitive advantage to the Contractor, or

      B. impair the Contractor's objectivity in performing the contract work.

Section 3:

The Contractor warrants that, to the best of the Contractor's knowledge and belief, there are no facts or circumstances which could give rise to an actual or potential conflict of interest or that the Contractor has disclosed all such information, if any.

Section 4

The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after award of the contract to the Contractor, the Contractor will make a full disclosure in writing to the Contracting Officer. This disclosure shall include a description of actions, which the Contractor has taken or proposes to take, after consultation with the Contracting Officer, to avoid, mitigate, or neutralize the actual or potential conflict.

Section 5

The Authority may terminate this contract for convenience, in whole or in part, if it deems such termination necessary to avoid a conflict of interest. If the Contractor becomes aware of a potential conflict of interest after contract award to the Contractor and does not immediately disclose it to the Authority, or if the Contractor misrepresents or misrepresents relevant information to the Contracting Officer, the Authority may terminate this contract for default, debar the contractor from any/all future Authority or District contracting, or pursue such other remedies as may be permitted by law or the contract.

Section 6

The Contractor agrees to insert in any subcontract or consultant agreement hereunder, provisions which shall conform substantially to the language of this paragraph B.

### 3.    Recovery of Debt Owed the District

The Offeror hereby agrees that the District of Columbia or the Authority may use all or any portion of any consideration or refund due to the Offeror under this contract to satisfy in whole or in part, any debt due to the District of Columbia.

### 4.    Invoicing for Payment

The Contractor shall bill and shall be paid in advance for the Administrative and Health Care Services that are required in this RFP and the resulting contract. Specifically, the Contractor shall submit invoices for these services not later than forty-five (45) days before the first (1st) day of each month during each Contract Period. Contractors will be paid not later than the first (1st) day of each month for which a proper invoice has been received on a timely basis. Invoices must be submitted in original and three (3) copies and must be signed by an officer or principal of the Contractor and must certify that the amounts being billed are correct and proper. Invoices must contain the name of the contractor, the address, the telephone number, contract number, the task order number, the purchase order number, the period of performance, the Federal ID number, the D-U-N-S number, the address to which payment must be mailed, and must clearly indicate the charges for which the Contractor is seeking payment. Invoices will be paid by the fifth (5th) day of each month following receipt of a proper invoice. All charges must be in accordance with the costs as awarded. Invoices failing to comply with these requirements may result in a delay of payment to the Contractor.

Invoices must be submitted in writing to:

>        District of Columbia Government
>        Department Of Health
>        825 North Capitol Street, N.W.
>        Washington, D.C. 20001
>        Attn: Contracting Officer Technical Representative

A copy of the invoice shall be sent to the Authority's Chief Financial Officer at DCFRA, 441 Fourth Street, NW, Suite 570, Washington, DC 20001. The Contractor is cautioned that services performed in excess of the amount authorized, as a result of this RFP and resultant contract will not be paid. The Contractor must carefully monitor costs incurred in the performance of the contract and advise the Contract Administrator, the COTR, and the Contract Officer when reaching 75% of the total authorized amount of the contract. The Authority shall not be responsible for rendering payment under the Contract. Payment shall be the responsibility of the District of Columbia government.

### 5.    Authority Rights in Data

All information and documentation supplied to the Contractor by the Authority or by the District,

17

or technical reports and memoranda produced by the Contractor in the performance of this Contract, shall be the sole property of the Authority and the District of Columbia. The Contractor retains ownership of intellectual property and personal documents used in the performance of this contract (except to the extent created or generated as a result of this contract). All data produced by the Contractor are works made for hire and are the sole property of the Authority and the District. The Contractor shall not publish or reproduce such data in whole or in part or in any manner or form, or authorize others to do so, or make any other use of such data, without the written consent of the Authority until such time as the Authority or the District may have released such data to the public.

6.    **Confidentiality**

All information obtained or developed during contract performance and all conversations between the Authority or the District and the Contractor with regard to the contract shall be held confidential by the Contractor, and shall not be disclosed to a third party in the absence of a written waiver by the Authority and the District, except as may be required by law.

7.    **Press Releases and Other Public Announcements**

The Contractor shall not issue any press releases or make other public announcements of any sort with respect to the subject matter of this contract without prior written permission of the Authority and the District.

8.    **Termination by Default**

The Authority may by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

   (a) If the Contractor fails to make delivery of the supplies or to perform the services within the time specified in this contract or any extension thereof;

   (b) If the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

   c). If this contract is terminated as provided in this section, the Authority in addition to any other rights provided in this clause, may require the Contractor to transfer title and deliver to the Authority or District, in the manner and to the extent directed by the Contracting Officer, all data, documentation, and other information as the Contractor has specifically produced or specifically acquired or obtained for the performance of this contract; and the Contractor shall, upon direction of the Contracting Officer, protect and preserve property in the possession of the Contractor in which the Authority or District has interest. Payment for completed deliverables accepted by the Authority or District shall be at the contract price. The Authority or District may withhold from amounts

18

otherwise due the Contractor such sum as the Contracting Officer determines to be necessary to protect the Authority or District against loss because of default, outstanding damages the Authority or District may incur, or outstanding liens or claims of former lien holders.

d). If after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall be determined as if the notice of termination had been issued for a Termination for Convenience of the Authority.

The rights and remedies of the Authority provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

If the Authority elects its option under this provision, the Authority, at its discretion may provide for the purchase of improvements on a cost less accelerated depreciation basis.

## 9.    Indemnification

The Contractor shall indemnify and hold harmless the Authority and the District and all their officers, agents and servants against any and all claims or liability arising from or based on, or as consequence of or result of, any act. omission or default of the Contractor, its employees, or its subcontractors, in the performance of this contract regardless of whether or not any damage resulting from Contractor's act, omission or default is caused in part by the Authority or the District.

Monies due or becoming due the Contractor under this contract may be retained by the Authority or the District as necessary to satisfy any outstanding claim the Authority or the District may have against the Contractor regardless of whether or not any damage resulting from the Contractor's act, omission, or default is caused in part by the Authority or District. Offerors may propose the maximum liability that they are willing to accept.

## 10.    Taxes

The Authority and the Government of the District of Columbia are exempt from, and will not pay, Federal Excise Taxes and D.C. Sales and Use Tax.

## 11.    Changes

The Contracting Officer may, at any time, make changes in this contract within the general scope hereof by written order only. Any claim for adjustment to the contract pursuant to a change requested under this paragraph must be asserted within ten (10) days from the date the change is offered; provided, however, that the Contracting Officer, if he determines that the facts justify such action, may receive, consider and adjust such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the failure to agree shall be considered a dispute. The decision of the Authority's Contracting

Officer is considered final and the contractor may pursue whatever remedies it may have in court. Nothing in this contract shall excuse the Contractor from proceeding with the contract as changed.

## 12.    Termination for the Convenience of the Authority

The Authority may terminate performance of work under this contract in whole or in part if it determines that termination is in the Authority's interest. Delivering a Notice of Termination to the Contractor shall effect termination. In the event of termination, the Contractor shall be paid for work satisfactorily performed, but no payment shall be made for work not performed. The Contractor shall:

    a.  Place no further subcontracts or orders (referred to as subcontracts in this clause) for materials, services, or facilities, except as necessary to complete the continued portion of the contract.

    b.  Terminate all subcontracts to the extent they relate to the work terminated.

    c.  Assign to the Authority or District, as directed by the Contracting Officer, all rights, title and interest of the Contractor under the subcontracts terminated, in which case the Authority or District shall have the right to settle or pay any termination settlement proposal arising out of those terminations.

    d.  With approval or ratification to the extent required by the Contracting Officer, settle all outstanding liabilities and termination settlement proposals arising from the termination of subcontracts. The approval or ratification will be final for purposes of this clause.

    e.  As directed by the Contracting Officer, transfer title and deliver to the Authority or the District (i) the fabricated or unfabricated parts, work in process, completed work, supplies, and other materials produced or acquired for the work terminated, and (ii) the completed or partially completed plans, drawings, information, and other property that, if the contract has been completed, would be required to be furnished to the District.

## 13.    Assignment

The Contractor may not assign its rights and obligations under this contract in whole or in part. At any time, The Authority may assign all its rights and obligations under this contract to the District of Columbia whereupon the Authority will be no longer a party to or liable under this contract.

## 14.    Waiver of Rights

The failure of the Authority to insist upon strict performance of the terms and conditions of this contract, or to exercise any rights or remedies, shall not be construed as a waiver of its rights to any exercise of such rights, or to rely on any such terms or conditions at any time thereafter.

15.    **Insurance**

At all times during the contract performance, the Contractor shall carry insurance of the types and in the minimum amounts required by law and present evidence thereof to the Contracting Officer prior to contract award.

16.    **Performance Bond**

If the Authority determines that it is in the best interest of the District to do so, it may require the successful Offeror to have in place sufficient financial reserves to ensure against any unexpected changes in the contractor's financial condition. This financial assurance may take the form of a restricted cash reserve or a performance bond equal to the value of two months of the Monthly Administrative Budget and two months of the Monthly Health Services Budget.

17.    **Contractor's Working Files**

The Contractor must maintain working files on all work performed under this contract. The Contracting Officer can require that the Contractor provide the Authority or the District with all such information.

18.    **Notices**

Notices provided for herein, unless expressly provided for otherwise in this contract shall be in writing and may be delivered personally or by placing them in the U.S. mail, first class and certified, return receipt requested, with postage prepaid and addressed as follows:

If to the Authority:

>   District of Columbia Financial Responsibility
>   and Management Assistance Authority
>   441 Fourth Street, N.W., Suite 570N
>   Washington, D.C. 20001
>   Attention:  Contracting Officer (Contract No._____)
>   Tel: 202-504-3400

If to the District:

>   District of Columbia government
>   Department of Health
>   825 North Capitol Street, N.E.
>   Washington, D.C. 20001
>   Attention: Contracting Officer Technical Representative (Contract No. _____)
>   Tel: 202-442-5999

If to the Contractor:

Firm Name
Street Address
City, State Zip Code
Attention: Point of Contact
Tel: Number

## 19.    Financial Standards

Offerors' should provide the following financial information:

♦  Provide audited financial statements for the three most recent fiscal years for which statements are available.  The statements must include a balance sheet, statement of revenue and expenses, and a statement of cash flows.  Statements must include the auditors' opinion, the notes to the financial statements and management letters submitted by the auditor to the Offeror.  If no audited financial statements are available explain the reason and submit unaudited financial statements.

♦  Provide unaudited financial statements for the period between the last month covered by the audited statements required above and the month before the proposal is submitted.

♦  Include an analysis and evaluation of future financial condition and stability.

♦  Provide lines of credit that are available.

♦  The Offeror should explain how it will fund development and start-up costs

The Offeror should provide any other information that it believes would be important to DCFRA in evaluating the Offeror's ability to meet the RFP requirements.  This is optional information. Offerors are cautioned to provide information not covered elsewhere, but which would be of significant interest to the Authority.

Offerors must include the financial information delineated above for all partners and subcontractors included in the response. Offerors must present information that establishes their possession of the financial resources and protections that are commensurate with the financial responsibilities, opportunities and risks that are inherent in this project.

## 20.    Subcontracting

The Contractor shall advise the Contracting Officer before awarding any subcontracts above twenty-five thousand dollars ($25,000).  All subcontracts above twenty-five thousand dollars ($25,000) with the exception of individual provider contracts that were not presented in the original response to this RFP are subject to the approval of the Contracting Officer.

The selected Contractor shall include in all subcontracts a provision that requires the subcontractor to look solely to the Contractor for payment for services rendered to the uninsured population.

### 21. Audit and Records

At any time before final payment and three (3) years thereafter, the Authority may audit the Contractor's invoices and all payments and reimbursements, patient-specific UB-92 and HCFA 1500 data, listing of patients, performance records, cost records, proposals, reports and all other information and data pertaining this contract. The Authority may reduce any payment by an amount(s) determined to constitute unallowable payments.

### 22. Independent Contractor

In performing work under this contract, the Contractor is acting solely as an independent contractor and not as an employee or agent of the Authority. Specifically, the Contractor is forbidden from representing itself to third parties as an Authority employee or agent, including District of Columbia government officials and employees; determining Authority policy; independently interpreting Authority policies or regulations on behalf of the Authority; purporting to issue orders or take other action on behalf of the Authority; and preparing documents on Authority letterhead. The Contractor shall include a comparable provision in any subcontract entered into in connection with this Agreement.

### 23. Appropriation of Funds

The Authority's and District's liability under this contract is contingent upon the future availability of appropriated funds with which to make payment for contract purposes. The Authority's and District's liability for the payment hereunder shall not arise unless and until such appropriation shall have been provided. The Authority shall have no liability to make any payments under this contract and shall not be liable for any breach hereof by the District or the Contractor or any of its subcontractors.

### 24. Drug Free Workplace (July 1990)

1. Definitions used in this clause are as follows:

"Controlled substance" means a controlled substance as defined in schedules I through V of Section 202 of the Controlled Substances Act (21 U.S.C. 812) and as further defined in the regulation at 21 CFR 1308.11 - 1308.15.

"Conviction" means a finding of guilt (including a plea of no contest) or imposition of sentence, or both, by any judicial body charged with the responsibility to determine violations of the Federal or State criminal drug statutes.

"Criminal drug statute" means a Federal or Non-Federal criminal statute involving the manufacture, distribution, dispensing, possession, or use of any controlled substance.

23

"Drug-free workplace" means the site(s) for the performance of work done by the Contractor in connection with a specific contract at which employees of the Contractors are prohibited from engaging in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance.

"Employee" means an employee of a Contractor directly engaged in the performance of work under a Government contract. "Directly engaged" is defined to include all direct cost employees and all other Contractor employees who have other than a minimal impact or involvement in contract performance.

"Individual" means an Offeror/Contractor that has no more than one employee including the Offeror/Contractor.

2.  The Contractor, if other than an individual, shall, within 30 calendar days after award agree to:

   a). Publish a statement notifying such employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the Contractor's workplace and specifying the actions that will be taken against employees for violations of each prohibition;

   b). Establish an on going drug-free awareness program to inform such employees about:

      i.    The dangers of drug abuse in the workplace;

      ii.   The Contractor's policy of maintaining a drug free workplace;

      iii.  Any available drug counseling, rehabilitation and employee assistance programs; and

      iv.   The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

   c). Provide all employees engaged in the performance of the contract with a copy of the statement required by subparagraph 2(a) of this clause;

   d). Notify such employees, in writing, of the statement required in subparagraph 2(a) of this clause that as a condition of continued employment on this contract, the employee will abide by the terms of the statement; notify the employer in writing of the employee's conviction for a criminal drug statue for a violation occurring in the workplace no later than five (5) calendar days after such conviction.

   e). The Contractor should notify the Contracting Officer, in writing, within ten (10) calendar days after receiving notice under subdivision 2(a) of this clause, from an employee or

24

otherwise receiving actual notice of such conviction. The notice shall include the position and the title of the employee;

f). Within 30 calendar days after receiving notice under subdivision 2(a) of this clause of a conviction, take one of the following actions with respect to any employee who is convicted of a drug abuse violation occurring in the workplace,

    (i)    Take appropriate personnel action against such employee up to and Including termination; or

    (ii)    Require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purpose by a Federal, State or local health, law enforcement or other appropriate agency.

g). Make a good faith effort to maintain a drug-free workplace through implementation of subparagraphs B.1 through B.6 of this clause.

3. The Contractor, if an individual, agrees by award of the contract or acceptance of a purchase order, or a task order, not to engage in the unlawful manufacture, distribution, dispensing, possession or use of a controlled substance in the performance of this contract. In addition to other remedies available to the Government, the Contractor's failure to comply with the requirements of paragraph (B) or (C) of this clause may render the Contractor subject to suspension of contract payments, termination of the contract for default, and suspension or debarment.

**25.   Employment Agreement:**

For all bids or proposals over $ 100,000, except those in which the Offeror is located outside the Washington Metropolitan area and will perform no work in the Washington Metropolitan area, the following certification is required:

    The Offeror recognizes that one of the primary goals of the District government is the creation of job opportunities for bona fide District residents. Accordingly, the bidder/Offeror agrees to pursue the District's following goals for utilization of bona fide residents of the District of Columbia with respect to this contract and in compliance with Mayor's Order 83-265. (1) at least fifty-one percent of all jobs created are to be performed by employees who are residents of the District of Columbia and (2) at least fifty-one percent of apprentices and trainees employed shall be residents of the District of Columbia registered in programs approved by the D.C. Apprenticeship Council. The Offeror also agrees to notify all prospective subcontractors, prior to execution of any contractual agreements, that the subcontractors are expected to implement Mayor's Order 83-265 in their own employment practices. The Offeror understands and will comply with the requirements of the Volunteer Apprenticeship Act of 1978, D.C. Code Section 36-401 et.seq. and the First Source Employment Agreement Act of 1984., D.C. Code 1-1161 et seq.

26.    **Hiring of District Residents:**

All new employment resulting from this contract or subcontracts hereto, as defined in Mayor's Order 83-265 and implementing instructions, shall include the following basic goals and objectives for utilization of bona fide residents of the District of Columbia in each project's labor force:

(a)    at least fifty-one (51) percent of all jobs created are to be performed by employees who are residents of the District of Columbia.

(b)    at least fifty-one (51) percent of apprentices and trainees employed shall be residents of the District of Columbia registered in programs approved by the District of Columbia Apprenticeship Council. The Contractor shall negotiate an Employment Agreement with the District of Columbia Department of Employment Services for jobs created as a result of this contract. The Department of Employment Services shall be the contractor's first source of referral for qualified applicants, trainees and other workers in the implementation of employment goals contained in this clause.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

## SECTION II.        SCOPE OF SERVICES

## GENERAL INFORMATION FOR THE OFFEROR: UNINSURED HEALTH CARE ACCESS

### A.    <u>Introduction</u>

The District of Columbia Financial Responsibility and Management Assistance Authority ("Authority"), is seeking proposals from qualified healthcare providers ("Offerors") in response to Request for Proposal No. DCFRA-00-R-039 to obtain the services of a qualified healthcare provider ("Contractor") to provide comprehensive, integrated and coordinated health care services to the uninsured population of the District of Columbia. The selected contractor will be required to provide primary healthcare, specialty healthcare, in-patient services, emergency/urgent care and public school healthcare. In addition, the selected Contractor must demonstrate that it can:

- ◆ Provide an integrated health care delivery system;
- ◆ Supply an appropriate number and mix of health care facilities, professionals and other personnel;
- ◆ Deliver health care services in geographic locations that are reasonably accessible to the uninsured population and/or make other arrangements that will ensure timely access to needed services;
- ◆ Meet appropriate licensure, certification and/or accreditation standards;
- ◆ Demonstrate an effective and appropriate quality assurance/improvement program;
- ◆ Deliver services in a high quality, cost-effective manner;
- ◆ Demonstrate excellent customer services/patient services capabilities including mechanisms for measuring and raising patient satisfaction and for identifying and resolving patient complaints and grievances;
- ◆ Establish linkages between uninsured persons and primary care providers to the maximum extent possible with the aim of preventing illness, improving health status and ensuring the timely delivery of appropriate health care services
- ◆ Assist the Department of Health in enrolling eligible persons in Medicaid, Medicare, CHIP or other programs that offer health care coverage;
- ◆ Supply the Authority with timely, accurate and sufficiently detailed data, reports and analyses regarding uninsured patients and the health care services they receive; and
- ◆ Build the capacity to enroll uninsured persons in a prepaid, high quality, integrated delivery system that will link individuals into a primary care system that emphasizes prevention, meets routine care needs and coordinates with a supportive network of emergency, specialty and hospital resources

The Contractor will be evaluated on the aforementioned items along with the proposed business structure, ability to control utilization, past performance and its proposed price.

The Authority intends to make a single award to one Contractor or Consortium as a result of this RFP.

## B.    Purpose

This RFP provides interested parties with sufficient information to enable them to prepare and submit proposals for consideration by the Authority to satisfy its need to identify and select a vendor that is qualified to assume responsibility for the delivery of health care services to the subset of the uninsured population of the District of Columbia currently receiving services through the Public Benefit Corporation (PBC). The Authority encourages interested Offerors to submit proposals following the specific instructions contained in Section III this RFP

## C.    Background

The District of Columbia is a city of contrasts. It is characterized by wide disparities in wealth and poverty, by racial divides, by deficiencies in the availability of health resources and by differences in health status. With a resident population of 519,000,[1] the District ranks first in average annual pay, in personal income and in the number of physicians per 100,000 population. At the same time, it ranks last or near last for the number of outpatient visits, children in poverty[2], and in infant mortality rates.[3] Despite having many physicians and eleven (11) acute care hospitals (including one public hospital) within 69 square miles, the District's health care statistics are alarming. A large percentage of District residents do not have access to primary and preventive care. The premature death rate in the District, a measure of the health of the population that reflects the potential years of life lost before age 65 was more than double the national average in 1995.

In February 1995, the Blue Ribbon Panel on Health Care Reform Implementation identified significant concerns with the health care delivery system in the District of Columbia. As part of its report, the Panel stated that "The District of Columbia is faced with a crisis; the crisis threatens the public health, the economic viability, and long term future of the City".[4] The report further identified several indicators of the health crisis facing the District. These included increasing HIV/AIDS rates; high levels of communicable diseases such as TB, STDs and hepatitis; the highest premature mortality rates in the nation; and excessive use of expensive hospital and specialty services. The most dramatic disparity in health status and health resources is seen in the poorest and most vulnerable citizens of the District. In part, the creation of the Public Benefit Corporation was seen as an opportunity to improve health care services for the poor and underserved in the District.

In August 1996, the D.C. City Council formed the District of Columbia Health and Hospitals Public Benefit Corporation (PBC) in order "to provide comprehensive, community-centered

---

[1] US Census 7/1/99
[2] Health Forum, Hospital Statistics
[3] Health Forum, Hospital Statistics, 1999
[4] Final Report of the Mayor's Panel on Health Care Reform Implementaton, February 1995.

health care to residents of the District and assume the functions and personnel of the D.C. General Hospital and Commission on Public Health Community Clinics." The mission of the PBC was "to be a community oriented leader in the delivery of comprehensive, high quality cost effective and timely medical care, with a special community commitment to ensuring care for the District of Columbia's underserved and indigent." At the time, it was thought that the establishment of the PBC would reduce expenditures, promote economy, and increase the efficiency with which health care services would be provided to the residents of the District of Columbia. In passing this legislation the D.C. City Council demonstrated its commitment to ensuring that the residents of the District have access to high quality, comprehensive, community-centered health care and medical services, regardless of the ability of those residents to pay for health care services.

Unfortunately, it is now five years later and the District is still facing a serious health crisis. According to the Healthy People 2010 Plan for the District of Columbia,[5] many of the conditions that were present during the health crisis in 1995 continue to be of concern today. Concurrent with this health crisis, the District is also facing severe fiscal stresses within the hospital environment. According to the District of Columbia Hospital Association only four of the District's eleven acute care hospitals reported positive operating margins in 1999.[6] This financial weakness is caused by various factors including the presence of excessive and duplicative hospital facilities; decreased admissions and lengths of stay pursuant to the presence of managed care; increasing substitution of community-based care for hospital-based services; and by stringent payment policies adopted by Medicare, Medicaid and private payers. Nowhere are the fiscal pressures more evident than at the Public Benefit Corporation's D.C. General Hospital.

As the cornerstone of the public safety net, D.C. General Hospital, and the eight PBC neighborhood health centers (NHCs) have served the uninsured and underserved of the City for more than 188 years. Over the years, as public and private health insurance expanded and covered more of the population, the demand for services at D.C. General declined. Today, on average, just over 150 of its beds are occupied, and according to the Hospital's own records, the emergency room has seen a 40 percent decrease in visits involving the most serious trauma during the past five years. The average length of stay (ALOS) at D.C. General exceeds the national average for most services, even when adjustments are made to restrict the comparison to hospitals treating similar populations.

Based on statistics provided by D.C. General Hospital, it provides approximately 52,000 emergency room visits, about 90,000 ambulatory clinic visits and 10,000 total hospital admissions annually. Approximately 40 % to 50% of those visits are for the uninsured. The remaining patients seen on-site at D.C. General have insurance through Medicare, Medicaid or another third party payer. An additional 100,000 visits are provided by the neighborhood health centers. A comprehensive list of the services provided, the specific utilization of these services, and payer status of the patients is included as Appendix B. The D.C. General physical plant has also declined because resources have not been available to maintain it. Independent reports have

---

[5] The District of Columbia Health People 2010 Plan. A Strategy for Better Health. Government of the District of Columbia, September 2000
[6] District of Columbia Hospital Association. Financial Indicators 1999.

estimated the cost of repairing and updating the hospital at close to $100 million dollars, and the actual cost could be substantially higher. The decline in patient volumes, the tightening of reimbursements by payers and the relatively high operating costs of D.C. General have produced large annual operating deficits. The expected continuation of these factors makes it unlikely that the PBC can survive in its current form.

In addition to the health care services provided by D.C. General and the PBC neighborhood health clinics, primary care services are provided to the poor through a network of private not-for-profit health clinics across the District. These private clinics perform two vital functions within the safety net—first, they are direct providers of care; and, second, they serve as an entry point for the uninsured into the larger health care system for hospitalization and ancillary care services. Many of the patients seen by these clinics are referred to D.C. General for hospital and ancillary care services.

The private acute care hospitals in the District are also a vital part of the health care safety net. Approximately two-thirds of the hospitalizations required for the uninsured are provided by these hospitals. At least one of the private hospitals is increasing the amount of services it provides to the uninsured without the incentive of Disproportionate Share Hospital payments. Although D.C. General Hospital handles the largest number of uninsured admissions, the private acute care hospitals within the District collectively provide approximately 8,000 uninsured admissions each year.

Recognizing that a major public health and financial crisis is imminent, the PBC Board of Directors, the DCFRA, the City Council and the Mayor's Office have worked diligently together to determine the most feasible option for addressing the continuing fiscal problems of the PBC, while at the same time preserving the safety net for the uninsured. After reviewing several ,options, the parties decided to use this RFP process to identify a vendor capable of providing the health care services that are currently being provided to the poor and the uninsured by D.C. General Hospital and the PBC clinics.

## D.    Target Population

This RFP is targeted to the subset of the approximately 80,000 uninsured residents of the District of Columbia that are currently served by the PBC and who are expected to continue to rely on the Contractor for their health care. In 1999, the PBC provided 4016 inpatient hospital admissions, 31,720 emergency room visits, approximately 91,000 hospital based ambulatory care and specialty care visits, and approximately 76,000 community-based outpatient (NHC) visits to the uninsured population.

D.C. General Hospital and the NHCs have traditionally served both insured and uninsured patients. The Contractor can reasonably expect some proportion of this clientele of insured patients to use it for services. This RFP, however, proposes to compensate the Contractor only for services delivered to the uninsured D.C. resident meeting eligibility criteria established by the Authority.

E.    **Cultural and Linguistic Competence**

A cultural and linguistically competent system of care acknowledges and incorporates, at all levels, the importance of cultural and language, the cultural strengths associated with people and communities, the assessment of cross-cultural relations, vigilance towards the dynamics inherent in cultural and linguistic differences, and the expansion of cultural and linguistic knowledge. To that end, policies and procedures are designed and implemented that facilitate staff and providers continuously working and relating to others effectively and efficiently in cross cultural situations to ensure the adaptation of services to meet the consumer's culturally and linguistically unique needs. Offerors will develop a cultural competency plan based on the following assumptions:

- ◆ Only culturally competent practitioners and administrators working within culturally competent system of care can ensure both culturally competent assessment and provision of appropriate services;
- ◆ Cultural, ethnic, and linguistic diversity enhances the personal and professional experiences of all stakeholders;
- ◆ Services must be geographically, temporally, physiologically, culturally, and linguistically accessible;
- ◆ Culturally specific data on prevalence, incidence, utilization and outcomes must guide system level service design;
- ◆ The imperatives of safety and permanence are common to all populations;
- ◆ There may be a significant diversity of response to treatment modalities among ethnically diverse individuals;
- ◆ A community based, Culturally Competent, prevention and early intervention focused system of care facilitates high quality, cost-effective outcomes.

Offeror will function according to a Cultural Competence philosophy through which the Offeror will monitor and evaluate cultural appropriateness of outreach and interventions, identify opportunities for improving effectiveness and access, establish initiatives to accomplish agreed upon improvements, monitor resolution of problem areas. Offeror's Cultural Competence philosophy is an ongoing process that must span every aspect of program operations and unite organizations, members, and providers in a continuous upward spiral of culturally competent planning action, and evaluation.

F.    **Services to be Performed by the Contractor**

The District is committed to ensuring that a comprehensive system of integrated, high quality, affordable health care is available to the uninsured. As such proposals that do not clearly provide for a comprehensive and well-integrated system of care based on the above list of services will be considered unresponsive and will be disqualified from consideration for award. Offerors will be asked to offer and deliver both the health care services and the administrative services identified below. As part of their response, Offerors must identify how and where they will provide each of the services included in the project. Offerors are encouraged to provide at least some of the services on site at the D.C. General campus. Offerors should also include in their response what if any capital investments they plan to make to any PBC facility or new

facility on the D.C. General campus. The cost anticipated for capital improvements will not be considered in the Authority's evaluation of the Offerors proposal and is requested for informational purposes only. The Authority at its discretion may negotiate a capital budget with the successful Offeror separate and apart from this RFP.   The Authority may also negotiate or arrange leases or other use arrangements of existing PBC facilities on behalf the Contractor. The selected Contractor will be reimbursed for any capital expenditures that are approved by the Authority and incurred by the Contractor in the performance of this contract in the event the contract is terminated prior to the end of its scheduled term.

1.    **Health Care Services**

Offerors will be asked to bid and deliver all of the following health care services:

◆  Community Based Primary Care Services

Offerors are asked to address the manner in which they will ensure that the target population will have access to a primary care home.  The response should clearly describe the approach (es) the Offeror will use to identify how the contractor will identify the target population and assist them in selecting a primary care provider.  If the Offeror determines that it is not practical to expect most uninsured patients to select a primary care provider, the Offeror must describe how they will assign a primary care provider to the individual members of the target population.  If the Offeror intends to assign patients to PCPs, the Offeror must describe the process that will be used to allow the target population to change primary care providers. The response should also clearly articulate what provider types will be considered primary care providers.  If specialty providers will be used as primary care providers, Offerors must describe how they will identify such specialists and any requirements these providers must meet to be designated as primary care providers.

Offerors must describe their plans for maintaining and managing the eight (8) neighborhood health centers that are currently managed by the PBC or their plans for substituting alternative sources of care for some or all of these health centers These ambulatory care clinics provide approximately 76,000 visits annually.  The name, location, service array and staffing pattern for each neighborhood health center is found in Appendix D.  Earlier this year, the Bureau of Primary Health Care performed an assessment of the neighborhood health centers.  A copy of the assessment report can be found in the Bidder's Library. Offerors are asked to describe how they will arrange and facilitate appropriate referrals for inpatient and ancillary services needed by individuals using the Neighborhood Health Centers or their successors.  Offerors should also address their strategy for ensuring that persons who are referred for inpatient and ancillary services will be returned to the referring health center, and to the appropriate primary health care provider, for follow-up and ongoing services.

The District is committed to improving health outcomes for the residents of the District. Therefore, Offerors are asked to describe how they will ensure that primary and preventive care services are available to the target population.  Additionally, Offerors should describe how they will ensure that needed health care services are available at the most appropriate

level of care. The Authority expects the Offerors (and the selected Contractor) to concentrate a substantial degree of energy on strategies to increase the use of primary care services and to reduce the frequency of inappropriate hospitalizations.

◆  Inpatient Hospital Services

The Offeror should demonstrate the ability to provide the inpatient hospital services that are required by the Target Population. In particular, Offerors must describe in detail the ways in which they will ensure the availability and accessibility of services to the residents of Wards 5, 6, and 7. Patients hospitalized at DC General come largely from Ward 5—zip codes 20002, 20018, 20017 (19.24%), Ward 6—zip codes 20003, 20020 (27.82%) and Ward 7—zip codes 20019 (28.11%). Appendix E shows D.C. General inpatient and outpatient volume by Ward by zip code. During calendar year 1999, the PBC had a total of 10,503 discharges, with an average daily census of 164 and an average length of stay of 10.06 days for surgical, 6.04 days for non-surgical, and 11.41 days for ICU/CCU patients. Of those discharges, 4,016 were for uninsured patients. These 4,016 uninsured patients included 2,947 self-pay and 1,069 charity patients. The following table gives the age and sex of patients discharged from DC General for calendar year 1999.

| Ages | Female | Male | Unknown | Total |
|------|--------|------|---------|-------|
| 0-17 | 812 | 756 | | 1,568 |
| 18-34 | 1,250 | 1,144 | 7 | 2,411 |
| 35-54 | 1,458 | 2,750 | 2 | 4,210 |
| 55-64 | 413 | 696 | | 1,108 |
| 65-74 | 318 | 309 | | 627 |
| 75+ | 395 | 278 | | 673 |
| All | 4,656 | 5,932 | 9 | 10,597 |

Offerors are directed to Appendix F for information regarding the most common discharge and outpatient diagnoses at DC General Hospital. Appendix G provides data regarding D.C. General's distribution of patients by "diagnosis related group" (DRG) over the January – June, 2000 period.

Offerors must be able to demonstrate their ability to provide all needed services required during an inpatient hospitalization and must document the support services they intend to make available for the care and support of the hospitalized patients. Offerors must also describe how they will facilitate the return of hospitalized patients to the primary care system upon discharge from the hospital.

◆  Emergency Room Services

The Offeror must be able to demonstrate the ability to provide comprehensive emergency room care. Offerors should also specifically identify the level of emergency room services they will provide (i.e., Level 1 trauma, Level 2, Level 3, etc.) At a minimum, the Offeror

must be able to provide Level 3 emergency room services. If the Offeror does not provide Level 1 or Level 2 emergency room services, the Offeror must describe how it will ensure that Level 1 and Level 2 emergency room services will be available on a timely basis to uninsured patients when they are needed. The description should include referral and transfer arrangements the Offeror would negotiate to support necessary Level 1 and Level 2 emergency services. Additionally, the Offeror should identify mechanisms for payment for required Level 1 and Level 2 trauma care that is not provided on site. The Offeror is financially responsible for these services.

Offerors should also describe how they will ensure that necessary follow-up care is provided to patients who are treated and released from emergency room care. The description should include how the Offeror will ensure that all patients receive follow-up care at the most appropriate level.

According to available data, DC General provided 52,000 emergency room visits for fiscal year 2000. Of the 52,000 visits, 31,720 were for uninsured patients. According to PBC officials, approximately fifty percent of all emergency room visits could have been treated in a primary care setting. D.C. General also treated 821 "code yellow" emergency room visits in 1999. Of that number, 366 were uninsured (according to DCHA information gathered by the utilization and scope of service workgroup of the PBC transition task force).

♦ Ambulatory Care Services (includes all ambulatory surgery services, laboratory services, radiology, and other diagnostic services: a list of current ambulatory care services provided by the PBC may be found in Appendix H.

The Offeror must describe how they will ensure the provision of all specialty and subspecialty services provided by D.C. General Hospital. Under the requirements of this RFP, Offerors are responsible for providing, at minimum, the same types and levels of services that are currently available at DC General. Appendix I provides information regarding the types of visits and the associated utilization and payer status of all clinic services provided on site at DC General Hospital. In FY 2000, there were 91,056 ambulatory care clinic visits at D.C. General.

Offerors should also be aware that there are fourteen (14) private, not-for-profit clinics that provide primary care services to the uninsured population in the District of Columbia. Currently, up to two-thirds of the uninsured receive primary care services through this network of not-for-profit clinics. These clinics serve approximately 19,000 people. Many of the uninsured seen through this network are referred to the PBC for necessary inpatient admissions and ancillary care. Offerors must describe the methods they will use to ensure proper coordination with the private, not-for-profit clinics in the treatment of uninsured patients, including the ways in which they will facilitate patient referrals for patients historically seen by the PBC. The referral process should not only describe how patients will be referred for inpatient and ancillary services, but should also describe how these patients will be referred back to the source provider upon discharge or when the ancillary services have been completed.

In order to ensure that the selected Contractor has or will have the capacity to meet the needs of the target population, Offerors are required to include in their response information about their current staffing mix, including numbers and types of medical staff (including physicians, by specialty and board certification status); nurses (RNs, LPNs, etc.); and related credentialing requirements. Offerors should also include a staffing plan that delineates how they will increase staff to meet the additional care delivery and administrative burdens that will arise out of the requirements of this RFP. The Authority may elect to conduct a review of the Offeror's facilities to determine the capacity of the Offeror to provide needed services to the target population. Offerors should make their facilities and staff available if the Authority it is determined that, a review is needed.

◆  School Health Services

The School Health Program is currently administered by the PBC under a Memorandum of Understanding between the PBC and DOH. The Contractor selected as a result of this RFP will be required to assume responsibility for continuing this program in the schools. For your convenience the following items can be reviewed in the Offeror's Library:

a). Memorandum of Understanding between the Department of Health and the PBC;
b). The Immunization of School Students Act of 1979 (D.C. Law 3-20; D.C. Code, sec. 31-501;
c). The Student Heaqlth Care Act of 1985 ( D.C. Law 6-66; D.C. Code sec. 31-2401;
d). The District of Columbia Public School Nurse Assignment Act of 1987 ( D.C. Law 7-45; D.C. Code, sec. 31-242; and
e). The Administration of Medication by Public School Employees Act of 1993 ( D.C. Law 10-55; D.C. Code, sec. 31-2431 ct seq)

The School Health Program must be available to all students enrolled in 147 District of Columbia public schools including 4 self contained schools and public charter schools. Regulation requires that school health programs provide twenty (20) hours of nursing each week. The school health program should focus on preventive services. At a minimum, the school health program should provide basic health services such as review of immunization status, basic health screenings, administer medications, and comprehensive education and prevention programs for smoking, nutrition, pregnancy, HIV/AIDS, substance abuse and mental illness. The Contractor will also be responsible through the School Health Program to identify and refer to care all pregnant students in their first trimester of pregnancy. School health nurses are also responsible for implementing effective referrals into the larger health care system when a health need is identified. Through the school health program, the selected contractor will promote the health of students, identify and prevent health problems and injuries and ensure a safe and healthy environment for students.

Offerors should describe in their response how they will effectively manage the school health program. Offerors should specifically describe how they will facilitate or coordinate services between the school health program and community based providers, hospitals and manged care organizations for those students that are enrolled in Medicaid and receive care through one of the Medicaid HMOs. This requirement is not meant to exclude those students who are

enrolled in HMOs or seeing other providers from participating in the school health program. Instead, its aim is to ensure that the primary care provider is included in health care planning for the student.

The Contractor must employ staff that possess adequate training and competence to perform the duties to which they have been assigned. The Offeror should describe how they will ensure that their proposed staffing pattern is consistent with the requirements of the MOU and District Law for the school health program. Also, describe on-going training programs and competency standards that you will implement to determine staff's ability to perform the duties to which they are assigned. If the Offeror determines that current staffing is not in compliance with these requirements, the response should include a staffing plan that describes how the Offeror will bring school health staffing into compliance.

The Offeror should also describe how they will facilitate a strong partnership with the D.C. Public School administration. The Offeror's response should address how the school health program will embrace parental involvement in the school health program.

The Authority is interested in collecting utilization and other relevant data from the school health program. The Memorandum of Understanding, found in the Offeror's Library contains a listing of reports required for this program. Accordingly, Offerors should describe how they will track and trend appropriate utilization data on the school health program.

◆ Dentistry

The PBC currently provides comprehensive diagnostic, preventive, therapeutic, and emergency dental services to adults and children on an inpatient and outpatient basis. These dental services are provided at D.C. General Hospital and at all of the Neighborhood Health Centers except the Health Services for Children with Special Needs and the Woodridge Clinics. The current dental program provides:

   a). Twenty-four hour emergency maxillofacial services, including structures, by a team of maxillofacial surgeons and dental staff;
   b). Comprehensive general denistry services to medically compromised patients with special needs and patients referred for oral health poblems;
   c). Diagnostic, preventive and therapeutic periodontal services;
   d). Comprehensive pediatric dental services for all children;
   e). Ambulatory adult and pediatric anesthesia during complex dental procedures;
   f). Maxillofacial prosthodontics for patients requiring oral facial reconstruction and prosthesis;
   g). Endodontic services necessary to support the restorative treatment of patients; and
   h). Comprehensive dental services for oncology.

The department is staffed by two oral and maxillofacial surgeons, one pediatric dentist, one maxillofacial prosthodontist, one registered dental higienist and five dental assistants. The dental department staffing is bolstered by five oral and maxillofacial surgeons and four pediatric dentists. All dentist and dental hygienists are licensed in the District of Columbia

and are board eligible or board certified in specialties relevant to their duties within the dental program.

Offerors should describe in detail how they will provide the dental benefit. The description should specifically address services they will offer, staffing patterns and location of dental services for the uninsured health care program.

- Other Miscellaneous Health Care programs funded by block grants including WIC, HIV/AIDS and Maternal Child Health programs.

Offerors will also be required to manage the following block grant or other health care programs:

    WIC program
    DOH/HIV
    Maternal Child Health Program
    Day Care Program

Program descriptions for the block grant programs identified above can be found in the Offeror's library.

D.C. General Hospital also provides a pharmaceutical program for uninsured patients seen in the ambulatory care program or the Neighborhood Health Centers who require pharmaceuticals but are unable to pay for them. The cost of this program is estimated to be $1 million annually. If the District chooses to purchase pharmaceuticals for this population, Offerors will be asked to administer the pharmaceutical program but will not be responsible for assuming the cost of drugs purchased for this population.

- Mental Health and Substance Abuse Services

The Offeror is not responsible either programmatically or financially for mental health care services for the uninsured population. However, it is critical that individuals that have mental health care issues receive coordinated care between the uninsured health program and the Commission on Mental Health or its successor entity. Additionally, the Offeror should describe how it will ensure timely access to care for those individuals within the uninsured population needing substance abuse treatment services.

The Offerors are invited to propose arrangements with DOH APRA whereby the Offeror will provide the substance abuse component of this program. If this option is chosen, Offerors should describe in detail how they will coordinate these services with APRA.

It is highly likely that some individuals within the target population will also be dually diagnosed with substance abuse, mental health, developmental delay, and other conditions. The Offeror should fully describe how they will coordinate services for this special needs population to ensure the availability and accessibility of necessary health care services.

37

The following health care services are not the financial responsibility of the Offeror:

- Corrections
- Long Term Care
- Long Term Rehabilitation

Although Offerors are not financially responsible for these services, the selected contractor will be responsible for developing and implementing a coordination plan for these services that ensures timely access to care for long term care and long term rehabilitation. The contractor will also be responsible for coordinating care with the Contractor selected by the Department of Corrections to manage health care services for the incarcerated population and ensure an appropriate continuum of care for these individuals upon release from custody.

2.    **Administrative Services**

The Offeror must describe the manner in which it will deliver the following administrative services:

- Enrollment and Eligibility

   The Contractor will be required to enroll uninsured persons in a health care program designed to provide them with a direct linkage to primary care, ready access to emergency care, and timely access to secondary and tertiary health care. The Offeror must develop a data base regarding these persons that will include the person's name, age, sex, date of birth, social security number, place of residence, other relevant available demographic information, and detailed cost and utilization data. The Offeror will be required to issue ID cards or use other mechanisms to facilitate the access of uninsured patients to needed services and the appropriate tracking of their utilization of services. When an uninsured person presents at the contractor's site, the contractor will determine the individual's eligibility for participation in the program using criteria established by DOH. If the individual meets eligibility criteria, the contractor will enroll the individual into the program. The Contractor will also be responsible for enrolling into the program any individual that is referred from another provider across the city. Only bona fide District of Columbia residents will be admitted into the program and determined eligible to receive health care services through this program.

   The Authority expects the Contractor to facilitate the identification of third party resources available to persons who are uninsured. These resources may be Medicaid, Medicare or any other third party resource. The Contractor will be expected to develop a process of notifying the Authority when a participant in the uninsured health program gains insurance through Medicaid, Medicare or some other payer.

   The District currently assigns DHS eligibility workers to the PBC to screen applicants for eligibility for human service programs. These workers collect and enter eligibility information into the ACEDS system. The Authority anticipates that these workers will be assigned to the Contractor to perform the eligibility determination functions required by this program.

38

Offerors should describe the process they will use to enroll and disenroll participants in the health care program.

◆ Non-District of Columbia Residents

The uninsured health care program Contractor will not be financially responsible for uninsured persons who are not residents of the District of Columbia. Offerors should describe how they intend to ensure that each person served by the program is a resident of the District of Columbia.

◆ Provider Network

Offerors must demonstrate their ability to provide sufficient physicians, including both primary care and specialty physicians; other licensed health professionals, such as certified registered nurse practitioners, physicians' assistants and registered nurses; and appropriate inpatient and outpatient facilities to ensure that uninsured persons have access to necessary health care services. Offerors should include with their bid, in a format of their own choosing, a clear depiction of the numbers, types and locations of the providers and facilities they will make available and the relation between this supply of providers and the number and location of the uninsured population they will be called upon to treat. Maps that identify particular wards and zip codes and show the availability of health care resources to the residents of those areas would be especially helpful.

◆ Customer/Patient Services

Offerors must provide uninsured persons with access to information regarding the uninsured health care program. Offerors should describe how they plan to supply information to individuals who present at or call their site. Offerors should be able to collect data about the number and types of calls received. Offerors must demonstrate that they will have patient/customer service programs designed to maintain and/or improve patient satisfaction and address patient complaints and grievances in an expeditious and fair manner.

◆ Coordination with Medicaid

Offerors must include with their proposal a plan to identify Medicaid eligible persons and facilitate their enrollment in the Medicaid program. The District expects that the successful contractor will aggressively identify those individuals who are eligible for Medicaid and assist them in moving from the uninsured program to the Medicaid program. The ability of the Offeror to assist and work closely with the DOH in enrolling eligible persons in Medicare, Medicaid, CHIP or other programs that provide health care coverage is a key aspect of the project. In addition, this activity will protect the Contractor from financial losses because it will reduce the burden on the budget provided to the Contractor for health care services.

◆  Maintenance of Effort

The District expects all providers, including Offerors, to continue to provide their current level of uncompensated care and to apply reasonable uncompensated care policies to all persons who request health care services.  The Contractor will be given more specific criteria regarding eligibility for payment made under this program prior to the effective date for anty contract resulting from this RFP.  Thus, the Contractor that is selected pursuant to this contract will need to be able to demonstrate that it has equalled or exceeded the prior year's level of uncompensated care in order to receive full payments under this program.   In their response, Offerors must acknowledge their acceptance of this provision.

It is important to ensure that the Contractor is not burdened by an unexpected increase in the proportion of uncompensated care services that it delivers relative to the share formerly provided by D.C. General and the public clinics.   Therefore, at the end of each contract period, the Authority will review data reflecting the level of uncompensated care provided to the uninsured population served by all of the providers in the District.  The Authority, at its discretion, may redistribute public funds and/or adjust the budget for this program based upon this review.

The Contractor must maintain and consistently apply uncompensated care policies that reflect and respond to the ability of patients to pay for their health care services.  Offerors must include with this response a copy of their uncompensated care policies.

◆  Management Information System

Offerors must describe the management information system they will use for this program. The District will require the successful contractor to track the eligibility, enrollment, and utilization of all services through the uninsured health care program.  Offerors must be prepared to provide the District with complete, detailed, patient-specific UB-92, HCFA 1500 and demographic data in a computerized format on a monthly basis.  The Offeror should describe its ability to provide the District with monthly, quarterly and annual reports that document the use and cost of services, in total and by type; key patterns of use, cost, and illness; and important trends.  The Offeror will need to be able to track and demonstrate improvements in the quality of care; the accessibility of care; the availability of specialty, ancillary and other services; and enrollment in Medicaid have all improved under this program.  The District is committed to ensuring that the dollars appropriated to this program follow and are expended on the uninsured.  Accordingly, the successful contractor must be able to identify each uninsured person who receives a service under this program.  It is not necessary for an Offeror to acquire a new information system to accommodate this program. However, an Offeror's must be able to provide the data referred to above if it chooses not to implement a new data capacity.

◆  Prior Authorization/Utilization Management

The selected Contractor shall operate a well-defined utilization management system that ensures adequate control over high cost and high-risk services.  This system must be

compatible with and should promote timely access to necessary medical care. Offerors should describe any services that will require prior authorization or approval and include timeframes and standards for response to request for services requiring authorization. The Offeror should also identify and include with their response criteria that will be used to determine medical necessity. The Offeror should implement a case management program and include a comprehensive description of it in the response. All criteria used must be consistent with national guidelines, industry standards or promulgated by professional medical associations or other expert committees. The Offeror should also describe how they will ensure the availability of second opinions when there is a question concerning a diagnosis or treatment.

The Authority is committed to ensuring that the uninsured population has access to necessary health care services of high quality that are provided at the most appropriate level of care. Therefore, the Authority may develop a prior authorization and utilization management function within the Government.

Offerors should describe in their responses how they will assure that uninsured persons receive necessary health care services at the most appropriate level of care.

♦ Quality Improvement

Offerors must describe their quality improvement program. Annual quality improvement plans should include at least one study that addresses the needs of the uninsured or the needs of this program. At a minimum, the contractor must be able to demonstrate that it will routinely assess and improve the appropriateness and quality of care delivered, and that it will undertake efforts to ensure that the safety net system has been preserved through implementation of this program. The Offeror must also describe clinical efforts that will be undertaken to impact on health outcomes of the target population. At a minimum, the Offeror should address strategies and activities it will take consistent with the goals of Healthy People 2010. Additionally, the contractor must demonstrate that ancillary, specialty care and hospitalization services needed by the uninsured are available to the uninsured on a timely basis.

The Contractor will be required to establish a process to address complaints and grievances. Offerors should describe how they will implement this requirement.

As part of its oversight of this program, the District intends to conduct periodic quality reviews through an outside vendor. The annual quality reviews will evaluate accessibility, availability, utilization and program costs. The quality assurance services will be designed to ensure that the health care services provided to uninsured patients are appropriate and of high quality; that the uninsured population has sufficient access to needed services and is not underserved; and that persons with chronic health care problems, such as diabetes, heart disease, HIV/AIDS and hypertension are identified and provided with appropriate preventive and follow-up care whenever and to the fullest extent possible.

◆  Reporting Requirements

The Contractor will be required to submit reports and information to be specified by the DCFRA. The Authority will specify the reporting periods and the due dates of all data reports. The Contractor may be subject to financial penalties for failure to submit accurate data in accordance with report submission timeframes.

The Contractor must have the capacity to transmit large amounts of data to the DCFRA via telephone or Internet. This data will include "dummy" claims data (i.e., HCFA 1500s and UB-92s on a monthly basis) and client demographic data and may include service authorization data. As such, the contractor must have the ability to collect, sort, query, report, store and transmit all such information for each member served.

The Contractor must supply data to the Authority in formats that will permit the Authority to measure the cost, utilization and types of services being provided. Contractors may be subject to financial penalties for failure to comply with specified formats or for failure to provide the Authority with access to data as specified by the Authority.

As specified above, the District will require the successful Offeror to track the eligibility, enrollment and utilization of all services through the uninsured health care program. Offerors must be prepared to provide the District with complete, detailed, patient-specific UB-92, HCFA 1500 and demographic data in a computerized format on a monthly basis. The Offeror should describe its ability to provide the District with monthly, quarterly and annual reports that identify the persons served using social security numbers or other unique identifiers and document the use and cost of services, in total and by type; show key patterns of use, cost, and illness; and identify important trends.

The Contractor shall submit reports according to the following timelines:

    a.  Annual reports shall be submitted within sixty (60 ) days following the last day of the contract period;

    b.  Semiannual reports shall be submitted thirty (30) days following the last day of each six-month period;

    c.  Quarterly reports shall be submitted thirty (30) days following the end of the preceding quarter or by April 30, July 30, October 30, and January 30, assuming the contract period coincides with the calendar year; and

    d.  Monthly reports shall be submitted thirty (30) days following the end of each month.

Failure to submit timely, accurate and comprehensive reports may result in reductions in the Administrative Services Fee.

A list of required reports is included as Appendix J

◆  **Performance Standards**

The Authority will hold the contractor responsible for the following performance standards and

others mentioned or implied elsewhere in this RFP.  These performance standards will be evaluated periodically to determine the need for adjustments or revisions of the standard.

| Element | Standard | Corrective Action/ Sanction |
|---|---|---|
| Preventive health exams for persons with diabetes, hypertension, heart disease, etc. | 85% | Corrective action plan first quarter then sanctions |
| 80% of pregnant women begin prenatal care during the first thirteen (13) weeks of pregnancy | 80% | Corrective action plan for first two quarters, sanction thereafter |
| Referrals for specialty and ancillary care initiated outside contractor's facility completed within 2 weeks of referral | 95% | Sanction |
| Reports are submitted in required format within timeframes established by the Authority | 95% | Sanction after first quarter |
| Reduction in inappropriate ER use | 10% | Corrective action plan |
| Reduction in inappropriate hospitalizations | 10% | Corrective action plan |
| Achieve 10% increase in primary care visits | 10% | Corrective action plan |
| Contractor obtains contracting authority approval for all subcontracts above specified amounts | 100% | Sanction |
| Primary care providers identified for uninsured persons | 95% | Corrective action plan |
| Maintain health care services in geographic locations that are reasonably accessible to the uninsured population | 100% | Sanction |
| Uninsured persons are screened for their eligibility for Medicaid and other third party resources | 100% | Sanction |
| Requirements of block grant programs met | 100% | Sanction |
| Partnerships or coordination agreements completed with DC Public Schools, Commission of Mental Health, Department of Corrections | 100% | Corrective action plan |
| Submission of annual quality improvement plan | 100% | Corrective action plan |
| Complaints and grievances resolved to the satisfaction of the patient and within reasonable timeframes | 95% | Correction action plan |

♦  Any other administrative services directly requested or implied by other sections of this RFP

**F.    Cost Proposal**

The District of Columbia intends to pay for the administrative and health care services that are

43

specified in this RFP in a manner that will encourage them to be delivered on a high quality, cost-effective basis. Accordingly, the structure of the methodology that will be used to pay the Contractor is as follows:

1.　　The Contractor will be required to provide the Administrative Services and the Health Care Services described earlier in this Section.

2.　　The Total Budget for the First Contract Period will consist of (a) the Total Administrative Services Budget, which will be established by multiplying the Monthly Administrative Fee (MAF) by the number of months in the First Contract Period and (b) the Total Health Care Services Budget, which will be established by multiplying the Monthly Health Care Fee (MHCF) by the number of months in the First Contract Period. The First Contract Period shall be defined as the period extending from the Effective Date of the contract that is issued pursuant to this RFP through the immediately following December 31, or through the date that would create a First Contract Period equal to twelve (12) months. The Second Contract Period shall be the twelve month period beginning immediately after the end of the First Contract Period; and the Third, Fourth and any subsequent contract periods shall respectively consist, unless specified differently by the Authority, of the twelve month periods immediately following the previous contract period.

3.　　The Offerors are required to propose the monthly dollar amount, exclusive of the Incentive or Penalty Adjustment referred to below, that they are willing to accept as payment if full for the Administrative Services that they are required to offer in response to this RFP. This amount, which may be modified pursuant to discussions and negotiations with the Offeror, including the submission of "best and final" offers, will be known as the Monthly Administrative Fee. In the First Contract Period, the MAF will be stated as an aggregate amount (e.g., $100,000 per month); however, in subsequent contract periods, as the data base supporting this project becomes more robust, the Monthly Administrative Fee may be converted from an aggregate amount into a "Per Member Per Month" (PMPM) amount. The Total Administrative Services Budget for any contract period will be the MAF multiplied by the number of months in the contract period. The payment that will be made to the Contractor for Administrative Services during any contract period will consist of:

　　　a.　　A monthly payment of eighty-five percent (85%) of the agreed-upon MAF; plus

　　　b.　　An Administrative Services Reward or Penalty Adjustment

The Administrative Services Reward Adjustment will be a positive amount equal to as much as fifteen percent (15%) of the Monthly Administrative Fee that is agreed-upon by the Contractor for the contract period. The Administrative Services Penalty Adjustment will be a negative amount equal to as much as fifteen percent (15%) of the Monthly Administrative Fee that is agreed-upon by

44

the Contractor for the contract period. The Authority will determine whether an Administrative Services Reward or Penalty Adjustment is warranted based on the performance of the Contractor in meeting the Administrative Services requirements that are established in the contract. The relevant performance requirements are generally described elsewhere in this RFP and will be established more specifically by the Authority prior to the issuance of a contract.

The Administrative Services Reward or Penalty Adjustment, if any, will be determined on a periodic basis (e.g., quarterly or semi-annually) depending on the Contractor's performance in the previous time period that is the subject of the adjustment. The adjustments will be paid to the Contractor on a lump-sum basis or through an increase in the MAF in an upcoming contract period.

4. The Offerors are required to propose the monthly dollar amount, exclusive of the Efficiency Adjustment and the Program Adjustment described below, that they are willing to accept as payment for the Health Care Services they are required to offer in response to this RFP. This amount, which may be modified pursuant to discussions and negotiations with the Offerors, including the submission of "best and final" offers, will be known as the Monthly Health Care Fee (MHCF). In the First Contract Period, this amount will be stated as an aggregate amount (e.g., $3 million per month); provided, however, that in subsequent contract periods, as the data base supporting this project becomes more robust, the Monthly Health Care Fee may be converted into a "Per Member Per Month" (PMPM) amount. The Total Health Care Services Budget for any contract period will be the MHCF multiplied by the number of months in the contract period. The payment that will be made to the Contractor for Health Care Services during any contract period will consist of:

    a. A monthly payment of ninety-five percent (95%) of the agreed-upon MHCF; plus

    b. A Health Care Services Efficiency Adjustment; plus

    c. A Health Care Services Program Adjustment.

5. The five percent (5%) difference between the agreed-upon MHCF and the monthly payment will be used by the Authority to create a Contingency Fund that will be available to fund budget excesses, extraordinary cost items, special projects, studies, analyses or other activities that are judged by the Authority, in its sole discretion, to be appropriate and consistent with the aims and objectives of this project.

6. The Health Care Services Efficiency Adjustment (HCSEA) will be determined as follows:

    a. A specific time period of consecutive months, to be known as an "Assessment Period", will be defined by the Authority. An Assessment Period (AP) may be a Contract Period or a different

period of time (e.g., a calendar quarter) specified by the Authority. The computations described below pertain to any particular Assessment Period.

b.      The Health Care Services actually provided will be valued by multiplying the number of medically necessary services rendered by the related Fee Schedule

c.      The resulting amount, plus a reasonable adjustment for "Incurred But Not Reported Claims" (IBNR), will be the Health Care Services Actual Cost ("Actual Cost").

d.      The MHCF multiplied by the number of months in the contract period will be the Total Health Care Services Budget ("THCSB").

e.      The Total Health Care Services Budget will be compared to the Actual Cost.

f.      If the Actual Cost is less than the THCSB, the Contractor will receive a positive Efficiency Adjustment: specifically, the MHCF for the next time period will be reduced by fifty percent (50%) of the first twenty-five percent (25%) difference, and by seventy-five percent (75%) of any additional difference, between the Actual Cost and the THCSB, thereby permitting the Contractor to share in the savings.

g .     If the Actual Cost exceeds the THCSB, the Contractor will receive a negative Efficiency Adjustment: specifically, the MHCF for the next time period will be increased by twenty-five percent (25%) of the first twenty-five percent (25%) difference, and by fifty percent (50%) of any additional difference, between the Actual Cost and the THCSB, thereby requiring the Contractor to bear a portion of the excess.

h.      The Health Care Services Efficiency Adjustment may be applied to the MHCF at any time when the Authority determines that the Actual Cost for any time period has differed substantially from the Total Health Care Services Budget for that time period after reasonable adjustment for the expected impact of "Incurred But Not Reported Services" (IBNR). The Efficiency Adjustment will be made for the time period needed to recognize the savings or excess from the previous period.

i.   The Health Care Services Efficiency Adjustment may be applied to the MHCF at any time when the Authority determines that the Actual Cost for any time period has differed substantially from the Total Health Care Services Budget for that time period after reasonable adjustment for the expected impact of "Incurred But Not Reported Services" (IBNR).

7.   The Health Care Program Adjustment (HCPA) will be an additional amount, equal to as much as five percent (5%) of the Total Health Care Services Budget for any contract period, that will be paid to the Contractor if the Authority determines that the Contractor has met or exceeded the Health Care Services requirements of the contract. The Health Care Program Adjustment, if any, will be determined on a periodic basis (e.g., semi-annually) depending on the Contractor's performance in the previous time period that is the subject of these adjustments. The adjustments will be paid to the Contractor on a lump-sum basis or through an increase in the MHCF in a future time period.

8.   In the Cost Proposal, the Offeror must propose the Fee Schedule amounts that it will accept as the bases for the assignment of cost values in the computation of the Actual Cost of the Health Care Services that are provided to the Target Population. The Fee Schedule amounts that are proposed (a) must not exceed ninety-five percent (95%) of the provider's Medicaid payment rates for the particular Contract Period unless the provider is a hospital in which case the fee schedule proposed on behalf of the hospital must not exceed the Standard Rate specified below. and (b) must be stated on the same basis as the Medicaid fee schedule that is applicable to the providers for each type of health care service specified below. These amounts may be modified by the Authority, pursuant to discussions and negotiations with the Offeror, including the submission of "best and final" offers, prior to the award of the contract. The proposed Fee Schedule amounts must conform to the following instructions:

a.   Inpatient Hospital Services: The Offeror must propose the dollar amount that it will accept as the "Standard Rate" per inpatient discharge. The Standard Rate that is offered can be different by hospital or uniform across all hospitals that will be used by the Contractor but shall not exceed $ 5900.00. The Standard Rate shall be inclusive of all hospital services except for the professional services of physicians unless the Offeror specifies that the professional services of physicians are included in the Standard Rate and provides information about the amount of physician compensation that is included in the Standard Rate. The Standard Rate shall be equal to the cost value that the Offeror would assign to an inpatient discharge with a relative weight of 1.0. The Casemix Index is computed as the (Sum of the number of discharges multiplied by their associated DRG weights) divided by the number of unweighted discharges. The Contractor will be required to assign each discharged patient to a "diagnosis related group" (DRG). The cost value of any

particular inpatient hospital discharge will be computed by multiplying the Standard Rate by the applicable DRG weight. The DRG Grouper that will be used for the classification of inpatient discharges will be the same DRG Grouper used by the Medicaid program   and the relative weights to be applied to the various DRGs will be those specified for use by the Medicaid program for the particular time period. The Actual Cost of all of the inpatient hospital services provided during any time period for which these services are measured will be equal to the sum of the cost values assigned in the manner specified above to each of the inpatient discharges that occurred during the time period. a basis of cost  determination for each hospital.

a.     Emergency Room (ER) Services: The Offeror must propose the ER dollar amount (in the form of the percentage of the Medicaid fee schedule) that it will accept as the cost value of ER services.

b.     Ambulatory Surgery Services: The Offeror must propose the ambulatory surgery dollar amount (in the form of the percentage of the Medicaid fee schedule) that it will accept as the cost value of ambulatory surgery services.

c.     Community-Based Primary Care Clinic Services: The Offeror must propose the community-based primary care clinic ambulatory surgery dollar amount (in the form of the percentage of the Medicaid fee schedule) that it will accept as the cost value of community-based primary care clinic services.

d.     Physician Services: The Offeror must propose the percentage of the Medicaid Physician Fee Schedule that it will accept as the cost value to be assigned to services provided by physicians. If, for example, the Medicaid fee for a particular physician service were $55.00, and the Offeror proposed and the Authority accepted 90%, the cost value to be assigned would be $49.50.

e.     Specialty Clinics: The Offeror must propose the specialty clinics dollar amount (in the form of the percentage of the Medicaid fee schedule) that it will accept as the cost value to be assigned to services provided by physicians.

f.     Other Health Care Services: The Offeror must propose the dollar amount(s) (in the form of the percentage of the Medicaid fee schedule) that it will accept as the cost value to be assigned to these other health care services.

g.     School Health Services: The Offeror must propose the dollar

amount(s) that it will accept as payment in full for these health care services.

9. In addition to specifying the Fee Schedule amounts that would be accepted as the cost values of the Health Care Services provided under the contract, the Offeror must specify in its Cost Proposal the dollar amounts that it would accept as the Total Budget, including both the Total Administrative Services Budget and the Total Health Care Budget, for the First Contract Period. At this time, the number of months that will be included in the First Contract Period is uncertain, but may be less than twelve, so the Offeror must specify the per month amount that it would accept as its Total Budget/Month during the First Contract Period. The Total Budget that the Offeror would accept for the First Contract Period will then be determined by the Authority on the basis of the following formula:

Total Budget = (A/30 days) x B

where

A =   The number of days in the First Contract Period and
B =   The Per Month Amount that the Offeror is willing to accept as its Total Budget/Month for the First Contract Period

If the number of months that are included in the First Contract Period is less than nine (9), the Authority may apply a seasonality adjustment to reflect the expected variation in health care expenses during the year. If a seasonality adjustment is to be made, it will be specified before award of the contract. The First Contract Period will not be longer than twelve (12) months.

The Offeror's Cost Proposal must also specify the Total Budget it will accept for the Second Contract Period, the Third Contract Period and the Fourth Contract Period, based on the following assumptions:

a.   The provisions of this Section will be in force during these contract periods
b.   Each of these contract periods will consist of twelve (12) months
c.   If any of these contract periods consists of less than or more than twelve (12) months, the Total Budget/Month for that contract period will be computed and the Total Budget for the contract period will be established according to the following formula:

Total Budget = Total Budget/Month x Number of Months in the Contract Period

The Offeror's Cost Proposal for each Contract Period must specify the Total Budget, including the Total Administrative Services Budget and the Total Health Care Services Budget, broken down by type of Health Care Service and program,

in the format specified below.  As noted above, the Offeror's Cost Proposal must be separated from the Offeror's Technical Proposal.

10.    The Offeror's Cost Proposal must present the Total Budget that the Offeror will accept for the First Contract Period.  The presentation should provide the Total Budget that the Offeror will accept and the other information requested below in the aggregate across all of the types of health care programs covered in this RFP (i.e., for Items 10 b., 1-8 below) combined, and separately for each of the types of programs, in the following format:

Total Budget/Month for First Contract Period
All Program Types

a.    Total Administrative Services Budget/Month          $ _____

b.    Total Health Care Services Budget/Month             $ _____

(1)    Inpatient Hospital Services

    (a)    Standard Rate Per Discharge =          $ _____
    (b)    Assumed Casemix Index =                   _____
    (c)    Assumed Number of
        Discharges/Month =                        _____
    (d)    Amount Per Month
        (a) x (b) x (c) =                      $ _____

(2)    ER Services

    (a)    Cost Amount/ER Visit =                 $ _____
    (b)    Assumed Number of ER Visits =             _____
    (c)    Amount Per Month
        (a) x (b) =                            $ _____

Note: Offerors are encouraged but not required to submit information showing their assumed distribution of ER visits across the ER revenue codes.

(3)    Ambulatory Surgery

    (a)    Cost Amount/Visit                      $ _____
    (b)    Assumed Number of Visits              $ _____
    (c)    Amount Per Month                       $ _____

Note: Those ambulatory surgery occasions when a patient receives more than one surgical procedure should be counted as a single ambulatory surgery visit. Offerors are encouraged but not required to submit

50

information showing their assumed distribution of visits across the eight Medicare Ambulatory Surgery Categories (ASCs).

(4)     Physician Services

   (a)     Acceptable Percentage of Medicaid Fee
           Schedule = _____

   (b)     Primary Care Physicians (PCPs)

| Cost Amount Per Visit | Assumed Number of Visits/Month | Amount Per Month |
|---|---|---|
| $ _____ | _____ | $ _____ |

   (c)     Specialty Care Physicians (SCPs)

| Cost Amount Per Visit | Assumed Number of Visits/Month | Amount Per Month |
|---|---|---|
| $ _____ | _____ | $ _____ |

   (d)     Other Physicians (e.g., hospital-based physicians)

| Cost Amount Per Visit | Assumed Number of Visits/Month | Amount Per Month |
|---|---|---|
| $ _____ | _____ | $ _____ |

   (e)     All Physicians

| Cost Amount Per Visit | Assumed Number of Visits/Month | Amount Per Month |
|---|---|---|
| $ _____ | _____ | $ _____ |

           Note: The All Physicians entries should reflect the combination of
           the entries for the PCPs, SCPs and Other Physicians.

(5)     Clinics

| Cost Amount Per Visit | Assumed Number of Visits/Month | Amount Per Month |
|---|---|---|
| $ _____ | _____ | $ _____ |

(6)    Other Health Care Services

       Amount Per Month    $ _____

(7)    School Health Services

       Amount Per Month    $ _____

(8)    Dental Health Services

       Amount Per Month $_____

(9)    Total Health Care Services Budget/Month
       (This amount should equal the sum of the
       Amount Per Month entries for Items 1-7 above
       and should equal the Amount/Month entry for
       10(b) above)                                              $ _____

c.    Total Budget/Month for First Contract Period
       Equals Item 10 a. + Item 10 b.                      $ _____

11.    The Offeror must also present in its Cost Proposal the Total Budget Per Month
that it will accept in the aggregate across all of the types of health care programs
covered in this RFP in the Second, Third and Fourth Contract Periods.  The
Authority will multiply these amounts by the number of months in those Contract
Periods to establish the Total Budget that the Offeror will accept for each of these
contract periods.  The following format should be used for this presentation:

| Contract Period | Total Administrative Services Budget/Month | Total Health Care Services Budget/Month | Total Budget Per Month | % Over Prior Period |
|---|---|---|---|---|
| Second | $ _____ | $ _____ | $ _____ | _____ |
| Third | $ _____ | $ _____ | $ _____ | _____ |
| Fourth | $ _____ | $ _____ | $ _____ | _____ |

The Offeror is permitted but is not required to provide more detail (e.g., by type
of health care program and/or by type of Health Care Service) regarding these
budget amounts for these Contract Periods. This additional information would be
helpful if the Offeror expects significant changes to occur in the proportions of
the Health Care Services budget that will be accounted for by its various
constituent elements (e.g., inpatient) and if the Offeror can also supply a brief
description of its rationale for these expected changes.

## SECTION III. INFORMATION REQUIRED FROM OFFERORS

This section provides instructions for preparing the submission, both technical and cost proposals. Any proposal not responding fully to the requirements of this RFP may be disqualified as non-responsive. Before the technical and cost proposals are reviewed, each proposal will be reviewed to determine if all the mandatory requirements are present. Any proposal not meeting the mandatory requirements may be disqualified.

### A. Mandatory Requirements

- Proposals must be received on or before 2:00 01/16/01 at the location specified in Section I of this RFP.

- A complete response must be submitted using the format outlined in the paragraphs that follow.

- The transmittal letter must contain the signature of an official or employee with the legal authority to bind the Offerors to the commitments made in the proposal.

- The Offerors must meet all regulatory requirements necessary to perform the services required under the contract.

- Proposals must contain a table of contents listing all sections, figures and tables

- Proposals must follow the format below:

  Tab 1:   Executive Summary

  Tab 2:   Corporate Background and Experience

  Tab 3:   Key Administrative Positions and Staffing Plan

  Tab 4:   Compliance with Scope of Work/Work Plan

  Tab 5:   Supporting Documentation

  Tab 6:   Cost Proposal

### B. Transmittal Letter

The transmittal letter must be written on the Offeror's official business letterhead and must bear an original signature by an individual with legal authority to bind the Offeror . The transmittal letter must also include the following information:

12.    Offerors are required to respond to this cost proposal using the methodology and formats stated above.  However, Offerors are invited to propose modifications and/or alternative methods that they believe may better satisfy the objectives of this RFP.  Proposed modifications of the cost methodology may be submitted as supplementary material and do not require duplicate submission of the other material in the proposal.

13.    Offerors should describe their experience in managing the care and controlling the cost of services needed by uninsured or low income populations.  Offerors should describe the cost management methods they have used in the past and intend to apply in this project, as well as any new efforts they plan to implement in support of the budgets they propose in their response.

- A statement to certify that the Offeror organization is not currently under suspension or debarment by the District of Columbia any other state or the federal government.

- Identification of the person who will serve as the primary contact for the Authority's Contracting Officer, that person's address, telephone, FAX number and e-mail address.

- A statement that acknowledges and agrees to abide by the procurement rules and procedures, contract terms and conditions and all other rights reserved by the Authority as specified in the RFP. Partial acceptance must clearly be indicated with justifications provided.

- Offerors must also comply with all relevant licensure, certification and registration requirements.

- A statement certifying that the prices in the proposal have been arrived at independently and without consultation, communication or agreement for the purposes of restricting competition; that the prices quoted in the cost proposal have not been disclosed by the Offeror, and will not be disclosed prior to the submission date; and that no attempt has been made by the Offeror to induce any other person or firm to submit or not submit a proposal for the purpose of restricting competition.

- If the Offeror proposes subcontractors, a statement that the prime contractor accepts full responsibility for the performance of any partners or subcontractors.

- The Offeror's assurance that the proposal shall remain in full force and effect for at least one hundred eighty (180) days from the proposal due date specified in the RFP or through the effective date of the operational contract resulting from this RFP. All prices proposed by the Offeror must be firm for six months from the due date of the proposals.

**C. Volume I: Technical Proposal**

This section includes instructions for preparing the technical proposal. Offerors must review the instructions carefully to ensure adherence to RFP requirements. Failure to fully comply with RFP requirements will result in disqualification.

Executive Summary

The executive summary should introduce the Offeror to the Authority in succinct and clear terms. The Offeror should highlight the Offeror's key strengths and provide an overview of the Offeror's ability to meet the requirements of the RFP. The executive summary should highlight and summarize the contents of the Offerors response. Additionally, the executive summary should provide sufficient information to ensure the Offeror's understanding of the District's

needs that generated the RFP, the District's objectives in requesting the services, and the nature and scope of the work involved. The response should clearly demonstrate the Offeror's intent to ensure that all care provided under this RFP is culturally and linguistically appropriate. Additionally, the Offeror should discuss how they will ensure that residents of Wards 5, 6, and 7 have access to necessary health care services. The Offeror should also demonstrate its understanding and knowledge of:

♦ The economic, ethnic, racial, social, special needs, cultural, linguistic and community climate in the project area;

♦ Socioeconomic and physical and behavioral health issues of the target population;

♦ The health care needs of the target population;

♦ The importance of input from the community and advocacy groups

♦ The importance of developing an integrated and coordinated health care delivery system for the target population

♦ The importance of outreach to the target population

♦ The role of the private primary care safety net for the target population

♦ The differences if any between the Medicaid population and the population served through this RFP.

Background and Experience

The Offeror should describe the history and relevant experience of the Offeror and any partners or subcontractors. Offerors should provide complete information on the ownership of the company (names and percent of ownership); date the company was established; and the date the company began operations. This same information should be provided for subcontractors. Additionally, Offerors should provide the corporate address and the address of the business entity if different from the corporate address. Corporate by-laws, articles of incorporation and annual reports for the most recent three-(3) years should be included as an attachment to the response to this RFP. The Offerors should provide the same information for all subcontractors. The Offeror should demonstrate its financial ability to undertake a project of this size and to minimize financial risk to the District. If the Offeror is a new corporation created to respond to this RFP, the Offeror must submit the financial information requested above for each of the partner/owners of the new corporation.

Offerors should describe experience they have had in serving populations the same or similar to populations served through this RFP, including individuals with serious mental illnesses and/or developmental disabilities, persons who are homeless, persons with addictions, and persons who are dually diagnosed (mental health and any co-occurring condition). Offerors should also

56

describe any experience in working with providers serving the population identified above. For each experience identified, Offerors should provide:

Offerors should also describe any special techniques, skills or abilities that the Offeror considers critical to accomplish the requirements outlined in this RFP. Offerors must be able to demonstrate prior experience as described above or offer detailed explanation of the qualifications or past experience that prepared the Offeror to assume responsibility for the scope of work requested by this RFP.

Key administrative positions and staffing plan

This section should include a description of the Offeror's current organizational structure and proposed organizational structure for this project. Offerors must demonstrate that the proposed organizational structure is comprehensive enough to include all of the functions required under this RFP.

Offerors should identify Board of Directors, for both the Corporate and Local entity, and describe the role of board members in governance and policy making. This section must include information on how the Offeror plans to include consumers, persons in recovery and families in the decision making process.

Offerors should identify the name and position of the person to negotiate the contract with The Authority. Additionally, the Offeror should identify the name and position of the account manager or the person who will have ultimate responsibility and accountability for the contract.

In this section Offerors should include the proposed project team, organization charts, names of proposed key staff, job descriptions of key positions and resumes of all key staff, including relevant licensure, registration or certification possessed. If individuals are not currently on staff, the Offeror should indicate the time frame for hiring staff into key positions. For purposes of this RFP, key positions are identified as:

- ◆ Project manager or equivalent
- ◆ Medical/Clinical Director
- ◆ Chief Financial Officer/Financial Director

Statement of Work

The District of Columbia  is seeking a contractor who can provide a comprehensive and integrated system of medical and health care services to the target population. Offerors should be aware that responses will be evaluated on whether or not the Offeror demonstrates through their response the ability to develop and implement a comprehensive, integrated and coordinated system of care. Offerors who are not able to demonstrate a comprehensive, integrated and coordinated system of care will be disqualified as unresponsive to the RFP and will not be considered for award.

# SECTION VI.    EVALUATION AND SELECTION PROCESS

## A.    EVALUATION COMMITTEE

The selection committee will be comprised of individuals selected by the Authority to evaluate the responses. The selection committee will use a point formula during the review process to score proposals that meet the mandatory criteria. Each member of the selection committee will first score technical requirements by each of the criteria described. The full committee will then convene to review and discuss these evaluations and combine the individual scores to arrive at a composite technical score for each contractor. At this point, contractors with an unacceptably low technical score will be eliminated from further consideration.

Only contractors meeting the mandatory criteria will have their proposals evaluated and scored for both technical qualifications and price. The following represents the principal selection criteria, which will be considered during the evaluation process.

## B.    TECHNICAL QUALIFICATIONS: (Maximum Points - 500)

1.    Offerors Qualifications (Maximum Points - 150)

- ♦ The Offeror's past experience and performance on comparable contracts
- ♦ The Offeror's knowledge and understanding of the needs of the Authority

2.    Offeror's Proposed Personnel and Organizational Structure (100)

- ♦ The quality of the contractor's professional and management personnel assigned to support this service. The Authority will give up to fifty (50) preference

3.    Approach (Maximum Points - 250)

- ♦ Offeror's compliance with requirements of the RFP and ability to fulfill the scope of work.

## C.    PRICE

After the composite technical score for each contractor has been established additional points will be added to the technical score based on the price bid. The maximum score for price will be assigned to the contractor offering the lowest total all-inclusive maximum price. Offerors who propose the most cost-effective use of funds will also receive higher points for the cost portion of the response. Appropriate fractional scores will be assigned to other offerors.

## D.    EVALUATION CRITERIA

The evaluation criteria set forth below are arranged in descending order of importance.

♦ Cost Proposals— The District will look favorably on those Offerors that propose solutions that are most likely to hold expenditures within the agreed-upon budget, which are realistic and which offer advantages relative to the cost proposals of other bidders. Cost and price realism will be used to evaluate the Offeror's proposals.

♦ Work Statement—The Committee will evaluate the degree to which the Offeror's response meets the goals and objectives of the District in issuing this RFP. Preference will be given to those proposals that maintain some level of service delivery on-site at the current location of D.C. General. Additionally, Offerors who propose to offer the full range of services requested by this RFP will receive preference.

♦ Key Administrative Positions and Staffing—Offerors will be evaluated on the sufficiency of the proposed staffing to meet the needs of the target population. The staffing plan will also be evaluated to determine that the proposed staffing is realistic and obtainable. Additionally, the District will award preference to those Offerors agreeing to offer positions to current employees of the PBC who meet position requirements and to those Offerors who commit to the First Source Agreement requirements. (Appendix K).

♦ Background and Experience—Offerors will be evaluated on the extent to which the Offeror's previous experience and organizational structure lends itself to meeting the purpose of the RFP.

## E.    EVALUATION PROCESS

The Committee will evaluate each technical proposal using the evaluation criteria set forth above. The Committee may request discussion with the Offeror regarding its proposal; if so, these discussions will be documented and become part of the technical proposal. Only those Offerors whose technical proposals are deemed reasonably acceptable for selected of award and who are determined "responsible" shall be considered "Qualified Offerors." Accordingly, if the Committee, with the concurrence of the Project Officer, determines at any time that an Offeror is not reasonably acceptable, or the Project Officer determines an Offeror not to be responsible, that Offeror will be notified and the financial proposal will not be reviewed.

Following the completion of the technical evaluation of all Offerors, including discussions, the Committee will rank each qualified Offeror's technical proposal prior to reviewing sealed cost proposals. The Committee may then enter into discussions after reviewing the cost proposals. Cost and price realism will be used to evaluate the Offeror's proposals. Cost and price realism is reflected in the difference between an Offeror's proposed costs and the Authority's determination of most probable costs that would be incurred by the solicitation's requirements. Differences between the proposed costs and most probable costs may reflect an attempt to buy-in or a lack of understanding of the requirements. Lack of cost realism may be reflected in the results of the overall evaluation.

Then, if it is determined to be in the best interest of the District, the Authority may invite Offerors to make final revisions to their technical and/or financial proposals through submission of a Best and Final Offer.

The Committee shall recommend the Offeror whose overall proposal provides the most advantageous offer to the District considering price and the evaluation criteria set forth in the RFP.

The Authority will notify all Offerors of the outcome of the solicitation.

## F.    DISCUSSIONS

The Evaluation Committee may enter into discussions with qualified or potentially qualified Offerors may be asked to participate in face to face discussions with the Committee concerning their proposals.  Discussions may also be conducted by telephone, mail, E-mail, or facsimile transmission at the discretion of the Authority.

## G.    BEST AND FINAL OFFERS

When it is deemed in the best interest of the District, the Authority may permit qualified Offerors to revise their initial proposals by submitting a Best And Final Offer (BAFO). The Authority shall notify each qualified Offeror of the scope of the requested BAFO (Technical and/COST) and shall establish a date and time for the Offeror's submission.  The Authority may consult with and seek the recommendation of the Evaluation Committee during the BAFO process.

## H.    DEBRIEFING OF UNSUCCESSFUL OFFERORS'

The Authority at its own discretion may grant unsuccessful Offerors a debriefing meeting upon their written request to the Authority.

## Table of Appendices

APPENDIX                          CONTENT

APPENDIX A                        OFFEROR'S LIBRARY CONTENTS

APPENDIX B                        PBC SERVICES, UTILIZATON,
                                  PAYER STATUS

APPENDIX C                        RESERVED

APPENDIX D                        LISTING OF NHCs, SERVICE ARRAY
                                  STAFFING PATTERNS

APPENDIX E                        PBC AMBULATORY VISITS BY WARD
                                  AND ZIP

APPENDIX F                        MOST COMMON HOSPITAL
                                  DISCHARGES AND OUTPATIENT
                                  DIAGNOSIS (PBC)

APPENDIX G                        DISTRIBUTION OF PATIENTS BY DRG

APPENDIX H                        LIST OF AMBULATORY CARE
                                  CENTER VISITS BY PAYER

APPENDIX I                        NHC VISITS BY PAYER SOURCE

APPENDIX J                        PARTIAL LIST OF REPORTS

APPENDIX K                        FIRST SOURCE AGREEMENT

**APPENDIX A**

**APPENDIX A**  **CONTENTS OF OFFEROR'S LIBRARY**

1. BPHC REPORT ON NEIGHBORHOOD HEALTH CLINICS

2. DHHS/HRSA PHYSICAL ASSESSMENT OF NEIGHBORHOOD HEALTH CENTERS

3. REPORTS OF PBC TRANSITION TASK FORCE

   ♦ UTILIZATION AND SCOPE OF SERVICE
   ♦ FINANCIAL
   ♦ MODELS

4. CAMBIO REPORTS

5. CFO'S REPORT

6. MEMORANDUM OF UNDERSTANDING (PBC/DOH)

7. THE IMMUNIZATION OF SCHOOL STUDENTS ACT OF 1979

8. THE STUDENT HEALTH CARE ACT OF 1985

9. THE DISTRICT OF COLUMBIA PUBLIC SCHOOL NURSE ASSIGNMENT ACT OF 1987

10. THE ADMINISTRATION OF MEDICATION BY PUBLIC SCHOOL EMPLOYEES ACT OF 1993

**APPENDIX B**

Organizational Plan for Provision of Patient Care
PBC Regulation No. 106.08

_Inpatient Care Units_
General Surgery/Trauma (22N/S, 23S)
Intensive Care, Adult (SICU, MICU, CCU)
Internal Medicine and Oncology (43 N, 52 N/S)
Locked Ward (44N)
Maternal/Child Health (Labor and Delivery, OB2, Nursery, Peds, NICU)
Substance Abuse (Unit 42 N)
Post Anesthesia Care Unit

_Patient Services Departments_
Ambulatory Care Clinics (hospital-based medical, surgical, pediatric, obstetrics and gynecology,
    podiatry, and specialty clinics)
Ambulatory Surgery
Anesthesiology
Audiology
Cardiac Catheterization Lab
Community Health Centers (including pediatrics, obstetrics and gynecology, medicine, dental,
    and podiatry clinics)
Dental Clinic (hospital-based)
Diagnostic Center
Dialysis: Hemodialysis
Dietary Department
EEG Laboratory
Emergency Care Center- Level I Trauma
HIV Center - now known as the Phoenix Center
Heart Station
Medicine
Neurology/Neurosurgery
Nuclear Medicine
Obstetrics and Gynecology
Ophthalmology
Orthopedics
Pathology and Laboratory Services
Pediatrics
Pharmacy
Physical Medicine and Rehabilitation
Psychiatry
Quality Management and Utilization Review
Radiology
Renal Dialysis Unit
Respiratory Care

8

Organizational Plan for Provision of Patient Care

## DCHH-PBC
## INSTALL MODEL PATIENT CARE DOCUMENTATION
### HOSPITAL SERVICE

| CODE | DESCRIPTION |
|------|-------------|
| ALG | Allergy/Immunology |
| AMB | Ambulatory Surgery |
| AUD | Audio logy |
| BOR | Border Baby |
| CAD | Cadaver |
| CAR | Cardiology |
| CAT | Cath Lab |
| CCU | Cardiac Care |
| CON | CSH Conversion Recs |
| CSH | Community Health Clinic |
| DEH | Dental Hygiene |
| DEN | Dentistry |
| DER | Dermatology |
| DIA | Diagnostics |
| DLY | Dialysis |
| DPE | Developmental Peds |
| EEG | EEG |
| EMR | Emergency Room |
| END | Endocrinology |
| ENT | Otolaryngology |

Prepared for DCHH-PBC
AppSpec, Inc.
Confidential
09/27/00

XV



# DCHH-PBC
## INSTALL MODEL PATIENT CARE DOCUMENTATION

| CODE | DESCRIPTION |
|------|-------------|
| FAM  | Family Practice |
| GAS  | Gastrorentorology |
| GYN  | Gynecology |
| HEM  | Hematology |
| HND  | Ortho Hand Surgery |
| HSC  | HSCSN |
| HSS  | Heart Station |
| IFD  | Infectious Diseases |
| HIS  | Infectious Health |
| LAB  | Laboratory |
| MED  | Internal Medicine |
| MIC  | Medical Intensive Care |
| MTR  | Trauma |
| NBN  | Newborn Nursery |
| NEP  | Nephrology |
| NEU  | Neurology |
| NIC  | Neonatal Intensive Care |
| NRS  | Neurosurgery |
| NUC  | Nuclear Medicine |
| NUT  | Nutrition |
| OBS  | Obstetric |

XVI

Prepared for DCHH-PBC
AppSpec, Inc.
Confidential
09/27/00

*AppSpec Inc.*

## DCHH-PBC
## INSTALL MODEL PATIENT CARE DOCUMENTATION

| CODE | DESCRIPTION |
|------|-------------|
| OCC | Occupational Therapy |
| OMS | Oral Surgery |
| ONC | Oncology |
| OPH | Ophthalmology |
| OPS | Outpatient Surgery |
| ORT | Orthopedics |
| OSV | Observation |
| PCH | Psychology |
| PCU | Pulmonary Care |
| PDE | Pediatric Dentistry |
| PED | Pediatrics |
| PFL | Pulmonary Function Lab |
| PHT | Physical Therapy |
| PLS | Plastic Surgery |
| PMR | Physical Med/Rehab |
| POD | Podiatry |
| PSY | Psychiatry |
| RAD | Radiology/Imaging |
| REC | Recreational Therapy |
| RHE | Rheumatology |
| RON | Radiation/Oncology |
| RSP | Peds Respigam |

XVII

Prepared for DCHH-PBC
AppSpec, Inc.
Confidential
09/27/00

AppSpec Inc.

## DCHH-PBC
## INSTALL MODEL PATIENT CARE DOCUMENTATION

| CODE | DESCRIPTION |
|------|-------------|
| SIC | Surgical Intensive Care |
| SOS | Social Services |
| SPE | Speech |
| SUB | Substance Abuse |
| SUR | General Surgery |
| THS | Cardio-Thorasic Surgery |
| TRA | Inpatient Trauma |
| URO | Urology |

Prepared for DCHH-PBC
AppSpec, Inc.
Confidential
09/27/00

XVIII

AppSpec, Inc.

OCT-03-00  14:16  From:                                                T-373  P.07  Job-277

**PBC**
**DC GENERAL**

## FY2000 ANNUALIZED PATIENT DAYS

| Service | Bue Cross | Commercial | Corrections | Med Charity | Grants | MAMCO | Tricare | Medicare | Medicaid DC | M'caid Other | City Agency | Self Pay | MA Pending | W/Comp | Total | % to Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AMB | | | | | | | | | | | 1 | 6 | | | 7 | 0.01% |
| CAR | | 3 | | 6 | | 3 | | 32 | 7 | | | 11 | | | 62 | 0.10% |
| CCU | 58 | 57 | 37 | 155 | | 84 | | 514 | 152 | | 18 | 222 | 4 | | 1,301 | 2.18% |
| DEH | | | | 12 | | | | | | | | 18 | | | 25 | 0.04% |
| DEN | | | 112 | 10 | | | | | 4 | | | 52 | | | 181 | 0.30% |
| DIA | | | | | | | | | | | | | | | 10 | 0.02% |
| EEG | | | | | | | | | 1 | | | | | | 1 | 0.00% |
| EMR | | 10 | | 12 | | 6 | | 3 | 6 | | | 14 | | | 41 | 0.07% |
| ENT | | 28 | 39 | 23 | | 19 | | 21 | 75 | | | 152 | 6 | | 345 | 0.58% |
| GYN | | | | 113 | | 90 | | 21 | 39 | | | 189 | | | 489 | 0.82% |
| HND | | | 8 | 12 | | | | | | | | | | | 21 | 0.03% |
| IFD | | | | | | | | | | | | | | | 7 | 0.01% |
| MED | 573 | 753 | 1,935 | 2,619 | 39 | 572 | | 8,841 | 6,576 | 55 | 768 | 5,460 | 269 | | 28,458 | 47.75% |
| MIC | 15 | 115 | 50 | 58 | | 11 | | 678 | 247 | 1 | | 296 | | | 1,470 | 2.47% |
| MTR | | | | | | | | 8 | | | | | | | 11 | 0.02% |
| NBN | 3 | 25 | 12 | 30 | | 1,775 | | 86 | 1,541 | 1 | | 790 | 32 | | 4,295 | 7.21% |
| NEP | | | 10 | 8 | | | | | | | | | | | 18 | 0.03% |
| NEU | | | | | | 1 | | | | | | 1 | | | 3 | 0.00% |
| NIC | | | | 1 | | 76 | | | | | | | | | 77 | 0.13% |
| NRS | 7 | 19 | 62 | | | 17 | | 22 | 21 | | 28 | 72 | | | 247 | 0.41% |
| OBS | 11 | 57 | 72 | 189 | | 1,133 | | 46 | 742 | 15 | | 668 | 18 | | 2,950 | 4.95% |
| OMS | | 15 | 18 | 30 | | 8 | | 12 | 7 | | | 215 | | | 307 | 0.51% |
| ONC | | | 32 | 8 | | | | | 3 | | | | | | 43 | 0.07% |
| OPH | | | | 10 | | | | 3 | 15 | | | | | | 28 | 0.05% |
| OPS | | | | 1 | | | | | | | | | | | 1 | 0.00% |
| ORT | 33 | 178 | 239 | 392 | | 238 | | 380 | 354 | | 108 | 677 | 36 | | 2,632 | 4.42% |
| PCH | | | | | | | | | 6 | | | | | | 6 | 0.01% |
| PED | 52 | 146 | 6 | 18 | | 1,293 | | 7 | 580 | 33 | | 410 | 52 | | 2,597 | 4.36% |
| POD | | | 6 | 3 | | | | | | | | | | | 8 | 0.01% |
| RSP | | | | | | 6 | | | | | | | | | 6 | 0.01% |
| SIC | 3 | 195 | | 50 | | 68 | | 105 | 22 | | 35 | 168 | 15 | | 645 | 1.08% |
| SUB | 30 | 62 | | 1,047 | | 246 | | 66 | 452 | | 44 | 2,569 | 15 | | 4,531 | 7.60% |
| SUR | 269 | 416 | 593 | 1,022 | | 537 | 1 | 1,420 | 1,244 | 4 | 171 | 2,679 | 84 | 1 | 8,443 | 14.17% |
| TRA | | 12 | 4 | 6 | | 23 | | 1 | 3 | | 4 | 44 | | | 99 | 0.17% |
| URO | | 3 | 29 | 35 | | 11 | | 68 | 25 | | | 64 | 1 | | 235 | 0.39% |
| | 1,069 | 2,094 | 3,261 | 5,868 | 39 | 6,222 | 1 | 12,332 | 12,126 | 109 | 1,175 | 14,784 | 518 | 1 | 59,600 | 100.00% |
| | 1.79% | 3.51% | 5.47% | 9.85% | 0.06% | 10.44% | 0.00% | 20.69% | 20.35% | 0.18% | 1.97% | 24.80% | 0.87% | 0.00% | 100.00% | |

1. Annualized days by service/payor from PBC systems  Base period 1/1/00 to 9/21/00.
2. Data is not 'scrubbed'. Majority of Medicare days will most likely be reclassified to Medicaid for billing & audit purposes.

**PBC**
**DC GENERAL**

## FY00 PATIENT DAYS - 1/1/00 to 9/21/00

| Service | Blue Cross | Commercial | Corrections | Med Charity | Grants | MA MCO | Tricare | Medicare | Medicaid DC | M'caid Other | City Agency | Self Pay | MA Pending | W/Comp | Total | % to Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AMB | | | | | | | | | | | 1 | 4 | | | 5 | 0.01% |
| CAR | | 1 | | 4 | | 2 | | 23 | 5 | | | 8 | | | 45 | 0.10% |
| CCU | 42 | 41 | 27 | 112 | | 61 | | 372 | 110 | | 13 | 161 | 3 | | 942 | 2.18% |
| DEH | | | | 9 | | | | | | | | 13 | | | 18 | 0.04% |
| DEN | | | 81 | 7 | | 5 | | | 3 | | | 38 | | | 131 | 0.30% |
| DIA | | | | | | | | | | | | | | | 7 | 0.02% |
| EEG | | | | | | | | | 1 | | | | | | 1 | 0.00% |
| EMR | 1 | | | 9 | | 4 | | 2 | 4 | | | 10 | | | 30 | 0.07% |
| ENT | 5 | 7 | 28 | 17 | | 14 | | 15 | 54 | | | 110 | | | 250 | 0.58% |
| GYN | 3 | 20 | | 82 | | 65 | | 15 | 28 | | | 137 | 4 | | 354 | 0.82% |
| HND | | | 6 | 9 | | | | | | | | | | | 15 | 0.03% |
| | | | | 5 | | | | | | | | | | | 5 | 0.01% |
| IFD | 415 | 545 | 1401 | 1896 | 28 | 414 | | 6401 | 4761 | 40 | 556 | 3953 | 195 | | 20605 | 47.75% |
| MED | 11 | 83 | 36 | 42 | | 8 | | 491 | 179 | | | 214 | | | 1064 | 2.47% |
| MIC | | | | | | | | | 5 | | | 3 | | | 8 | 0.02% |
| MTR | 2 | 18 | 9 | 22 | | 1285 | | 62 | 1116 | 1 | | 572 | 23 | | 3110 | 7.21% |
| NBN | | | 7 | | | | | 6 | | | | | | | 13 | 0.03% |
| NEP | | | | | | 1 | | | | | | 1 | | | 2 | 0.00% |
| NEU | | | | | | 55 | | | | | | 1 | | | 56 | 0.13% |
| NIC | | | | | | 12 | | 16 | 15 | | 20 | 52 | | | 179 | 0.41% |
| NRS | 5 | 14 | 45 | 137 | | 820 | | 33 | 537 | | | 484 | | | 2136 | 4.95% |
| OBS | 8 | 41 | 52 | 22 | | | | | | 11 | | 156 | 13 | | 222 | 0.51% |
| OMS | | 11 | 13 | 7 | | 6 | | 9 | 5 | | | | | | 31 | 0.07% |
| ONC | | | 23 | 6 | | | | 2 | 11 | | | | | | 20 | 0.05% |
| OPH | | | | 1 | | | | | | | | | | | 1 | 0.00% |
| OPS | 24 | 129 | 173 | 284 | | 172 | | 275 | 256 | | 77 | 490 | 26 | | 1906 | 4.42% |
| ORT | | | | | | | | | 4 | | | | | | 4 | 0.01% |
| PCH | 38 | 106 | 3 | 13 | | 936 | | 5 | 420 | 24 | | 297 | 38 | | 1880 | 4.36% |
| PED | | | 4 | 2 | | | | | | | | | | | 6 | 0.01% |
| POD | | | | | | | | | | | | | | | 4 | 0.01% |
| RSP | | | | | | 4 | | | | | | | | | 4 | 0.01% |
| SIC | 2 | 141 | | 36 | | 49 | | 76 | 16 | | 25 | 122 | | | 467 | 1.08% |
| SUB | 22 | 45 | | 758 | | 178 | | 48 | 327 | | 32 | 1860 | 11 | | 3281 | 7.60% |
| SUR | 195 | 301 | 429 | 740 | | 389 | 1 | 1028 | 901 | 3 | 124 | 1940 | 61 | 1 | 6113 | 14.17% |
| TRA | 1 | 9 | 3 | 4 | | 17 | | 1 | 2 | | 3 | 32 | 1 | | 72 | 0.17% |
| URO | | 2 | 21 | 25 | | 8 | | 49 | 18 | | | 46 | | | 170 | 0.39% |
| | 774 | 1516 | 2361 | 4249 | 28 | 4505 | 1 | 8929 | 6780 | 79 | 851 | 10704 | 375 | 1 | 43153 | 100.00% |
| | 1.79% | 3.51% | 5.47% | 9.85% | 0.06% | 10.44% | 0.00% | 20.69% | 20.35% | 0.18% | 1.97% | 24.60% | 0.87% | 0.00% | 100.00% | |

**PBC**
**DC GENERAL**

| Service | Blue Cross | Commercial | Corrections | Med Charity | Grants | MA MCO | Tricare | Medicare | Medicaid DC | Mcaid Other | City Agency | Self Pay | MA Pending | WkComp | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AMB | | 20.00% | | | | | | | | | | 80.00% | | | 100.00% |
| CAR | | 4.44% | | 8.89% | | 4.44% | | 51.11% | 11.11% | | 2.22% | 17.78% | | | 100.00% |
| CCU | 4.46% | 4.35% | 2.87% | 11.89% | | 6.48% | | 39.49% | 11.68% | | 1.38% | 17.09% | 0.32% | | 100.00% |
| DEH | | | | | | 27.78% | | | | | | 72.22% | | | 100.00% |
| DEN | | | 61.83% | 6.87% | | | | | 2.29% | | | 29.01% | | | 100.00% |
| DIA | | | | 100.00% | | | | | | | | | | | 100.00% |
| EEG | 3.33% | | | 30.00% | | 13.33% | | 6.67% | 13.33% | | | 33.33% | | | 100.00% |
| EMR | 2.00% | 2.80% | 11.20% | 6.80% | | 5.60% | | 6.00% | 21.60% | | | 44.00% | | | 100.00% |
| ENT | | | | | | | | | | | | | | | |
| GYN | 0.85% | 5.65% | | 23.16% | | 18.36% | | 4.24% | 7.91% | | | 38.70% | 1.13% | | 100.00% |
| HND | | | 40.00% | 60.00% | | | | | | | | | | | 100.00% |
| IFD | 2.01% | 2.64% | 6.80% | 9.20% | 0.14% | 2.01% | | 31.07% | 23.11% | 0.18% | 2.70% | 19.18% | 0.95% | | 100.00% |
| MED | 1.03% | 7.80% | 3.38% | 3.95% | | 0.75% | | 46.15% | 16.82% | | | 20.11% | | | 100.00% |
| MIC | | | | | | | | | 62.50% | | | 37.50% | | | 100.00% |
| MTR | | | | | | | | | | | | | | | |
| NBN | 0.06% | 0.58% | 0.29% | 0.71% | | 41.32% | | 1.99% | 35.88% | 0.03% | | 18.39% | 0.74% | | 100.00% |
| NEP | | | 53.85% | | | | | 10.00% | 6.45% | | 11.17% | | | | 100.00% |
| NEU | | | | | | 98.21% | | | | | | 1.79% | | | 100.00% |
| NIC | | | | | | 50.00% | | | | | | 50.00% | | | 100.00% |
| NRS | 2.79% | 7.82% | 25.14% | 6.41% | | 8.70% | | 8.94% | 8.38% | 0.51% | | 29.05% | 0.61% | | 100.00% |
| OBS | 0.37% | 1.92% | 2.43% | 9.91% | | 38.59% | | 1.54% | 25.14% | | | 22.66% | | | 100.00% |
| OMS | | 4.95% | 5.86% | 19.35% | | 2.70% | | 4.05% | 2.25% | | | 70.27% | | | 100.00% |
| ONC | | | | 35.00% | | | | 10.00% | 55.00% | | | | | | 100.00% |
| OPH | | | 74.19% | | | | | | | | | | | | 100.00% |
| OPS | | | | 100.00% | | | | | | | | | | | 100.00% |
| ORT | 1.26% | 6.77% | 9.08% | 14.80% | | 9.02% | | 14.43% | 13.43% | | 4.04% | 25.71% | 1.36% | | 100.00% |
| PCH | | | | | | | | | 100.00% | | | | | | 100.00% |
| PED | 2.02% | 5.64% | 0.16% | 0.69% | | 49.79% | | 0.27% | 22.34% | 1.28% | | 15.80% | 2.02% | | 100.00% |
| POD | | | 66.67% | 33.33% | | | | | | | | | | | 100.00% |
| RSP | | | | | | 100.00% | | | | | | | | | 100.00% |
| SIC | 0.43% | 30.19% | | 7.71% | | 10.49% | | 16.27% | 3.43% | 0.09% | 5.35% | 26.12% | 0.34% | | 100.00% |
| SUB | 0.67% | 1.37% | | 23.10% | | 5.43% | | 1.46% | 9.97% | | 0.98% | 56.69% | 0.34% | | 100.00% |
| SUR | 3.19% | 4.92% | 7.02% | 12.11% | | 6.36% | 0.02% | 16.82% | 14.74% | 0.05% | 2.03% | 31.74% | 1.00% | 0.02% | 100.00% |
| TRA | 1.39% | 12.50% | 4.17% | 5.56% | | 23.61% | | 1.39% | 2.78% | | 4.17% | 44.44% | | | 100.00% |
| URO | 1.18% | | 12.35% | 14.71% | | 4.71% | | 28.82% | 10.59% | | 1.97% | 27.06% | 0.59% | | 100.00% |
| | 1.79% | 3.51% | 5.47% | 9.65% | 0.06% | 10.44% | 0.00% | 20.69% | 20.35% | 0.18% | 1.97% | 24.80% | 0.87% | 0.00% | 100.00% |

**D.C.G.H.**
**STATISTICAL SUMMARY - ACTUAL**
**BY MONTH AND YTD - FY 1999**

| DESCRIPTION | OCT. 98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | YTD FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A. PATIENT DAYS** | | | | | | | | | | | | | |
| ADULTS | 4,830 | 5,039 | 5,167 | 5,020 | 4,871 | 5,335 | 4,868 | 5,184 | 4,891 | 5,002 | 4,668 | 5,030 | 59,905 |
| NURSERY | 514 | 408 | 466 | 555 | 375 | 418 | 280 | 542 | 577 | 557 | 602 | 496 | 5,790 |
| TOTAL | 5,344 | 5,447 | 5,633 | 5,575 | 5,246 | 5,753 | 5,148 | 5,726 | 5,468 | 5,559 | 5,270 | 5,526 | 65,695 |
| **B. AVERAGE DAILY CENSUS** | | | | | | | | | | | | | |
| EXCLUDING NEWBORN | 155.8 | 168.0 | 166.7 | 161.9 | 174.0 | 172.1 | 162.3 | 167.2 | 163.0 | 161.4 | 150.6 | 167.7 | 164.2 |
| INCLUDING NEWBORN | 172.4 | 181.6 | 181.7 | 179.8 | 187.4 | 185.6 | 171.6 | 184.7 | 182.3 | 179.3 | 170.0 | 184.2 | 180.0 |
| **C. OPERATING BEDS** | | | | | | | | | | | | | |
| EXCLUDING NEWBORN | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 |
| INCLUDING NEWBORN | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 |
| **D. % OCCUPANCY** | | | | | | | | | | | | | |
| EXCLUDING NEWBORN | 62.3% | 67.2% | 66.7% | 64.8% | 69.6% | 68.8% | 64.9% | 66.9% | 65.2% | 64.5% | 60.2% | 67.1% | 65.7% |
| INCLUDING NEWBORN | 53.5% | 56.4% | 56.4% | 55.9% | 58.2% | 57.6% | 53.3% | 57.4% | 56.6% | 55.7% | 52.8% | 57.2% | 55.9% |
| **E. ADMISSIONS** | | | | | | | | | | | | | |
| ADULT | 834 | 786 | 794 | 849 | 789 | 904 | 822 | 870 | 901 | 863 | 867 | 918 | 10,197 |
| NEWBORN | 75 | 57 | 71 | 72 | 46 | 68 | 46 | 63 | 56 | 71 | 62 | 79 | 766 |
| TOTAL | 909 | 843 | 865 | 921 | 835 | 972 | 868 | 933 | 957 | 934 | 929 | 997 | 10,963 |
| **F. DISCHARGES** | | | | | | | | | | | | | |
| ADULT | 866 | 782 | 813 | 845 | 759 | 897 | 852 | 848 | 908 | 869 | 875 | 754 | 10,068 |
| NEWBORN | 81 | 56 | 71 | 71 | 45 | 68 | 53 | 56 | 61 | 70 | 65 | 61 | 758 |
| TOTAL | 947 | 838 | 884 | 916 | 804 | 965 | 905 | 904 | 969 | 939 | 940 | 815 | 10,826 |
| **G. AVERAGE LENGTH OF STAY** | | | | | | | | | | | | | |
| ADULT | 5.6 | 6.4 | 6.4 | 5.9 | 6.4 | 5.9 | 5.7 | 6.1 | 5.4 | 5.8 | 5.3 | 6.7 | 6.0 |
| NEWBORN | 6.3 | 7.3 | 6.6 | 7.8 | 8.3 | 6.1 | 5.3 | 9.7 | 9.5 | 8.0 | 9.3 | 8.1 | 7.6 |
| TOTAL | 5.6 | 6.5 | 6.4 | 6.1 | 6.5 | 6.0 | 5.7 | 6.3 | 5.6 | 5.9 | 5.6 | 6.8 | 6.1 |
| **H. OUTPATIENT & E.R.** | | | | | | | | | | | | | |
| E.R. VISITS ADULT | 3,765 | 3,630 | 3,632 | 3,890 | 3,654 | 3,892 | 3,827 | 3,944 | 3,968 | 4,089 | 4,013 | 3,062 | 45,366 |
| E.R. VISITS OBSTETRICS | 172 | 167 | 174 | 180 | 142 | 149 | 131 | 187 | 200 | 212 | 196 | 124 | 2,034 |
| E.R. VISITS PEDIATRIC | 455 | 381 | 376 | 558 | 534 | 448 | 409 | 389 | 327 | 386 | 395 | 386 | 5,044 |
| TOTAL E.R. | 4,392 | 4,178 | 4,182 | 4,628 | 4,330 | 4,489 | 4,367 | 4,520 | 4,495 | 4,687 | 4,604 | 3,572 | 52,444 |
| **I. O-P VISITS** | | | | | | | | | | | | | |
| O-P VISITS | 8,280 | 7,248 | 7,567 | 7,244 | 7,403 | 8,687 | 7,883 | 7,512 | 7,853 | 7,202 | 7,977 | 5,756 | 90,612 |
| TOTAL O.P & E.R | 12,672 | 11,426 | 11,749 | 11,872 | 11,733 | 13,176 | 12,250 | 12,032 | 12,348 | 11,889 | 12,581 | 9,328 | 143,056 |
| **J. MINUTES** | | | | | | | | | | | | | |
| OPERATING ROOM | 22,320 | 23,010 | 30,840 | 21,960 | 27,960 | 29,010 | 31,890 | 17,310 | 27,060 | 30,180 | 20,550 | 54,060 | 336,150 |
| RECOVERY ROOM | 10,890 | 9,690 | 15,930 | 13,890 | 15,060 | 15,810 | 17,010 | 14,010 | 13,020 | 22,740 | 10,980 | 27,360 | 166,390 |
| **CASES** | | | | | | | | | | | | | |
| OPERATING ROOM | 181 | 165 | 244 | 188 | 213 | 228 | 228 | 159 | 205 | 242 | 155 | 401 | 2,609 |
| RECOVERY ROOM | 141 | 127 | 198 | 165 | 178 | 188 | 195 | 160 | 165 | 292 | 137 | 354 | 2,300 |
| AM. SURG CTR. CASES | 209 | 153 | 137 | 146 | 152 | 183 | 124 | 138 | 153 | 138 | 141 | 117 | 1,791 |
| **K. DELIVERIES** | 75 | 57 | 71 | 72 | 46 | 68 | 46 | 63 | 56 | 71 | 62 | 79 | 766 |
| **L. REFERRED OUTPATIENTS** | 2,942 | 1,234 | 730 | 1,193 | 1,274 | 1,545 | 870 | 1,348 | 966 | 932 | 1,535 | 1,243 | 15,812 |

99 stats

# D.C.G.H.
## PATIENT DAYS
### BY NURSING UNIT
### BY MONTH AND YTD - FY 1999

| SERVICE CODE | NURSING UNITS | OCT. 98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **MEDICINE / SURGERY** | | | | | | | | | | | | | |
| 42 | ADULT SUBSTANCE ABUSE | 459 | 471 | 418 | 464 | 405 | 453 | 430 | 509 | 505 | 483 | 448 | 510 | 5,555 |
| 4N | MEDICINE | 771 | 786 | 768 | 819 | 769 | 804 | 765 | 809 | 757 | 802 | 787 | 780 | 9,417 |
| 44N | MEDICINE | 331 | 377 | 301 | 196 | 251 | 223 | 364 | 319 | 312 | 314 | 339 | 335 | 3,662 |
| 51N & 51S | LCW'KWARD | 941 | 921 | 940 | 963 | 916 | 967 | 916 | 960 | 947 | 917 | 864 | 893 | 11,145 |
| 12 N & S | MED/SURGERY | 524 | 560 | 575 | 532 | 560 | 532 | 400 | 491 | 408 | 521 | 378 | 451 | 5,932 |
| 13S | SURGERY | 604 | 613 | 696 | 614 | 714 | 832 | 705 | 797 | 738 | 809 | 628 | 784 | 8,534 |
| | SUBTOTAL | 3,630 | 3,728 | 3,698 | 3,588 | 3,615 | 3,811 | 3,580 | 3,885 | 3,667 | 3,846 | 3,444 | 3,753 | 44,245 |
| PEDS. | PEDIATRICS | 168 | 217 | 227 | 292 | 282 | 364 | 285 | 208 | 226 | 201 | 206 | 230 | 2,906 |
| OB1 | OBSTETRICS | 289 | 269 | 384 | 327 | 240 | 335 | 260 | 307 | 270 | 280 | 303 | 320 | 3,584 |
| | **CRITICAL CARE** | | | | | | | | | | | | | |
| CCU | CCU | 243 | 244 | 253 | 245 | 271 | 250 | 222 | 228 | 212 | 201 | 198 | 219 | 2,736 |
| MICU | MICU | 261 | 270 | 277 | 273 | 241 | 277 | 250 | 266 | 258 | 229 | 252 | 263 | 3,119 |
| SICU | SICU | 239 | 311 | 328 | 295 | 272 | 298 | 271 | 288 | 258 | 245 | 265 | 245 | 3,315 |
| | SUBTOTAL | 743 | 825 | 858 | 813 | 734 | 825 | 743 | 784 | 728 | 675 | 715 | 727 | 9,170 |
| | **NURSERY** | | | | | | | | | | | | | |
| NUR | NURSERY | 84 | 52 | 78 | 89 | 46 | 81 | 51 | 59 | 57 | 82 | 100 | 41 | 820 |
| NICU | NICU | 153 | 125 | 179 | 225 | 147 | 148 | 107 | 269 | 216 | 220 | 213 | 259 | 2,261 |
| PN | PREMATURE NURSERY | 277 | 231 | 209 | 241 | 182 | 189 | 122 | 214 | 304 | 255 | 289 | 196 | 2,709 |
| | SUBTOTAL | 514 | 408 | 466 | 555 | 375 | 418 | 280 | 542 | 577 | 557 | 602 | 496 | 5,790 |
| | **TOTAL** | 5,344 | 5,447 | 5,633 | 5,575 | 5,246 | 5,753 | 5,148 | 5,726 | 5,468 | 5,559 | 5,270 | 5,526 | 65,695 |
| BB | BOARDER BABIES (INCLUDED IN PEDS.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**D.C.G.H.**
**ADMISSIONS**
**BY NURSING UNIT**
**BY MONTH AND YTD - FY 1999**

| SERVICE CODE | NURSING UNITS | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **MEDICINE / SURGERY** | | | | | | | | | | | | | |
| 42 | ADULT SUBSTANCE ABUSE | 79 | 86 | 77 | 81 | 68 | 94 | 94 | 78 | 89 | 82 | 88 | 91 | 1,007 |
| 43N | MEDICINE | 113 | 89 | 98 | 105 | 97 | 103 | 112 | 113 | 111 | 106 | 96 | 114 | 1,257 |
| 44N | LOCKWARD | 41 | 42 | 31 | 31 | 35 | 47 | 39 | 42 | 34 | 59 | 48 | 41 | 490 |
| 52N & 52S | MEDICINE | 113 | 108 | 119 | 121 | 96 | 126 | 109 | 118 | 117 | 94 | 121 | 109 | 1,351 |
| 12 N & S | SURGERY | 102 | 104 | 109 | 108 | 91 | 115 | 105 | 118 | 118 | 102 | 130 | 124 | 1,326 |
| 23S | SURGERY | 78 | 89 | 71 | 98 | 105 | 115 | 89 | 105 | 111 | 99 | 84 | 117 | 1,161 |
| | SUBTOTAL | 526 | 518 | 505 | 544 | 492 | 600 | 548 | 574 | 580 | 542 | 567 | 596 | 6,592 |
| PEDS. | PEDIATRICS | 66 | 66 | 64 | 81 | 76 | 76 | 65 | 55 | 70 | 56 | 61 | 75 | 811 |
| OB2 | OBSTETRICS | 100 | 86 | 105 | 100 | 92 | 96 | 82 | 100 | 89 | 96 | 88 | 98 | 1,132 |
| | **CRITICAL CARE** | | | | | | | | | | | | | |
| CCU | CCU | 40 | 59 | 62 | 60 | 50 | 58 | 53 | 61 | 63 | 72 | 63 | 54 | 695 |
| MICU | MICU | 45 | 23 | 33 | 25 | 35 | 30 | 52 | 48 | 46 | 55 | 57 | 51 | 500 |
| SICU | SICU | 57 | 34 | 25 | 39 | 44 | 44 | 22 | 32 | 53 | 42 | 31 | 44 | 467 |
| | SUBTOTAL | 142 | 116 | 120 | 124 | 129 | 132 | 127 | 141 | 162 | 169 | 151 | 149 | 1,662 |
| NUR | NURSERY | 33 | 25 | 28 | 34 | 16 | 29 | 21 | 23 | 18 | 33 | 32 | 19 | 311 |
| NICU | NURSERY | 7 | 17 | 12 | 14 | 6 | 13 | 9 | 11 | 11 | 11 | 6 | 27 | 144 |
| PN | PREMATURE NURSERY | 35 | 15 | 31 | 24 | 24 | 26 | 16 | 29 | 27 | 27 | 24 | 33 | 311 |
| | SUBTOTAL | 75 | 57 | 71 | 72 | 46 | 68 | 46 | 63 | 56 | 71 | 62 | 79 | 766 |
| | **TOTAL** | 909 | 843 | 865 | 921 | 835 | 972 | 868 | 933 | 957 | 934 | 929 | 997 | 10,963 |
| BB | BOARDER BABIES (INCLUDED IN PEDS.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

## D.C.G.H.
## DISCHARGES
## BY NURSING UNIT
## BY MONTH AND YTD - FY 1999

| SERVICE CODE | NURSING UNITS | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **MEDICINE / SURGERY** | | | | | | | | | | | | | |
| 41 | ADULT SUBSTANCE ABUSE | 83 | 93 | 73 | 85 | 66 | 86 | 98 | 89 | 75 | 86 | 87 | 81 | 1,002 |
| 4JN | MEDICINE | 114 | 93 | 100 | 101 | 90 | 109 | 107 | 105 | 110 | 103 | 95 | 120 | 1,247 |
| 44N | L & W WARD | 46 | 37 | 35 | 35 | 34 | 40 | 45 | 34 | 51 | 56 | 46 | 35 | 494 |
| 52N & 52S | MEDICINE | 116 | 109 | 120 | 121 | 92 | 125 | 115 | 113 | 122 | 98 | 121 | 73 | 1,325 |
| 22 N & S | SURGERY | 112 | 106 | 107 | 103 | 97 | 114 | 110 | 111 | 125 | 100 | 143 | 98 | 1,326 |
| 23S | SURGERY | 85 | 87 | 74 | 100 | 92 | 117 | 91 | 97 | 116 | 100 | 87 | 82 | 1,128 |
| | SUBTOTAL | 556 | 525 | 509 | 545 | 471 | 591 | 566 | 549 | 599 | 543 | 579 | 489 | 6,522 |
| PEDS. | PEDIATRICS | 68 | 59 | 72 | 79 | 71 | 72 | 72 | 63 | 61 | 59 | 60 | 58 | 794 |
| OB2 | OBSTETRICS | 96 | 86 | 110 | 98 | 86 | 100 | 88 | 93 | 87 | 99 | 87 | 76 | 1,106 |
| | **CRITICAL CARE** | | | | | | | | | | | | | |
| CCU | CCU | 40 | 60 | 61 | 60 | 50 | 58 | 52 | 60 | 65 | 69 | 63 | 45 | 683 |
| MICU | MICU | 45 | 23 | 34 | 24 | 36 | 31 | 53 | 48 | 46 | 58 | 55 | 43 | 496 |
| SICU | SICU | 61 | 29 | 27 | 39 | 45 | 45 | 21 | 35 | 50 | 41 | 31 | 43 | 467 |
| | SUBTOTAL | 146 | 112 | 122 | 123 | 131 | 134 | 126 | 143 | 161 | 168 | 149 | 131 | 1,646 |
| NUR | NURSERY | 33 | 24 | 29 | 35 | 13 | 31 | 23 | 19 | 24 | 31 | 35 | 24 | 321 |
| NICU | NURSERY | 13 | 14 | 10 | 15 | 8 | 13 | 9 | 11 | 13 | 10 | 6 | 16 | 138 |
| PN | PREMATURE NURSERY | 35 | 18 | 32 | 21 | 24 | 24 | 21 | 26 | 24 | 29 | 24 | 21 | 299 |
| | SUBTOTAL | 81 | 56 | 71 | 71 | 45 | 68 | 53 | 56 | 61 | 70 | 65 | 61 | 758 |
| | **TOTAL** | 947 | 838 | 884 | 916 | 804 | 965 | 905 | 904 | 969 | 939 | 940 | 815 | 10,826 |
| BR | BOARDER BABIES (INCLUDED IN PEDS.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

# D.C.G.H.
## AVERAGE LENGTH OF STAY
## BY NURSING UNIT
## BY MONTH AND YTD - FY 1999

| SERVICE CODE | NURSING UNITS | Oct-98 | Nov-98 | Dec-08 | Jan-99 | Feb-99 | Mar-99 | Apr-99 | May-99 | Jun-99 | Jul-99 | Aug-99 | Sep-99 | YTD FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **MEDICINE** | | | | | | | | | | | | | |
| 42 | ADULT SUBSTANCE ABUSE | 5.5 | 5.1 | 5.7 | 5.5 | 6.1 | 5.3 | 4.4 | 5.7 | 6.7 | 5.6 | 5.1 | 6.3 | 5.6 |
| 43N | MEDICINE | 6.8 | 8.5 | 7.7 | 8.1 | 8.5 | 7.4 | 7.1 | 7.7 | 6.9 | 7.8 | 8.3 | 6.5 | 7.6 |
| 44N | LMKWARD | 7.2 | 10.2 | 8.6 | 5.6 | 7.4 | 5.6 | 8.1 | 9.4 | 6.1 | 5.6 | 7.4 | 9.6 | 7.6 |
| 52N & 51S | MEDICINE | 8.1 | 8.4 | 7.8 | 8.0 | 10.0 | 7.7 | 8.0 | 8.5 | 7.8 | 9.4 | 7.1 | 12.2 | 8.6 |
| 12 N & S | SURGERY | 4.7 | 5.3 | 5.4 | 5.2 | 5.8 | 4.7 | 3.6 | 4.4 | 3.3 | 5.2 | 2.6 | 4.6 | 4.6 |
| 23S | SURGERY | 7.1 | 7.0 | 9.4 | 6.1 | 7.8 | 7.1 | 7.7 | 8.2 | 6.4 | 8.1 | 7.2 | 9.6 | 7.6 |
| | SUBTOTAL | 6.5 | 7.1 | 7.3 | 6.6 | 7.7 | 6.4 | 6.3 | 7.1 | 6.1 | 7.1 | 5.9 | 7.7 | 6.8 |
| PEDS. | PEDIATRICS | 2.5 | 3.7 | 3.2 | 3.7 | 4.0 | 5.1 | 4.0 | 3.3 | 3.7 | 3.4 | 3.4 | 4.0 | 3.6 |
| OB2 | OBSTETRICS | 3.0 | 3.1 | 3.5 | 3.3 | 2.8 | 3.4 | 3.0 | 3.3 | 3.1 | 2.8 | 3.5 | 4.2 | 3.2 |
| | **CRITICAL CARE** | | | | | | | | | | | | | |
| CCU | CCU | 6.1 | 4.1 | 4.1 | 4.1 | 4.4 | 4.3 | 4.3 | 3.8 | 3.3 | 2.9 | 3.1 | 4.9 | 4.1 |
| MICU | MICU | 5.8 | 11.7 | 8.1 | 11.4 | 6.7 | 8.9 | 4.7 | 5.6 | 5.6 | 3.9 | 4.6 | 6.1 | 6.9 |
| SICU | SICU | 3.9 | 10.7 | 12.1 | 7.6 | 6.0 | 6.6 | 12.9 | 8.2 | 5.2 | 6.0 | 8.5 | 5.7 | 7.8 |
| | SUBTOTAL | 5.1 | 7.4 | 7.0 | 6.6 | 5.6 | 6.2 | 5.9 | 5.5 | 4.5 | 4.0 | 4.8 | 5.5 | 5.7 |
| NUR | NURSERY | 2.5 | 2.2 | 2.7 | 2.5 | 3.5 | 2.6 | 2.2 | 3.1 | 2.4 | 2.6 | 2.9 | 1.7 | 2.6 |
| NICU | NURSERY | 11.8 | 8.9 | 17.9 | 15.0 | 18.4 | 11.4 | 11.9 | 24.5 | 16.6 | 22.0 | 35.5 | 16.2 | 17.5 |
| PN | PREMATURE NURSERY | 7.9 | 12.8 | 12.1 | 11.5 | 7.6 | 7.9 | 5.8 | 8.2 | 12.7 | 8.8 | 12.0 | 9.3 | 9.3 |
| | SUBTOTAL | 6.3 | 7.3 | 6.6 | 7.8 | 8.3 | 6.1 | 5.3 | 9.7 | 9.5 | 8.0 | 9.3 | 8.1 | 7.7 |
| | **TOTAL** | 5.6 | 6.5 | 6.4 | 6.1 | 6.5 | 6.0 | 5.7 | 6.3 | 5.6 | 5.9 | 5.6 | 6.8 | 6.1 |
| BB | BOARDER BABIES (INCLUDED IN PEDS.) | 0 | 0 | 0.0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |

## D.C.G.H.
## OCCUPIED BEDS
## BY NURSING UNIT
## BY MONTH AND YTD - FY 1999

| SERVICE CODE | NURSING UNITS | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **MEDICINE** | | | | | | | | | | | | | |
| 42 | ADULT NURSTAN'T ABUSE | 14.8 | 15.7 | 13.5 | 15.0 | 14.5 | 14.6 | 14.3 | 16.4 | 16.8 | 15.6 | 14.5 | 17.0 | 15.2 |
| 43N | MEDICINE | 24.9 | 26.2 | 24.8 | 26.4 | 27.5 | 25.9 | 25.5 | 26.1 | 25.2 | 25.9 | 25.4 | 26.0 | 25.8 |
| 44N | LOCKWARD | 10.7 | 12.6 | 9.7 | 6.3 | 9.0 | 7.2 | 12.1 | 10.3 | 10.4 | 10.1 | 10.9 | 11.2 | 10.0 |
| 52N & 52S | MEDICINE | 30.4 | 30.7 | 30.3 | 31.1 | 32.7 | 31.2 | 30.5 | 31.0 | 31.6 | 29.6 | 27.9 | 29.8 | 30.6 |
| 63 | MEDICINE | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 21 N & S | SURGERY | 16.9 | 18.7 | 18.5 | 17.2 | 20.0 | 17.2 | 13.3 | 15.8 | 13.6 | 16.8 | 12.2 | 15.0 | 16.3 |
| 23S | SURGERY | 19.5 | 20.4 | 22.5 | 19.8 | 25.5 | 26.8 | 23.5 | 25.7 | 24.6 | 26.1 | 20.3 | 26.1 | 23.4 |
| | SUBTOTAL | 117.1 | 124.3 | 119.3 | 115.7 | 129.1 | 122.9 | 119.3 | 125.3 | 122.2 | 124.1 | 111.1 | 125.1 | 121.3 |
| PEDS. | PEDIATRICS | 5.4 | 7.2 | 7.3 | 9.4 | 10.1 | 11.7 | 9.5 | 6.7 | 7.5 | 6.5 | 6.6 | 7.7 | 8.0 |
| OB2 | OBSTETRICS | 9.3 | 9.0 | 12.4 | 10.5 | 8.6 | 10.8 | 8.7 | 9.9 | 9.0 | 9.0 | 9.8 | 10.7 | 9.8 |
| | **CRITICAL CARE** | | | | | | | | | | | | | |
| CCU | CCU | 7.8 | 8.1 | 8.2 | 7.9 | 7.9 | 8.1 | 7.4 | 7.4 | 7.1 | 6.5 | 6.4 | 7.3 | 7.5 |
| MICU | MICU | 8.4 | 9.0 | 8.9 | 8.8 | 8.6 | 8.9 | 8.3 | 8.6 | 8.6 | 7.4 | 8.1 | 8.8 | 8.5 |
| SICU | SICU | 7.7 | 10.4 | 10.6 | 9.5 | 9.7 | 9.6 | 9.0 | 9.3 | 8.6 | 7.9 | 8.5 | 8.2 | 9.1 |
| | SUBTOTAL | 24.0 | 27.5 | 27.7 | 26.2 | 26.2 | 26.6 | 24.8 | 25.3 | 24.3 | 21.8 | 23.1 | 24.2 | 25.1 |
| NUR | NURSERY | 2.7 | 1.7 | 2.5 | 2.9 | 1.6 | 2.6 | 1.7 | 1.9 | 1.9 | 2.6 | 3.2 | 1.4 | 2.2 |
| NICU | NICU | 4.9 | 4.2 | 5.8 | 7.3 | 5.3 | 4.8 | 3.6 | 8.7 | 7.2 | 7.1 | 6.9 | 8.6 | 6.2 |
| PN | PREMATURE NURSERY | 8.9 | 7.7 | 6.7 | 7.8 | 6.5 | 6.1 | 4.1 | 6.9 | 10.1 | 8.2 | 9.3 | 6.5 | 7.4 |
| | SUBTOTAL | 16.6 | 13.6 | 15.0 | 17.9 | 13.4 | 13.5 | 9.3 | 17.5 | 19.2 | 18.0 | 19.4 | 16.5 | 15.8 |
| | **TOTAL** | 172.4 | 181.6 | 181.7 | 179.8 | 187.4 | 185.6 | 171.6 | 184.7 | 182.3 | 179.3 | 170.0 | 184.2 | 180.0 |

10/13/99

99-stats

D.C.G.H.
OPERATING BEDS
BY NURSING UNIT
BY MONTH AND YTD - FY 1999

| SERVICE CODE | NURSING UNITS | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **MEDICINE** | | | | | | | | | | | | | |
| 42 | ADULT SUBSTANCE ABUSE | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 |
| 43N | MEDICINE | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 | 29.0 |
| 44N | LINKWARD | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 |
| 52N & 53S | MEDICINE | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 | 35.0 |
| 63 | MEDICINE | 33.0 | 33.0 | 33.0 | 33.0 | 33.0 | 29.0 | 29.0 | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 | 28.2 |
| 21N & S | SURGERY | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 |
| 13S | SURGERY | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 | 27.0 | 27.0 | 33.0 | 33.0 | 33.0 | 33.0 | 33.0 | 27.8 |
| | SUBTOTAL | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 | 181.0 |
| PEDS. | PEDIATRICS | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 | 26.0 |
| OB2 | OBSTETRICS | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 |
| | **CRITICAL CARE** | | | | | | | | | | | | | |
| CCU | CCU | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| MICU | MICU | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 |
| SICU | SICU | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| | SUBTOTAL | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 | 27.0 |
| NUR | NURSERY | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 |
| NICU | NURSERY NICU | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| PN | PREMATURE NURSERY | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 |
| | SUBTOTAL | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 | 72.0 |
| | **TOTAL** | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 |

**D.C.G.H.**
**PERCENTAGE OF OCCUPANCY**
**BY NURSING UNIT**
**BY MONTH AND YTD - FY 1999**

| SERVICE CODE | NURSING UNITS | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **MEDICINE** | | | | | | | | | | | | | |
| 42 | ADULT SUBSTANCE ABUSE | 74.0% | 78.5% | 67.4% | 74.8% | 72.3% | 73.1% | 71.7% | 82.1% | 84.2% | 77.9% | 72.3% | 85.0% | 76.1% |
| 43N | MEDICINE | 85.8% | 90.3% | 85.4% | 91.1% | 94.7% | 89.4% | 87.9% | 90.0% | 87.0% | 89.2% | 87.5% | 89.7% | 89.0% |
| 44N | LN'KWARD | 66.7% | 78.5% | 60.7% | 39.5% | 56.0% | 45.0% | 75.8% | 64.3% | 65.0% | 63.3% | 68.3% | 69.8% | 62.8% |
| 52N & 52S | MEDICINE | 86.7% | 87.7% | 86.6% | 88.8% | 93.5% | 89.1% | 87.2% | 88.5% | 90.2% | 84.5% | 85.0% | 85.0% | 87.3% |
| 61 | MEDICINE | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 12 N & S | SURGERY | 67.6% | 74.7% | 74.2% | 68.6% | 80.0% | 68.6% | 53.3% | 63.4% | 54.4% | 67.2% | 48.8% | 60.1% | 65.1% |
| 23S | SURGERY | 84.7% | 88.8% | 97.6% | 86.1% | 110.9% | 99.4% | 87.0% | 77.9% | 74.5% | 79.1% | 61.4% | 79.2% | 85.6% |
| | SUBTOTAL | 64.7% | 68.7% | 65.9% | 63.9% | 71.3% | 67.9% | 65.9% | 69.2% | 67.5% | 68.5% | 61.4% | 69.1% | 67.0% |
| PEDS. | PEDIATRICS | 20.8% | 27.8% | 28.2% | 36.2% | 38.7% | 45.2% | 36.5% | 25.8% | 29.0% | 24.9% | 25.6% | 29.5% | 30.7% |
| OB | OBSTETRICS | 58.3% | 56.0% | 77.4% | 65.9% | 53.6% | 67.5% | 54.2% | 61.9% | 56.3% | 56.5% | 61.1% | 66.7% | 61.3% |
| | **CRITICAL CARE** | | | | | | | | | | | | | |
| CCU | CCU | 98.0% | 101.7% | 102.0% | 98.8% | 98.7% | 100.8% | 92.5% | 91.9% | 88.3% | 81.0% | 79.8% | 91.3% | 93.7% |
| MICU | MICU | 93.5% | 100.0% | 99.3% | 97.8% | 95.6% | 99.3% | 92.6% | 96.1% | 95.6% | 82.1% | 90.3% | 97.4% | 95.0% |
| SICU | SICU | 77.1% | 103.7% | 105.8% | 95.2% | 97.1% | 96.1% | 90.3% | 92.9% | 86.0% | 79.0% | 85.5% | 81.7% | 90.9% |
| | SUBTOTAL | 88.8% | 101.9% | 102.5% | 97.1% | 97.1% | 98.6% | 91.7% | 93.7% | 89.9% | 80.6% | 85.4% | 89.8% | 93.1% |
| NUR | NURSERY | 15.9% | 10.2% | 14.8% | 16.9% | 9.7% | 15.4% | 10.0% | 11.2% | 11.2% | 15.6% | 19.0% | 8.0% | 13.2% |
| NICU | NURSERY | 32.9% | 27.8% | 38.5% | 48.4% | 35.0% | 31.8% | 23.8% | 57.8% | 48.0% | 47.3% | 45.8% | 57.6% | 41.2% |
| PN | PREMATURE NURSERY | 22.3% | 19.3% | 16.9% | 19.4% | 16.3% | 15.2% | 10.2% | 17.3% | 25.3% | 20.6% | 23.3% | 16.3% | 18.5% |
| | SUBTOTAL | 23.0% | 18.9% | 20.9% | 24.9% | 18.6% | 18.7% | 13.0% | 24.3% | 26.7% | 25.0% | 27.0% | 23.0% | 22.0% |
| | **TOTAL** | 53.5% | 56.4% | 56.4% | 55.9% | 58.2% | 57.6% | 53.3% | 57.4% | 56.6% | 55.7% | 52.8% | 57.2% | 55.9% |

**D.C.G.H.**
**SURGICAL MINUTES / CASES**
**BY NURSING UNIT**
**BY MONTH AND YTD - FY 1999**

| | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MINUTES** | | | | | | | | | | | | | |
| **OPERATING ROOM** | | | | | | | | | | | | | |
| INPATIENT | 13,620 | 12,000 | 18,630 | 14,880 | 17,040 | 17,940 | 22,360 | 9,780 | 15,780 | 19,020 | 12,330 | 32,040 | 205,440 |
| OUTPATIENT | 8,700 | 11,010 | 12,210 | 7,080 | 10,920 | 11,070 | 9,510 | 7,530 | 11,280 | 11,160 | 8,220 | 22,020 | 130,710 |
| TOTAL | 22,320 | 23,010 | 30,840 | 21,960 | 27,960 | 29,010 | 31,890 | 17,310 | 27,060 | 30,180 | 20,550 | 54,060 | 336,150 |
| **RECOVERY ROOM** | | | | | | | | | | | | | |
| INPATIENT | 6,460 | 4,890 | 8,840 | 8,790 | 7,890 | 8,490 | 10,890 | 6,810 | 7,110 | 13,050 | 6,150 | 14,190 | 103,620 |
| OUTPATIENT | 4,410 | 4,800 | 7,050 | 5,100 | 7,170 | 7,320 | 6,120 | 7,200 | 5,910 | 9,690 | 4,830 | 13,170 | 82,770 |
| TOTAL | 10,890 | 9,690 | 15,930 | 13,890 | 15,060 | 15,810 | 17,010 | 14,010 | 13,020 | 22,740 | 10,980 | 27,360 | 186,390 |
| **CASES** | | | | | | | | | | | | | |
| **OPERATING ROOM** | | | | | | | | | | | | | |
| INPATIENT | 92 | 71 | 119 | 104 | 102 | 120 | 130 | 75 | 100 | 139 | 76 | 205 | 1,333 |
| OUTPATIENT | 89 | 94 | 125 | 84 | 111 | 108 | 98 | 84 | 105 | 103 | 79 | 196 | 1,276 |
| TOTAL | 181 | 165 | 244 | 188 | 213 | 228 | 228 | 159 | 205 | 242 | 155 | 401 | 2,609 |
| **RECOVERY ROOM** | | | | | | | | | | | | | |
| INPATIENT | 80 | 59 | 102 | 101 | 92 | 101 | 125 | 74 | 83 | 161 | 75 | 184 | 1,237 |
| OUTPATIENT | 61 | 68 | 96 | 64 | 86 | 87 | 70 | 86 | 82 | 131 | 62 | 170 | 1,063 |
| TOTAL | 141 | 127 | 198 | 165 | 178 | 188 | 195 | 160 | 165 | 292 | 137 | 354 | 2,300 |
| AM. SURG CTR. CASES | 209 | 153 | 137 | 146 | 152 | 183 | 124 | 138 | 153 | 138 | 141 | 117 | 1,791 |

10/13/99

99 stats

D.C.G.H.
EMERGENCY ROOM VISITS
BY NURSING UNIT
BY MONTH AND YTD - FY 1999

| EMERGENCY ROOM SERVICES | OCT. 98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EC-PEDS | 455 | 381 | 376 | 558 | 534 | 448 | 409 | 389 | 327 | 386 | 395 | 386 | 5,044 |
| EC-OB | 172 | 167 | 174 | 180 | 142 | 149 | 131 | 187 | 200 | 212 | 196 | 124 | 2,034 |
| ECC MINOR TRAUMA | 964 | 881 | 813 | 912 | 851 | 1,006 | 1,011 | 1,074 | 1,058 | 1,098 | 1,049 | 784 | 11,501 |
| ECC WALKING | 1,931 | 1,946 | 2,065 | 2,132 | 2,063 | 2,089 | 2,025 | 1,988 | 2,020 | 2,112 | 2,046 | 1,620 | 24,037 |
| ECC STRETCHER | 743 | 666 | 613 | 733 | 656 | 696 | 675 | 755 | 759 | 762 | 760 | 557 | 8,375 |
| ECC MAJOR TRAUMA | 127 | 137 | 141 | 113 | 84 | 101 | 116 | 127 | 131 | 117 | 158 | 101 | 1,453 |
| TOTAL | 4,392 | 4,178 | 4,182 | 4,628 | 4,330 | 4,489 | 4,367 | 4,520 | 4,495 | 4,687 | 4,604 | 3,572 | 52,444 |

Page 10

10/13/99

99-stats

D.C.G.H.
CLINIC VISITS
BY MONTH AND YTD - FY 1999

## DENTAL

| Code | CLINIC NAME | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 94 | DENTAL GENERAL | 163 | 162 | 178 | 135 | 147 | 166 | 178 | 165 | 185 | 133 | 135 | 143 | 1,890 |
| 95 | DENTAL HYG | 81 | 69 | 9 | 76 | 76 | 67 | 73 | 84 | 90 | 76 | 80 | 52 | 833 |
| 96 | DENTAL 1 | 3 | 12 | 0 | 7 | 4 | 11 | 6 | 7 | 5 | 3 | 2 | 4 | 64 |
| 97 | DENTAL 2 | 0 | 2 | 0 | 0 | 1 | 3 | 4 | 1 | 0 | 1 | 5 | 7 | 24 |
| 99 | DENTAL ORAL | 110 | 113 | 100 | 144 | 87 | 185 | 99 | 137 | 84 | 153 | 163 | 115 | 1,490 |
| 100 | DENTAL ORAL I | 103 | 84 | 121 | 42 | 86 | 45 | 103 | 25 | 57 | 3 | 1 | 0 | 670 |
| 101 | DENTAL ORAL J | 104 | 79 | 94 | 95 | 99 | 116 | 104 | 102 | 131 | 133 | 156 | 78 | 1,291 |
| 102 | DENTAL PERIS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 3 |
| 257 | DENTAL PROST | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | E GDEN | 617 | 590 | 646 | 587 | 647 | 817 | 749 | 608 | 667 | 687 | 779 | 569 | 7,963 |
|  | **TOTAL DENTAL** | 1,181 | 1,111 | 1,148 | 1,087 | 1,147 | 1,410 | 1,316 | 1,130 | 1,219 | 1,189 | 1,322 | 968 | 14,228 |

## MEDICINE

| Code | CLINIC NAME | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 267 | ACCC MED | 149 | 132 | 126 | 110 | 115 | 154 | 120 | 107 | 158 | 138 | 153 | 123 | 1,585 |
| 74 | ALLERGY | 68 | 70 | 46 | 60 | 57 | 74 | 75 | 76 | 63 | 56 | 52 | 33 | 730 |
| 7 | CARDIAC | 103 | 96 | 120 | 120 | 82 | 131 | 95 | 107 | 138 | 104 | 136 | 74 | 1,306 |
| 40 | CARDIAC | 71 | 55 | 96 | 89 | 72 | 95 | 95 | 70 | 104 | 78 | 98 | 86 | 985 |
| 41 | CHEST | 34 | 59 | 39 | 48 | 45 | 83 | 41 | 46 | 45 | 42 | 57 | 34 | 573 |
| 3 | CHEST | 76 | 65 | 47 | 58 | 87 | 80 | 63 | 50 | 34 | 38 | 49 | 31 | 678 |
| 75 | DERM | 96 | 103 | 107 | 21 | 24 | 26 | 0 | 1 | 2 | 2 | 10 | 15 | 369 |
| 51 | ENDO | 38 | 24 | 30 | 21 | 24 | 26 | 33 | 9 | 14 | 2 | 10 | 15 | 280 |
| 8 | GASTRO | 125 | 133 | 128 | 98 | 126 | 151 | 128 | 152 | 145 | 133 | 114 | 107 | 1,540 |
| 5 | GASTRO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 253 | GASTRO (MFW) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 46 | HEMA | 37 | 33 | 24 | 22 | 22 | 27 | 41 | 35 | 26 | 32 | 21 | 24 | 344 |
| 11 | HEMA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 43 | HYPER | 33 | 16 | 20 | 18 | 22 | 30 | 17 | 19 | 23 | 22 | 15 | 17 | 252 |
| 9 | HYPER | 0 | 6 | 0 | 5 | 9 | 4 | 15 | 11 | 6 | 7 | 6 | 7 | 76 |
| 129 | HIS | 14 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| 259 | HIS NUTRITION | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 22 | HIS TEST & COIN | 357 | 317 | 365 | 381 | 329 | 441 | 322 | 296 | 312 | 328 | 310 | 210 | 3,968 |
| 47 | INTERNAL MED. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 195 | LIPID | 1 | 2 | 6 | 4 | 0 | 7 | 14 | 18 | 0 | 0 | 0 | 0 | 1 |
| 249 | LIVER-CLINIC | 3 | 2 | 6 | 4 | 17 | 7 | 14 | 18 | 17 | 16 | 10 | 13 | 127 |
| 131 | MED REF. | 101 | 98 | 102 | 82 | 89 | 97 | 71 | 95 | 63 | 44 | 62 | 51 | 955 |
| 49 | MED REF. | 56 | 70 | 70 | 58 | 60 | 85 | 66 | 53 | 46 | 55 | 63 | 54 | 731 |
| 13 | MFU | 413 | 416 | 428 | 392 | 404 | 497 | 459 | 426 | 361 | 401 | 437 | 270 | 4,904 |
| 48 | MFU | 400 | 389 | 440 | 384 | 416 | 436 | 455 | 427 | 362 | 327 | 428 | 305 | 4,769 |
| 113 | NUTRITION | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 11 | ONCO | 102 | 97 | 100 | 97 | 89 | 94 | 107 | 80 | 85 | 77 | 76 | 65 | 1,069 |
| 42 | ONCO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 65 | PACEMAKER | 28 | 30 | 28 | 14 | 31 | 24 | 34 | 32 | 13 | 31 | 16 | 15 | 296 |
| 122 | PRE-OP | 8 | 11 | 10 | 11 | 7 | 9 | 7 | 8 | 0 | 9 | 11 | 9 | 100 |
| 222 | PSY-SUB-ABUS (SAP) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | RENAL | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 44 | RENAL | 63 | 35 | 61 | 48 | 57 | 52 | 66 | 57 | 71 | 59 | 53 | 58 | 680 |
| 45 | RHEUM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 76 | RHEUMATOLOGY | 64 | 47 | 62 | 53 | 48 | 75 | 59 | 75 | 53 | 75 | 65 | 44 | 720 |
| 119 | SARCOID | 23 | 20 | 19 | 21 | 18 | 21 | 17 | 18 | 22 | 22 | 13 | 12 | 216 |
| 64 | (NFE) MED | 14 | 6 | 5 | 6 | 13 | 5 | 5 | 11 | 11 | 8 | 3 | 5 | 102 |
|  | **TOTAL MEDICINE** | 2,477 | 2,325 | 2,479 | 2,200 | 2,241 | 2,698 | 2,379 | 2,274 | 2,169 | 2,133 | 2,275 | 1,710 | 27,360 |

10/13/99

DCCH
CLINIC VISITS
BY MONTH AND YTD - FY 1999

| | OCT. 98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OB / GYN** | | | | | | | | | | | | | |
| PRENATAL | 0 | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 5 |
| GYN | 613 | 467 | 546 | 477 | 464 | 514 | 544 | 533 | 649 | 511 | 573 | 404 | 6,295 |
| BIRTH CONTROL | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 5 |
| POST PARTUM | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| GYN CLINIC | 62 | 64 | 54 | 32 | 37 | 59 | 28 | 38 | 47 | 36 | 51 | 35 | 543 |
| **TOTAL OB / GYN** | 675 | 534 | 602 | 509 | 504 | 574 | 572 | 571 | 697 | 548 | 625 | 439 | 6,850 |
| **PEDIATRICS** | | | | | | | | | | | | | |
| PEDS-WB | 38 | 23 | 25 | 36 | 25 | 29 | 26 | 34 | 28 | 24 | 36 | 30 | 354 |
| PD GT SURG | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PD HI NURSING | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PEDS-HERM | 9 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 |
| PEDS-CARD | 17 | 19 | 14 | 15 | 16 | 6 | 16 | 13 | 8 | 12 | 1 | 0 | 138 |
| PEDS-ALLY | 36 | 31 | 27 | 34 | 32 | 42 | 34 | 46 | 47 | 43 | 35 | 32 | 439 |
| PEDS-NEURO | 18 | 26 | 26 | 30 | 27 | 35 | 34 | 39 | 37 | 27 | 33 | 22 | 354 |
| PEDS-ENDO | 9 | 9 | 6 | 3 | 3 | 8 | 3 | 8 | 7 | 4 | 5 | 6 | 71 |
| PEDS-GI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PED HAB | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PD HBNK | 25 | 19 | 38 | 33 | 26 | 52 | 39 | 20 | 35 | 29 | 25 | 23 | 364 |
| PD H.M. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 2 |
| PD NURSING | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 3 |
| PD GEN EY | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 8 |
| PEDS-HEMA | 8 | 4 | 5 | 8 | 5 | 6 | 2 | 10 | 2 | 10 | 12 | 3 | 75 |
| PEDS-MFU | 101 | 83 | 75 | 94 | 116 | 109 | 87 | 76 | 52 | 47 | 65 | 60 | 965 |
| PED ADOL | 52 | 32 | 32 | 33 | 31 | 53 | 32 | 43 | 31 | 35 | 58 | 31 | 463 |
| PD LWEIT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PDS PAY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **TOTAL PEDIATRICS** | 315 | 253 | 253 | 286 | 281 | 340 | 274 | 292 | 248 | 232 | 271 | 209 | 3,254 |
| **SURGERY** | | | | | | | | | | | | | |
| **EYE CLINIC** | | | | | | | | | | | | | |
| EYE ACADEMIC | 12 | 10 | 10 | 18 | 11 | 10 | 20 | 22 | 16 | 7 | 9 | 2 | 147 |
| EYE CONTACT | 35 | 34 | 25 | 35 | 46 | 42 | 36 | 21 | 38 | 35 | 23 | 17 | 387 |
| EYE GLAUCOMA | 71 | 89 | 46 | 57 | 52 | 99 | 52 | 57 | 64 | 47 | 76 | 23 | 733 |
| EYE RETINA | 69 | 38 | 54 | 51 | 49 | 78 | 51 | 56 | 61 | 37 | 39 | 31 | 614 |
| GEN EYE AM. | 330 | 234 | 265 | 286 | 321 | 338 | 330 | 303 | 335 | 264 | 193 | 192 | 3,391 |
| GEN EYE PM. | 198 | 135 | 119 | 145 | 124 | 153 | 106 | 172 | 163 | 137 | 157 | 104 | 1,713 |
| EYE CORNEA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **SUBTOTAL EYE** | 715 | 541 | 519 | 592 | 603 | 720 | 595 | 631 | 677 | 527 | 497 | 369 | 6,986 |

D.C.G.H.
CLINIC VISITS
BY MONTH AND YTD - FY 1999

## OTHER SURGERY

| | | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 268 | ACCC SURG | 9 | 5 | 6 | 8 | 6 | 8 | 18 | 8 | 10 | 9 | 12 | 2 | 101 |
| 21 | ENT | 177 | 158 | 180 | 186 | 171 | 186 | 190 | 185 | 167 | 168 | 164 | 122 | 2,054 |
| 269 | NEURO-SEIZURE | 56 | 29 | 26 | 39 | 36 | 30 | 24 | 27 | 23 | 33 | 17 | 14 | 354 |
| 23 | NEUROSURGERY | 163 | 114 | 164 | 148 | 133 | 160 | 149 | 139 | 171 | 149 | 130 | 120 | 1,740 |
| 59 | NEURSURG | 67 | 49 | 62 | 61 | 49 | 51 | 79 | 83 | 68 | 63 | 57 | 20 | 709 |
| 25 | ORTHO | 314 | 356 | 330 | 359 | 332 | 377 | 293 | 316 | 379 | 310 | 420 | 263 | 4,049 |
| 261 | ORTHO (HAND) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 26 | PLAST. SURG | 2 | 3 | 1 | 6 | 7 | 9 | 2 | 2 | 4 | 1 | 5 | 2 | 44 |
| 27 | PLAST. SURG | 7 | 9 | 8 | 13 | 14 | 16 | 17 | 14 | 22 | 13 | 17 | 14 | 164 |
| 31 | PODIATRY | 156 | 114 | 86 | 101 | 145 | 161 | 75 | 174 | 178 | 96 | 150 | 112 | 1,548 |
| 125 | PODIATRY-PREOP | 4 | 8 | 7 | 6 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 34 |
| 240 | PRE-SURGERY | 187 | 142 | 137 | 141 | 149 | 165 | 168 | 143 | 179 | 161 | 169 | 105 | 1,846 |
| 29 | SURGERY | 337 | 321 | 316 | 293 | 281 | 270 | 290 | 270 | 287 | 287 | 326 | 189 | 3,467 |
| 30 | SURGERY | 294 | 244 | 237 | 207 | 227 | 279 | 262 | 222 | 243 | 224 | 244 | 169 | 2,852 |
| 28 | THORACIC SURG | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20 | UROLOGY | 165 | 140 | 164 | 155 | 183 | 197 | 155 | 143 | 158 | 202 | 149 | 119 | 1,930 |
| 33 | VASCULESS | 3 | 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| | SUB-TOTAL OTHER SURGERY | 1,942 | 1,694 | 1,727 | 1,724 | 1,741 | 1,909 | 1,722 | 1,726 | 1,890 | 1,716 | 1,860 | 1,251 | 20,900 |
| | **TOTAL SURGERY** | 2,657 | 2,235 | 2,246 | 2,316 | 2,344 | 2,629 | 2,317 | 2,357 | 2,567 | 2,243 | 2,357 | 1,620 | 27,888 |
| | **P M & R** | | | | | | | | | | | | | |
| 1 | PT | 455 | 392 | 426 | 380 | 390 | 481 | 507 | 407 | 426 | 425 | 539 | 395 | 5,223 |
| 2 | OT | 153 | 106 | 116 | 100 | 123 | 156 | 144 | 140 | 160 | 131 | 165 | 112 | 1,606 |
| 6 | RT | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 5 |
| 14 | P M & R | 162 | 113 | 123 | 131 | 116 | 149 | 150 | 144 | 160 | 143 | 170 | 113 | 1,674 |
| | TOTAL P M & R | 770 | 612 | 665 | 611 | 630 | 786 | 802 | 691 | 747 | 699 | 875 | 620 | 8,508 |
| | **SPEECH & HEARING** | | | | | | | | | | | | | |
| 17 | SPEECH | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 6 | 8 |
| 19 | HEARING | 50 | 41 | 60 | 67 | 69 | 66 | 75 | 47 | 44 | 30 | 55 | 50 | 654 |
| | SUB-TOTAL SPEECH & HEARING | 50 | 41 | 60 | 67 | 69 | 66 | 76 | 47 | 44 | 31 | 55 | 56 | 662 |
| | **MANAGED CARE PEDS** | | | | | | | | | | | | | |
| 262 | MILTEER PEDS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 263 | LAGOC PEDS | 36 | 25 | 25 | 45 | 37 | 41 | 30 | 24 | 33 | 33 | 31 | 27 | 387 |
| 264 | JOHNSON PEDS | 47 | 25 | 29 | 30 | 48 | 42 | 35 | 35 | 30 | 26 | 32 | 25 | 404 |
| 265 | CULLINS PEDS | 31 | 46 | 31 | 49 | 66 | 55 | 44 | 47 | 54 | 38 | 65 | 44 | 570 |
| 326 | SCALES PEDS | 41 | 41 | 29 | 44 | 36 | 46 | 38 | 44 | 45 | 30 | 69 | 38 | 501 |
| | TOTAL | 155 | 137 | 114 | 168 | 187 | 184 | 147 | 150 | 162 | 127 | 197 | 134 | 1862 |
| 274 | MANAGED CARE / ME | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | **TOTAL CLINIC VISITS** | 8,280 | 7,248 | 7,567 | 7,244 | 7,403 | 8,687 | 7,883 | 7,512 | 7,853 | 7,202 | 7,977 | 5,756 | 90,613 |

99.stats

| Code | REFERRED-OUTPATIENTS | OCT.98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 132 | REFERRED-OUTPATIENTS | 345 | 294 | 264 | 303 | 362 | 439 | 346 | 374 | 431 | 409 | 361 | 289 | 4,217 |
| 133 | GT MED "R" | 185 | 171 | 156 | 161 | 196 | 215 | 209 | 194 | 239 | 143 | 96 | 57 | 2,022 |
| 134 | HUMED "R" | 20 | 24 | 23 | 24 | 23 | 23 | 24 | 16 | 23 | 33 | 22 | 16 | 271 |
| 137 | IBS "R" | 99 | 58 | 3 | 0 | 0 | 2 | 5 | 2 | 4 | 6 | 6 | 0 | 179 |
| 139 | Z AU/MICHIGAN | 228 | 57 | 3 | 0 | 1 | 6 | 5 | 0 | 2 | 2 | 2 | 0 | 299 |
| 141 | Z ANA/NEIGH | 133 | 55 | 2 | 1 | 0 | 0 | 6 | 2 | 0 | 0 | 1 | 0 | 202 |
| 145 | Z MEN/HEIGHTS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 147 | Z CLAR/HEIGHTS | 906 | 163 | 29 | 37 | 48 | 52 | 55 | 38 | 54 | 49 | 35 | 11 | 1,081 |
| 149 | Z CON/HEIGH | 35 | 21 | 1 | 1 | 0 | 0 | 4 | 2 | 1 | 1 | 0 | 5 | 464 |
| 151 | Z D.C. JAIL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 153 | Z D.C. VILLAGE | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 1 |
| 155 | Z 15TH ST II | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| 157 | Z GAMF/HLTH | 1 | 0 | 0 | 1 | 0 | 1 | 2 | 1 | 3 | 3 | 2 | 1 | 0 |
| 159 | Z HC TO TH HM | 123 | 32 | 14 | 31 | 30 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| 161 | Z HUNT PL M | 31 | 15 | 2 | 0 | 0 | 0 | 2 | 9 | 7 | 15 | 9 | 8 | 159 |
| 163 | Z LORTON REFORM | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 194 |
| 165 | Z MULTI/CULT. | 0 | 0 | 2 | 0 | 0 | 0 | 5 | 8 | 0 | 0 | 3 | 0 | 0 |
| 167 | Z UPPER CARD | 7 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 19 |
| 171 | Z S.O.M.E. | 0 | 1 | 0 | 1 | 1 | 1 | 0 | 1 | 0 | 6 | 2 | 2 | 0 |
| 173 | Z ZACH FREE | 0 | 0 | 1 | 0 | 2 | 6 | 3 | 3 | 6 | 1 | 6 | 1 | 2 |
| 177 | PRIVATE AGCY | 2 | 0 | 0 | 0 | 1 | 2 | 0 | 1 | 1 | 0 | 1 | 0 | 9 |
| 179 | Z PHYSICIAN MED. | 0 | 0 | 1 | 1 | 0 | 1 | 2 | 0 | 1 | 6 | 2 | 0 | 19 |
| 181 | Z N.STREET CL | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 4 | 1 | 2 | 1 | 2 |
| 183 | Z K/AK(HALL) | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 3 | 3 | 1 | 0 | 10 |
| 185 | REF./HLTH | 24 | 9 | 16 | 39 | 30 | 17 | 9 | 11 | 11 | 20 | 6 | 1 | 193 |
| 187 | Z S.E.ELIZ. HOSPITAL | 179 | 32 | 2 | 0 | 6 | 6 | 3 | 3 | 4 | 1 | 1 | 0 | 229 |
| 189 | SW HEALTH CNT | 186 | 56 | 3 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 249 |
| 193 | Z WHIT/RIDGE | 1 | 0 | 0 | 1 | 1 | 1 | 196 | 0 | 0 | 0 | 0 | 0 | 199 |
| 196 | E/ PEDS "R" | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| 197 | PEDNAPHIL "R" | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 6 | 1 | 0 | 3 |
| 198 | PEDSALLY "R" | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 3 |
| 199 | PEDSGU "R" | 6 | 0 | 1 | 1 | 0 | 1 | 3 | 2 | 2 | 2 | 2 | 0 | 39 |
| 200 | PEDSNEURO "R" | 4 | 2 | 8 | 0 | 5 | 1 | 3 | 3 | 1 | 7 | 2 | 1 | 18 |
| 201 | PEDSMFU "R" | 0 | 0 | 2 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 1 |
| 202 | Z CHILDREN CN | 175 | 57 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 234 |
| 204 | Z W/JONES H | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 206 | Z J.R. JOHNSON | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 208 | Z WASH / NUR FA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| 212 | Z HOWARD UNIV. | 0 | 0 | 3 | 1 | 4 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| 214 | VIS / REHAB. | 0 | 0 | 1 | 2 | 4 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 11 |
| 216 | Z PRIVATE PHYS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 223 | Z E END OF THE RI | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 225 | Z SPRINGRD | 2 | 0 | 0 | 2 | 0 | 0 | 3 | 4 | 6 | 1 | 7 | 4 | 2 |
| 227 | Z WHIT / WALKER | 21 | 17 | 17 | 13 | 12 | 13 | 3 | 7 | 5 | 6 | 7 | 7 | 116 |
| 233 | HUSURG "R" | 4 | 6 | 14 | 9 | 3 | 11 | 3 | 5 | 2 | 1 | 2 | 4 | 80 |
| 234 | GT SURG "R" | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 235 | EYE "R" | 172 | 132 | 133 | 151 | 152 | 177 | 171 | 157 | 140 | 195 | 190 | 141 | 1,911 |
| 236 | PRENAT "R" | 50 | 41 | 28 | 38 | 31 | 25 | 16 | 15 | 16 | 7 | 2 | 2 | 271 |
| 237 | GYN-ONC O "R" | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 238 | POSTPAR "R" | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 239 | CHAC "R" | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 241 | NEURO "R" | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 |
| 246 | GT VAS ACCESS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |

99 stats

| REFERRED OUTPATIENTS (cont'd) | | OCT. 98 | NOV.98 | DEC.98 | JAN.99 | FEB.99 | MAR.99 | APR.99 | MAY.99 | JUN.99 | JUL.99 | AUG.99 | SEP.99 | FY 1999 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 247 | AMP MINOR | 21 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 2 | 0 | 26 |
| 248 | CLOSED RX SERIES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 250 | RADIATION ONCOLOGY | 303 | 197 | 221 | 210 | 241 | 193 | 128 | 196 | 266 | 231 | 114 | 166 | 2,466 |
| 251 | HRNG;ORIENT CL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 252 | DENTR'S RES HU | 38 | 13 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 56 |
| 254 | DIAGNO | 86 | 67 | 82 | 64 | 92 | 91 | 126 | 103 | 129 | 127 | 126 | 72 | 1,165 |
| 255 | SEDIATION GT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 256 | SEDIATION HU | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | TOTAL | 3,389 | 1,529 | 1,037 | 1,087 | 1,238 | 1,309 | 1,322 | 1,156 | 1,360 | 1,279 | 996 | 773 | 16,475 |

10/13/99

# APPENDIX C

**APPENDIX D**

Organizational Plan for Provision of Patient Care
PBC Regulation No. 106.08

| COMMUNITY HEALTH CENTER | SERVICES PROVIDED | MD staff | AP staff | RN staff | LPN/NA | HT |
|---|---|---|---|---|---|---|
| Adams Morgan, Ward 1 2250 Champlain St, NW, M-F, 8:15 a.m.- 4:45 p.m. | Medical, Dental, Nutrition, OB/Gyn, Bilingual Staff and Social Services | 1.6 MD .9 DDS | .4 MW | 2 | 1 NA | 1 |
| Anacostia (Ward 6) 1328 W. Street, NW Hours: M, W, F 8:15a.m. to 4:45 p.m. and T, TH 8:15 a.m. to 8:45 p.m. and Saturday, 9 am to 1 p.m. | Dental, Medical, OB/GYN, Midwifery, Nutrition (WIC), Pediatrics, Pharmacy, Social Services, Supplemental Food Program | 3 MD 1 DDS | 1 NP .2 MW | 4 | 3 LPN 1 NA | 1 |
| Benning Heights (Ward 7) 46th and Benning Road, SE Hours: 8:15 a.m. to 4:45 p.m. | Dental, Laboratory, Medical, Nutrition (WIC) OB/GYN, Pediatrics, Social Services and Supplemental Foods Program | 4.8 MD 1 DDS | | 3.5 | 1 NA | 2 |
| Congress Heights Ward 8 3720 MLK Avenue Hours M, T, Th and Fr 8:15 a.m. to 4:45 p.m.; Wednesday, 8:15 to 8:45 p.m., and Saturday 9:00 to 1:00 p.m. | Dental, HIV counseling, Medical, Nutrition, OB/Gyn, Midwifery, Pediatrics, Pharmacy and Social Services | 3 MD 1 DDS | 1 NP .2 MW | 4 | 1LPN 3 NA | 3 |
| Health Services for Children with Special Needs (Ward 6) 1900 Mass. Avenue, Bldg. 10 Hours 8:15 a.m. to 4:45 p.m. | Developmental Evaluations, birth to three years, Orthopedic, Nutritional, Occupational And Physical Therapy, Ophthalmology, Speech Therapy, Audiology, Social Services, SSI/CBF | 2.2 MD | | 2.5 | | 1 |
| Hunt Place (Ward 7) 4130 Hunt Place, NE Hours, 7:30 a.m. to 4:45 p.m., M-F | Dental, Nutrition,(WIC) OB/GYN, Midwifery, Pediatrics, Pharmacy, Social Services, Speech and Hearing, Stock's nest | 3.6 MD 1 DDS | 1 NP .1 MW | 4 | 4NA | 1 |
| Southwest(Ward 2) 850 Delaware Avenue, SW Hours 7:30 a.m. to 4:45 p.m. | Dental, Medical, Pediatrics, OB/GYN, Podiatry, Social Services, Nutrition, Financial Counseling, HIV Counseling, Pharmacy | 3.0 MD 1.1 DDS 1 POD | .1 MW | 4 | 4 NA | 1 |

35

Organizational Plan for Provision of Patient Care

Organizational Plan for Provision of Patient Care
PBC Regulation No. 106.08

| | | | | | | |
|---|---|---|---|---|---|---|
| Walker Jones(Ward 2)<br>1100 First Street, NW<br>M, W, F 8:15a.m. to 4:45 p.m., T ,<br>Th 7:30 a.m. to 7:30 p.m. and Sat 9<br>a.m. to 1 p.m. | Dental, Medical Pediatrics,<br>OB/GYN, Nutrition, Social<br>Services, Pharmacy, HIV<br>Counseling | 3 MD<br>2 DDS | | 3 | 1 LPN<br>2 NA | 1 |
| Woodridge (Ward 5)<br>2146 24th Place, NE<br>Hours: M-F 8:15 a.m. to 4:45 p.m. | Medical, Pediatrics, OB/GYN,<br>Social services, Nutrition (WIC) | 3.4  MD | .2 MW | 3.5 | 2 NA | 1 |

APPENDIX E

## D.C. Health and Hospital Public Benefit Corporation

Patient's Visits
By
WARD/ZIP CODE

| INPATIENTS WARD | ZIP CODE | # of VISITS | PERCENTAGE ( %) |
|---|---|---|---|
| 1 | 20009 | 232 | |
| | 20010 | 216 | |
| Total | | 448 | 4.61% |
| 2 | | | |
| | 20007 | 15 | |
| | 20001 | 440 | |
| | 20004 | 9 | |
| | 20024 | 236 | |
| Total | | 700 | 7.21% |
| 3 | 20008 | 7 | |
| | 20015 | 4 | |
| | 20016 | 5 | |
| Total | | 16 | 0.16% |
| 4 | 20011 | 257 | |
| | 20012 | 38 | |
| | 20017 | 99 | |
| | 20317 | -- | |
| Total | | 394 | 4.06% |
| 5 | 20002 | 1587 | |
| | 20018 | 183 | |
| | 20017 | 99 | |
| Total | | 1869 | 19.24% |
| 6 | 20003 | 1218 | |
| | 20020 | 1484 | |
| Total | | 2702 | 27.82% |
| 7 | 20019 | 2730 | |
| Total | | 2730 | 28.11% |
| 8 | 20032 | 854 | |
| Total | | 854 | 8.79% |
| TOTAL INPATIENTS | | 9713 | 100.00% |

| WARD | ZIP CODE | OUTPATIENTS | | |
|---|---|---|---|---|
| 1 | 20009 | 4521 | | |
| | 20010 | 3553 | | |
| Total | | 8074 | 5.96% | |
| 2 | 20007 | 188 | | |
| | 20001 | 8906 | | |
| | 20004 | 25 | | |
| | 20024 | 5345 | | |
| Total | | 14464 | 10.67% | |
| 3 | 20008 | 121 | | |
| | 20015 | 129 | | |
| | 20016 | 82 | | |
| Total | | 332 | 0.25% | |
| 4 | 20011 | 6538 | | |
| | 20012 | 766 | | |
| | 20017 | 1975 | | |
| | 20317 | -- | | |
| Total | | 9279 | 6.85% | |
| 5 | 20002 | 19552 | | |
| | 20018 | 3577 | | |
| | 20017 | 1975 | | |
| Total | | 25104 | 18.53% | |
| 6 | 20003 | 11363 | | |
| | 20020 | 21839 | | |
| Total | | 33202 | 24.50% | |
| 7 | 20019 | 26311 | | |
| Total | | 26311 | 19.42% | |
| 8 | 20032 | 18744 | | |
| Total | | 18744 | 13.83% | |
| **TOTAL OUTPATIENTS** | | **135510** | **100.00%** | |

| WARD | ZIP CODE | EMERGENCY SERVICES | | |
|---|---|---|---|---|
| 1 | 20009 | 1132 | | |
| | 20010 | 948 | | |
| Total | | 2080 | 4.45% | |
| 2 | 20007 | 64 | | |
| | 20001 | 2251 | | |
| | 20004 | 29 | | |
| | 20024 | 2324 | | |
| Total | | 4668 | 9.99% | |
| 3 | 20008 | 63 | | |
| | 20015 | 32 | | |
| | 20016 | 28 | | |
| Total | | 123 | 0.26% | |
| 4 | 20011 | 1613 | | |
| | 20012 | 705 | | |
| | 20017 | 466 | | |
| | 20317 | 1 | | |
| Total | | 2785 | 5.96% | |
| 5 | 20002 | 8786 | | |
| | 20018 | 803 | | |
| | 20017 | 466 | | |
| Total | | 10055 | 21.52% | |
| 6 | 20003 | 5295 | | |
| | 20020 | 6809 | | |
| Total | | 12104 | 25.90% | |
| 7 | 20019 | 11575 | | |
| Total | | 11575 | 24.77% | |
| 8 | 20032 | 3341 | | |
| Total | | 3341 | 7.15% | |
| **TOTAL EMERGENCY** | | **46731** | **100.00%** | |

**APPENDIX F**

District of Columbia Hospital Association
Patient Data System
1999 Data
District of Columbia General Hospital

DCHA's Patient Data System includes information on all patients discharged from 14 District hospitals. D.C. General Hospital has submitted information for all of 1999. Unfortunately because of some technical information system problems, not all discharges included a diagnosis or DRG. These discharges did have the payer information; the vast majority of these patients without diagnoses are uninsured. Of those patients with diagnoses coded, DCHA has run aggregated information about the most common primary, secondary and tertiary diagnoses. **For all payers, the most common diagnoses are the following:**

| Number of Patients | Diagnosis (Primary, Secondary, Tertiary) |
|---|---|
| 1188 | Nondependent Abuse of Drugs* |
| 842 | Disorders of Fluid, Electrolyte & Acid-Base Balance |
| 785 | Essential Hypertension+ |
| 563 | Diabetes Mellitus+ |
| 542 | General Symptoms (Hallucinations, Collapse, Coma, etc.)* |
| 487 | Heart Failure |
| 466 | Single Liveborn |
| 420 | Pneumonia+ |
| 380 | Drug Dependence* |
| 365 | HIV |
| 363 | Asthma+ |
| 358 | Other Disorders of the Urethra & Urinary Tract |
| 291 | Outcome of Delivery |
| 273 | Other & Unspecified Anemias |
| 266 | Alcohol Dependence Syndrome* |
| 260 | Hypertensive Renal Disease+ |
| 260 | Cardiac Diarythmias |
| 233 | Other Current Conditions in the Mother (complicating pregnancy, childbirth or the puerperium (diabetes, thyroid, etc.) |
| 223 | Other Diseases of the Lung (emphysema) |
| 195 | Septicemia |

10/5/00

When the uninsured are separated out (of those for whom DCHA has diagnoses), the top twenty diagnoses are the following:

| Number of Patients | Diagnosis (Primary, Secondary or Tertiary) |
|---|---|
| 729 | Nondependent Abuse of Drugs* |
| 392 | Essential Hypertension+ |
| 357 | Disorders of Fluid, Electrolyte and Acid-Base Balance |
| 274 | Single Liveborn |
| 232 | Diabetes Mellitus+ |
| 204 | General Symptoms (Hallucinations, Collapse, Coma, etc.)* |
| 193 | Asthma+ |
| 188 | Outcome of Delivery |
| 181 | Pneumonia, Organism Unspecified+ |
| 179 | Drug Dependence* |
| 153 | Other Disorders of Urethra, and Urinary Tract |
| 139 | Heart Failure |
| 133 | Other Current Conditions in the Mother (complicating pregnancy, childbirth or the puerperium (diabetes, thyroid, etc.) |
| 132 | Alcohol Dependence Syndrome* |
| 131 | HIV |
| 124 | Other Unspecified Anemias |
| 106 | Need for Prophylactic Vaccination and Inoculation against single disease |
| 99 | Candidiasis |
| 91 | Hypertensive Renal Disease+ |
| 87 | Cardiac Diarythmias |

Source: DCHA Patient Data System - 1999

It is notable that four of the top twenty (on both charts – of all payers and of uninsured only) are related to drug and/or alcohol abuse (marked with *), and even some others may have a causal relationship to alcohol and/or drug abuse. It is also important to note that another group of the most common diagnoses for DCGH inpatients are "ambulatory sensitive" (marked with +): they respond well to timely primary care (including hypertension, diabetes, asthma, and pneumonia).

DCHA also calculated the costs of patients who must be hospitalized with ambulatory sensitive conditions. At DCGH, these patients have an average cost per case of $7,396 (or $6.2 million for 845 cases for whom we have diagnoses; because of the information system problem, this cost could be as much as doubled – or some $12 million). The average cost per case of these patients at four other similar hospitals is $9,695 (or $52.8 million for 5,444 cases). 10/5/00

75

# Table II.   Most Common Diagnoses of Outpatients Treated and Released from the Emergency Care Center at D.C. General Hospital During CY98*

as a percentage of all primary and secondary diagnoses (n = 65,546)

| Diagnosis | Number/% |
|---|---|
| •Hypertension | 5,532/8.3% |
| •Convulsions | 2,297/3.5% |
| •Alcohol Abuse | 1,924/2.9% |
| •Psychosis | 1,440/2.2% |
| •Asthma | 1,378//2.1% |
| •Diabetes Mellitus without Complications | 1,377/2.1% |
| •Sprain of Neck | 1,224/1.9% |
| •Contusion Face/Scalp | 1,130/1.7% |
| •Opioid Abuse | 1,035/1.6% |
| •Acute Upper Respiratory Infection | 950/1.4% |
| •Lumbar Sprain | 873/1.3% |
| •Head Abrasion | 811/1.2% |
| •Acute Bronchitis | 722/1.1% |
| •Urinary Tract Infection | 527/.8% |
| •Open Wound of Scalp | 387/.6% |

*ICD-9 Data furnished by Medical Records Department at D.C. General Hospital.

District of Columbia Health and Hospitals Public Benefit Corporation, 1999



APPENDIX G

# D. C. GENERAL HOSPITAL
## Payor and DRG
## January - June 2000 Discharges



| MDC | DRG'S TEXT | TOTALS | % of TL | SELF* | % of DRG | CAID | % of DRG | CARE | % of DRG | CAID MCO | % of DRG | COMM** | % of DRG | PEND MCO | % of DRG | CORR | % of DRG | CITY Agn. | % of DRG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Dis. & Disorders of the Respiratory System | 551 | 12.3% | 153 | 27.8% | 118 | 21.4% | 102 | 18.5% | 98 | 17.8% | 35 | 6.4% | 14 | 2.5% | 15 | 2.7% | 16 | 2.9% |
| 5 | Dis. & Disorders of the Circulatory System | 527 | 11.7% | 141 | 26.8% | 92 | 17.5% | 194 | 36.8% | 16 | 3.0% | 44 | 8.3% | 4 | 0.8% | 30 | 5.7% | 6 | 1.1% |
| 14 | Pregnancy, Childbirth & Puerperium | 433 | 9.6% | 131 | 30.3% | 100 | 23.1% | 2 | 0.5% | 175 | 40.4% | 17 | 3.9% | 0 | 0.0% | 3 | 0.7% | 0 | 0.0% |
| 20 | Alcohol/Drug Use and Alcohol/Drug-Induced Organic Mental Disorders | 406 | 9.0% | 312 | 76.8% | 27 | 6.7% | 10 | 2.5% | 23 | 5.7% | 14 | 3.4% | 4 | 1.0% | 7 | 1.7% | 9 | 2.2% |
| 15 | Newborns and Other Neonates with Cond-tions Originating in the Perinatal Period | 312 | 6.9% | 61 | 19.6% | 101 | 32.4% | 3 | 1.0% | 136 | 43.6% | 5 | 1.6% | 5 | 1.6% | 1 | 0.3% | 0 | 0.0% |
| 9 | Diseases & Disorders of the Skin, Subcutaneous Tissue and Breast | 274 | 6.1% | 150 | 54.7% | 31 | 11.3% | 22 | 8.0% | 17 | 6.2% | 27 | 9.9% | 1 | 0.4% | 19 | 6.9% | 7 | 2.6% |
| 10 | Endocrine, Nutritional and Metabolic Diseases and Disorders | 237 | 5.3% | 93 | 39.2% | 28 | 11.8% | 73 | 30.8% | 11 | 4.6% | 12 | 5.1% | 2 | 0.8% | 15 | 6.3% | 3 | 1.3% |
| 1 | Dis. & disorders of the nervous system | 220 | 4.9% | 55 | 25.0% | 38 | 17.3% | 56 | 25.5% | 23 | 10.5% | 26 | 11.8% | 3 | 1.4% | 14 | 6.4% | 5 | 2.3% |
| 6 | Dis. & Disorders of the Digestive System | 212 | 4.7% | 84 | 39.6% | 42 | 19.8% | 32 | 15.1% | 18 | 8.5% | 10 | 4.7% | 2 | 0.9% | 20 | 9.4% | 4 | 1.9% |
| 8 | Diseases & Disorders of the Musculo-skeletal System & Connective Tissue | 209 | 4.7% | 96 | 45.9% | 18 | 8.6% | 29 | 13.9% | 23 | 11.0% | 23 | 11.0% | 2 | 1.0% | 11 | 5.3% | 7 | 3.3% |
| 25 | Human Immunodeficiency Virus Infections | 163 | 3.6% | 46 | 28.2% | 64 | 39.3% | 10 | 6.1% | 6 | 3.7% | 2 | 1.2% | 6 | 3.7% | 26 | 16.0% | 3 | 1.8% |
| 3 | Diseases & Disorders of the Ear, Nose, Mouth & Throat | 158 | 3.5% | 82 | 51.9% | 18 | 11.4% | 5 | 3.2% | 32 | 20.3% | 7 | 4.4% | 1 | 0.6% | 11 | 7.0% | 2 | 1.3% |
| 16 | Dis. & Disorders of Blood, blood-forming organs & Immunological Disorders | 78 | 1.7% | 25 | 32.1% | 14 | 17.9% | 13 | 16.7% | 7 | 9.0% | 3 | 3.8% | 3 | 3.8% | 11 | 14.1% | 4 | 5.1% |
| 11 | Diseases & Disorders of the Kidney and Urinary Tract | 146 | 3.2% | 21 | 14.5% | 34 | 23.4% | 48 | 33.1% | 17 | 11.7% | 7 | 4.8% | 1 | 0.8% | 15 | 10.3% | 1 | 0.7% |
| 7 | Diseases & Disorders of the Hepatobiliary System and Pancreas | 132 | 2.9% | 65 | 49.2% | 26 | 18.9% | 12 | 9.1% | 10 | 7.6% | 4 | 3.0% | 1 | 0.8% | 15 | 11.4% | 0 | 0.0% |
| 21 | Injury, Poisoning & Toxic Effects of Drugs | 121 | 2.7% | 55 | 45.5% | 17 | 14.0% | 11 | 9.1% | 14 | 11.6% | 11 | 9.1% | 2 | 1.7% | 10 | 8.3% | 1 | 0.8% |
| 18 | Infectious and Parasitic Diseases | 62 | 1.4% | 15 | 24.2% | 17 | 27.4% | 15 | 24.3% | 5 | 9.4% | 2 | 3.0% | 2 | 0.0% | 1 | 1.6% | 1 | 1.9% |
| 99 | Other DRGs Associated w/ All MDCs | 53 | 1.2% | 11 | 20.8% | 14 | 26.4% | 15 | 28.3% | 0 | 0.0% | 7 | 13.2% | 0 | 0.0% | 0 | 0.0% | 1 | 1.9% |
| 17 | Myeloproliferative Diseases & Disorders, & Poorly Differentiated Neoplasms | 36 | 0.8% | 6 | 17.1% | 20 | 57.1% | 3 | 8.6% | 0 | 0.0% | 1 | 2.9% | 1 | 2.9% | 4 | 11.4% | 0 | 0.0% |
| 24 | Multiple Significant Trauma | 24 | 0.5% | 10 | 41.7% | 3 | 12.5% | 2 | 8.3% | 2 | 8.3% | 4 | 16.7% | 0 | 0.0% | 0 | 0.0% | 3 | 12.5% |
| 12 | Diseases & Disorders of the Male Reproductive System | 20 | 0.4% | 10 | 50.0% | 2 | 10.0% | 1 | 5.0% | 0 | 0.0% | 3 | 15.0% | 2 | 10.0% | 2 | 10.0% | 0 | 0.0% |
| 23 | Factors Influencing Health Status and Other Contacts with Health Services | 18 | 0.4% | 3 | 16.7% | 5 | 27.8% | 6 | 37.5% | 2 | 11.1% | 2 | 11.1% | 0 | 5.6% | 3 | 16.7% | 0 | 0.0% |
| 19 | Mental Diseases and Disorders | 16 | 0.4% | 5 | 31.3% | 1 | 6.3% | 6 | 37.5% | 0 | 0.0% | 0 | 18.8% | 0 | 0.0% | 2 | 18.2% | 1 | 9.1% |
| 2 | Diseases and disorders of the eye | 11 | 0.2% | 5 | 45.5% | 1 | 9.1% | 1 | 9.1% | 0 | 0.0% | 1 | 9.1% | 1 | 9.1% | 2 | 18.2% | 0 | 0.0% |
| 22 | Burns | 2 | 0.0% | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 50.0% | 0 | 0.0% |
| | Total | 4493 | 100% | 1677 | 37.3% | 836 | 18.6% | 671 | 14.9% | 662 | 14.7% | 273 | 6.1% | 62 | 1.4% | 238 | 5.3% | 74 | 1.6% |

\* Includes Medical Charities discharges

\*\* Includes Blue Cross discharges

# D. C. GENERAL HOSPITAL
## PAYOR AND DRG
### Jan. - June 2000 Discharges

| MDC | Final DRG: | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 001 | 001 CRANIOTOMY W/O TRAUMA | 6 | 3 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 1 | 002 | 002 CRANIOTOMY W/TRAUMA | 4 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 |
| 1 | 007 | 007 NERVE P,C,O WITH CC | 3 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 1 | 008 | 008 NERVE P,C,O W/O CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 009 | 009 SPINAL DISORDERS & INJURIES | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 010 | 010 NERV SYS NEO WITH CC | 3 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 |
| 1 | 012 | 012 DEGEN NERVE SYS DISORDERS | 5 | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| 1 | 013 | 013 MULT SCLEROSIS & CEREB ATAX | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1 | 014 | 014 SPEC CEREBROVAS W/O TIA | 34 | 5 | 7 | 17 | 2 | 2 | 0 | 1 | 0 |
| 1 | 015 | 015 TIA & PRECEREBRAL OCCLUSION | 9 | 4 | 0 | 2 | 0 | 2 | 0 | 1 | 0 |
| 1 | 017 | 017 NONSP CEREBROVAS W/O CC | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 018 | 018 NERVE P,C WITH CC | 5 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 019 | 019 NERVE P,C W/O CC | 3 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| 1 | 020 | 020 NERVOUS INF EXCEPT VIR MEN | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 021 | 021 VIRAL MENINGITIS | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 022 | 022 HYPERTENSIVE ENCEPHALOPATHY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 023 | 023 NONTRAUMATIC STUPOR & COMA | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 024 | 024 SEIZ, HEADACHE 18+ WITH CC | 47 | 7 | 11 | 15 | 3 | 5 | 1 | 2 | 3 |
| 1 | 025 | 025 SEIZ, HEADACHE 18+ W/O CC | 24 | 5 | 5 | 7 | 3 | 0 | 0 | 4 | 0 |
| 1 | 026 | 026 SEIZ, HEADACHE 0-17 | 18 | 2 | 4 | 0 | 9 | 2 | 1 | 0 | 0 |
| 1 | 027 | 027 STUPOR & COMA, COMA > 1 HR | 9 | 1 | 1 | 1 | 1 | 1 | 0 | 2 | 0 |
| 1 | 028 | 028 STUPOR & COMA, < 1 HR 18+ W/CC | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 1 | 029 | 029 STUPOR & COMA, < 1 HR 18+ W/O CC | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 1 | 030 | 030 STUPOR & COMA, < 1 HR 0-17 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1 | 031 | 031 CONCUSSION 18+ WITH CC | 8 | 3 | 3 | 1 | 1 | 0 | 0 | 0 | 0 |
| 1 | 032 | 032 CONCUSSION 18+ W/O CC | 9 | 5 | 1 | 0 | 0 | 3 | 0 | 0 | 0 |
| 1 | 033 | 033 CONCUSSION 0-17 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 034 | 034 NERVE (OTHER) WITH CC | 6 | 2 | 1 | 2 | 1 | 0 | 0 | 0 | 0 |
| 1 | 035 | 035 NERVE (OTHER) W/O CC | 3 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 |
| 1 | 039 | 039 LENS PROCEDURES | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 044 | 044 ACUTE MAJOR EYE INFECTIONS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 2 | 045 | 045 NEUROLOGICAL EYE DISORDERS | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 2 | 046 | 046 OTHER EYE DISORDERS 18+ WITH CC | 5 | 3 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |

* Includes Medical Charities discharges

** Includes Blue Cross discharges

# D. C. GENERAL HOSPITAL

PAYOR AND DRG

Jan. - June 2000 Discharges

| MDC | Final DRG. | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 047 | 047 OTHER EYE DISORDERS 18+ W/O CC | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 049 | 049 MAJOR HEAD/NECK PROCEDURE | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 051 | 051 SALIVARY GLAND PROC EXC SIAL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 053 | 053 SINUS/MASTOID PROCEDURES 18+ | 6 | 4 | 0 | 0 | 1 | 1 | 0 | 1 | 0 |
| 3 | 055 | 055 MISC EAR/NOSE/THROAT PROCEDURES | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 056 | 056 RHINOPLASTY | 3 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 3 | 057 | 057 T&A EX TON &/OR ADEN ONLY 18+ | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 3 | 060 | 060 TONSIL &/OR ADENOID 0-17 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 3 | 061 | 061 MYRING W/TUBE INSERT 18+ | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 3 | 063 | 063 OTHER EAR/NOSE/THROAT OR PROC | 26 | 22 | 1 | 1 | -1 | 1 | 1 | 1 | 0 |
| 3 | 064 | 064 EAR/NOSE/THROAT MALIGNANCY | 11 | 3 | 6 | 1 | 0 | 1 | 0 | 0 | 0 |
| 3 | 065 | 065 DYSEQUILIBRIUM | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 067 | 067 EPIGLOTTITIS | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| 3 | 068 | 068 OTITIS MEDIA & URI 18+ WITH CC | 6 | 3 | 1 | 0 | 0 | 2 | 0 | 0 | 0 |
| 3 | 069 | 069 OTITIS MEDIA & URI 18+ W/O CC | 16 | 10 | 1 | 0 | 3 | 2 | 0 | 3 | 0 |
| 3 | 070 | 070 OTITIS MEDIA & URI 0-17 | 23 | 5 | 3 | 0 | 12 | 2 | 1 | 1 | 0 |
| 3 | 071 | 071 LARYNGOTRACHEITIS | 7 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 0 |
| 3 | 072 | 072 NASAL TRAUMA & DEFORMITY | 5 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 |
| 3 | 073 | 073 OTHER EAR/NOSE/THROAT DX 18+ | 4 | 2 | 2 | 1 | 0 | 0 | 0 | 3 | 0 |
| 3 | 074 | 074 OTHER EAR/NOSE/THROAT DX 0-17 | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 3 | 168 | 168 MOUTH PROCEDURES WITH CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 185 | 185 DENTAL+ORAL EXC EXT+RESTOR 18+ | 22 | 14 | 4 | 0 | 1 | 1 | 0 | 4 | 0 |
| 3 | 186 | 186 DENTAL+ORAL EXC EXT+RESTOR 0-17 | 7 | 5 | 2 | 1 | 3 | 1 | 0 | 1 | 0 |
| 3 | 187 | 187 DENTAL EXTRACTIONS & RESTORATION | 6 | 5 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| 4 | 075 | 075 MAJOR CHEST PROCEDURES | 3 | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| 4 | 076 | 076 OTHR RESP SYS OR PRO WITH CC | 7 | 2 | 1 | 2 | 1 | 1 | 1 | 1 | 0 |
| 4 | 077 | 077 OTHR RESP SYS OR PRO W/O CC | 3 | 1 | 1 | 2 | 0 | 0 | 0 | 1 | 0 |
| 4 | 078 | 078 PULMONARY EMBOLISM | 17 | 5 | 5 | 2 | 1 | 4 | 0 | 2 | 0 |
| 4 | 079 | 079 RESP INFECT & INFL 18+ WITH CC | 16 | 3 | 3 | 6 | 1 | 1 | 0 | 2 | 0 |
| 4 | 080 | 080 RESP INFECT & INFL 18+ W/O CC | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 4 | 082 | 082 RESPIRATORY NEOPLASMS | 22 | 6 | 8 | 3 | 0 | 2 | 1 | 1 | 0 |
| 4 | 083 | 083 MAJOR CHEST TRAUMA WITH CC | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 4 | 084 | 084 MAJOR CHEST TRAUMA W/O CC | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 4 | 085 | 085 PLEURAL EFFUSION WITH CC | 5 | 2 | 1 | 1 | 0 | 1 | 1 | 0 | 0 |

\* Includes Medical Charities discharges

\*\* Includes Blue Cross discharges



# D. C. GENERAL HOSPITAL

PAYOR AND DRG

Jan. - June 2000 Discharges

| MDC | Final DRG: | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 087 | 087 PULMONARY EDEMA & RESP FAIL | 11 | 1 | 2 | 2 | 3 | 1 | 0 | 1 | 0 |
| 4 | 088 | 088 CHRON OBSTRUC PULMONARY DISEASE | 29 | 7 | 7 | 11 | 0 | 3 | 1 | 0 | 0 |
| 4 | 089 | 089 SIMP PNEUM & PLEURISY 18+ W/CC | 107 | 39 | 18 | 32 | 3 | 3 | 1 | 5 | 0 |
| 4 | 090 | 090 SIMP PNEUM & PLEURISY 18+ W/O CC | 31 | 17 | 4 | 7 | 1 | 1 | 0 | 1 | 6 |
| 4 | 091 | 091 SIMP PNEUM & PLEURISY 0-17 | 59 | 6 | 11 | 4 | 37 | 2 | 3 | 1 | 0 |
| 4 | 092 | 092 INTERSTITIAL LUNG DSE WITH CC | 7 | 1 | 1 | 3 | 0 | 2 | 0 | 0 | 0 |
| 4 | 093 | 093 INTERSTITIAL LUNG DSE W/O CC | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 4 | 094 | 094 PNEUMOTHORAX WITH CC | 10 | 5 | 2 | 0 | 1 | 1 | 0 | 1 | 1 |
| 4 | 095 | 095 PNEUMOTHORAX W/O CC | 9 | 6 | 1 | 0 | 0 | 1 | 1 | 0 | 0 |
| 4 | 096 | 096 BRONCHITIS & ASTHMA 18+ WITH CC | 38 | 11 | 13 | 4 | 2 | 3 | 2 | 2 | 1 |
| 4 | 097 | 097 BRONCHITIS & ASTHMA 18+ W/O CC | 31 | 15 | 9 | 2 | 2 | 1 | 0 | 2 | 0 |
| 4 | 098 | 098 BRONCHITIS & ASTHMA 0-17 | 70 | 7 | 17 | 0 | 39 | 5 | 2 | 0 | 0 |
| 4 | 099 | 099 RESP SIGNS & SYMPTOMS WITH CC | 3 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 100 | 100 RESP SIGNS & SYMPTOMS W/O CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 101 | 101 OTHER RESP DIAG WITH CC | 16 | 6 | 4 | 3 | 1 | 1 | 0 | 1 | 2 |
| 4 | 102 | 102 OTHER RESP DIAG W/O CC | 6 | 1 | 1 | 0 | 2 | 2 | 1 | 1 | 0 |
| 4 | 475 | 475 RESP SYS DIAG W VENTILAT SUPPORT | 42 | 5 | 7 | 23 | 1 | 5 | 1 | 0 | 0 |
| 4 | 110 | 110 MAJ CARDIOVASC PROC W/CC | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | 113 | 113 AMPUT CIRC DS EXC UP LIMB & TOE | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 5 | 114 | 114 UP LIMB & TOE AMPUT FOR CIRC DIS | 5 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 |
| 5 | 116 | 116 OTH PACE IMP/PTCA W COR STENT | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 5 | 120 | 120 OTHER CIRC SYS OR PRO | 10 | 2 | 4 | 4 | 0 | 1 | 0 | 0 | 0 |
| 5 | 121 | 121 CIRC DIS W AMI&MAJ COMP LIVE | 20 | 1 | 2 | 15 | 1 | 1 | 1 | 0 | 0 |
| 5 | 122 | 122 CIRC DIS W AMI W/O MAJ COMP LIVE | 6 | 3 | 0 | 0 | 0 | 3 | 0 | 0 | 0 |
| 5 | 123 | 123 CIRC DIS W AMI EXPIRED | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |
| 5 | 124 | 124 CIRC EXC AMI W CATH & CMPLX DG | 59 | 15 | 14 | 21 | 1 | 5 | 1 | 3 | 0 |
| 5 | 125 | 125 CIRC EXC AMI W CATH W/O CMPLX DG | 20 | 5 | 5 | 5 | 0 | 2 | 1 | 0 | 1 |
| 5 | 127 | 127 HEART FAILURE & SHOCK | 126 | 29 | 24 | 51 | 4 | 9 | 1 | 7 | 1 |
| 5 | 129 | 129 CARDIAC ARREST, UNEXPLAINED | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| 5 | 130 | 130 PERIPHERAL VASC DS WITH CC | 20 | 10 | 2 | 6 | 0 | 0 | 0 | 0 | 2 |
| 5 | 131 | 131 PERIPHERAL VASC DS W/O CC | 7 | 3 | 3 | 1 | 0 | 1 | 0 | 0 | 0 |
| 5 | 132 | 132 ATHEROSCLEROSIS WITH CC | 22 | 2 | 5 | 9 | 0 | 3 | 0 | 3 | 0 |
| 5 | 133 | 133 ATHEROSCLEROSIS W/O CC | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 5 | 134 | 134 HYPERTENSION | 16 | 5 | 2 | 5 | 1 | 1 | 0 | 2 | 0 |



\* Includes Medical Charities discharges

\*\* Includes Blue Cross discharges

# D. C. GENERAL HOSPITAL

## PAYOR AND DRG
### Jan. - June 2000 Discharges

| MDC | Final DRG: | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 135 | 135 CARD CONG & VALV 18+ WITH CC | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | 136 | 136 CARD CONG & VALV 18+ W/O CC | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| 5 | 138 | 138 CARD ARR & CONDUCT DIS WITH CC | 38 | 9 | 7 | 18 | 0 | 3 | 0 | 0 | 0 |
| 5 | 139 | 139 CARD ARR & CONDUCT DIS W/O CC | 8 | 3 | 1 | 3 | 0 | 1 | 0 | 0 | 0 |
| 5 | 140 | 140 ANGINA PECTORIS | 49 | 17 | 9 | 17 | 1 | 4 | 1 | 0 | 0 |
| 5 | 141 | 141 SYNCOPE & COLLAPSE WITH CC | 18 | 3 | 4 | 5 | 1 | 3 | 1 | 1 | 0 |
| 5 | 142 | 142 SYNCOPE & COLLAPSE W/O CC | 20 | 4 | 1 | 9 | 2 | 3 | 0 | 1 | 0 |
| 5 | 143 | 143 CHEST PAIN | 21 | 8 | 5 | 5 | 1 | 2 | 0 | 0 | 0 |
| 5 | 144 | 144 OTHR CIR DIAG WITH CC | 24 | 7 | 7 | 7 | 1 | 0 | 2 | 0 | 0 |
| 5 | 145 | 145 OTHR CIR DIAG W/O CC | 2 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 5 | 479 | 479 OTHER VASCULAR PROC W/O CC | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | 478 | 478 OTHER VASCULAR PROC W CC | 17 | 5 | 1 | 5 | 0 | 1 | 0 | 5 | 0 |
| 6 | 148 | 148 MAJOR SM+LG BOWEL PR WITH CC | 12 | 5 | 4 | 2 | 1 | 0 | 0 | 0 | 0 |
| 6 | 149 | 149 MAJOR SM+LG BOWEL PR W/O CC | 6 | 2 | 0 | 2 | 1 | 2 | 0 | 0 | 1 |
| 6 | 150 | 150 PERITONEAL ADHESIOLYSIS WITH CC | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 6 | 151 | 151 PERITONEAL ADHESIOLYSIS W/O CC | 1 | 1 | 0 | 2 | 2 | 0 | 0 | 1 | 0 |
| 6 | 152 | 152 MINOR BOWEL PR WITH CC | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 6 | 153 | 153 MINOR BOWEL PR W/O CC | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 154 | 154 STOM,ESPH,DUO PROC 18+ WITH CC | 6 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 0 |
| 6 | 157 | 157 ANAL & STOMAL PROC WITH CC | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 158 | 158 ANAL & STOMAL PROC W/O CC | 7 | 2 | 2 | 1 | 1 | 0 | 0 | 1 | 0 |
| 6 | 159 | 159 HERN PROC EX ING&FEM 18+ WITH CC | 5 | 2 | 0 | 1 | 1 | 1 | 0 | 0 | 0 |
| 6 | 160 | 160 HERN PROC EX ING&FEM 18+ W/O CC | 8 | 4 | 0 | 4 | 0 | 0 | 0 | 4 | 2 |
| 6 | 161 | 161 ING&FEM HERN PROC 18+ WITH CC | 4 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 2 |
| 6 | 162 | 162 ING&FEM HERN PROC 18+ W/O CC | 6 | 4 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| 6 | 165 | 165 APPEND W/COMP PR DIAG WITH CC | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 6 | 167 | 167 APPEND W/O COMP PR DIAG W/O CC | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 170 | 170 OTH DIGESTIVE SYS WITH CC | 2 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| 6 | 171 | 171 OTH DIGESTIVE SYS W/O CC | 2 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 |
| 6 | 172 | 172 DIGESTIVE MALIG WITH CC | 6 | 1 | 2 | 2 | 0 | 1 | 0 | 0 | 0 |
| 6 | 174 | 174 GI HEMORRHAGE WITH CC | 31 | 15 | 3 | 9 | 1 | 2 | 0 | 1 | 0 |
| 6 | 175 | 175 GI HEMORRHAGE W/O CC | 6 | 4 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| 6 | 176 | 176 COMPLICATED PEPTIC ULCER | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 177 | 177 UNCOMP PEPTIC ULCER WITH CC | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

** Includes Medical Charities discharges

* Includes Blue Cross discharges






# D. C. General Hospital

## PAYOR AND DRG
### Jan. - June 2000 Discharges

| MDC | Final DRG: | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 178 | 178 UNCOMP PEPTIC ULCER W/O CC | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 179 | 179 INFLAMMATORY BOWEL DISEASE | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 180 | 180 GI OBSTRUCTION WITH CC | 4 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| 6 | 181 | 181 GI OBSTRUCTION W/O CC | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 6 | 182 | 182 ES,GAS+MI DG 18+ WITH CC | 25 | 10 | 6 | 4 | 2 | 2 | 0 | 0 | 0 |
| 6 | 183 | 183 ES,GAS+MI DG 18+ W/O CC | 15 | 7 | 3 | 1 | 1 | 2 | 0 | 0 | 0 |
| 6 | 184 | 184 ES,GAS+MI DIGEST 0-17 | 17 | 2 | 6 | 1 | 9 | 0 | 0 | 0 | 0 |
| 7 | 188 | 188 OTH DIGEST SYS DIAG 18+ WITH CC | 17 | 4 | 6 | 4 | 1 | 2 | 0 | 0 | 0 |
| 7 | 189 | 189 OTH DIGEST SYS DIAG 18+ W/O CC | 11 | 1 | 2 | 3 | 0 | 5 | 0 | 0 | 0 |
| 7 | 191 | 191 PANCREAS/LIVER PROCEDURES W CC | 4 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | 193 | 193 BIL TR PROC EX ONLY CHOLEC W/CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | 197 | 197 CHOL W/O CDE WITH CC | 3 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| 7 | 200 | 200 HEPATOBIL DIAG PROC NONMALIG | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | 201 | 201 HEPATOBIL OR PANC O.R. PROC | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 7 | 202 | 202 CIRRHOSIS & ALCOHOL HEPATITIS | 34 | 12 | 13 | 4 | 0 | 5 | 0 | 4 | 0 |
| 7 | 203 | 203 MALIG OF HEPAT SYS OR PANCREAS | 4 | 2 | 0 | 1 | 0 | 4 | 0 | 0 | 0 |
| 7 | 204 | 204 DIS OF PANCREAS EXC MALIG | 46 | 29 | 7 | 3 | 2 | 5 | 0 | 5 | 0 |
| 7 | 205 | 205 DIS OF LIV EX MA,CR,HEP WITH CC | 18 | 8 | 7 | 1 | 1 | 1 | 0 | 0 | 0 |
| 7 | 206 | 206 DIS OF LIV EX MA,CR,HEP W/O CC | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 7 | 207 | 207 DIS BIL TRCT WITH CC | 5 | 1 | 0 | 3 | 0 | 1 | 0 | 0 | 0 |
| 7 | 208 | 208 DIS BIL TRCT W/O CC | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 |
| 7 | 493 | 493 LAPAROSCOPIC CHOL W/O CDE CC | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | 494 | 494 LAPAROSCOPIC CHOL W/O CDE W/O CC | 4 | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 0 |
| 8 | 209 | 209 MAJ JOINT+LIMB REATT RX LOW EXT | 4 | 1 | 1 | 3 | 0 | 0 | 0 | 0 | 0 |
| 8 | 210 | 210 HIP+FEM EX MAJ JNT 18+ WITH CC | 11 | 3 | 1 | 3 | 1 | 1 | 0 | 1 | 1 |
| 8 | 211 | 211 HIP+FEM EX MAJ JNT 18+ W/O CC | 14 | 7 | 1 | 1 | 2 | 3 | 0 | 0 | 0 |
| 8 | 213 | 213 AMP MUSCU & CONN TISSUE DIS | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 8 | 216 | 216 BIOP MUSCUL SYS & CONN TISUE | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 217 | 217 DEBR+SKIN GRAFT EXCEPT HAND | 7 | 2 | 2 | 0 | 0 | 2 | 0 | 0 | 1 |
| 8 | 218 | 218 LOW EXT EX HP,FT,FM 18+ WITH CC | 11 | 6 | 1 | 0 | 1 | 5 | 0 | 0 | 2 |
| 8 | 219 | 219 LOW EXT EX HP,FT,FE 18+ W/O CC | 17 | 8 | 1 | 3 | 0 | 5 | 0 | 0 | 0 |
| 8 | 220 | 220 LOW EXT EX HP,FT,FE 0-17 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| 8 | 223 | 223 MAJ SH/ELB PROC/OTH UP EXT W CC | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 8 | 224 | 224 MAJ SH/ELB RX/OTH UP EXT W/O CC | 8 | 5 | 0 | 0 | 0 | 3 | 0 | 0 | 1 |

** Includes Medical Charities discharges

* Includes Blue Cross discharges

## D. C. GENERAL HOSPITAL
### PAYOR AND DRG
Jan. - June 2000 Discharges

| MDC | Final DRG | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | 225 | 225 FOOT PROCEDURES | 7 | 3 | 1 | 0 | 0 | 2 | 0 | 0 | 1 |
| 8 | 226 | 226 SOFT TISSUE PROC WITH CC | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| 8 | 227 | 227 SOFT TISSUE PROC W/O CC | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 8 | 228 | 228 MA TH/JNT RX/OTH HND/WR PR W/CC | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 229 | 229 HAND PROC EXC MAJ JNT W/O CC | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 230 | 230 LOC EXC&REM INT FX DEV HP&FEM | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 231 | 231 LOC EX&REM INT FX DEV EX HP&FEM | 8 | 3 | 2 | 0 | 0 | 2 | 1 | 0 | 0 |
| 8 | 233 | 233 MUSC&CONN TIS OR PROC WITH CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 234 | 234 MUSC&CONN TIS OR PROC W/O CC | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 235 | 235 FRACTURES OF FEMUR | 4 | 1 | 1 | 1 | 0 | 0 | 1 | 0 | 0 |
| 8 | 236 | 236 FRACTURES HIP & PELVIS | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 237 | 237 SPRN,STRN&DISLOC HIP,PELV,THIGH | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 8 | 238 | 238 OSTEOMYELITIS | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 239 | 239 PATH FRAC&MUSC&CONN TISSUE MALIG | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 8 | 240 | 240 CONN TISSUE DIS WITH CC | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 241 | 241 CONN TISSUE DIS W/O CC | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 8 | 242 | 242 SEPTIC ARTHRITIS | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 8 | 243 | 243 MEDICAL BACK PROBLEMS | 14 | 8 | 2 | 1 | 1 | 2 | 0 | 0 | 0 |
| 8 | 244 | 244 BONE DS&SPEC ARTHROPATH WITH CC | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 245 | 245 BONE DS&SPEC ARTHROPATH W/O CC | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 8 | 247 | 247 SIGNS&SYMPTOMS MUSC&CONN TISSUE | 9 | 5 | 1 | 1 | 0 | 2 | 0 | 0 | 0 |
| 8 | 248 | 248 TENDONITIS, MYOSITIS & BURSITIS | 6 | 1 | 1 | 1 | 0 | 1 | 0 | 0 | 2 |
| 8 | 250 | 250 FX/SPR/STR/DIS FRARM,HD,FT W/CC | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 251 | 251 FX/SPR/STR/DIS FRARM,HD,FT W/O CC | 6 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 252 | 252 FX/SPR/STR/DIS FRARM,HD,FT 0-17 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 253 | 253 FX/SP/STR/DIS UPAR,LOLG 18+ W CC | 10 | 4 | 4 | 2 | 0 | 0 | 0 | 0 | 0 |
| 8 | 254 | 254 FX/SP/STR UPAR,LOLG 18+ W/O CC | 4 | 0 | 2 | 0 | 0 | 0 | 1 | 1 | 0 |
| 8 | 255 | 255 FX/SPR/STR UPAR,LOLG X FT 0-17 | 13 | 6 | 2 | 0 | 4 | 1 | 0 | 0 | 0 |
| 8 | 256 | 256 OTHER MUSC & CONN TISSUE DIAG | 6 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 499 | 499 BACK/NECK PROC EX SP FUS W CC | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 503 | 503 KNEE PROC W PDX INFEC | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 8 | 501 | 501 KNEE PROC W/O PDX INFEC | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 9 | 257 | 257 TOTAL MAST FOR MALIG WITH CC | 5 | 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 |
| 9 | 258 | 258 TOTAL MAST FOR MALIG W/O CC | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

• Includes Medical Charities discharges

•• Includes Blue Cross discharges

# D. C. GENERAL HOSPITAL
## PAYOR AND DRG
### Jan. - June 2000 Discharges

| MDC | Final DRG | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 | 259 | 259 SUBTOTAL MAST FOR MALIG WITH CC | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 9 | 261 | 261 BREAST NONMALIG EX BIO+LOC EX | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | 262 | 262 BREAST BIO&LOC EX NON-MALIG | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| 9 | 263 | 263 SK GFT &/OR DEBR UL,CEL WITH CC | 6 | 3 | 1 | 2 | 0 | 0 | 0 | 0 | 0 |
| 9 | 264 | 264 SK GFT &/OR DEBR UL,CEL W/O CC | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 9 | 265 | 265 SK GFT &/OR DEBR X UL/CEL W CC | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 9 | 266 | 266 SK GFT &/OR DEBR X UL/CEL W/O CC | 5 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 9 | 267 | 267 PERIANAL & PILONIDAL PROC | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 9 | 269 | 269 OTH SK SBCT TIS&BST PRO WITH CC | 4 | 2 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 9 | 270 | 270 OTH SK SBCT TIS&BST PRO W/O CC | 11 | 6 | 1 | 0 | 0 | 3 | 0 | 1 | 0 |
| 9 | 271 | 271 SKIN ULCERS | 13 | 7 | 1 | 3 | 0 | 1 | 0 | 1 | 0 |
| 9 | 272 | 272 MAJ SKIN DISORDERS WITH CC | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | 273 | 273 MAJ SKIN DISORDERS W/O CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | 274 | 274 MALIG BRST DISORDERS WITH CC | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| 9 | 276 | 276 NON-MALIGNANT BREAST DISORDERS | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | 277 | 277 CELLULITIS 18+ WITH CC | 42 | 26 | 5 | 3 | 2 | 0 | 1 | 4 | 2 |
| 9 | 278 | 278 CELLULITIS 18+ W/O CC | 29 | 19 | 1 | 4 | 1 | 0 | 0 | 2 | 2 |
| 9 | 279 | 279 CELLULITIS 0-17 | 8 | 2 | 3 | 0 | 0 | 3 | 0 | 0 | 0 |
| 9 | 280 | 280 TRAUM SKIN/SBCT TI&BR 18+ W/CC | 37 | 25 | 5 | 0 | 2 | 3 | 0 | 2 | 0 |
| 9 | 281 | 281 TRAUM SKIN/SBCT TI&BR 18+ W/O CC | 69 | 36 | 5 | 7 | 3 | 13 | 0 | 4 | 1 |
| 9 | 282 | 282 TRAUM SKIN/SBCT TI&BR 0-17 | 12 | 4 | 0 | 0 | 6 | 2 | 0 | 0 | 0 |
| 9 | 283 | 283 MINOR SKIN DISORDERS WITH CC | 4 | 1 | 0 | 0 | 0 | 0 | 1 | 2 | 0 |
| 9 | 284 | 284 MINOR SKIN DISORDERS W/O CC | 8 | 3 | 1 | 0 | 2 | 0 | 0 | 1 | 1 |
| 10 | 285 | 285 AMP LO LMB,END,NUT&MET DIS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | 287 | 287 GFT&DBD,ENDO,NUT&MET DIS | 1 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| 10 | 290 | 290 THYROID PROCEDURES | 5 | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 0 |
| 10 | 294 | 294 DIABETES 36+ | 122 | 52 | 12 | 37 | 2 | 6 | 0 | 11 | 2 |
| 10 | 295 | 295 DIABETES 0-35 | 8 | 7 | 0 | 0 | 3 | 2 | 1 | 2 | 1 |
| 10 | 296 | 296 NUT&META DISORDERS 18+ WITH CC | 55 | 14 | 7 | 25 | 3 | 2 | 1 | 2 | 1 |
| 10 | 297 | 297 NUT&META DISORDERS 18+ W/O CC | 24 | 8 | 6 | 8 | 0 | 0 | 0 | 1 | 1 |
| 10 | 298 | 298 NUT&META DISORDERS 0-17 | 10 | 2 | 1 | 1 | 4 | 2 | 0 | 0 | 0 |
| 10 | 300 | 300 ENDOCRINE DISORDERS WITH CC | 7 | 4 | 1 | 1 | 1 | 0 | 0 | 0 | 0 |
| 10 | 301 | 301 ENDOCRINE DISORDERS W/O CC | 4 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 0 |
| 11 | 303 | 303 KID,URETER&MAJ BLA PRO FOR NEO | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |




# D. C. GENERAL HOSPITAL

PAYOR AND DRG
Jan. - June 2000 Discharges

| MDC | Final DRG: | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 304 | 304 KID,URETER&MAJ BLA N-MAL W CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | 305 | 305 KID,URETER&MAJ BLA N-MAL W/O CC | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 11 | 308 | 308 MINOR BLADDER PROC W CC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | 309 | 309 MINOR BLADDER PROC W/O CC | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 11 | 310 | 310 TRANSURETHRAL PROC W CC | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 11 | 315 | 315 KID+URIN TRACT O.R. PROCEDURES | 12 | 0 | 5 | 1 | 2 | 1 | 0 | 3 | 0 |
| 11 | 316 | 316 RENAL FAILURE | 49 | 7 | 14 | 13 | 0 | 5 | 0 | 7 | 1 |
| 11 | 320 | 320 KID&URIN TRACT INF 18+ WITH CC | 44 | 2 | 10 | 27 | 3 | 1 | 0 | 1 | 0 |
| 11 | 321 | 321 KID&URIN TRACT INF 18+ W/O CC | 11 | 4 | 3 | 2 | 1 | 0 | 1 | 0 | 0 |
| 11 | 322 | 322 KID&URIN TRACT INF 0-17 | 12 | 3 | 1 | 0 | 8 | 0 | 0 | 0 | 0 |
| 11 | 323 | 323 URINARY STONE W CC &/OR ESWL | 2 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 11 | 331 | 331 KID&URIN TRACT DIAG 18+ WITH CC | 7 | 2 | 0 | 4 | 0 | 0 | 1 | 0 | 0 |
| 11 | 332 | 332 KID&URIN TRACT DIAG 18+ W/O CC | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 12 | 334 | 334 MAJ MALE PELV PROC WITH CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12 | 335 | 335 MAJ MALE PELV PROC W/O CC | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 |
| 12 | 337 | 337 TRANSURETHR PROSTATECTOMY W/O CC | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 0 |
| 12 | 339 | 339 TESTES PROC NON-MALIG 18+ | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 12 | 341 | 341 PENIS PROCEDURES | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 12 | 345 | 345 MALE REPRO O.R. PROC NON-MALIG | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 |
| 12 | 346 | 346 MALIGNANCY, MALE REPRO WITH CC | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| 12 | 347 | 347 MALIGNANCY, MALE REPRO W/O CC | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 12 | 350 | 350 INFLAMMATION OF MALE REPRO SYS | 6 | 4 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| 3 | 354 | 354 UTER,ADNEX PR FOR NON-MAL W CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 354 | 354 UTER,ADNEX PR FOR NON-MAL W/O CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 | 355 | 355 UTER,ADNEX PR FOR NON-MAL W/O CC | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 13 | 357 | 357 UTER,ADNEX PROC FOR MALIG | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 | 358 | 358 UTER,ADNEX NON-MALIG WITH CC | 9 | 8 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 13 | 359 | 359 UTER,ADNEX NON-MALIG W/O CC | 24 | 17 | 2 | 1 | 3 | 0 | 0 | 1 | 0 |
| 13 | 359 | 359 UTER,ADNEX NON-MALIG W/O CC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 | 360 | 360 VAGINA,CERVIX&VULVA PROCEDURE | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 13 | 364 | 364 D+C, CONIZ EXCEPT MALIG | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 13 | 364 | 364 D+C, CONIZ EXCEPT MALIG | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 13 | 365 | 365 FEM REPRO SYS O.R. PROCEDURES | 4 | 4 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 13 | 368 | 368 INFECT, FEMALE REPRO SYS | 21 | 7 | 3 | 1 | 7 | 1 | 0 | 1 | 0 |
| 13 | 369 | 369 MENSTRUAL & OTHER FEM REPRO DIS | 9 | 1 | 1 | 1 | 5 | 1 | 0 | 1 | 0 |
| 13 | 369 | 369 MENSTRUAL & OTHER FEM REPRO DIS | 1 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| 14 | 370 | 370 C SECTION WITH CC | 24 | 6 | 9 | 0 | 7 | 1 | 0 | 1 | 0 |
| 14 | 370 | 370 C SECTION WITH CC | 24 | 6 | 9 | 0 | 7 | 1 | 0 | 1 | 0 |
| 14 | 371 | 371 C SECTION W/O CC | 60 | 15 | 15 | 1 | 27 | 2 | 0 | 0 | 0 |
| 14 | 371 | 371 C SECTION W/O CC | 60 | 15 | 15 | 1 | 27 | 2 | 0 | 0 | 0 |



\* Includes Medical Charities discharges

\*\* Includes Blue Cross discharges





## D. C. GENERAL HOSPITAL
### PAYOR AND DRG
### Jan. - June 2000 Discharges

| MDC | Final DRG: | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 372 | 372 VAGINAL DELIVERY W COMP DIAG | 34 | 7 | 11 | 0 | 15 | 0 | 1 | 0 | 0 |
| 14 | 373 | 373 VAGINAL DELIVERY W/O COMP DIAG | 174 | 47 | 42 | 1 | 74 | 8 | 1 | 1 | 0 |
| 14 | 374 | 374 VAGINAL DELIVERY W STER &/OR D+C | 24 | 7 | 4 | 0 | 13 | 0 | 0 | 0 | 0 |
| 14 | 376 | 376 POSTPART & POSTABORT DIAG W/O PR | 7 | 1 | 1 | 0 | 5 | 0 | 0 | 0 | 0 |
| 14 | 377 | 377 POSTPART & POSTABORT DIAG W OR | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 | 378 | 378 ECTOPIC PREGNANCY | 5 | 2 | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| 14 | 379 | 379 THREATENED ABORTION | 8 | 2 | 1 | 0 | 5 | 0 | 0 | 0 | 0 |
| 14 | 380 | 380 ABORTION W/O D&C | 6 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 0 |
| 14 | 381 | 381 ABORT W D&C, ASP CUR/HYSTEROTOMY | 40 | 20 | 4 | 0 | 11 | 3 | 1 | 1 | 0 |
| 14 | 382 | 382 FALSE LABOR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 | 383 | 383 ANTEPARTUM DIAG W MED COMPL | 33 | 15 | 7 | 0 | 10 | 1 | 0 | 0 | 0 |
| 14 | 384 | 384 ANTEPARTUM DIAG W/O MED COMPL | 16 | 8 | 4 | 0 | 3 | 1 | 0 | 0 | 0 |
| 15 | 385 | 385 NEONATES,DIED OR TRANSFERRED | 8 | 3 | 4 | 0 | 1 | 0 | 0 | 0 | 0 |
| 15 | 386 | 386 EXTR IMMATURITY OR RDS, NEONATE | 16 | 4 | 5 | 0 | 7 | 0 | 0 | 0 | 0 |
| 15 | 387 | 387 PREMATURITY W MAJ PROB | 18 | 2 | 9 | 1 | 6 | 0 | 0 | 0 | 0 |
| 15 | 388 | 388 PREMATURITY W/O MAJ PROB | 13 | 3 | 5 | 0 | 5 | 0 | 0 | 0 | 0 |
| 15 | 389 | 389 FULL TERM NEONATE W MAJ PROB | 75 | 17 | 21 | 1 | 32 | 2 | 2 | 0 | 0 |
| 15 | 390 | 390 NEONATE W OTHER SIGNIFICANT PROB | 106 | 20 | 35 | 1 | 46 | 2 | 2 | 1 | 0 |
| 15 | 391 | 391 NORMAL NEWBORN | 75 | 12 | 22 | 0 | 38 | 1 | 2 | 0 | 0 |
| 15 | 470 | 470 UNGROUPABLE | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 16 | 392 | 392 SPLENECTOMY 18+ | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 16 | 394 | 394 OR PROC OF BLOOD&BLOOD FORM ORG | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 16 | 395 | 395 RED BLD CELL DIS 18+ | 52 | 18 | 13 | 8 | 2 | 2 | 1 | 7 | 2 |
| 16 | 396 | 396 RED BLD CELL DIS 0-17 | 3 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 |
| 16 | 397 | 397 COAGULATION DISORDERS | 7 | 2 | 1 | 0 | 1 | 0 | 0 | 3 | 0 |
| 16 | 398 | 398 RETICULO&IMMUNITY DIS WITH CC | 9 | 1 | 0 | 4 | 1 | 1 | 0 | 0 | 0 |
| 16 | 399 | 399 RETICULO&IMMUNITY DIS W/O CC | 4 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 1 |
| 17 | 401 | 401 LYMPH/LEUK W O.R. PROC W CC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 17 | 403 | 403 LYMPH/LEUK WITH CC | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 17 | 408 | 408 MYELO DIS W MIN O.R. PR | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 17 | 409 | 409 RADIOTHERAPY | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 17 | 410 | 410 CHEMO W/O AC LEUK AS SECON DX | 25 | 5 | 17 | 3 | 0 | 0 | 0 | 0 | 0 |
| 17 | 413 | 413 OTH MYELOPROLIF DIS WITH CC | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 17 | 414 | 414 OTH MYELOPROLIF DIS W/O CC | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |

\* Includes Medical Charities discharges

\*\* Includes Blue Cross discharges



# D. C. GENERAL HOSPITAL

PAYOR AND DRG

Jan. - June 2000 Discharges

| MDC Final | DRG: | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | P'ND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 473 | 473 ACUTE LEUK W/O MAJ OR PROC 18+ | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 18 | 415 | 415 O.R. PROC INFECT & PARASIT DIS | 7 | 4 | 2 | 1 | 0 | 0 | 0 | 0 | 0 |
| 18 | 416 | 416 SEPTICEMIA 18+ | 27 | 5 | 8 | 12 | 1 | 0 | 0 | 1 | 0 |
| 18 | 417 | 417 SEPTICEMIA 0-17 | 10 | 1 | 5 | 0 | 4 | 0 | 0 | 0 | 0 |
| 18 | 418 | 418 POST OP & POST-TRAUMA INFECT | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 | 419 | 419 FEVER UNKNOWN ORIG 18+ WITH CC | 3 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| 18 | 420 | 420 FEVER UNKNOWN ORIG 18+ W/O CC | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 18 | 421 | 421 VIRAL ILLNESS 18+ | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| 18 | 422 | 422 VIRAL ILLNESS & FUO 0-17 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 | 423 | 423 OTH INFECT & PARASIT DSE DIAG | 4 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| 19 | 425 | 425 AC ADJ REACT&DIST OF PSYCH DYS | 5 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 19 | 429 | 429 ORGANIC DISTURB & MENTAL RETARD | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |
| 19 | 430 | 430 PSYCHOSES | 7 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 |
| 19 | 432 | 432 OTHER MENTAL DISORDER DIAGNOSES | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20 | 433 | 433 ALC/DRUG ABUSE/DEPEND, LEFT AMA | 42 | 33 | 2 | 1 | 3 | 0 | 0 | 1 | 0 |
| 20 | 434 | 434 ALC/DRUG ABUSE/DEPEND,DETOX W CC | 55 | 29 | 5 | 5 | 3 | 1 | 0 | 2 | 0 |
| 20 | 435 | 435 ALC/DRUG ABUSE/DEPEND,DETOX W/O CC | 34 | 20 | 1 | 1 | 2 | 2 | 0 | 4 | 0 |
| 20 | 436 | 436 ALC/DRUG DEPEND W/REHAB THERAPY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20 | 437 | 437 ALC/DRUG DEPEND,COMB REHAB/DETOX | 274 / 230 | 230 | 19 | 3 | 15 | 5 | 1 | 1 | 1 |
| 20 | 440 | 440 WOUND DEBRIDEMENTS FOR INJURIES | 3 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 21 | 441 | 441 HAND PROCEDURES FOR INJURIES | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| 21 | 442 | 442 OTHER O.R. PROC INJUR WITH CC | 6 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 21 | 443 | 443 OTHER O.R. PROC INJUR W/O CC | 7 | 5 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 21 | 444 | 444 TRAUMATIC INJURY 18+ WITH CC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 21 | 445 | 445 TRAUMATIC INJURY 18+ W/O CC | 24 | 13 | 3 | 0 | 6 | 0 | 0 | 2 | 0 |
| 21 | 446 | 446 TRAUMATIC INJURY AGE 0-17 | 8 | 1 | 0 | 0 | 7 | 0 | 0 | 0 | 0 |
| 21 | 447 | 447 ALLERGIC REACTIONS 18+ | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 21 | 449 | 449 POISON&TOX EFF DRUGS 18+ W CC | 45 | 19 | 7 | 7 | 2 | 5 | 1 | 4 | 0 |
| 21 | 450 | 450 POISON&TOX EFF DRUGS 18+ W/O CC | 4 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 21 | 451 | 451 POISON&TOX EFF DRUGS 0-17 | 6 | 2 | 1 | 0 | 3 | 0 | 0 | 0 | 0 |
| 21 | 452 | 452 COMPLICATIONS OF TREAT WITH CC | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 21 | 453 | 453 COMPLICATIONS OF TREAT W/O CC | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 21 | 454 | 454 INJUR,POISON&TOX EFF WITH CC | 5 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 0 |
| 21 | 455 | 455 INJUR,POISON&TOX EFF W/O CC | 4 | 1 | 1 | 1 | 0 | 0 | 1 | 0 | 1 |



* Includes Medical Charities discharges

** Includes Blue Cross discharges

9/27/00, DCGH DRGs-2000 Jan-Jun- 09266...ed rpt

# D. C. General Hospital
## PAYOR AND DRG
### Jan. - June 2000 Discharges

| MDC | Final DRG: | DRG'S TEXT | TOTALS | SELF* | CAID | CARE | CAID MCO | COMM.** | PEND CAID | CORR | CITY AGEN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 22 | 509 | 509 FT BURN WO GRAFT/INHL INJ WO CC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| 22 | 511 | 511 NONEXT BURN WO CC OR SIG TRAUMA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 23 | 463 | 463 SIGNS & SYMPTOMS WITH CC | 6 | 1 | 3 | 1 | 0 | 0 | 0 | 1 | 0 |
| 23 | 464 | 464 SIGNS & SYMPTOMS WO CC | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 23 | 466 | 466 AFTERCARE W/O HX MAL SEC DX | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 |
| 23 | 467 | 467 OTHER FACTORS INFLU HLTH STAT | 8 | 2 | 2 | 0 | 1 | 2 | 1 | 0 | 0 |
| 24 | 485 | 485 LIMB REATT,HIP/FEM RX MLT SIG TR | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 24 | 486 | 486 OTHER O.R. RX FOR MULT SIGN TR | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 24 | 487 | 487 OTHER MULTIPLE SIGN TRAUMA | 17 | 9 | 2 | 2 | 1 | 3 | 0 | 0 | 0 |
| 25 | 488 | 488 HIV W EXTENSIVE O.R. RX | 5 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 1 |
| 25 | 489 | 489 HIV W MAJOR RELATED CONDITION | 125 | 35 | 53 | 9 | 5 | 0 | 5 | 15 | 3 |
| 25 | 490 | 490 HIV W OR W/O OTHER RELATED COND | 34 | 11 | 11 | 1 | 1 | 2 | 1 | 7 | 0 |
| 99 | 468 | 468 EXTENSIVE UNRELATED O.R. PROC | 13 | 4 | 4 | 3 | 1 | 1 | 0 | 0 | 0 |
| 99 | 477 | 477 UNRELATED NONEXTENSIVE PROCEDURE | 6 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 1 |
| 99 | 482 | 482 TRACH FOR FACE,MOUTH,NECK DX | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| 99 | 483 | 483 TRACH EXCEPT FACE,MOUTH,NECK DX | 30 | 2 | 7 | 12 | 3 | 6 | 0 | 0 | 0 |
| | Total | Total | 4,493 | 1,677 | 836 | 671 | 662 | 273 | 62 | 238 | 74 |

* Includes Medical Charties discharges

** Includes Blue Cross discharges



APPENDIX  H

PBC
DC General Hospital
Hospital Based Outpatient Visits

Actual visits for the period 01/01/00 to 08/31/00

| Clinics | Blue Cross | Commercial | Corrections | Hill Burton | Medical Charity | Grants | HMO | MA MCO | Tricare | Medicare | Medicaid | MA/aid Other | City Agency | Self Pay | Other | W/Comp | Total | % to Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DCACCMEDRRLL | 17 | 7 | | | 336 | | | 12 | | 331 | 210 | | | 231 | | 3 | 1,149 | 1.1% |
| DCACCSURGFLL | | | | | 29 | | | | | 18 | 23 | | | 21 | | | 96 | 0.1% |
| DCALLERGY | 8 | 7 | 20 | | 136 | 3 | | 22 | | 67 | 76 | | 9 | 117 | | | 457 | 0.4% |
| DCAMBSURG | 8 | 9 | 154 | | 301 | 3 | | 44 | | 105 | 162 | 1 | 1 | 228 | 1 | | 1,025 | 1.0% |
| DCAMBSURGFED | | | | | | | | | | | | | | | | | 2 | 0.0% |
| DCAMPDONOR | 13 | 23 | 53 | | 350 | | | 22 | | 547 | 317 | | 1 | 286 | 6 | | 1,619 | 1.5% |
| DCCARDIAC | | | | | 2 | | | 1 | | 6 | 1 | | | 4 | | | 15 | 0.0% |
| DCCARDIACCATH | | | | | | | | | | | | | | | | | 1 | 0.0% |
| DCCORRECTIONS | | | | | | | | 34 | | | 7 | | 1 | 34 | | | 87 | 0.1% |
| DCDEVANESTII | 36 | 5 | | | 500 | 2 | | 202 | | 98 | 177 | 1 | 1 | 732 | | | 1,822 | 1.7% |
| DCDENGEN | | 21 | 14 | | 203 | 38 | | 88 | | 24 | 43 | | | 207 | | | 598 | 0.5% |
| DCDENHYG | 7 | 7 | 5 | | | 13 | | 31 | | | 15 | | | 2 | | | 51 | 0.0% |
| DCDENHYGPEDS | 36 | 3 | | | 212 | 14 | | 170 | | 71 | 201 | | 15 | 627 | 1 | | 1,785 | 1.8% |
| DCDENORALBURG | 20 | 36 | 424 | | 8 | | | 510 | | 2 | 121 | | | 223 | | | 882 | 0.8% |
| DCDENPED | 9 | 9 | | | 674 | 39 | | 874 | | 125 | 260 | | 16 | 3,451 | | | 5,749 | 5.3% |
| DCDENTALWALK | 65 | 127 | 98 | | 244 | 3 | | 15 | | 161 | 105 | | 8 | 204 | 1 | | 837 | 0.8% |
| DCDIAGNOSTIC | 18 | 13 | 65 | | 1 | | | | | 1 | | | | 1 | | | 3 | 0.0% |
| DCECHO | | | | | | | | | | | | | | | | | 2 | 0.0% |
| DCEEG | | | | | | | | | | | | | | | | | | |
| DCEKG | | 3 | 18 | | 41 | | | 4 | | 11 | 16 | | 1 | 43 | 2 | | 135 | 0.1% |
| DCENDO | 23 | 21 | 111 | | 372 | 6 | | 83 | | 260 | 276 | | 6 | 360 | 1 | 1 | 1,522 | 1.4% |
| DCENT | 69 | 54 | 106 | | 1,242 | 15 | | 105 | | 1,137 | 613 | | 24 | 892 | | | 4,263 | 3.9% |
| DCEYEGENERAU | 8 | 5 | 5 | | 47 | 1 | | | | 145 | 65 | | 24 | 46 | | | 325 | 0.3% |
| DCEYEGLAUCOMA | | | | | 14 | | | | | 24 | 8 | | | 9 | | | 58 | 0.1% |
| DCEYEHVF | 4 | 3 | 12 | | 90 | | 1 | | | 94 | 74 | | | 60 | | | 340 | 0.3% |
| DCEYERETINA | 13 | 12 | 192 | | 283 | 6 | 1 | 3 | | 172 | 168 | | 5 | 260 | | | 1,133 | 1.0% |
| DCGI | 18 | 21 | 265 | | 462 | 8 | | 12 | | 191 | 202 | | 19 | 545 | | 8 | 1,817 | 1.7% |
| DCGTSURGERY | 9 | 8 | | | 74 | 3 | | 70 | | 52 | 76 | | | 138 | | | 422 | 0.4% |
| DCGYNONC | | 7 | 16 | | 88 | | | 53 | | 338 | 167 | | | 50 | | | 672 | 0.6% |
| DCHEAR | 10 | 1 | | | 7 | | | 2 | | 45 | 28 | | 7 | 23 | | | 178 | 0.2% |
| DCHEMATOLOGY | 1 | 5 | 27 | | 38 | | | 4 | | 256 | 232 | | 23 | 669 | | 10 | 2,128 | 1.9% |
| DCHUSURGERY | 27 | 44 | 303 | | 510 | 4 | | 46 | 1 | 68 | 22 | | | 31 | | | 2,326 | 2.1% |
| DCHYPER | 2 | 11 | | | 40 | 1 | | | | 101 | 611 | | 24 | 172 | 2 | | 159 | 0.1% |
| DCHSDR | 8 | 26 | 59 | | 340 | 888 | | 82 | | 12 | 24 | 14 | | 36 | 1 | | 6,054 | 5.5% |
| DCLIVER | 6 | 1 | | | 78 | | | 83 | | 1,967 | 1,095 | | 3 | 1,019 | | | 447 | 0.4% |
| DCMEDFU | 76 | 58 | 8 | | 1,741 | 3 | | 14 | | 41 | 51 | | 2 | 154 | | | 492 | 0.5% |
| DCMEDREFGT | 2 | 7 | 5 | | 171 | | | 25 | | 58 | 63 | | | 162 | | | 1 | 0.0% |
| DCMEDREFIIU | 4 | 10 | 6 | | 174 | | | | | | | | | 1 | | | 212 | 0.2% |
| DCMEDSPEC | | | | | | | | | | | | | | | | | 1,129 | 1.0% |
| DCNEURO-SEIZ | 3 | 7 | 4 | | 46 | 4 | | 9 | | 28 | 56 | | 3 | 59 | 2 | | 522 | 0.5% |
| DCNEUROLOGY | 15 | 6 | 39 | | 341 | | | 20 | | 208 | 252 | | | 238 | | 6 | 10 | 0.0% |
| DCNEUROSURG | 4 | 7 | 78 | | 130 | 3 | | 13 | | 86 | 140 | 4 | | 58 | | | 254 | 0.2% |
| DCNEUMED | | 1 | | | 1 | | | 1 | | 2 | | | | 5 | | | 5,619 | 5.1% |
| DCNUTRITION | 3 | 2 | | | 70 | | | 3 | | 80 | 59 | | 2 | 35 | | | 749 | 0.7% |
| DCNYGYN | 15 | 88 | 68 | | 981 | 76 | 13 | 1,179 | 1 | 212 | 800 | | 24 | 2,124 | 15 | | 11 | 0.0% |
| DCOB/GYN | 11 | 5 | 48 | | 131 | | | 7 | | 182 | 239 | | 7 | 118 | 1 | | 2,887 | 2.6% |
| DCORTHOHAND | | | | | 5 | | | | | 2 | 1 | | | 1 | | | 180 | 0.2% |
| DCORTHOPEDIC | 65 | 78 | 255 | 1 | 881 | 1 | | 108 | | 324 | 351 | | 22 | 752 | 3 | 48 | 459 | 0.4% |
| DCPACEMAKER | 2 | 4 | 3 | | 34 | | | 3 | | 72 | 43 | | | 19 | | | 238 | 0.2% |
| DCPEDAIOLES | 11 | 13 | 5 | | 2 | | | 174 | | 8 | 115 | | 30 | 101 | | | 72 | 0.1% |
| DCPEDALLERGY | | 5 | | | | | | 175 | | | 40 | | | 14 | | | 1,176 | 1.1% |
| DCPEDCARD | 3 | 2 | | | | | | 38 | | 1 | 14 | | 1 | 17 | | | 45 | 0.0% |
| DCPEDCONT | 8 | 24 | | | 70 | 5 | | 752 | | 185 | 185 | | 2 | 198 | 5 | | 83 | 0.1% |
| DCPEDENDO | | | | | | | | 30 | | 9 | | | | 6 | | | 185 | 0.2% |
| DCPEDHEMAT | | | | | | | | 44 | | 25 | | | | 14 | | | 727 | 0.7% |
| DCPEDHRSK | | 1 | | | | | | 87 | | 65 | | | | 31 | 1 | | 185 | 0.2% |
| DCPEDMEOFU | 6 | 13 | | | | | | 429 | | 128 | | | 3 | 145 | 2 | | 727 | 0.7% |

PBC
DC General Hospital
Hospital Based Outpatient Visits

| Department | Total | % |
|---|---|---|
| DCPENNEURO | 226 | 0.2% |
| DCPEPHUTRIT | 2 | 0.0% |
| DCPEDWELLBABY | 253 | 0.2% |
| DCPLASTSURG | 176 | 0.2% |
| DCPARDR | 1,120 | 1.0% |
| DCPAROT | 1,348 | 1.2% |
| DCPMRPT | 3,351 | 3.1% |
| DCPMRRT | 3 | 0.0% |
| DCPODIATRY | 1,299 | 1.2% |
| DCPREDP | 174 | 0.2% |
| DCPREDPTEST | 1,330 | 1.2% |
| DCPFULMONARY | 466 | 0.4% |
| DCRADCT&CAM | 1 | 0.0% |
| DCRADIOLOGY | 77 | 0.1% |
| DCREFOPD | 8,323 | 7.6% |
| DCRENAL | 384 | 0.4% |
| DCRENALDIALY | 11 | 0.0% |
| DCRHEUMAT | 477 | 0.4% |
| DCSARCOID | 157 | 0.1% |
| DCSPEECH | 110 | 0.1% |
| DCUROLOGY | 1,427 | 1.3% |
| ERFASTTRACK | 7,086 | 6.5% |
| ERMALTRAUMA | 363 | 0.3% |
| ERMENTALOBS | 1 | 0.0% |
| ERMINTRAUMA | 8,332 | 7.6% |
| EROBROOM | 648 | 0.6% |
| ERPEDIATRICS | 4,996 | 4.6% |
| ERSTRETCHER | 3,905 | 3.8% |
| ERWALKIN | 9,799 | 9.0% |
| Total | 109,254 | 100.0% |

OCT-03-00  14:16  From:   T-373  P.10/32  Job-277

PBC
DC General Hospital
Hospital Based Outpatient Visits

| Annualized Visits Clinics | Blue Cross | Commercial | Corrections | Hill Burden | Medical Charity | Grants | HMO | MA MCO | Tricare | Medicare | Medicaid | M'caid Other | City Agency | Self Pay | MA Pending | Other | W/Comp | Total | % to Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DCACCMEDRFLL | 25 | 10 | 1 | | 503 | | | 18 | | 495 | 314 | | 1 | 346 | | | 4 | 1,718 | 1.1% |
| DCACCSURGRH | | | | | 43 | | | | | 27 | 34 | | | 1 | | | 1 | 144 | 0.1% |
| DCALLERGY | 12 | 10 | 30 | | 203 | | | 33 | | 100 | 114 | 1 | 1 | 175 | | | | 684 | 0.4% |
| DCAMBSURG | 12 | 13 | 230 | | 450 | | | 66 | | 157 | 242 | | 13 | 341 | | | | 1,533 | 0.9% |
| DCAMBSURGPED | | | | | | | | | | | | | | | | | | | 0.0% |
| DCAMPDONOR | | | | | | | | | | | | | | 3 | | | | 3 | 0.0% |
| DCCARDIAC | 19 | 34 | 79 | | 524 | | | 33 | | 818 | 474 | | | 428 | | | | 2,422 | 1.5% |
| DCCARDIACCATH | | | 1 | | 3 | | | 1 | | 9 | | | | 6 | | | | 22 | 0.0% |
| DCCORRECTIONS | | | | | | | | | | | | | | | | | | 1 | 0.0% |
| DCDEANNESTH | | 7 | 1 | | 4 | 3 | | 51 | | 1 | 10 | | 1 | 51 | | | | 130 | 0.1% |
| DCDENANEN | 54 | 36 | 21 | | 748 | 67 | | 302 | | 147 | 265 | | | 1,065 | | | | 2,728 | 1.7% |
| DCDENINYO | 10 | 10 | 7 | | 304 | 19 | | 132 | | 35 | 64 | | 1 | 310 | | | | 895 | 0.5% |
| DCDENHYGPED6 | | 4 | | | | | | 48 | | | 22 | | | 3 | | | | 76 | 0.0% |
| DCDENORALSURG | 30 | 45 | 634 | | 317 | 21 | | 254 | | 106 | 301 | | 22 | 938 | | | | 2,670 | 1.6% |
| DCDENPED | 13 | 13 | | | 12 | | | 783 | | 3 | 181 | | | 334 | | | | 1,319 | 0.8% |
| DCDENTALWALK | 97 | 190 | 147 | | 1,008 | 58 | | 1,307 | | 187 | 419 | | 24 | 5,162 | 1 | | | 8,600 | 5.3% |
| DCDIAGNOSTIC | 27 | 19 | 97 | | 365 | 4 | | 22 | | 241 | 157 | | 12 | 305 | | | | 1,252 | 0.8% |
| DCECHO | | | | | | | | | | 1 | | | | | | | | 4 | 0.0% |
| DCEEG | | | | | | | | | | | | | | | | | | 1 | 0.0% |
| DCEKG | | | | | | | 1 | 1 | | | | | | | | | | | 0.0% |
| DCENDO | 4 | 4 | 1 | | 61 | 9 | | 6 | | 16 | 24 | | 1 | 64 | 3 | | 1 | 202 | 0.1% |
| DCENT | 34 | 31 | 166 | | 558 | 22 | | 124 | | 389 | 413 | | 36 | 539 | 1 | | 36 | 2,277 | 1.4% |
| DCEYEGENERAL | 103 | 67 | 159 | | 1,858 | | | 157 | | 1,701 | 817 | | | 1,334 | 3 | | | 6,377 | 3.9% |
| DCEYEGLAUCOMA | 12 | 7 | 7 | | 70 | 1 | | | | 217 | 97 | | 1 | 69 | | | 1 | 485 | 0.3% |
| DCEYEHVF | | | 4 | | 21 | | | | | 36 | 12 | | | 13 | | | | 87 | 0.1% |
| DCEYERETINA | 6 | 4 | 18 | | 135 | | | 4 | | 141 | 111 | | 7 | 90 | 1 | | | 509 | 0.3% |
| DCGI | 19 | 18 | 287 | | 438 | 8 | 19 | 18 | | 257 | 251 | | 28 | 389 | | | | 1,695 | 1.0% |
| DCGISURGERY | 27 | 43 | 386 | | 691 | 12 | | 105 | | 286 | 302 | | 1 | 815 | 1 | | 12 | 2,719 | 1.7% |
| DCGYNONC | 13 | 12 | 10 | | 111 | 4 | | 79 | | 78 | 114 | | | 206 | | | | 631 | 0.4% |
| DCHEAR | 15 | 7 | 24 | | 132 | | | 3 | | 506 | 75 | | 10 | 75 | | | | 1,005 | 0.6% |
| DCHEMATOLOGY | 1 | 7 | 7 | | 57 | 6 | | | | 67 | 42 | | 34 | 34 | | | | 266 | 0.2% |
| DCHUSURGERY | 40 | 67 | 453 | | 763 | 1 | | 69 | | 383 | 347 | | 36 | 1,001 | | | 15 | 3,180 | 1.8% |
| DCHYPER | 3 | 16 | | | 60 | | | 123 | | 102 | 33 | | | 46 | | | | 263 | 0.2% |
| DCHSDR | 12 | 39 | 88 | | 509 | 1,228 | | 1 | 1 | 151 | 914 | 21 | | 257 | | | | 3,479 | 2.1% |
| DCLIVER | | 8 | 1 | | 117 | | | 1 | | 16 | 35 | | 4 | 54 | | | | 238 | 0.1% |
| DCMEDFU | 114 | 87 | 13 | | 2,604 | 4 | | 124 | 1 | 2,942 | 1,638 | | 3 | 1,524 | | | 1 | 9,056 | 5.5% |
| DCMEDREFGT | 3 | 10 | 7 | | 256 | | | 21 | | 61 | 76 | | | 230 | | | | 668 | 0.4% |
| DCMEDREFHU | 6 | 15 | 12 | | 260 | | | 37 | | 84 | 79 | | | 242 | | | | 736 | 0.5% |
| DCMEDSPEC | | | | | | | | | | | | | | 1 | | | | 1 | 0.0% |
| DCNEURO_SEIZ | 4 | 10 | 6 | | 68 | | | 13 | | 42 | 84 | | | 88 | | | 1 | 317 | 0.2% |
| DCNEUROLOGY | 22 | 9 | 58 | | 510 | 6 | | 30 | 1 | 311 | 377 | | 4 | 356 | 3 | | 9 | 1,689 | 1.0% |
| DCNEUROSURG | 6 | 10 | 117 | | 194 | | | 19 | | 129 | 209 | | 10 | 87 | | | | 781 | 0.5% |
| DCNUCMED | | | | | 1 | | | | | 3 | | | | 7 | | | | 15 | 0.0% |
| DCNUTRITION | 4 | 3 | 102 | | 105 | 114 | | 4 | | 120 | 88 | | 3 | 52 | | | | 380 | 0.2% |
| DCOBGYN | 52 | 129 | | | 1,467 | 1 | | 1,764 | | 317 | 1,187 | | 36 | 3,177 | | | | 8,405 | 5.1% |
| DCONCOLOGY | 16 | 7 | 72 | | 186 | | | 10 | | 272 | 358 | 6 | 10 | 615 | | | | 1,120 | 0.7% |
| DCORTHOHAND | | | 381 | 1 | 7 | | | | | 3 | 1 | | | 1 | | | | 16 | 0.0% |
| DCORTHOPEDIC | 97 | 114 | | | 1,318 | 1 | | 162 | | 485 | 525 | | 33 | 1,125 | 4 | | 72 | 4,319 | 2.6% |
| DCPACEMAKER | 3 | 6 | 4 | | 51 | | | 4 | | 108 | 64 | | 45 | 28 | | | | 269 | 0.2% |
| DCPEDADOLES | 16 | 19 | 7 | | 3 | | | 260 | | 12 | 172 | | | 151 | | | | 687 | 0.4% |
| DCPEDALLERGY | 6 | 3 | | | | | | 262 | | 1 | 60 | | | 21 | | | | 356 | 0.2% |
| DCPEDCARD | | | | | | | | 57 | | | 21 | | 1 | 25 | | | | 106 | 0.1% |
| DCPEDCONT | 12 | 36 | 36 | | | | | 1,125 | 3 | | 277 | | 3 | 296 | 7 | | | 1,759 | 1.1% |
| DCPEDENDO | | | | | | | | 45 | | | 13 | | | | | | | 67 | 0.0% |
| DCPEDHEMAT | | | | | | | | 66 | | | 37 | | | 21 | | | | 124 | 0.1% |
| DCPEDHIRSK | 9 | 1 | | | | | | 130 | | | 97 | | | 46 | 1 | | | 277 | 0.2% |
| DCPEDMEDFU | | 19 | | | | | | 642 | | | 191 | | 4 | 217 | 3 | | | 1,088 | 0.7% |

Page 1 of 4

PBC
DC General Hospital
Hospital Based Outpatient Visits

| | | | | | | | | | | | | | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPENNEURO | 6 | | | | | | | | | | | | 338 | 0.2% |
| DCPEDNJTRI1 | | | | | | | | | | | | | 3 | 0.0% |
| DCPEDWELLBABY | | | | | | | | | | | | | 378 | 0.2% |
| DCPLASTSURG | | | | | | | | | | | | | 283 | 0.2% |
| DCPHROR | 10 | | | | | | | | | | | | 1,604 | 1.0% |
| DCPHRO1 | | | 55 | | | | 96 | | | 88 | | | 2,016 | 1.2% |
| DCPHRRT | | | | | | | | | | 3 | | | 5,013 | 3.1% |
| DCPADIATRY | 12 | 21 | 84 | | | 6 | 105 | | 3 | 68 | | 15 | 4 | 0.0% |
| DCPREOP | 66 | 16 | 48 | 4 | 1 | 220 | 28 | | 5 | 350 | | 24 | 1,943 | 1.2% |
| DCPREOPTEST | 72 | 70 | 178 | 12 | | 184 | 302 | 1 | 5 | 435 | | 30 | 260 | 0.2% |
| DCPULMONARY | | | | | | 642 | 341 | 4 | 7 | 1,108 | | | 1,990 | 1.2% |
| DCRADCTSCAN | | | | | | | 915 | | | | | | 696 | 0.4% |
| DCRADIOLOG1 | 22 | 12 | 18 | 4 | | 630 | 4 | | | 4 | | 3 | 1 | 0.0% |
| DCREFOPD | | 1 | 28 | | | 45 | 334 | | 3 | 241 | | | 115 | 0.1% |
| DCRENAL | 18 | 16 | 299 | 9 | | 244 | 55 | 1 | 1 | 36 | | 1 | 12,450 | 7.6% |
| DCRENALDIALY | 7 | 3 | 51 | 4 | | 181 | 332 | | 16 | 405 | | | 589 | 0.4% |
| DCRHEUMAT | | | | | | | 166 | | 12 | 85 | 1 | | 16 | 0.0% |
| DCSARCOID | | | | | | | | | | 1 | | | 714 | 0.4% |
| DCSPEECH | 1 | 135 | 10 | | | 19 | 21 | 1 | | 33 | 1 | | 235 | 0.1% |
| DCUROLOGY | 169 | 10 | 798 | 399 | 1 | 2,358 | 1,970 | | 111 | 2,812 | 9 | 1 | 177 | 0.1% |
| ERFASTTRACK | 3 | | 48 | | | 198 | 144 | | 7 | 84 | 1 | | 2,135 | 1.3% |
| ERIAJTRAUMA | 1 | | 3 | | | 3 | 4 | | | 1 | | | 10,600 | 6.5% |
| ERIAENTRALOBS | 16 | 1 | 18 | 1 | | 180 | 181 | | | 67 | | | 543 | 0.3% |
| ERIAINTRAUMA | 7 | | 19 | | | 76 | 36 | | | 36 | | | 1 | 0.0% |
| EROBROOM | 1 | | 12 | | | 21 | 82 | | 16 | 31 | | | 12,464 | 7.6% |
| ERIPEDIATRIC1 | 18 | 34 | 350 | 7 | | 449 | 316 | 10 | 350 | 416 | | 1 | 969 | 0.8% |
| ERISTRETCHER | 127 | 290 | 579 | 21 | | 522 | 696 | 24 | 37 | 5,878 | | 9 | 7,474 | 4.6% |
| ERWALKIN | 15 | 48 | 9 | 13 | | 3 | 10 | | | 356 | | | 6,641 | 3.8% |
| | | | | | | | 1 | | 371 | 7,719 | | 166 | 14,658 | 9.9% |
| | 232 | 1,010 | 440 | | 1 | 322 | 449 | 8 | 90 | 352 | | | | |
| | 12 | 33 | 43 | 1 | | 4 | 120 | 21 | 51 | 1,070 | | | | |
| | 61 | 277 | 22 | 12 | | 683 | 1,037 | 3 | 504 | 2,820 | 1 | 4 | | |
| | 117 | 575 | 510 | 15 | 3 | 939 | 588 | 18 | 444 | 7,961 | | 10 | | |
| Total | 2,762 | 4,233 | 7,780 | 2,199 | 7 | 19,418 | 21,312 | 124 | 2,459 | 55,808 | 76 | 383 | 163,433 | 100.0% |
| | 1.3% | 2.6% | 4.8% | 1.3% | 0.0% | 11.9% | 13.0% | 0.1% | 1.5% | 34.1% | 0.0% | 0.2% | 100.0% | |

**APPENDIX I**

PBC
DC GENERAL
FY00 CHC VISITS - ANNUALIZED

| Service | Appx Months of Service | Base Cross | Commercial | Corrections | Med Charity | Grants | All MCOs | TriCare | Medicare | Medicaid DC | M'caid Other | City Agency | Self Pay | Other | Total | % to Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anacostia ACDENTAL | 4 | 27 | 60 |  | 128 | 9 | 318 |  | 96 | 414 | 3 |  | 674 | 21 | 1,740 | 7.19% |
| Anacostia ACDENMYG | 4 |  |  |  |  |  |  |  |  |  |  |  | 27 |  | 27 | 0.11% |
| Anacostia ACOBGYN | 4 | 54 | 75 | 3 | 573 |  | 168 |  | 504 | 210 |  |  | 1,646 |  | 3,373 | 13.52% |
| Anacostia ACPEDS | 4 | 30 | 12 |  | 273 | 12 | 676 |  | 45 | 330 | 3 |  | 1,197 |  | 2,778 | 11.48% |
| Anacostia ACSOCS | 4 | 12 | 102 |  | 9 |  | 1,559 |  |  | 390 |  |  | 1,227 |  | 3,699 | 15.28% |
| Adams Morgan AMDENTAL | 6 |  |  |  |  |  |  |  |  |  |  |  | 14 |  | 14 | 0.06% |
| Adams Morgan AMMED | 6 |  |  |  | 2 |  |  |  |  |  |  |  | 112 |  | 112 | 0.50% |
| Ardens Morgan AMOBGYN | 6 |  | 2 |  |  |  | 2 |  |  |  |  |  | 32 |  | 34 | 0.14% |
| Benning Heights BHMED | 2 |  |  |  |  |  |  |  |  |  |  |  | 66 |  | 66 | 0.27% |
| Benning Heights BHPEDS | 2 |  |  |  | 6 |  |  |  |  |  |  |  | 12 |  | 12 | 0.05% |
| Congress Heights CHDENTAL | 8 | 6 | 35 |  | 119 | 6 | 461 |  | 39 | 241 | 3 | 6 | 1,533 |  | 1,533 | 6.36% |
| Congress Heights CHMED | 8 | 63 | 165 | 11 | 839 | 99 | 1,904 |  | 431 | 411 | 3 | 6 | 4,205 |  | 4,205 | 17.37% |
| Congress Heights CHOBGYN | 8 | 56 | 87 |  | 328 | 51 | 258 |  | 45 | 440 | 2 | 1 | 2,360 |  | 2,360 | 11.40% |
| Congress Heights CHPEDS | 8 | 14 | 63 |  | 329 |  | 522 |  | 11 | 601 | 5 | 6 | 2,909 |  | 2,909 | 12.01% |
| Congress Heights CHPOD | 8 |  |  |  | 15 | 2 | 843 |  | 17 | 12 |  |  | 1,158 |  | 1,158 | 0.24% |
| Hunt Place HPAUDI | 3 |  |  |  |  |  | 2 |  |  |  |  |  | 59 |  | 59 | 0.24% |
| Hunt Place HPDENMYG | 3 | 4 | 24 |  |  |  | 228 |  | 8 | 64 |  |  | 144 |  | 144 | 0.25% |
| Hunt Place HPDENTAL | 3 |  |  |  |  |  |  |  |  | 44 |  |  | 80 |  | 80 | 0.33% |
| Hunt Place HPMED | 3 | 32 | 24 |  | 24 | 16 | 176 |  | 60 | 304 |  | 8 | 384 |  | 1,904 | 4.15% |
| Hunt Place HPOBGYN | 3 | 12 | 24 |  | 52 | 4 | 4 |  |  | 12 |  |  | 516 |  | 516 | 2.13% |
| Hunt Place HPPEDS-H | 3 | 44 | 28 | 4 | 64 |  | 304 |  | 8 | 212 | 8 |  | 766 |  | 766 | 3.17% |
| Hunt Place HPPEDS-H | 3 | 44 | 32 |  |  |  | 1,904 |  |  | 264 |  |  | 3,528 |  | 3,528 | 14.57% |
| HSCSN HSCSNAUDI | 3 | 68 | 104 |  |  |  | 426 |  |  | 112 |  |  | 840 |  | 1,504 | 6.21% |
| HSCSN HSCSNDTPR | 3 |  | 8 |  |  |  | 128 |  |  | 136 |  | 8 | 108 |  | 3,473 | 3.47% |
| HSCSN HSCSNDEVPEDS | 3 |  | 4 |  |  |  | 36 |  | 4 | 44 | 32 |  | 498 |  | 840 | 3.47% |
| HSCSN HSCSNDOCTTH | 3 |  |  |  |  |  | 16 |  |  | 104 |  | 8 | 180 |  | 108 | 0.45% |
| HSCSN HSCSNOPTHAL | 3 |  | 4 |  |  |  | 82 |  |  | 44 | 24 |  | 96 |  | 208 | 1.35% |
| HSCSN HSCSNORALSUR | 3 |  | 8 |  | 4 |  | 24 |  |  | 72 |  |  | 52 |  | 52 | 0.21% |
| HSCSN HSCSNORTHO | 3 | 8 | 12 |  |  | 4 | 24 |  |  | 24 | 24 |  | 208 |  | 208 | 0.85% |
| HSCSN HSCSNPHYTH | 3 |  |  |  |  |  | 68 |  |  | 60 |  |  | 36 |  | 36 | 0.50% |
| HSCSN HSCSNPSYTH | 3 |  | 6 |  | 4 | 4 | 24 |  |  | 80 | 48 |  | 272 |  | 272 | 1.12% |
| HSCSN HSCSN | 3 |  | 12 |  | 4 |  | 48 |  |  | 28 |  |  | 80 |  | 80 | 0.33% |
| HSCSN HSCSNSPEECH | 3 |  | 4 |  | 4 |  | 4 |  |  |  |  |  | 68 |  | 68 | 0.03% |
| HSCSN HSCSNSS | 3 |  | 4 |  | 4 |  | 60 |  |  | 40 | 12 |  | 148 |  | 148 | 0.61% |
| HSCSN HSCSNSS | 3 |  |  |  |  |  | 12 |  |  | 2 |  |  | 32 |  | 32 | 0.13% |
| Southwest SWDENMYG | 7 |  |  |  |  |  | 4 |  |  | 4 |  |  | 4 |  | 4 | 0.02% |
| Southwest SWDERM | 7 |  |  |  |  |  |  |  |  |  |  |  | 5 |  | 5 | 0.02% |
| Southwest SWDENTAL | 7 | 12 | 21 | 2 | 24 | 3 | 103 |  | 33 | 139 | 12 | 34 | 384 |  | 732 | 3.02% |
| Southwest SWENT | 7 |  |  |  |  |  |  |  |  | 2 |  |  | 2 |  | 2 | 0.01% |
| Southwest SWMED | 7 | 213 | 213 | 7 | 697 | 113 | 395 |  | 1,202 | 710 | 3 | 34 | 2,671 | 4 | 6,250 | 25.82% |
| Southwest SWOBGYN | 7 | 95 | 84 |  | 192 | 50 | 300 |  | 99 | 230 | 3 | 3 | 1,874 |  | 1,874 | 7.74% |
| Southwest SWPEDS | 7 | 19 | 161 |  | 21 |  | 1,034 |  | 45 | 389 | 5 |  | 2,883 |  | 2,883 | 11.13% |
| Southwest SWPOD | 7 | 24 | 81 | 9 | 321 | 26 | 82 |  | 588 | 194 |  |  | 1,025 |  | 1,808 | 7.48% |
| Southwest SWJAUD | 7 | 72 |  |  |  |  |  |  |  |  |  |  | 537 |  | 537 | 2.02% |
| Southwest SWJAUD | 7 |  |  |  |  |  |  |  |  |  |  |  | 4 | 4 | 4 | 0.02% |
| Walker Jones WJDENTAL | 3 | 8 | 28 |  | 112 | 4 | 116 |  | 84 | 292 |  | 4 | 908 |  | 908 | 6.65% |
| Walker Jones WJMED | 3 | 16 | 12 | 12 | 296 | 4 | 4 |  | 152 | 101 |  |  | 1,388 |  | 1,388 | 5.73% |
| Walker Jones WJOBGYN | 3 |  | 4 |  | 40 | 4 | 16 |  | 12 | 24 |  |  | 884 |  | 884 | 3.57% |
| Walker Jones WJPEDS | 3 |  |  |  |  | 4 | 16 |  |  | 192 |  |  | 752 |  | 752 | 3.21% |
| Woodridge WRDENTAL | 3 | 30 | 60 |  | 372 | 18 | 52 |  | 78 | 186 | 12 | 6 | 776 |  | 776 | 10.19% |
| Woodridge WRMED | 2 | 60 | 60 |  | 186 | 6 | 176 |  | 24 | 216 |  |  | 1,578 |  | 1,950 | 8.06% |
| Woodridge WROBGYN | 2 | 42 |  |  |  |  | 402 |  |  | 612 |  | 12 | 1,002 |  | 2,466 | 10.19% |
| Woodridge WRPEDS | 2 | 48 | 54 |  |  |  | 948 |  |  |  |  |  | 912 |  | 2,574 | 10.63% |
| **Total** |  | **825** | **1,531** | **59** | **4,905** | **414** | **12,550** | **0** | **3,564** | **8,304** | **210** | **82** | **25,481** | **24** | **58,195** | **100.00%** |
|  |  | 1.42% | 2.61% | 0.10% | 8.44% | 0.71% | 21.57% | 0.00% | 6.17% | 14.29% | 0.36% | 0.14% | 43.85% | 0.04% |  |  |

1. Annualized visits by service/payor from PBC systems. Base period 1/1/00 to 8/31/00. Annualization period adjusted based on month the CHC came "on-line".
2. Data is not "scrubbed".

P&C
DC GENERAL

FY00 CHC VISITS - 1/1/00 to 6/31/00

| Service | | Accal Month of Service | Blue Cross | Commercial | Downtown | Low County | Grants | # HMO | Tricare | Medicare | Medicaid | Sat Scale | Self Pay | Other | Total | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anacostia | ACDENTAL | 4 | | | | | | 106 | | 32 | 153 | 1 | 208 | | 580 | 2.40% |
| Anacostia | ACDENHYG | 4 | | | | | | 3 | | | 1 | | 5 | | 9 | 0.04% |
| Anacostia | ACMED | 4 | 18 | 20 | 1 | 191 | 3 | 56 | | 168 | 70 | 2 | 562 | | 1,091 | 4.51% |
| Anacostia | ACOBGYN | 4 | 10 | 25 | | 91 | | 292 | | 15 | 110 | | 926 | | 926 | 3.83% |
| Anacostia | ACPEDS | 4 | 4 | 34 | | 3 | 4 | 653 | | | 130 | 1 | 399 | | 1,233 | 5.08% |
| Anacostia | ACSOCS | 4 | | | | | | | | | | | 409 | | 7 | 0.03% |
| Adams Morgan | AMDENTAL | 6 | | | | | | | | | | | 66 | | 60 | 0.22% |
| Adams Morgan | AMMED | 6 | | 1 | | | | | | | | | 66 | | 60 | 0.25% |
| Adams Morgan | AMOBGYN | 6 | | | | | | | | | | | 17 | | 11 | 0.05% |
| Adams Morgan | AMPEDS | 6 | | | | 2 | | | | 1 | | | 9 | | 11 | 0.05% |
| Benning Heights | BHMED | 2 | | | | | 1 | | | | | | 9 | | 11 | 0.05% |
| Benning Heights | BHPEDS | 2 | | | | | | | | | | | | | 2 | 0.01% |
| Congress Heights | CHDENTAL | 6 | 4 | 23 | 1 | 75 | 4 | 307 | | 26 | 147 | 2 | 394 | | 1,026 | 4.23% |
| Congress Heights | CHMED | 6 | 55 | 110 | | 559 | 60 | 172 | | 287 | 214 | 2 | 1,264 | | 2,423 | 9.98% |
| Congress Heights | CHOBGYN | 6 | 24 | 58 | | 219 | 34 | 348 | | 30 | 293 | 1 | 825 | 1 | 1,440 | 7.60% |
| Congress Heights | CHPEDS | 6 | 9 | 42 | | 6 | 1 | 552 | | 7 | 534 | 5 | 772 | | 1,309 | 7.05% |
| Congress Heights | CHPOD | 6 | | | | 10 | | | | 11 | | 4 | | | 36 | 0.18% |
| Hunt Place | HPDENHYG | 3 | | 6 | | | | | | | | | 35 | | 39 | 0.48% |
| Hunt Place | HPDENTAL | 3 | 8 | 6 | | 1 | | 57 | | 2 | 17 | | 117 | | 117 | 0.28% |
| Hunt Place | HPMED | 3 | 8 | 2 | 7 | | 1 | 44 | | 15 | 96 | | 96 | | 251 | 1.04% |
| Hunt Place | HPOBGYN | 3 | 11 | 7 | 1 | 6 | 4 | 76 | | 2 | 88 | | 129 | | 129 | 0.53% |
| Hunt Place | HPPEDS | 3 | 11 | 8 | | 13 | 1 | 476 | | | 321 | | 199 | | 882 | 3.54% |
| Hunt Place | HPSPEECH | 3 | 17 | 26 | | 16 | | 321 | | | 376 | 2 | 376 | | 210 | 1.55% |
| Hunt Place | HSCSNAUDI | 3 | | 2 | | | | 32 | | 33 | 27 | | 127 | | 127 | 0.97% |
| Hunt Place | HSCSNBHNR | 3 | | | | | | 197 | | 14 | 45 | | 45 | | 27 | 0.50% |
| Hunt Place | HSCSN | 3 | | | | | | | | | 27 | | 27 | | 27 | 0.11% |
| Hunt Place | HSCSNDEVPEDS | 3 | | | | | | 29 | | | 11 | | 82 | | 62 | 0.34% |
| Hunt Place | HSCSN | 3 | | | | | | 23 | | 26 | | 6 | | | 27 | 0.05% |
| Hunt Place | HSCSNOPTHAL | 3 | | 3 | | | | 73 | | 11 | 18 | | 24 | | 82 | 0.27% |
| Hunt Place | HSCSNORALSUR | 3 | | | | | | | | | 15 | | 10 | | 52 | 0.12% |
| Hunt Place | HSCSNORTHO | 3 | 2 | 2 | | | | 17 | | 15 | 7 | | 30 | | 30 | 0.12% |
| Hunt Place | HSCSNPHYTH | 3 | | | | | | 12 | | | | | 20 | | 68 | 0.28% |
| Hunt Place | HSCSNSOCS | 3 | | | | | | 17 | | | | 12 | 17 | | 20 | 0.08% |
| Hunt Place | HSCSN | 3 | | | | | | 15 | | | | | | | 2 | 0.01% |
| Hunt Place | HSCSNSPEECH | 3 | | | | | | 3 | | | 10 | 3 | 6 | | 37 | 0.15% |
| Hunt Place | HSCSNSSI | 3 | | | | | | 2 | | | | | | | 2 | 0.02% |
| Southwest | HSCSN | 3 | | | | | | 5 | | | 1 | 7 | 3 | | 3 | 0.01% |
| Southwest | SWDENTAL | 7 | 7 | 12 | 1 | 14 | 2 | 60 | | 19 | 81 | | 224 | | 427 | 1.76% |
| Southwest | SWDENTAL | 7 | | | | | | | | | 1 | | 1 | | 3 | 0.02% |
| Southwest | SWERHM | 7 | | 1 | | | | | | | 10 | | 8 | | 17 | 0.13% |
| Southwest | SWENT | 7 | | | | | | | | | | | | | 3 | 0.01% |
| Southwest | SWMED | 7 | 56 | 124 | 4 | 523 | 68 | 178 | | 701 | 414 | 2 | 1,559 | | 3,646 | 15.90% |
| Southwest | SWOBGYN | 7 | 11 | 49 | | 112 | 58 | 175 | | 58 | 134 | 2 | 521 | | 1,031 | 4.24% |
| Southwest | SWPEDS | 7 | 14 | 88 | | 12 | 29 | 643 | | 26 | 27 | 29 | 596 | | 1,527 | 6.29% |
| Southwest | SWPOD | 7 | 42 | 47 | 6 | 187 | 15 | 45 | | 343 | 113 | | 313 | | 1,113 | 4.60% |
| Walker Jones | WJAUDI | 3 | | | | | | | | | | | | 1 | | 0.00% |
| Walker Jones | WJDENTAL | 3 | 2 | 7 | | 28 | | 44 | | 21 | 73 | | 227 | | 403 | 1.65% |
| Walker Jones | WJMED | 3 | 4 | 3 | 3 | 74 | | 1 | | 36 | 25 | 2 | 200 | | 347 | 1.43% |
| Walker Jones | WJOBGYN | 3 | 1 | 1 | | 10 | | 4 | | 3 | 6 | | 188 | | 216 | 0.89% |
| Walker Jones | WJPEDS | 3 | | | | | | 1 | | | 48 | | 133 | | 184 | 0.76% |
| Woodridge | WRMED | 2 | | | | | | | | | | | 263 | | 216 | 1.10% |
| Woodridge | WROBGYN | 3 | 5 | 10 | | 62 | 3 | 21 | | 13 | 31 | 2 | 167 | | 347 | 1.43% |
| Woodridge | WRPEDS | 2 | 9 | 10 | | 31 | 1 | 67 | | 4 | 35 | 1 | 152 | | 325 | 1.34% |
| Woodridge | WRPEDS | 2 | 8 | 9 | | | | 59 | | | 102 | | 152 | | 479 | 1.77% |
| | | | 332 | 743 | 25 | 2,291 | 129 | 4,780 | 0 | 1,822 | 3,473 | 65 | 41 | 9 | 24,268 | |
| | | | 1.37% | 3.07% | 0.10% | 9.45% | 0.53% | 19.73% | 0.00% | 7.53% | 14.35% | 0.27% | 0.17% | 0.04% | 100.00% | |

PBC
DC GENERAL

| Service | | Blue Cross | Commercial | Capitation | Med Claim | Gera | AllMOT | Tricare | Medicare | Medicaid DC | Med Other | Copay/other | Self Pay | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anacostia | ACDENTAL | 1.55% | 3.45% | | 7.41% | 0.52% | 18.28% | 5.52% | 27.26% | 0.17% | | 31.65% | | 100.00% |
| Anacostia | ACDEN4YG | | | | 11.11% | | 33.33% | | 11.11% | | | 55.56% | | 100.00% |
| Anacostia | ACMED | 1.65% | 2.29% | 0.09% | 17.51% | 0.43% | 5.11% | 15.40% | 6.42% | 0.18% | | 51.51% | 0.04% | 100.00% |
| Anacostia | AC08GYN | 1.08% | 0.43% | | 8.83% | | 31.53% | 1.62% | 44.44% | 0.07% | | 43.81% | 0.16% | 100.00% |
| Anacostia | ACPEDS | 0.32% | 2.76% | | 0.24% | 0.43% | 52.94% | | 10.54% | 0.11% | | 31.17% | | 100.00% |
| Anacostia | AC50CS | | | | | | | | | | | 65.71% | | 100.00% |
| Adams Morgan | AMDENTAL | | | | 14.29% | | | | | | | 93.33% | | 100.00% |
| Adams Morgan | AMMED | | 1.67% | | 14.33% | | | | | | | 81.82% | 1.67% | 100.00% |
| Adams Morgan | AMMED | | | | 3.33% | | | | | | | 81.82% | | 100.00% |
| Adams Morgan | AMOBGYN | | | | 9.09% | | | 9.09% | | | | 36.40% | | 100.00% |
| Banning Height | BMPEDS | 0.39% | 2.24% | 0.25% | 7.31% | 0.39% | 29.92% | 2.53% | 18.29% | 0.39% | | 43.81% | | 100.00% |
| Congress Heights | CHDENTAL | 1.61% | 3.92% | | 19.84% | 2.14% | 6.14% | 9.79% | | 0.07% | | 44.44% | 0.04% | 100.00% |
| Congress Heights | CHMED | 1.30% | 3.15% | | 11.90% | 1.85% | 18.91% | 13.62% | 15.92% | 0.65% | | 52.83% | | 100.00% |
| Congress Heights | CHOBGYN | 0.46% | 2.17% | | 0.31% | 9.36% | 28.96% | 9.36% | 7.48% | 0.21% | | 39.81% | | 100.00% |
| Congress Heights | CHPEDS | | | | 25.64% | 2.56% | 27.21% | 29.21% | 17.95% | 0.15% | | 12.86% | 2.56% | 100.00% |
| Congress Heights | CHPOD | 0.85% | 5.13% | | | | 48.72% | | 14.53% | | | 30.77% | | 100.00% |
| Hunt Place | HPAUDI | | 5.00% | | | | | | 30.00% | | | 30.00% | | 100.00% |
| Hunt Place | HPDEN4YG | 3.19% | 2.38% | | 2.39% | | 17.55% | 16.00% | 55.00% | | | 36.25% | | 100.00% |
| Hunt Place | HPDENTAL | 2.33% | 1.55% | | 10.04% | 3.10% | 0.79% | 5.98% | 30.26% | 0.39% | | 68.22% | | 100.00% |
| Hunt Place | HPMED | 2.93% | 1.66% | 0.27% | 11.90% | | 20.21% | | 13.99% | 0.07% | | 52.83% | | 100.00% |
| Hunt Place | HPOBGYN | 1.25% | 0.91% | | 4.26% | 0.17% | 53.97% | | 16.78% | | | 52.39% | | 100.00% |
| Hunt Place | HPPEDS | 8.10% | 12.38% | | | | 50.59% | | 7.48% | 0.53% | | 12.86% | | 100.00% |
| Hunt Place | HPSPEECH | | 1.64% | | | | 26.32% | | 27.67% | 6.56% | | 36.89% | 1.22% | 100.00% |
| HSCSN | HSCSNAUDI | | | | | | 33.33% | 8.82% | 18.52% | 7.41% | | 18.52% | | 100.00% |
| HSCSN | HSCSNBTHH | 1.22% | | | | | 28.00% | | 31.71% | 7.32% | | 29.27% | | 100.00% |
| HSCSN | HSCSNDEVPEDS | | 1.22% | | | | 30.77% | | 40.74% | | | 23.08% | | 100.00% |
| HSCSN | HSCSNDOCITH | | | | | | 44.23% | | 34.62% | 6.56% | | 18.23% | | 100.00% |
| HSCSN | HSCSNOPTHAL | | | | | | 20.00% | | 42.15% | 7.41% | | 30.00% | 1.92% | 100.00% |
| HSCSN | HSCSNORALSUR | 2.94% | 6.67% | 3.33% | | | 25.00% | | 34.62% | 7.32% | | 18.23% | 1.22% | 100.00% |
| HSCSN | HSCSNORTHO | | 4.41% | 1.47% | 1.47% | | 60.00% | | 20.00% | | | 25.00% | | 100.00% |
| HSCSN | HSCSNPHYTH | | | | | | 50.00% | | 22.06% | 20.00% | | 5.00% | | 100.00% |
| HSCSN | HSCSNSOCS | | | | | | 50.00% | | 35.00% | 17.65% | | | | 100.00% |
| HSCSN | HSCSNPEECH | 50.00% | 50.00% | | | | 40.54% | | | | | 21.62% | | 100.00% |
| HSCSN | HSCSNSSI | | 2.70% | | | | 75.00% | | 27.03% | 8.11% | | 100.00% | | 100.00% |
| Southwest | SWDENHYG | | | | | | 66.67% | 33.33% | | | | 25.00% | | 100.00% |
| Southwest | SWDENTAL | 1.64% | 2.81% | 0.73% | 3.28% | 0.47% | 14.06% | 4.45% | 10.97% | 1.64% | | 52.46% | | 100.00% |
| Southwest | SWDERM | | | | | | | | | | | 100.00% | | 100.00% |
| Southwest | SWENT | | | 0.11% | 14.34% | 1.41% | 4.88% | | 11.35% | 0.05% | 0.55% | 50.00% | | 100.00% |
| Southwest | SWMED | 1.54% | 3.40% | | 10.25% | 2.45% | 16.01% | 5.31% | 12.26% | 0.07% | 0.18% | 42.73% | | 100.00% |
| Southwest | SWOBGYN | 1.01% | 4.48% | 1.39% | | 0.65% | 38.36% | 1.65% | 14.45% | 0.18% | | 47.47% | | 100.00% |
| Southwest | SWPEDS | 0.89% | 5.60% | | 0.76% | | 6.70% | | 24.74% | | | 30.06% | | 100.00% |
| Southwest | SWPOD | 3.77% | 4.22% | 0.45% | 16.00% | 1.25% | 4.31% | 10.15% | 14.45% | | | 28.12% | 0.25% | 100.00% |
| Walker Jones | WJAUDI | | | | | | 100.00% | | 10.15% | | | 56.33% | | 100.00% |
| Walker Jones | WJDENTAL | 0.50% | 1.14% | | 6.95% | 0.29% | 10.92% | 5.21% | 18.11% | | | 57.64% | | 100.00% |
| Walker Jones | WJMED | 1.15% | 0.46% | 1.39% | 21.33% | | 0.29% | 10.95% | 7.20% | 0.29% | | 87.04% | | 100.00% |
| Walker Jones | WJOBGYN | | 0.66% | | 4.63% | 0.65% | 1.85% | 2.78% | | | | 88.56% | | 100.00% |
| Walker Jones | WJPEDS | | | | | | 6.70% | | 24.74% | | | 63.39% | | 100.00% |
| Woodridge | SWPOD | | | | | | 5.11% | 3.16% | 7.54% | 0.24% | | 51.38% | | 100.00% |
| Woodridge | WRMED | 1.22% | 2.43% | | 15.03% | 0.73% | 20.62% | 1.23% | 11.08% | 0.49% | | 63.99% | | 100.00% |
| Woodridge | WRROBGYN | 2.15% | 3.08% | | 8.54% | 0.31% | | | 23.78% | | 0.62% | 51.38% | | 100.00% |
| Woodridge | WRPEDS | 1.86% | 2.10% | | | 0.31% | 36.83% | | | | | 35.43% | | 100.00% |
| | | 1.42% | 2.81% | 0.10% | 8.44% | 0.71% | 21.67% | 6.17% | 14.29% | 0.35% | 0.14% | 43.85% | 0.04% | 100.00% |



**APPENDIX J**

## PARTIAL LIST OF REPORTS

Report 1: Listing of Patients Served During Contract Period

- ■ this report should list the names, unique ID numbers, addresses including zip codes (if available), other demographic information pertaining to the individual patients, and gross charges for services rendered to each patient
- ■ by provider (i.e., particular hospital, clinic, etc.)
- ■ by month and for the Contract Period

Report 2: Summary of Charges and Cost Values for Health Care Services Rendered to Uninsured Patients

- ■ this report should provide the gross charges for health care services rendered by type of health acre service (e.g., hospital inpatient, physician services, etc.) to patients
- ■ by month and for the Contract Period

Report 3: Discharges, Days, AverageLength of Stay (ALOS), Gross Charges, Charge Per Discharge, Charge Per Day and Cost Vale

- ■ by DRG by hospital and across all DRGs (i.e., in summary) and across all hospitals (i.e., in summary)
- ■ Note: Cost Value = Standard Rate x DRG Weight
- ■ by month and for the Contract Period

Report 4: Casemix Index

- ■ by hospital and across hospitals
- ■ by month and for the Contract Period

Report 5: Listing of Most Frequent Principal Diagnoses and Principal Procedures (Inpatient)

- ■ show the most frequent inpatient principal diagnoses that account for at least 75% of all principal diagnoses in rank order from most frequent to least frequent; show number and cumulative frequency and percentage and cumulative percentage of all procedures
- ■ show the most frequent inpatient principal procedures that account for at least 75% of all principal procedures in rank order from most frequent to least frequent; show number and cumulative frequency and percentage and cumulative percentage
- ■ by hospital and across hospitals in total
- ■ by month and for the Contract Period

Report 6: Listing of Most Frequent Diagnoses (Outpatient)

- ■ show the most frequent outpatient outpatient diagnoses that account for at least 75% of all outpatient diagnoses in rank order from most frequent to least frequent; show number and cumulative frequency and percentage and cumulative percentage of all procedures
- ■ by hospital and by NHC and by physicians aggregated (i.e., across all physicians combined)
- ■ by month and for the Contract Period

Report 7: Listing of Number of Occurrences by CPT-4 Code

- ■ show the CPT-4 codes that occur most frequently and account for at least seventy-five percent (75%) of all CPT-4 code occurrences
- ■ show by NHC and for all physicians aggregated (i.e., across all physicians combined)
- ■ by month and for the Contract Period

Report 8: Lisyting of High Cost Individuals

- show the 100 individuals (with their unique IDs) who had the highest total charges
- show their total charges
- present the listing in rank order from highest charges to lowest charges
- by quarter and for the Contract Period

Report 8: Primary Care Affiliations

- list each person (with unique ID) who has been enrolled in the uninsured program , their zip code of residence (if available) and their chief source of primary care (i.e., their primary care home)
- show the gross charges recorded for each person during the measurement perieod
- by month and for the Contract Period

Report 9: Disease Management

- list each person (with unique ID) who has been given a diagnosis of diabetes, heart disease, hypertension, AIDS/HIV or other chronic disease, their address (including zip code) and telephone number
- identify whether or not the person has been enrolled in a disease management program
- list the name of each person's chief primary care provider/site of primary care
- provide the information above for each type of chronic disease (e.g., diabetes, heart disease, hypertension or AIDS/HIV)
- by quarter and for the Contract Period

# APPENDIX K

## FIRST SOURCE EMPLOYMENT AGREEMENT

Contract Number: _____

Contract Amount: _____

Project Name: _____

Project Address: _____ Ward: _____

This Employment Agreement, in accordance with D.C. Law 5-93 and Mayor's Order 83-265 for recruitment, referral, and placement of D.C. residents, is between the District of Columbia, Department of Employment Services, hereinafter referred to as DOES, and _____

hereinafter, referred to as EMPLOYER. Under this Employment Agreement, the EMPLOYER will use DOES as its first source for recruitment, referral and placement of new hires or employees for the new jobs created by this project and will hire 51% D.C. residents for all new jobs created, as well, as 51% of apprentices employed in connection with the project shall be District residents registered in programs approved by the District of Columbia Apprenticeship Council.

I.   General Terms

    A.   The EMPLOYER will use DOES as its first source for the recruitment, referral and placement of employees.

    B.   The EMPLOYER shall require all contractors and subcontractors with contracts totaling $100,000 or more to enter into a First Source Employment Agreement with DOES.

    C.   DOES will provide recruitment, referral and placement services to the EMPLOYER subject to the limitations set out in this Agreement.

    D.   DOES participation in this Agreement will be carried out by the Office of the Director, with the Office of Employer Services, which is responsible for referral and placement of employees, or such other offices or divisions designated by DOES.

2

E.  This Agreement shall take effect when signed by
the parties below and shall be fully effective for
the duration of the contract and extension or
modifications to the contract.

F.  This Agreement shall not be construed as an
approval of the EMPLOYER'S bid package, bond
application, lease agreement, zoning application,
loan or contract/subcontract.

G.  DOES and the EMPLOYER agree that for purposes of
this Agreement, new hires and jobs created (both
union and nonunion) include all EMPLOYER'S job
openings and vacancies in the Washington
Metropolitan Area created as a result of internal
promotions, terminations and expansions of the
EMPLOYER'S workforce, as a result of this project,
including loans, lease agreements, zoning
applications, bonds, bids and contracts.

H.  For purposes of this Agreement, apprentices as
defined in D.C. Law 2-156, are included.

I.  The EMPLOYER shall register an apprenticeship
program with the D.C. Apprenticeship Council for
construction or renovation contracts or
subcontracts totaling $500,000 or more.  This
includes any construction or renovation contract
or subcontract signed as the result of a loan,
bond, grant, Exclusive Right Agreement, street or
alley closing, or a leasing agreement of real
property for 1 year or more.

II.  Recruitment

A.  The EMPLOYER will complete the attached Employment
Plan which will indicate the number of new jobs
projected, salary range, hiring dates and union
requirements.  The EMPLOYER will notify DOES of
its specific need for new employees as soon as
that need is identified.

B.  Notification of specific needs, as set forth in
Section II.A., must be given to DOES at least
five (5) business days (Monday - Friday) before
using any other referral source, and shall
include, but need not be limited to, the number of
employees needed by job title, qualification,
hiring date, rate of pay, hours of work, duration
of employment and work to be performed.

3

C.   Job openings to be filled by internal promotion from the EMPLOYERS'S current workforce need not be referred to DOES for placement and referral.

D.   The EMPLOYER will submit to DOES, prior to starting work on the project, the names, and social security numbers of all current employees, including apprentices, trainees and laid off workers who will be employed on the project.

III.   Referral

A.   DOES will screen and refer applicants according to the qualifications supplied by the EMPLOYER.

IV.   Placement

A.   DOES will notify the EMPLOYER, prior to the anticipated hiring dates, of the number of applicants DOES will refer as agreed.  DOES will make every reasonable effort to refer at least two qualified applicants for each job opening.

B.   The EMPLOYER will make all decisions on hiring new employees but will in good faith use reasonable efforts to select its new hires or employees from among the qualified persons referred by DOES.

C.   In the event DOES cannot refer the qualified personnel requested, within five (5) business days (Monday – Friday) from the date of notification, the EMPLOYER will be free to directly fill remaining positions for which no qualified applicants have been referred.  In this event, the EMPLOYER will still be required to meet the 51% goal.

D.   After the EMPLOYER has selected its employees, DOES will not be responsible for the employees' actions and the EMPLOYER hereby releases DOES from any liability for employees' actions.

V.   Training

DOES and the EMPLOYER may agree to develop skills training and on-the-job training programs; the training specifications and cost for such training will be mutually agreed upon by the EMPLOYER and DOES and covered in a separate Training Agreement.

VI.   Controlling Regulations and Laws

A.   If this Agreement conflicts with any labor laws or governmental regulations, the laws or regulations shall prevail.

4

B.   DOES will work within the terms of all collective
     bargaining agreements to which the EMPLOYER is a
     party.

C.   The EMPLOYER will provide DOES with written
     documentation that the EMPLOYER has provided the
     representative of any involved collective
     bargaining unit with a copy of this Agreement and
     has requested comments or objections.  If the
     representative has any comments or objections the
     EMPLOYER will provide them to DOES.

VII.  Agreement Modifications, Renewal, and Monitoring

A.   If, during the term of this Agreement, the
     EMPLOYER should transfer possession of all or a
     portion of its business concerns affected by this
     Agreement to any other party by lease, sales,
     assignment or otherwise, the EMPLOYER as a
     condition of transfer shall:

     1.   Notify the party taking possession of the
          existence of the EMPLOYER'S Agreement.

     2.   Notify the party taking possession that full
          compliance  with this Agreement is required
          in order to avoid termination of the project.

     3.   EMPLOYER shall, additionally, advise DOES
          within seven (7) days of the transfer.  This
          advice will include the name of the party
          taking possession and the name and  telephone
          of that party's representative.

B.   DOES shall monitor EMPLOYER'S performance under
     this Agreement. The EMPLOYER will cooperate in
     DOES' monitoring effort and will submit a Contract
     Compliance Form to DOES monthly.

C.   To assist DOES in the conduct of the monitoring
     review, the EMPLOYER will make available payroll
     and employment records for the review period
     indicated.

D.   If additional information is needed during the
     review, the EMPLOYER will provide the requested
     information to DOES.

5

E.  The EMPLOYER and DOES, or such other agent as DOES may designate, may mutually agree to modify this Agreement.

F.  The project may be terminated because of the EMPLOYER'S non-compliance with the provisions of this Agreement.

Dated this_____day of_____19_____

Signed:

_____         _____
DEPARTMENT OF EMPLOYMENT SERVICES        SIGNATURE OF EMPLOYER

                                         _____
                                         NAME OF COMPANY

                                         _____
                                         ADDRESS

                                         _____
                                         TELEPHONE

6

## EMPLOYMENT PLAN

Instructions:

o    Submit original to the Department of Employment
     Services (DOES) with First Source Employment Agreement.

o    Upon approval of project by the originating agency,
     DOES will contact Employer.

NAME OF FIRM_____

ADDRESS_____

TELEPHONE NUMBER_____FEDERAL IDENTIFICATION NO._____

CONTACT PERSON_____TITLE_____

TYPE OF BUSINESS_____

ORIGINATING DISTRICT AGENCY_____

TYPE OF PROJECT_____FUNDING AMOUNT_____

PROJECTED START DATE_____PROJECT DURATION_____

NEW JOB CREATION PROJECTIONS (Attach additional sheets, as needed.) Please
indicate the new position(s) your firm will create as a result of this project

| | JOB TITLE | # OF JOBS F/T    P/T | SALARY RANGE | UNION MEMBERSHIP REQUIRED NAME   LOCAL# | PROJECTED HIRE DATE |
|---|---|---|---|---|---|
| A | | | | | |
| B | | | | | |
| C | | | | | |
| D | | | | | |
| E | | | | | |

7

**CURRENT EMPLOYEES:  Please list the names and social security numbers of all current employees including apprentices and trainees who will be employed on the project.  Attach additional sheets as needed.**

| NAME OF EMPLOYEE | SOCIAL SECURITY |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Signature: _____    Date: _____



C

ENROLLED ORIGINAL

A RESOLUTION

14-55

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

March 6, 2001

To declare, on an emergency basis, the sense of the Council with respect to its position on the
District of Columbia Health and Hospitals Public Benefit Corporation and the District of
Columbia General Hospital particularly.

RESOLVED, BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this
resolution may be cited as the "Sense of the Council on the District of Columbia Health and
Hospitals Public Benefit Corporation and D.C. General Hospital Emergency Resolution of
2001".

Sec. 2. The Council finds that:
(1) The Mayor, the District of Columbia Financial Responsibility and
Management Assistance Authority ("Authority"), and Council agree that:
(A) There is a need to expand health insurance coverage to more District
residents;
(B) The District must ensure the provision of quality health services,
and
(C) The District of Columbia Health and Hospitals Public Benefit
Corporation ("PBC") cannot continue to function as it has in the past.
(2) The PBC is expected to exhaust its Fiscal Year 2001 appropriated subsidy by
mid-March.
(3) There exists an immediate need to address the health care and financial crisis
involving the PBC, particularly D.C. General Hospital, and to ensure a safety net for the
District's medically uninsured residents.
(4) The Council does not have the ability by law to initiate a reprogramming of
funds; the Council may only approve a reprogramming submitted by the Mayor.
(5) The District of Columbia Appropriations Act, 2001, permits the transfer of a
limited amount of non-federal funds for the purpose of restructuring the delivery of health
services in the District; provided, that (A) the transfer is pursuant to a plan approved by the
Mayor, the Council, the Authority, and the Board of Directors of the PBC ("PBC Board"), and
(B) the plan is submitted to Congress.
(6) On December 5, 2000, the Authority adopted a resolution containing
recommendations and orders concerning the PBC which recommended that the Council work

**ENROLLED ORIGINAL**

with the Mayor to prepare and approve a plan to establish an alternative publicly-financed health care delivery system that (A) is consistent with the current multi-year financial plan and budget for the District, (B) provides for equivalent volumes and types of services currently provided by the PBC to the uninsured, and (C) ensures that the services meet standards of quality and accessibility.

(7) The Authority further recommended that the Council enact legislation or approve regulations and reprogrammings, and undertake all other actions necessary to authorize and implement the alternative health care delivery system.

(8) The Council, in collaboration with the Mayor, the Authority, and the PBC Board issued a Request for Proposals ("RFP") to obtain, through a competitive process, a qualified provider or team of providers to deliver comprehensive, integrated, and coordinated health care services to the District's uninsured residents.

(9) The goal of the Council was to obtain a number of proposals, and to build partnerships between federal entities and local health care providers, to ensure that the health needs of the District's most vulnerable residents are met, preferably while retaining inpatient and trauma services on the D.C. General Hospital campus.

(10) The RFP process resulted in the submission of 2 proposals, one of which would maintain a hospital at D.C. General Hospital's current location, and the other which would maintain outpatient services on the hospital's campus while providing inpatient services at Greater Southeast Community Hospital and other facilities.

(11) The evaluators, selected to assist with the RFP process, recommended the acceptance of Greater Southeast Community Hospital's proposal. The negotiation of a letter contract with Greater Southeast Community Hospital ("GSCH") is underway.

(12) The Council has expressed, and continues to voice, concerns regarding such issues as:

(A) The resulting lack of trauma services in the eastern section of the District given that D.C. General Hospital is the only Level I trauma center serving that location and the high volume of cases it handles;

(B) The resulting lack of inpatient beds on the D.C. General Hospital site, exacerbating an existing imbalance in the geographic location of hospitals;

(C) The need for detailed performance measures that were not a part of the RFP but are imperative to determining the efficacy of the contract;

(D) The need to require a performance bond to ensure that monies are available should the contractor fail to comply with the requirements of the contract;

(E) The need to conduct due diligence on the proposed contractor's experience, ability, and financial stability to meet the specifications of the contract; and

(F) The timeframe and resources needed for a transition.

(13) In an effort to have these concerns addressed, the Council has raised questions at public hearings, in correspondence, and through representation on the Collaborative.

(14) The GSCH proposal, which contained a budgeted amount of at least $75 million, would cost more than the current appropriated subsidy, not including services now provided by the PBC to the Department of Corrections and other District agencies.

2

ENROLLED ORIGINAL

(15) The PBC subsidy of $45 million was under-budgeted and the Council is prepared to increase the subsidy, for a streamlined hospital and an appropriate number of community-based clinics, to no more than $100 million which appears consistent with the GSCH proposal.

(16) The Council has great concern that the out-year costs of contracting for services will increase and once the contractor begins performance, it will be too late and too costly to re-establish D.C. General Hospital.

(17) Past experience has demonstrated that the District's liberal social policies attract persons from other jurisdictions and threaten the District's ability to serve its citizens.

(18) The GSCH proposal has the potential to increase costs well beyond what is fiscally responsible given the District's limited tax base.

Sec. 3. It is the sense of the Council that significant concerns exist with the proposal submitted by Greater Southeast Community Hospital based on the unresolved issues and other considerations articulated in section 2, and that any alternative to the PBC, and D.C. General Hospital particularly, must address those issues adequately. It is further the sense of the Council that a streamlined version of the current health care system, appropriately funded, could provide the necessary care at less than the cost of contracting for services.

Sec. 4. It is the sense of the Council that the Authority should respect Home Rule and honor the decisions made by the elected officials of the District of Columbia and take no further action on the future of D.C. General Hospital and the PBC.

Sec. 5. This resolution shall take effect immediately upon the first date of publication in the D.C. Register.



COUNCIL OF THE DISTRICT OF COLUMBIA
WASHINGTON, D.C. 20001

**Council Period Fourteen**

## RECORD OF OFFICIAL COUNCIL VOTE

Docket No.    **PR14-95**          Resolution No.    **R14-55**

Action &
Date                    **ADOPTED, 03-06-01**

[  ]  Item on Consent Calendar

[ x ]  **ROLL CALL VOTE -Result**    **PASSED**                    ( 13-0-0-0 )

| Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB | Councilmember | Aye | Nay | NV | AB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chmn. Cropp | X | | | | Chavous | X | | | | Orange | X | | | |
| Allen | X | | | | Evans | X | | | | Patterson | X | | | |
| Ambrose | X | | | | Fenty | X | | | | Schwartz | X | | | |
| Brazil | X | | | | Graham | X | | | | | | | | |
| Catania | X | | | | Mendelson | X | | | | | | | | |

X – Indicate Vote                    AB – Absent                    NV –Present,  Not Voting

[  ]    **VOICE VOTE**    Result    _____

                    Absent    _____

        **Recorded Vote (On Request)**    _____

**CERTIFICATE OF RECORD**

_____        *March 8, 2001*
        Secretary to the Council                    **Date**



District of Columbia Financial Responsibility
and Management Assistance Authority
Washington, D.C.

April 13, 2001

The Honorable Anthony A. Williams
Mayor of the District of Columbia
One Judiciary Square
441 Fourth Street, NW, 11th Floor
Washington, D.C. 20001

Dear Mr. Mayor:

In order to maintain funding for the District of Columbia's publicly funded health care system pursuant to Public Law 106-522, the District of Columbia Financial Responsibility and Management Assistance Authority ("Authority") hereby transmits to the Office of the Mayor the contract developed pursuant to the proposal in response to Solicitation No. DCFRA #00-R-039 for your consideration, and for your transmittal to the Council of the District of Columbia for action.

Pursuant to Public Law 106-522, the Mayor, the District of Columbia Council ("the Council"), the Board of Directors of the Health and Hospitals Public Benefit Corporation ("PBC") and the Authority agreed to a plan to restructure health care services provided by the PBC by contracting with a private health care provider on December 17, 2000. Acknowledging actions by the District of Columbia Subcommittees of the House and Senate Appropriations Committees, the Chairman of the Council and the Office of the Mayor agreed that the Authority would use its procurement power under Public Law 104-8 to solicit private bids from qualified providers.

The Authority issued the public solicitation on December 17, 2000. The unanimous decision to select Greater Southeast Community Hospital Corporation ("GSCH") as a prime contractor followed separate "technical" and "price" evaluations by two teams, including representatives of the Mayor, the Council and the Authority, on March 14, 2001. This process was the predicate for the selection of a contractor to provide comprehensive, integrated and coordinated health care services to uninsured residents of the District of Columbia. The Authority formally agreed in principle to the proposed contract with GSCH on April 11, 2001.

The proposed contract is for an initial 5-year term with two 2-year option periods. It includes an average increase in service volume of thirty-four percent (34%) over the current PBC level of health care services and administration, at a base cost of $60,250,949 with an upper limit of $66,276,043. Other major contract costs include $7,010,522 for the school health program, $3,715,858 for corrections, $1,399,525 for trauma, $1,500,000 for program start-up, and $11,800,000 for one-time capital costs.

2

This proposed contract results in a new health care network combining public resources and administration with private management of the service delivery system. The proposed contract will improve the District's capacity to monitor the quality of health care services, enhance access to a comprehensive network of qualified providers, improve access to preventive services, and reduce reliance on expensive emergency and inpatient health care services.  As important, the proposed contract will provide your office and the Council the information required to make future decisions necessary to continually improve access to quality health care for uninsured residents.  Specifically, the proposed contract includes several provisions to improve the delivery system:

- □ services for District residents without health insurance whose family income is at or below 200 percent of the federal poverty level;

- □ a network comprised of three hospitals (inpatient, trauma care, specialties) and two Medicaid HMOs (providing administrative services for the network, management for existing public clinics and access to other providers) as well as other practitioners for diagnostic and specialty care;

- □ a requirement that the contractor and subcontractors maintain their current level of services to uninsured District residents as a condition of receiving compensation through the proposed contract;

- □ a plan to monitor and evaluate the cultural appropriateness of outreach and health care programs and

- □ a requirement to provide monthly, quarterly, and annual reports on volume, utilization, quality and costs.

The proposed contract also includes significant protections for District taxpayers, including requirements that:

- □ the contractor maintain a performance bond;

- □ payments are made only for services that have been provided based on the submission of claims for patient or administrative services performed under the contract;

- □ funds allocated by the District for this contract will not be transferred to the prime contractor but will instead be held, pending submission of a claim for reimbursement for services, by a third party disbursement agent and

- □ the District retain the right to assign any part of the contract to another provider if any party to the proposed agreement fails to perform.

3

It is the Authority's very strongly held view that this proposed contract will help reform the public health care system in a manner that serves District residents. It will also provide policy-makers with the right tools to manage this major new initiative while continuing their long-term plans to improve access to health insurance coverage for residents. Following many months of sometimes difficult but ultimately fruitful joint effort, local elected officials now have an opportunity to ratify this important new step in health care reform. The Authority, therefore, anticipates expeditious consideration of this important matter by your office and the Council.

Sincerely,

Alice M. Rivlin
Chairman

Enclosures

E

District of Columbia Financial Responsibility
and Management Assistance Authority
Washington, D.C.

April 18, 2001

The Honorable Anthony Williams
Mayor of the District of Columbia
One Judiciary Square
441 4th Street, N.W., Suite 1100-S
Washington, DC 20001

Dear Mayor Williams:

The District of Columbia Financial Responsibility and Management Assistance Authority ("the Authority") has transmitted to your office the proposed contract for health care services for uninsured District residents for your consideration and for your transmittal to the Council of the District of Columbia for action. It is essential that this proposed contract and the enabling legislation are approved before May 1, 2001.

The Authority formally agreed in principle to the proposed contract with Greater Southeast Community Hospital Corporation on April 11, 2001. The proposed contract assumes implementation will begin upon execution by May 1, 2001; and therefore, failure to do so will entail unacceptable financial and other risks. Any delay in executing the contract, which is the next phase of the restructuring process, will unacceptably deplete resources necessary to manage the transition as planned under the proposed contract. For example, any delay will risk depleting resources required to fully fund future placements for the participants in the resident training program. Similarly, resources that may be allocated for continued operations of the hospital and for assistance to eligible displaced employees may not be available if there is any delay.

It is in the best interests of the patients that have been traditionally served by the Public Benefit Corporation, the tax payers and Home Rule that local elected officials take the necessary steps to support the implementation of the proposed contract as soon as possible. The Authority strongly urges your office and the Council of the District of Columbia to conclude consideration of the contract and the enabling legislation no later than Monday, April 30, 2001. We look forward to a timely resolution of this important matter.

Sincerely

Alice M. Rivlin
Chairman

FILED
APR 30 2001
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

441 4th Street, NW, • Room 570 • Washington, DC 20001 • (202) 504-3400



**ANTHONY A. WILLIAMS**
MAYOR

April 23, 2001

The Honorable Linda W. Cropp
Chairman
Council of the District of Columbia
441 4th Street, NW, Suite 704
Washington, DC 20001

Dear Chairman Cropp:

Enclosed is the finalized contract (and CFO Certification) with Greater Southeast Community Hospital to establish the DC Healthcare Alliance. The Greater Southeast Community Hospital proposal was selected as the superior option presented through an open RFP process that was implemented under the direction of the PBC Collaborative. The contract is the culmination of a negotiation that involved representatives of the Council, Mayor, District CFO, and the Financial Authority.

I believe that the plan embodied in this contract presents the District with an unprecedented opportunity to create a health care safety net that will truly serve our residents effectively. Under the DC Alliance the District will finely be able to significantly reduce the city's unacceptable level of poor health. Every day that we delay this transition is costing the District valuable resources that could be better used in improving our health status.

Therefore, pursuant to Alice Rivlin's April 18, 2001 letter establishing the timeframes for implementing the contract, I urge you to support the enclosed contract.

Sincerely,

Anthony A. Williams

AAW/jp

Enclosure (2)

FILED

APR 3 0 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

01 0921



**ANTHONY A. WILLIAMS**
MAYOR

April 23, 2001

The Honorable Linda W. Cropp
Chairman
Council of the District of Columbia
441 4th Street, NW, Suite 704
Washington, DC 20001

Dear Chairman Cropp:

On several occasions during the past two years, my administration and the Council have participated in discussions and proposed actions that would dramatically transform the city's health care system. None of the earlier strategies presented the potential for the far-reaching change embodied in the enclosed "Health Care Privatization Emergency Amendment Act of 2001" and proposed contract with Greater Southeast Community Hospital for the DC Healthcare Alliance. Included with the Emergency Amendment Act are identically worded temporary and permanent bills and the corresponding emergency declaration resolution. If enacted, these bills would do the following:

- Reorganize the Department of Health, transfer the functions of the PBC to DOH, and create a new administration within DOH to oversee compliance of a private health care entity with a contract for delivery of the health care services currently provided by the Public Benefit Corporation (PBC).
- Repeal the Health and Hospitals Public Benefit Corporation Act of 1996 and abolish the PBC.
- Authorize the Mayor to contract for the delivery of comprehensive community-centered health care and medical services for the District's uninsured residents.
- Transfer the property and records of the PBC to the Department of Health.
- Temporarily exempt the contractor, the District government, and the PBC from certificate of need requirements regarding proposals to offer or develop new institutional health services or terminate health services pursuant to the contract.

The proposed legislation should be enacted on an emergency basis because the PBC is subject to spending limits imposed by Congress pursuant to the District of Columbia Appropriations Act, 2001. The PBC has already expended its subsidy for FY 2001, and failure to provide an

The Honorable Linda W. Cropp
Page 2

alternative health care system will negatively affect the District's ability to provide comprehensive health services to the city's uninsured residents. Further, this legislation will enable finalization of the contract negotiated with Greater Southeast Community Hospital to provide comprehensive health care services for the District's uninsured population under the DC Healthcare Alliance.

The proposed legislation, the "Health Care Privatization Emergency Amendment Act of 2001" and the temporary and permanent versions thereof and corresponding contract with Greater Southeast Community Hospital, advances the District's efforts to restructure our health care delivery safety net and carries out the actions approved by PBC Collaborative. I urge the Council to pass this legislation and corresponding contract by April 30, 2001. This will provide sufficient time for the May 1, 2001 contract implementation date stated in the enclosed April 18, 2001 letter from Alice Rivlin, chair of the District Financial Responsibility and Management Assistance Authority.

Sincerely,

Anthony A. Williams
Mayor

AAW/JP

Enclosures (6)

Chairman Linda W. Cropp,
at the request of the Mayor

A PROPOSED RESOLUTION

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

To declare the existence of an emergency with respect to the need to privatize comprehensive community-based health care for residents of the District and to abolish the Public Benefit Corporation.

RESOLVED, BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this resolution may be cited as the "Health Care Privatization Emergency Amendment Act of 2001 Emergency Declaration Resolution of 2001".

Sec. 2. (a) There exists an immediate crisis regarding the provision and delivery of comprehensive health care and medical treatment for residents of the District of Columbia.

(b) The District of Columbia Health and Hospitals Public Benefit Corporation ("Public Benefit Corporation") has required subsidies from the General Fund since its creation pursuant to the Health and Hospitals Public Benefit Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code § 32-261.1 et seq.). The FY 2001 $45.3 million appropriated subsidy from the General Fund to the Public Benefit Corporation has already been exhausted.

(c) The District of Columbia Appropriations Act, 2001 ("Appropriations Act"), approved November 22, 2000, Pub. L. 106-522, prohibits the District from using any additional appropriated funds for the Public Benefit Corporation, except as part of implementation of a health care restructuring plan that is approved by the Mayor, the Council, the Financial

Responsibility and Management Assistance Authority ("Authority"), and the Board of Directors

of the Public Benefit Corporation. The Appropriations Act authorizes the District to transfer

from other non-federal funds up to $90 million for the purpose of carrying out such an approved

plan to restructure health care delivery in the District.

(d) On December 4, 2000, the Authority issued a Resolution, Recommendations and

Orders under section 207 of the District of Columbia Financial Responsibility and Management

Assistance Act of 1995, approved April 17, 1995 (109 Stat. 116; D.C. Code § 47-392.7), for

repeal of Titles I and II of the Health and Hospitals Public Benefit Corporation Act of 1996 and

enactment of legislation and regulations and approval of reprogrammings necessary to

implement an alternative publicly-financed health care delivery system.

(e) On December 15, 2000, in accordance with the requirements of the Appropriations

Act, the Mayor submitted a restructuring plan to Congress that was approved by the Mayor, the

Council, the Authority, and the Board of Directors of the Public Benefit Corporation.

(f) Because the Public Benefit Corporation's appropriated FY 2001 subsidy of $45.3

million has already been exhausted, health care restructuring is essential to permit access to the

$90 million of funding authorized in the Appropriations Act and to maintain continuity of care

for the District's uninsured population.

(g) Enactment of the Health Care Privatization Emergency Amendment Act of 2001 will

assure access to the $90 million of funding to implement a restructured health care delivery

system as recommended by the Authority in its Resolution, Recommendations and Orders of

December 4, 2000, and in accordance with the approved restructuring plan of December 15,

2000.

Sec. 3. The Council of the District of Columbia finds that the circumstances enumerated

in section 2 constitute emergency circumstances making it necessary that the Health Care

Privatization Emergency Amendment Act of 2001 be adopted after a single reading.

Sec. 4. This resolution shall take effect immediately.

1
2

Chairman Linda W. Cropp,
at the request of the Mayor

3                                    A BILL

4

5            IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

6

7    To reorganize, on an emergency basis, the Department of Health by establishing a Health Care
8        Safety Net Administration in the Department of Health and to transfer functions of the
9        District of Columbia Public Benefit Corporation ("Public Benefit Corporation") to the
10       Department of Health; to authorize the Mayor to contract out any of the health care
11       functions of the Public Benefit Corporation; to exempt any contract to provide
12       comprehensive community-centered health care and medical services for District of
13       Columbia residents provided by the Public Benefit Corporation entered into by the Mayor
14       before the abolishment of the Public Benefit Corporation from certain provisions of the
15       District of Columbia Procurement Procedures Act of 1985; to amend the Health Services
16       Planning Program Re-establishment Act of 1996 to establish authority for establishing
17       requirements for charity care and to exempt the District government, the Public Benefit
18       Corporation, and any contractor that provides services provided by the Public Benefit
19       Corporation pursuant to a health care privatization contract from certain provisions of the
20       Health Services Planning Program Re-establishment Act of 1996; and to repeal the
21       Health and Hospitals Public Benefit Corporation Act of 1996 and abolish the Public
22       Benefit Corporation.
23
24       BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

25   act may be cited as the "Health Care Privatization Emergency Amendment Act of 2001".

26       Sec. 2.  Findings and purpose.

27       The Council finds and declares the following:

28       (1) The District of Columbia Health and Hospitals Public Benefit Corporation ("Public

29   Benefit Corporation") has operated with deficits for two consecutive fiscal years and has

30   depleted its $45.3 million FY 2001 subsidy.

31       (2) The District of Columbia Appropriations Act, 2001 ("Appropriations Act"), approved

32   November 22, 2000, Pub. L. 106-522, authorized the spending of non-Federal funds not to

1   exceed $90 million for the purpose of restructuring health care delivery pursuant to a

2   restructuring plan approved by the Mayor, the Council, the District of Columbia Financial

3   Responsibility and Management Assistance Authority ("Authority"), and the Board of Directors

4   of the Public Benefit Corporation.

5        (3) On December 4, 2000, the Authority issued a Resolution, Recommendations and

6   Orders pursuant to Section 207 of the District of Columbia Financial Responsibility and

7   Management Assistance Act, approved April 17, 1995 (109 Stat. 133; D.C. Code § 47-392.7),

8   concerning the Public Benefit Corporation, that, among other things, required the following to

9   occur within 90 days of December 4, 2000:

10         (A) Repeal of Titles I and II of the Health and Hospitals Public Benefit

11  Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code §§ 32-261.1-32-

12  262.20). ..

13         (B) Council enactment of legislation and regulations and approval of

14  reprogrammings necessary to authorize and implement an alternative publicly-financed health

15  care delivery system.

16        (4) On December 15, 2000, pursuant to the Appropriations Act, the Mayor submitted to

17  the Committee on Government Reform of the House of Representatives and the Committee on

18  Government Affairs of the Senate a health care delivery restructuring plan that was approved by

19  the Authority, the Mayor, the Council, and the Board of Directors of the Public Benefit

20  Corporation.

21        (5) The purpose of this act is to authorize implementation of an alternative publicly-

22  financed health care delivery system to replace the health care services formerly provided by the

23  Public Benefit Corporation, as recommended by the Authority in its Resolution,

1    Recommendations and Orders of December 4, 2000, and in accordance with the restructuring

2    plan of December 15, 2000.

3        Sec. 3.  Health Care Safety Net Administration establishment.

4        (a) There is established within the Department of Health a Health Care Safety Net

5    Administration to administer and monitor compliance with any contract that the Mayor makes,

6    pursuant to section 7, or that the Authority makes, with a health care entity to provide any of the

7    health care functions provided by the Public Benefit Corporation pursuant to the Health and

8    Hospitals Public Benefit Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212;

9    D.C. Code § 32-262.7(a)).

10        (b) The Health Care Safety Net Administration shall be responsible for all transition

11    activities that result from privatization of the functions of the Public Benefit Corporation and that

12    remain to be completed after abolishment of the Public Benefit Corporation pursuant to section

13    9, including the following:

14        (1) Termination and winding down of existing contracts of the Public Benefit

15    Corporation;

16        (2) Completion of administrative proceedings and court litigation previously handled by

17    the Office of the General Counsel of the Public Benefit Corporation or by private counsel

18    retained by the Public Benefit Corporation;

19        (3) Coordination of court litigation involving the Public Benefit Corporation that is being

20    handled by the Office of the Corporation Counsel;

21        (4) Assessment of outstanding claims against the Public Benefit Corporation; and

22        (5) Arranging for payment of lawful obligations of the Public Benefit Corporation that

23    are assumed by the District of Columbia pursuant to section 5.

3

1          (c) The Health Care Safety Net Administration shall exercise oversight of the services

2     contracted by the Mayor pursuant to section 7, or by the District of Columbia Financial

3     Responsibility and Management Assistance Authority, to ensure that the health of the population

4     is maintained and that the financial viability of the health care entity providing services exempted

5     pursuant to section 8 are addressed.

6          Sec. 4.  Transfers.

7          (a) The functions, real or personal property, personnel, unexpended balances of

8     appropriations, and records of the Public Benefit Corporation shall be transferred to the

9     Department of Health.

10          (b) Any monies remaining in the Health and Hospitals Public Benefit Corporation Fund

11     after the effective date of this act shall revert to the General Fund to the credit of the Department

12     of Health.

13          (c) The Department of Health shall recognize collective bargaining representatives that

14     have been duly certified by the District of Columbia Public Employees Relations Board and shall

15     assume and be bound by all existing collective bargaining agreements entered into by the Public

16     Benefit Corporation.

17          (d) Every employee of the Public Benefit Corporation shall be transferred to the

18     Department of Health.  All employees so transferred shall be under the direction and control of

19     the Director of the Department of Health or that director's designee or designees.  Transferred

20     employees shall retain the same rights and privileges that they had as employees of the Public

21     Benefit Corporation before the effective date of this act and shall not obtain any additional rights

22     or privileges as a result of the transfer.  They shall have all the duties and responsibilities that

23     they had as employees of the Public Benefit Corporation in addition to whatever duties and

4

1   responsibilities they acquire as employees of the Department of Health.  Transferred employees

2   shall constitute a separate competitive area within the Department of Health for purposes of

3   reductions in force only pursuant to section 2408 of the District of Columbia Government

4   Comprehensive Merit Personnel Act of 1978, effective March 3, 1979, D.C. Law 2-139, D.C.

5   Code § 1-625.7, and Chapter 24 of the District of Columbia Personnel Manual.  Lesser

6   competitive areas may be established by the personnel authority for these employees.  The

7   Mayor shall be the personnel authority for all employees of the Public Benefit Corporation who

8   are transferred to the Department of Health, except that the personnel authority for accounting,

9   budget, and financial management personnel who are transferred shall continue to be the Chief

10  Financial Officer of the District of Columbia.

11      Sec. 5.  Liabilities of the Public Benefit Corporation.

12      All liabilities of the Public Benefit Corporation shall be assumed by the District of

13  Columbia.

14      Sec. 6.  Health Care Safety Net Fund and Appropriations.

15      (a) There is established the Health Care Safety Net Fund ("Fund") as a nonlapsing,

16  revolving fund, to be administered by the Mayor as an agency fund as defined in section

17  373(2)(I) of Title 47 of the District of Columbia Code, to be used exclusively for the purposes

18  stated in section 3.  Revenues deposited into the Fund shall not revert to the General Fund at the

19  end of any fiscal year or at any other time but shall be continually available to the Department of

20  Health for the uses and purposes set forth in this act, subject to authorization by Congress in an

21  appropriations act.

22      (b) The Fund shall be financed through appropriations, the accounts receivable of the

23  Public Benefit Corporation, and gifts or donations.

5

1          (c) The Fund shall be accounted for under procedures established pursuant to subchapter

2    V of Chapter 3 of Title 47 of the District of Columbia Code.

3          (d) There are authorized to be appropriated from the general revenues of the District of

4    Columbia funds necessary to carry out the purposes of this act.

5          Sec. 7. Authorization to contract for comprehensive health care services.

6          (a) The Mayor is authorized to provide by contract or by other means any of the

7    comprehensive community-centered health care and medical services for residents of the District

8    of Columbia provided by the Public Benefit Corporation pursuant to the Health and Hospitals

9    Public Benefit Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code §

10   32-261.1 *et seq.*).

11         (b) A contract entered into pursuant to subsection (a) of this section before or

12   simultaneously with the abolishment of the Public Benefit Corporation pursuant to section 9

13   shall be exempt from the requirements of the District of Columbia Procurement Practices Act of

14   1985, effective February 21, 1986 (D.C. Law 6-85; D.C. Code § 1-1181.1 *et seq.*), except that the

15   contract shall be subject to section 105a of that act.

16         Sec. 8. Health services planning program amendments.

17      .   The Health Services Planning Program Re-establishment Act of 1996, effective April 9,

18   1997 (D.C. Law 11-191; D.C. Code § 32-351 *et seq.*), is amended as follows:

19         (1) Section 2 (D.C. Code § 32-351) is amended by adding a new paragraph (3A) to read

20   as follows:

21         "(3A) "Charity care" means the physician and hospital medical services provided to

22   persons who are unable to pay for the cost of services, especially those persons who are low-

23   income, uninsured and underinsured, but excluding those services determined to be caused by, or

6

1    categorized as, bad debt.".

2        (2) Section 3(b) (D.C. Code § 32-352(b)) is amended as follows:

3        (A) Paragraph (3) is amended by striking the word "and" at the end.

4        (B) Paragraph (4) is amended by striking the period at the end and inserting the phrase ";

5    and" in its place.

6        (C) A new paragraph (5) is added to read as follows:

7        "(5) Establishing, determining, and developing, in accordance with section 22,

8    requirements and standards for the implementation of unreimbursed charity care by all health

9    care facilities that receive a certificate of need, including an annual mechanism for monitoring

10    the provision of that charity care by the health care facilities.".

11        (3) Section 8 (D.C. Code § 32-357) is amended by adding new subsections (e), (f), and

12    (g) to read as follows:

13        "(e) Any proposal to offer or develop a new institutional health service, obligate a new

14    capital expenditure, or reduce or terminate a health service that would otherwise be subject to

15    certificate of need requirements, by a health care entity that has contracted with the District of

16    Columbia Financial Responsibility Management Assistance Authority, or with the Mayor

17    pursuant to section 7 of the Health Care Privatization Emergency Amendment Act of 2001, to

18    provide new health care services shall be exempt from certificate of need requirements only for

19    the purpose of maintaining the same level of care and services provided by the District of

20    Columbia Health and Hospitals Public Benefit Corporation ("Public Benefit Corporation").

21        "(f) The Administrator of the Health Care Safety Net Administration ("Administrator"),

22    established pursuant to section 3 of the Health Care Privatization Emergency Amendment Act of

23    2001, shall determine which new institutional health services, capital expenditures, and

1    reductions or terminations of health services qualify as health care services being taken over

2    from the Public Benefit Corporation.

3        "(g) The District government and the Public Benefit Corporation are exempt from

4    certificate of need requirements for any changes in health care service that may result from the

5    abolishment of the Public Benefit Corporation.".

6        Sec. 9. Repealers.

7        (a) The Health and Hospitals Public Benefit Corporation Act of 1996, effective April 9,

8    1997 (D.C. Law 11-212; D.C. Code § 32-261.1 *et seq.*), is repealed, and the Public Benefit

9    Corporation is abolished.

10        (b) Section 851(1)(D) of the District of Columbia Government Comprehensive Merit

11    Personnel Act of 1978, effective April 20, 1999 (D.C. Law 12-260; D.C. Code § 1-

12    609.51(1)(D)), is repealed.

13        (c) Section 2(e)(9) of the Confirmation Act of 1978, effective March 3, 1979 (D.C. Law

14    2-142; D.C. Code § 1-633.7(e)(9)), is repealed.

15        (d) Section 320(k) of the District of Columbia Procurement Practices Act of 1985,

16    effective April 15, 1997 (D.C. Law 11-259; D.C. Code § 1-1183.20(k)), is repealed.

17        Sec. 10.  Fiscal impact statement.

18        The Council adopts the forthcoming fiscal impact statement of the Chief Financial

19    Officer as the fiscal impact statement required by section 602(c)(3) of the District of Columbia

20    Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Code § 1-233(c)(3)).

21        Sec. 11. Effective date.

22        This act shall take effect following approval by the Mayor (or in the event of veto by the

23    Mayor, action by the Council to override the veto) and approval by the District of Columbia

8

Financial Responsibility and Management Assistance Authority as provided in section 203(a) of

the District of Columbia Financial Responsibility and Management Assistance Act of 1995,

approved April 17, 1995 (109 Stat. 116; D.C. Code § 47-392.3 (a)), and shall remain in effect for

no longer than 90 days, as provided for emergency acts of the Council of the District of

Columbia in section 412(a) of the District of Columbia Home Rule Act, approved December 24,

1973 (87 Stat. 788; D.C. Code § 1-229(a)).

Chairman Linda W. Cropp,
at the request of the Mayor

1
2

3                          A BILL

4

5          IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

6

7   To reorganize, on an temporary basis, the Department of Health by establishing a Health Care
8       Safety Net Administration in the Department of Health and to transfer functions of the
9       District of Columbia Public Benefit Corporation ("Public Benefit Corporation") to the
10      Department of Health; to authorize the Mayor to contract out any of the health care
11      functions of the Public Benefit Corporation; to exempt any contract to provide
12      comprehensive community-centered health care and medical services for District of
13      Columbia residents provided by the Public Benefit Corporation entered into by the Mayor
14      before the abolishment of the Public Benefit Corporation from certain provisions of the
15      District of Columbia Procurement Procedures Act of 1985; to amend the Health Services
16      Planning Program Re-establishment Act of 1996 to establish authority for establishing
17      requirements for charity care and to exempt the District government, the Public Benefit
18      Corporation, and any contractor that provides services provided by the Public Benefit
19      Corporation pursuant to a health care privatization contract from certain provisions of the
20      Health Services Planning Program Re-establishment Act of 1996; and to repeal the
21      Health and Hospitals Public Benefit Corporation Act of 1996 and abolish the Public
22      Benefit Corporation.
23
24      BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

25  act may be cited as the "Health Care Privatization Temporary Amendment Act of 2001".

26      Sec. 2. Findings and purpose.

27      The Council finds and declares the following:

28      (1) The District of Columbia Health and Hospitals Public Benefit Corporation ("Public

29  Benefit Corporation") has operated with deficits for two consecutive fiscal years and has

30  depleted its $45.3 million FY 2001 subsidy.

31      (2) The District of Columbia Appropriations Act, 2001 ("Appropriations Act"), approved

32  November 22, 2000, Pub. L. 106-522, authorized the spending of non-Federal funds not to

1

1    exceed $90 million for the purpose of restructuring health care delivery pursuant to a

2    restructuring plan approved by the Mayor, the Council, the District of Columbia Financial

3    Responsibility and Management Assistance Authority ("Authority"), and the Board of Directors

4    of the Public Benefit Corporation.

5          (3) On December 4, 2000, the Authority issued a Resolution, Recommendations and

6    Orders pursuant to Section 207 of the District of Columbia Financial Responsibility and

7    Management Assistance Act, approved April 17, 1995 (109 Stat. 133; D.C. Code § 47-392.7),

8    concerning the Public Benefit Corporation, that, among other things, required the following to

9    occur within 90 days of December 4, 2000:

10          (A) Repeal of Titles I and II of the Health and Hospitals Public Benefit

11    Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code §§ 32-261.1-32-

12    262.20).

13          (B) Council enactment of legislation and regulations and approval of

14    reprogrammings necessary to authorize and implement an alternative publicly-financed health

15    care delivery system.

16          (4) On December 15, 2000, pursuant to the Appropriations Act, the Mayor submitted to

17    the Committee on Government Reform of the House of Representatives and the Committee on

18    Government Affairs of the Senate a health care delivery restructuring plan that was approved by

19    the Authority, the Mayor, the Council, and the Board of Directors of the Public Benefit

20    Corporation.

21          (5) The purpose of this act is to authorize implementation of an alternative publicly-

22    financed health care delivery system to replace the health care services formerly provided by the

23    Public Benefit Corporation, as recommended by the Authority in its Resolution,

2

1    Recommendations and Orders of December 4, 2000, and in accordance with the restructuring

2    plan of December 15, 2000.

3        Sec. 3.  Health Care Safety Net Administration establishment.

4        (a) There is established within the Department of Health a Health Care Safety Net

5    Administration to administer and monitor compliance with any contract that the Mayor makes,

6    pursuant to section 7, or that the District of Columbia Financial Responsibility Management

7    Assistance Authority makes, with a health care entity to provide any of the health care functions

8    provided by the Public Benefit Corporation pursuant to the Health and Hospitals Public Benefit

9    Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code § 32-262.7(a)).

10       (b) The Health Care Safety Net Administration shall be responsible for all transition

11    activities that result from privatization of the functions of the Public Benefit Corporation and that

12    remain to be completed after abolishment of the Public Benefit Corporation pursuant to section

13    9, including the following:

14       (1) Termination and winding down of existing contracts of the Public Benefit

15    Corporation;

16       (2) Completion of administrative proceedings and court litigation previously handled by

17    the Office of the General Counsel of the Public Benefit Corporation or by private counsel

18    retained by the Public Benefit Corporation;

19       (3) Coordination of court litigation involving the Public Benefit Corporation that is being

20    handled by the Office of the Corporation Counsel;

21       (4) Assessment of outstanding claims against the Public Benefit Corporation; and

22       (5) Arranging for payment of lawful obligations of the Public Benefit Corporation that

23    are assumed by the District of Columbia pursuant to section 5.

1       (c) The Health Care Safety Net Administration shall exercise oversight of the services

2    contracted by the Mayor pursuant to section 7, or by the District of Columbia Financial

3    Responsibility and Management Assistance Authority, to ensure that the health of the population

4    is maintained and that the financial viability of the health care entity providing services exempted

5    pursuant to section 8 are addressed.

6       Sec. 4.  Transfers.

7       (a) The functions, real or personal property, personnel, unexpended balances of

8    appropriations, and records of the Public Benefit Corporation shall be transferred to the

9    Department of Health.

10       (b) Any monies remaining in the Health and Hospitals Public Benefit Corporation Fund

11    after the effective date of this act shall revert to the General Fund to the credit of the Department

12    of Health.

13       (c)  The Department of Health shall recognize collective bargaining representatives that

14    have been duly certified by the District of Columbia Public Employees Relations Board and shall

15    assume and be bound by all existing collective bargaining agreements entered into by the Public

16    Benefit Corporation.

17       (d) Every employee of the Public Benefit Corporation shall be transferred to the

18    Department of Health.  All employees so transferred shall be under the direction and control of

19    the Director of the Department of Health or that director's designee or designees.  Transferred

20    employees shall retain the same rights and privileges that they had as employees of the Public

21    Benefit Corporation before the effective date of this act and shall not obtain any additional rights

22    or privileges as a result of the transfer.  They shall have all the duties and responsibilities that

23    they had as employees of the Public Benefit Corporation in addition to whatever duties and

1   responsibilities they acquire as employees of the Department of Health.  Transferred employees

2   shall constitute a separate competitive area within the Department of Health for purposes of

3   reductions in force only pursuant to section 2408 of the District of Columbia Government

4   Comprehensive Merit Personnel Act of 1978, effective March 3, 1979, D.C. Law 2-139, D.C.

5   Code § 1-625.7, and Chapter 24 of the District of Columbia Personnel Manual.  Lesser

6   competitive areas may be established by the personnel authority for these employees.  The

7   Mayor shall be the personnel authority for all employees of the Public Benefit Corporation who

8   are transferred to the Department of Health, except that the personnel authority for accounting,

9   budget, and financial management personnel who are transferred shall continue to be the Chief

10  Financial Officer of the District of Columbia.

11      Sec. 5.  Liabilities of the Public Benefit Corporation.

12      All liabilities of the Public Benefit Corporation shall be assumed by the District of

13  Columbia.

14      Sec. 6.  Health Care Safety Net Fund and Appropriations.

15      (a) There is established the Health Care Safety Net Fund ("Fund") as a nonlapsing,

16  revolving fund, to be administered by the Mayor as an agency fund as defined in section

17  373(2)(I) of Title 47 of the District of Columbia Code, to be used exclusively for the purposes

18  stated in section 3.  Revenues deposited into the Fund shall not revert to the General Fund at the

19  end of any fiscal year or at any other time but shall be continually available to the Department of

20  Health for the uses and purposes set forth in this act, subject to authorization by Congress in an

21  appropriations act.

22      (b) The Fund shall be financed through appropriations, the accounts receivable of the

23  Public Benefit Corporation, and gifts or donations.

1     (c) The Fund shall be accounted for under procedures established pursuant to subchapter

2    V of Chapter 3 of Title 47 of the District of Columbia Code.

3     (d) There are authorized to be appropriated from the general revenues of the District of

4    Columbia funds necessary to carry out the purposes of this act.

5     Sec. 7. Authorization to contract for comprehensive health care services.

6     (a) The Mayor is authorized to provide by contract or by other means any of the

7    comprehensive community-centered health care and medical services for residents of the District

8    of Columbia provided by the Public Benefit Corporation pursuant to the Health and Hospitals

9    Public Benefit Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code §

10    32-261.1 *et seq.*).

11     (b) A contract entered into pursuant to subsection (a) of this section before or

12    simultaneously with the abolishment of the Public Benefit Corporation pursuant to section 9

13    shall be exempt from the requirements of the District of Columbia Procurement Practices Act of

14    1985, effective February 21, 1986 (D.C. Law 6-85; D.C. Code § 1-1181.1 *et seq.*), except that the

15    contract shall be subject to section 105a of that act.

16     Sec. 8. Health services planning program amendments.

17     The Health Services Planning Program Re-establishment Act of 1996, effective April 9,

18    1997 (D.C. Law 11-191; D.C. Code § 32-351 *et seq.*), is amended as follows:

19     (1) Section 2 (D.C. Code § 32-351) is amended by adding a new paragraph (3A) to read

20    as follows:

21     "(3A)  "Charity care" means the physician and hospital medical services provided to

22    persons who are unable to pay for the cost of services, especially those persons who are low-

23    income, uninsured and underinsured, but excluding those services determined to be caused by, or

1    categorized as, bad debt.".

2          (2) Section 3(b) (D.C. Code § 32-352(b)) is amended as follows:

3          (A) Paragraph (3) is amended by striking the word "and" at the end.

4          (B) Paragraph (4) is amended by striking the period at the end and inserting the phrase ";

5    and" in its place.

6          (C) A new paragraph (5) is added to read as follows:

7          "(5) Establishing, determining, and developing, in accordance with section 22,

8    requirements and standards for the implementation of unreimbursed charity care by all health

9    care facilities that receive a certificate of need, including an annual mechanism for monitoring

10   the provision of that charity care by the health care facilities.".

11         (3) Section 8 (D.C. Code § 32-357) is amended by adding new subsections (e), (f), and

12   (g) to read as follows:

13         "(e) Any proposal to offer or develop a new institutional health service, obligate a new

14   capital expenditure, or reduce or terminate a health service that would otherwise be subject to

15   certificate of need requirements, by a health care entity that has contracted with the District of

16   Columbia Financial Responsibility Management Assistance Authority, or with the Mayor

17   pursuant to section 7 of the Health Care Privatization Temporary Amendment Act of 2001, to

18   provide new health care services shall be exempt from certificate of need requirements only for

19   the purpose of maintaining the same level of care and services provided by the District of

20   Columbia Health and Hospitals Public Benefit Corporation ("Public Benefit Corporation").

21         "(f) The Administrator of the Health Care Safety Net Administration ("Administrator"),

22   established pursuant to section 3 of the Health Care Privatization Temporary Amendment Act of

23   2001, shall determine which new institutional health services, capital expenditures, and

7

1    reductions or terminations of health services qualify as health care services being taken over

2    from the Public Benefit Corporation.

3        "(g) The District government and the Public Benefit Corporation are exempt from

4    certificate of need requirements for any changes in health care service that may result from the

5    abolishment of the Public Benefit Corporation.".

6        Sec. 9.  Repealers.

7        (a) The Health and Hospitals Public Benefit Corporation Act of 1996, effective April 9,

8    1997 (D.C. Law 11-212; D.C. Code § 32-261.1 et seq.), is repealed, and the Public Benefit

9    Corporation is abolished.

10       (b) Section 851(1)(D) of the District of Columbia Government Comprehensive Merit

11   Personnel Act of 1978, effective April 20, 1999 (D.C. Law 12-260; D.C. Code § 1-

12   609.51(1)(D)), is repealed.

13       (c) Section 2(e)(9) of the Confirmation Act of 1978, effective March 3, 1979 (D.C. Law

14   2-142; D.C. Code § 1-633.7(e)(9)), is repealed.

15       (d) Section 320(k) of the District of Columbia Procurement Practices Act of 1985,

16   effective April 15, 1997 (D.C. Law 11-259; D.C. Code § 1-1183.20(k)), is repealed.

17       Sec. 10.  Fiscal impact statement.

18       The Council adopts the forthcoming fiscal impact statement of the Chief Financial

19   Officer as the fiscal impact statement required by section 602(c)(3) of the District of Columbia

20   Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Code § 1-233(c)(3)).

21       Sec. 11. Effective date.

22       (a)  This act shall take effect following approval by the Mayor (or in the event of veto by

23   the Mayor, action by the Council to override the veto) and approval by the Financial

8

1    Responsibility and Management Assistance Authority as provided in section 203(a) of the

2    District of Columbia Financial Responsibility and Management Assistance Act of 1995,

3    approved April 17, 1995 (109 Stat. 116; D.C. Code § 47-392.3(a)), a 30-day period of

4    Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule

5    Act, approved December 24, 1973 (87 Stat. 813; D.C. Code § 1-233(c)(1)),and publication in the

6    District of Columbia Register.

7              (b)  This act shall expire after 225 days of its having taken effect or upon the

8    effective date of the Health Care Privatization Amendment Act of 2001, whichever occurs first.

Chairman Linda W. Cropp,
at the request of the Mayor

A BILL

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

To reorganize the Department of Health by establishing a Health Care Safety Net Administration
in the Department of Health and to transfer functions of the District of Columbia Public
Benefit Corporation ("Public Benefit Corporation") to the Department of Health; to
authorize the Mayor to contract out any of the health care functions of the Public Benefit
Corporation; to exempt any contract to provide comprehensive community-centered
health care and medical services for District of Columbia residents provided by the Public
Benefit Corporation entered into by the Mayor before the abolishment of the Public
Benefit Corporation from certain provisions of the District of Columbia Procurement
Procedures Act of 1985; to amend the Health Services Planning Program Re-
establishment Act of 1996 to establish authority for establishing requirements for charity
care and to exempt the District government, the Public Benefit Corporation, and any
contractor that provides services provided by the Public Benefit Corporation pursuant to a
health care privatization contract from certain provisions of the Health Services Planning
Program Re-establishment Act of 1996; and to repeal the Health and Hospitals Public
Benefit Corporation Act of 1996 and abolish the Public Benefit Corporation.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

act may be cited as the "Health Care Privatization Amendment Act of 2001".

Sec. 2. Findings and purpose.

The Council finds and declares the following:

(1) The District of Columbia Health and Hospitals Public Benefit Corporation ("Public

Benefit Corporation") has operated with deficits for two consecutive fiscal years and has

depleted its $45.3 million FY 2001 subsidy.

(2) The District of Columbia Appropriations Act, 2001 ("Appropriations Act"), approved

November 22, 2000, Pub. L. 106-522, authorized the spending of non-Federal funds not to

1    exceed $90 million for the purpose of restructuring health care delivery pursuant to a

2    restructuring plan approved by the Mayor, the Council, the District of Columbia Financial

3    Responsibility and Management Assistance Authority ("Authority"), and the Board of Directors

4    of the Public Benefit Corporation.

5          (3) On December 4, 2000, the Authority issued a Resolution, Recommendations and

6    Orders pursuant to Section 207 of the District of Columbia Financial Responsibility and

7    Management Assistance Act, approved April 17, 1995 (109 Stat. 133; D.C. Code § 47-392.7),

8    concerning the Public Benefit Corporation, that, among other things, required the following to

9    occur within 90 days of December 4, 2000:

10          (A) Repeal of Titles I and II of the Health and Hospitals Public Benefit

11    Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code §§ 32-261.1-32-

12    262.20).

13          (B) Council enactment of legislation and regulations and approval of

14    reprogrammings necessary to authorize and implement an alternative publicly-financed health

15    care delivery system.

16          (4) On December 15, 2000, pursuant to the Appropriations Act, the Mayor submitted to

17    the Committee on Government Reform of the House of Representatives and the Committee on

18    Government Affairs of the Senate a health care delivery restructuring plan that was approved by

19    the Authority, the Mayor, the Council, and the Board of Directors of the Public Benefit

20    Corporation.

21          (5) The purpose of this act is to authorize implementation of an alternative publicly-

22    financed health care delivery system to replace the health care services formerly provided by the

23    Public Benefit Corporation, as recommended by the Authority in its Resolution,

1   Recommendations and Orders of December 4, 2000, and in accordance with the restructuring

2   plan of December 15, 2000.

3        Sec. 3.  Health Care Safety Net Administration establishment.

4        (a) There is established within the Department of Health a Health Care Safety Net

5   Administration to administer and monitor compliance with any contract that the Mayor makes,

6   pursuant to section 7, or that the District of Columbia Financial Responsibility Management

7   Assistance Authority makes, with a health care entity to provide any of the health care functions

8   provided by the Public Benefit Corporation pursuant to the Health and Hospitals Public Benefit

9   Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code § 32-262.7(a)).

10       (b) The Health Care Safety Net Administration shall be responsible for all transition

11  activities that result from privatization of the functions of the Public Benefit Corporation and that

12  remain to be completed after abolishment of the Public Benefit Corporation pursuant to section

13  9, including the following:

14       (1) Termination and winding down of existing contracts of the Public Benefit

15  Corporation;

16       (2) Completion of administrative proceedings and court litigation previously handled by

17  the Office of the General Counsel of the Public Benefit Corporation or by private counsel

18  retained by the Public Benefit Corporation;

19       (3) Coordination of court litigation involving the Public Benefit Corporation that is being

20  handled by the Office of the Corporation Counsel;

21       (4) Assessment of outstanding claims against the Public Benefit Corporation; and

22       (5) Arranging for payment of lawful obligations of the Public Benefit Corporation that

23  are assumed by the District of Columbia pursuant to section 5.

1    (c) The Health Care Safety Net Administration shall exercise oversight of the services

2    contracted by the Mayor pursuant to section 7, or by the District of Columbia Financial

3    Responsibility and Management Assistance Authority, to ensure that the health of the population

4    is maintained and that the financial viability of the health care entity providing services exempted

5    pursuant to section 8 are addressed.

6    Sec. 4. Transfers.

7    (a) The functions, real or personal property, personnel, unexpended balances of

8    appropriations, and records of the Public Benefit Corporation shall be transferred to the

9    Department of Health.

10    (b) Any monies remaining in the Health and Hospitals Public Benefit Corporation Fund

11    after the effective date of this act shall revert to the General Fund to the credit of the Department

12    of Health.

13    (c) The Department of Health shall recognize collective bargaining representatives that

14    have been duly certified by the District of Columbia Public Employees Relations Board and shall

15    assume and be bound by all existing collective bargaining agreements entered into by the Public

16    Benefit Corporation.

17    (d) Every employee of the Public Benefit Corporation shall be transferred to the

18    Department of Health. All employees so transferred shall be under the direction and control of

19    the Director of the Department of Health or that director's designee or designees. Transferred

20    employees shall retain the same rights and privileges that they had as employees of the Public

21    Benefit Corporation before the effective date of this act and shall not obtain any additional rights

22    or privileges as a result of the transfer. They shall have all the duties and responsibilities that

23    they had as employees of the Public Benefit Corporation in addition to whatever duties and

4

1    responsibilities they acquire as employees of the Department of Health. Transferred employees

2    shall constitute a separate competitive area within the Department of Health for purposes of

3    reductions in force only pursuant to section 2408 of the District of Columbia Government

4    Comprehensive Merit Personnel Act of 1978, effective March 3, 1979, D.C. Law 2-139, D.C.

5    Code § 1-625.7, and Chapter 24 of the District of Columbia Personnel Manual. Lesser

6    competitive areas may be established by the personnel authority for these employees. The

7    Mayor shall be the personnel authority for all employees of the Public Benefit Corporation who

8    are transferred to the Department of Health, except that the personnel authority for accounting,

9    budget, and financial management personnel who are transferred shall continue to be the Chief

10   Financial Officer of the District of Columbia.

11        Sec. 5. Liabilities of the Public Benefit Corporation.

12        All liabilities of the Public Benefit Corporation shall be assumed by the District of

13   Columbia.

14        Sec. 6. Health Care Safety Net Fund and Appropriations.

15        (a) There is established the Health Care Safety Net Fund ("Fund") as a nonlapsing,

16   revolving fund, to be administered by the Mayor as an agency fund as defined in section

17   373(2)(I) of Title 47 of the District of Columbia Code, to be used exclusively for the purposes

18   stated in section 3. Revenues deposited into the Fund shall not revert to the General Fund at the

19   end of any fiscal year or at any other time but shall be continually available to the Department of

20   Health for the uses and purposes set forth in this act, subject to authorization by Congress in an

21   appropriations act.

22        (b) The Fund shall be financed through appropriations, the accounts receivable of the

23   Public Benefit Corporation, and gifts or donations.

5

1         (c) The Fund shall be accounted for under procedures established pursuant to subchapter

2 V of Chapter 3 of Title 47 of the District of Columbia Code.

3         (d) There are authorized to be appropriated from the general revenues of the District of

4 Columbia funds necessary to carry out the purposes of this act.

5         Sec. 7. Authorization to contract for comprehensive health care services.

6         (a) The Mayor is authorized to provide by contract or by other means any of the

7 comprehensive community-centered health care and medical services for residents of the District

8 of Columbia provided by the Public Benefit Corporation pursuant to the Health and Hospitals

9 Public Benefit Corporation Act of 1996, effective April 9, 1997 (D.C. Law 11-212; D.C. Code §

10 32-261.1 *et seq.*).

11         (b) A contract entered into pursuant to subsection (a) of this section before or

12 simultaneously with the abolishment of the Public Benefit Corporation pursuant to section 9

13 shall be exempt from the requirements of the District of Columbia Procurement Practices Act of

14 1985, effective February 21, 1986 (D.C. Law 6-85; D.C. Code § 1-1181.1 *et seq.*), except that the

15 contract shall be subject to section 105a of that act.

16         Sec. 8. Health services planning program amendments.

17         The Health Services Planning Program Re-establishment Act of 1996, effective April 9,

18 1997 (D.C. Law 11-191; D.C. Code § 32-351 *et seq.*), is amended as follows:

19         (1) Section 2 (D.C. Code § 32-351) is amended by adding a new paragraph (3A) to read

20 as follows:

21         "(3A) "Charity care" means the physician and hospital medical services provided to

22 persons who are unable to pay for the cost of services, especially those persons who are low-

23 income, uninsured and underinsured, but excluding those services determined to be caused by, or

1    categorized as, bad debt.".

2         (2) Section 3(b) (D.C. Code § 32-352(b)) is amended as follows:

3         (A) Paragraph (3) is amended by striking the word "and" at the end.

4         (B) Paragraph (4) is amended by striking the period at the end and inserting the phrase ";

5    and" in its place.

6         (C) A new paragraph (5) is added to read as follows:

7         "(5) Establishing, determining, and developing, in accordance with section 22,

8    requirements and standards for the implementation of unreimbursed charity care by all health

9    care facilities that receive a certificate of need, including an annual mechanism for monitoring

10   the provision of that charity care by the health care facilities.".

11        (3) Section 8 (D.C. Code § 32-357) is amended by adding new subsections (e), (f), and

12   (g) to read as follows:

13        "(e) Any proposal to offer or develop a new institutional health service, obligate a new

14   capital expenditure, or reduce or terminate a health service that would otherwise be subject to

15   certificate of need requirements, by a health care entity that has contracted with the District of

16   Columbia Financial Responsibility Management Assistance Authority, or with the Mayor

17   pursuant to section 7 of the Health Care Privatization Amendment Act of 2001, to provide new

18   health care services shall be exempt from certificate of need requirements only for the purpose

19   of maintaining the same level of care and services provided by the District of Columbia Health

20   and Hospitals Public Benefit Corporation ("Public Benefit Corporation"). The exemptions

21   granted by this subsection shall be for a period of 225 days from the effective date of the Health

22   Care Privatization Amendment Act of 2001, except that proposals to develop trauma I capability

23   to match the levels existing at D.C. General Hospital as of January 1, 2001, shall be exempt from

1    certificate of need requirements for a period of 1 year from the effective date of the Health Care

2    Privatization Amendment Act of 2001.

3         "(f) The Administrator of the Health Care Safety Net Administration ("Administrator"),

4    established pursuant to section 3 of the Health Care Privatization Amendment Act of 2001, shall

5    determine which new institutional health services, capital expenditures, and reductions or

6    terminations of health services qualify as health care services being taken over from the Public

7    Benefit Corporation.  The Administrator's authority to make determinations and the exemptions

8    from certificate of need review pursuant to subsection (e) shall expire 1 year after the date the

9    first contract for health care services entered into pursuant to section 7 of the Health Care

10    Privatization Amendment Act of 2001 is signed.

11         "(g) The District government and the Public Benefit Corporation are exempt from

12    certificate of need requirements for any changes in health care service that may result from the

13    abolishment of the Public Benefit Corporation.".

14        Sec. 9.  Repealers.

15        (a) The Health and Hospitals Public Benefit Corporation Act of 1996, effective April 9,

16    1997 (D.C. Law 11-212; D.C. Code § 32-261.1 *et seq.*), is repealed, and the Public Benefit

17    Corporation is abolished.

18        (b) Section 851(1)(D) of the District of Columbia Government Comprehensive Merit

19    Personnel Act of 1978, effective April 20, 1999 (D.C. Law 12-260; D.C. Code § 1-

20    609.51(1)(D)), is repealed.

21        (c) Section 2(e)(9) of the Confirmation Act of 1978, effective March 3, 1979 (D.C. Law

22    2-142; D.C. Code § 1-633.7(e)(9)), is repealed.

23        (d) Section 320(k) of the District of Columbia Procurement Practices Act of 1985,

1    effective April 15, 1997 (D.C. Law 11-259; D.C. Code § 1-1183.20(k)), is repealed.

2        Sec. 10.  Fiscal impact statement.

3        The Council adopts the forthcoming fiscal impact statement of the Chief Financial

4    Officer as the fiscal impact statement required by section 602(c)(3) of the District of Columbia

5    Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Code § 1-233(c)(3)).

6        Sec. 11. Effective date.

7        This act shall take effect following approval by the Mayor (or in the event of veto by the

8    Mayor, action by the Council to override the veto) and approval by the Financial Responsibility

9    and Management Assistance Authority as provided in section 203(a) of the District of Columbia

10   Financial Responsibility and Management Assistance Act of 1995, approved April 17, 1995 (109

11   Stat. 116; D.C. Code § 47-392.3(a)), a 30-day period of Congressional review as provided in

12   section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87

13   Stat. 813; D.C. Code § 1-233(c)(1)), and publication in the District of Columbia Register.