**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

AUG 3 - 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

```
                                  )
KEVIN P. CHAVOUS, et al.,         )
                                  )
          Plaintiffs,             )
                                  )     Civil Action No. 01-921 (RWR)
     v.                           )
                                  )
DISTRICT OF COLUMBIA              )
FINANCIAL RESPONSIBILITY          )
AND MANAGEMENT ASSISTANCE         )
AUTHORITY, et al.,                )
                                  )
          Defendants.             )
                                  )
```

MEMORANDUM OPINION

Plaintiffs Kevin P. Chavous, David A. Catania and the
Committee of Interns and Residents[1] filed this action seeking to
declare void and to enjoin the implementation of the contract
between defendants District of Columbia Financial Responsibility
and Management Assistance Authority (the "Control Board" or
"Authority") and Greater Southeast Community Hospital Corporation
I ("GSE" or "Greater Southeast") to transfer the majority of the
services provided by the public D.C. General Hospital over to the
privately-run GSE.  The plaintiffs have moved for summary
judgment arguing that the Control Board's actions were ultra

---

[1] Plaintiffs Kevin P. Chavous and David A. Catania are
currently members of the Council of the District of Columbia.
(See First Amended Complaint ("Compl.") ¶ 6.)  The Committee of
Interns and Residents is a union of healthcare workers that
represents the interns and residents at D.C. General Hospital.
(Id. ¶ 7.)



*38*

- 2 -

vires, violated the Councilmembers' constitutional right to cast
unimpeded votes on issues of public importance, and violated the
separation of powers doctrine.[2]  Defendants Control Board and
Greater Southeast[3] have moved to dismiss the complaint arguing
that none of the plaintiffs have standing to bring this action,
but even if they do, the plaintiffs have failed to state a claim
upon which relief can be granted.  Because plaintiffs Chavous and
Catania have standing to bring this action, the defendants'
motion to dismiss for lack of subject matter jurisdiction as to
those plaintiffs' claims will be denied.  However, because the
Committee of Interns and Residents does not have standing to
bring this case, the motion to dismiss this plaintiff's claims
for lack of subject matter jurisdiction will be granted.  The
Control Board's and Greater Southeast's motions to dismiss the
ultra vires claim will be treated as motions for summary judgment
since they presented matters outside of the pleadings.  Those
motions will be granted since the Control Board, as a matter of
law, acted within its authority.  Further, these defendants'
motions to dismiss the constitutional claims will be granted

---

[2] Count One of the amended complaint contains the ultra
vires claim.  Count Two contains the constitutional claims.
Count Three adds the District of Columbia as a party plaintiffs
seek to enjoin.

[3] GSE joined in the Control Board's motion.  (See Greater
Southeast Community Hospital Corporation I's Motion to Dismiss
("GSE Mot. to Dism.") at 1.)

- 3 -

because neither argument states a valid legal claim.
Correspondingly, the plaintiffs' motion for summary judgment will
be denied.  Finally, the District of Columbia's motion to dismiss
the complaint against it also will be granted because the
plaintiffs have alleged no cognizable claim against the District.

<u>BACKGROUND</u>

As part of the fiscal year 2001 appropriation for the
District of Columbia, Congress allocated $90,000,000 "for the
purpose of restructuring the delivery of health services in the
District of Columbia."  District of Columbia Appropriations Act,
2001, Pub. L. No. 106-522, 114 Stat. 2440, 2452 (2000).  In
addition, Congress directed that a restructuring plan be prepared
and "approved by the Mayor of the District of Columbia, the [D.C.
Council], the [Control Board], the [Chief Financial Officer of
the District], and the Chair of the Board of Directors of the
[Public Benefit Corporation]."[4]  <u>Id</u>. at 2456.  After receiving
this direction from Congress, the Control Board issued its
"Resolution, Recommendations and Orders Concerning the Public
Benefit Corporation."  (<u>See</u> First Amended Complaint ("Compl.")
¶ 16.)  In it, the Control Board recommended, in relevant part,
that the D.C. Council repeal the act which established the PBC

---

[4] The Public Benefit Corporation ("PBC") was a non-profit
entity established to provide comprehensive community-centered
healthcare for the District of Columbia.  (<u>See</u> Compl. ¶ 12.)
When the PBC was created, the health-care functions performed by
D.C. General were thereafter performed by the PBC.  (<u>Id</u>.)

- 4 -

and work with the Mayor to "prepare and approve a plan to
establish an alternative publicly-financed health care delivery
system." (See Compl. Ex. A.) The Control Board also stated that
if the recommendations were not approved within ninety days, the
Control Board would implement the recommendation itself. (Id.)
The Council received the resolution on December 6, 2000. This
resolution also contained orders to the Mayor, the Director of
the D.C. Department of Health, and the Chief Financial Officer of
the District. (Id.)

On December 15, 2000, the Control Board issued a Request for
Proposal ("RFP") which sought to "obtain the services of one
qualified health care provider or team of qualified health care
providers . . . to provide comprehensive, integrated and
coordinated health care services to the uninsured population of
the District of Columbia." (See Pl. Ex. B.) Greater Southeast
submitted a proposal on January 30, 2001 (see Compl. ¶ 20), which
the Control Board ultimately accepted.

On March 6, 2001, the D.C. Council passed a unanimous
resolution rejecting the Control Board's recommendations, citing
a concern for the impact that a contract with Greater Southeast
would have on healthcare in the District of Columbia. (Id.
¶ 23.) In an effort to shore up D.C. General's short-term
financial future, the Council approved an additional $21 million
dollars to fund the PBC through the end of the fiscal year. (Id.

- 5 -

¶ 24.)  Despite the Council's objection to the GSE proposal which
would result in the privatization of healthcare for uninsured
residents in the city, and the Council's subsequent rejection of
the contract with GSE, the Control Board signed the contract with
GSE. (See id. ¶¶ 28-29.)  On April 30, 2001, the Control Board
issued a series of Acts ("the Privatization Acts") which, among
other things, abolished the PBC.  (See Pl. Ex. 10.) Plaintiffs
brought this action claiming, among other things, that the
Control Board acted outside of the authority granted by the
District of Columbia Financial Responsibility and Management
Assistance Act of 1995, Pub. L. No. 104-8 (1995) ("FRMAA" or "the
Act") when it signed this contract and abolished the PBC.  (See
Compl. ¶¶ 33-49.)

<u>DISCUSSION</u>

I.   <u>Standing</u>

The Control Board and GSE have moved under Fed. R. Civ. P.
12(b)(1) to dismiss the amended complaint for lack of subject
matter jurisdiction, arguing that the plaintiffs lack standing.
(See District of Columbia Financial Responsibility and Management
Assistance Authority's Motion to Dismiss ("Mot. to Dism.") at 2-
7.)  In order to invoke properly the authority of the federal
courts, a party must demonstrate that he or she has a "case" or
"controversy" sufficient to meet the requirements of Article III.
See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); see

- 6 -

also <u>Allen v. Wright</u>, 468 U.S. 737, 750 (1984) ("The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government."); <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.")

"[T]he irreducible constitutional minimum of standing" has three elements. <u>Defenders of Wildlife</u>, 504 U.S. at 560. First, the plaintiff must have suffered an "injury in fact," which is an invasion of "a legally protected interest" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, the claimant must demonstrate a causal connection between the injury and the conduct about which he complains. Third, it must be likely that the injury is subject to redress by means of a favorable court decision. <u>Id</u>. at 560-61. "[E]ach element [of the standing inquiry] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." <u>Id</u>. at 561.

This bedrock requirement is one with which the federal courts must strictly comply because "'the law of Art. III standing is built on a single basic idea -- the idea of separation of powers.'" <u>Raines v. Byrd</u>, 521 U.S. 811, 818, 820 (1997) (quoting <u>Allen v. Wright</u>, 468 U.S. 737, 752 (1984)). By employing the sorting mechanism established by the standing

- 7 -

inquiry, courts ensure that their powers are limited to reviewing only those disputes which are appropriately resolved through the judicial process.  See Defenders of Wildlife, 504 U.S. at 560. When reviewing a standing challenge, then, trial courts must "accept as true all material allegations of the complaint," and further, must "construe the complaint in favor of the complaining party." Warth, 422 U.S. at 501.  In other words, the trial court must accept as true the complainant's pleaded legal theory.  See American Fed'n of Gov't Employees v. Pierce, 697 F.2d 303, 305 (D.C. Cir. 1982); see also United States House of Representatives v. United States Dep't of Commerce, 11 F. Supp. 2d 76, 83 (D.D.C. 1998) ("In the context of a challenge to the plaintiff's standing to sue, [construing the complaint in favor of the complaining party] means that the plaintiff's arguments on the merits are accepted as valid.")  Here, plaintiffs' claims that the Control Board acted outside of the scope of its authority will be accepted as true for purposes of the standing analysis.

A.    Legislator Standing

Councilmembers Chavous and Catania argue that they have standing in their official capacity as legislators.  (See Plaintiffs' Opposition to the District of Columbia Financial Responsibility and Management Assistance Authority's Motion to Dismiss ("Opp. to Mot. to Dism.") at 11-15.)  In Raines, individual members of Congress challenged the constitutionality

- 8 -

of the Line Item Veto Act.  See Raines, 521 U.S. at 814.  There,
the members claimed that they had been injured because the Act
altered the practical effect of any votes they may have cast for
or against legislation, diminished their role in the repeal of
legislation, and altered the constitutional balance between the
legislative and executive branches.  Id. at 816.  The Court held
that the Congressmen did not have standing.  Their claim was more
properly characterized as an institutional injury, equally shared
by all members of Congress, and they had not been deprived of
anything to which they were personally entitled.  Id. at 829-30.

    The Court noted that one exception to the legislator
standing rule existed.  In Coleman v. Miller, 307 U.S. 433
(1939), the Kansas Senate ratified a proposed Child Labor
Amendment to the federal Constitution after a twenty-to-twenty
tie which was broken by the presiding officer of the Senate, the
Lieutenant Governor.  See Coleman, 307 U.S. at 435-36.
Thereafter, twenty-one members of the Senate, including the
twenty who voted against the amendment, brought an action
challenging the right of the Lieutenant Governor to cast the
deciding vote in the Senate.  Id. at 436.  The Supreme Court held
that the complaining legislators had standing because the
senators' votes against ratification "[had] been overridden and
virtually held for naught although . . . their votes would have
been sufficient to defeat ratification."  Id. at 438.  Coleman

- 9 -

has been interpreted as standing for the proposition that
"legislators whose votes would have been sufficient to defeat (or
enact) a specific legislative Act have standing to sue if that
legislative action goes into effect (or does not go into effect),
on the ground that their votes have been completely nullified."
Raines, 521 U.S. at 823.

    The Control Board argues that Chavous' and Catania's claims
are barred because they were not singled out for "specially
unfavorable treatment," and further, they have simply alleged a
form of institutional injury which is equally shared by all
members of the Council. (See Mot. to Dism. at 4.)  These
arguments, however, are unavailing.  Councilmembers Chavous and
Catania have made allegations which are sufficient to support
legislative standing in this case.  In the First Amended
Complaint, the plaintiffs claimed that even if the Control Board
had the authority to enter into the contract with GSE, that
authority ended on February 14, 2001, when the Control Board
certified that the District's financial crisis was over, thereby
triggering the start of the Control Board's demise.  (See Compl.
¶ 42.)  If this certification heralded an immediate shift in
power from the Control Board to the city's democratically-elected
institutions, as the plaintiffs contend, then the Council's
unanimous decision to reject the contract should have been
determinative.  Accordingly, members Chavous and Catania can

- 10 -

properly assert <u>Coleman</u> standing here.  Their votes against the
contract were more than sufficient to defeat the proposed action.
(<u>See id</u>. ¶ 28.)  Thus, it was not the absence of support which
prevented Chavous and Catania from achieving their legislative
goal; rather, it was the Control Board's direct override of the
Council's authority which had the effect of nullifying their
votes.  <u>See, e.g.</u>, <u>Alaska Legislative Council v. Babbitt</u>, 181
F.3d 1333, 1338 (D.C. Cir. 1999)(affirming the district court's
dismissal when members of the Alaska legislature failed to claim
that "[they] had the votes to enact a particular measure, that
they cast those votes or that the federal statute or the federal
defendants did something to nullify their votes.")

Assuming for the sake of argument that the Control Board
previously had the authority to enter into this contract, and
this authority was lost on February 14, 2001, the Council's
authority has been completely negated because the contract
against which it voted has gone into effect.  Councilmembers
Chavous and Catania have "'a plain, direct and adequate interest
in maintaining the effectiveness of their votes,'" <u>Raines</u>, 521
U.S. at 821-22 (quoting <u>Coleman</u>, 307 U.S. at 438), and it is this
interest which allegedly has been violated.  This court may hear
such claims.  Accordingly, the defendants' motion to dismiss

- 11 -

plaintiffs Chavous and Catania from the suit for lack of subject matter jurisdiction will be denied.[5]

B.   Union Standing

The defendants have also claimed that the Committee of Interns and Residents lacks standing here.   (See Mot. to Dism. at 5-7.)   Specifically, they claim that the union's grievance does not fall within the zone of interests promoted by the FRMAA. Though it is clear that the union meets the requirements of Article III standing -- its members have been injured by virtue of the fact that they have lost their jobs, this injury was caused by the Control Board's actions, and the injury can be redressed by this court -- it cannot meet the additional limits that courts have placed on standing.   "The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" Bennett v. Spear, 520 U.S. 154, 162 (1997) (quoting Warth, 422 U.S. at 498).   Thus, a plaintiff must not only establish constitutional standing, but it must meet the "judicially self-imposed limits on the exercise of federal jurisdiction" that are "founded in [a] concern about the proper -- and properly limited -- role of the courts in a democratic society." Bennett, 520 U.S. at 162 (citations omitted).   To that end, courts will examine whether "a plaintiff's grievance . . . fall[s] within the zone of

---

[5] The second and third elements of standing under Defenders of Wildlife are not in serious dispute.

- 12 -

interests protected or regulated by the statutory provision . . .
invoked in the suit." Id.  Though there "need be no indication
of congressional purpose to benefit the would-be plaintiff," the
zone of interests test seeks to "den[y] a right of review if the
plaintiff's interests are so marginally related to or
inconsistent with the purposes implicit in the statute that it
cannot reasonably be assumed that Congress intended to permit the
suit." Clarke v. Sec. Indus. Assoc., 479 U.S. 388, 399-400
(1987).

Defendants rely on Nat'l Fed'n of Federal Employees v.
Cheney, 883 F.2d 1038 (D.C. Cir. 1989) ("NFFE") to support their
claim that the union does not meet the prudential requirement of
standing embodied in the zone of interest test.  (See Mot. to
Dism. at 5-7)  In NFFE, the union of federal employees contested
a United States Army decision to contract out services that had
previously been handled by federal employees "in-house."  See
NFFE, 883 F.2d at 1040-41.  As a result of this decision, many
union members lost their jobs.  Id. at 1054 (Mikva, J.,
dissenting).  The court of appeals affirmed the district court's
decision granting the motion to dismiss, holding that the
plaintiffs did not meet the requirements of the zone of interest
test.  Id. at 1054.  After examining the legislative histories of
the statutes under which the union sued, the court held that the
plaintiffs' interests were both inconsistent with and only

- 13 -

marginally related to the purposes for which Congress passed the
statutes.  Id. at 1048-51.

   At first blush, the union appears to meet the requirements
of the test.  Not only have many of its members lost their jobs,
but the FRMAA itself states that one of the purposes of the Act
is to "ensur[e] the appropriate and efficient delivery of
services."  FRMAA § 2(b)(4)(C).  It would seem that the presence
of healthcare professionals is necessary to ensure that hospital
patients receive appropriate, efficient and effective healthcare
services.  Nevertheless, a closer look at the legislative history
of the statute reveals the weakness of that assumption.  First of
all, the entire thrust of the FRMAA was to force the District to
enact structural and fiscal reforms that would bring spending in
line with the generation of revenue.  See, e.g., H.R. Rep. No.
104-96 (1995), at 2 ("This Act is intended to redress the fiscal
and management problems that confront the District of Columbia
. . . .")  Second, Congress knew that the District's financial
woes were partly caused by the deficits that D.C. General was
running.  Id. at 8 (noting that in fiscal year 1993, D.C. General
was running at an operating deficit of $109 million).

   One of the steps that Congress believed would have
ameliorated the financial crisis was the elimination of jobs in
the city's bloated personnel structure.  Id. at 10 (noting that
in fiscal year 1995, the District had failed to make net

- 14 -

personnel reductions, a step that might have gone toward
effectively reducing spending).  While firing employees may not
have been specifically authorized in the FRMAA, "[r]educing the
number of District personnel [was] a stated management objective
for a number of years."  Id. at 14.  Moreover, when Congress
examined the powers that other oversight boards around the
country possessed, it concluded that one of the most important
powers that these institutions held was the "[a]uthority to order
cuts in the number of staff."  Id. at 29.  Thus, when Congress
created "the strongest financial oversight authority in our
Nation's history," 141 Cong. Rec. 10,134 (1995), reductions were
not only being contemplated, but were actively encouraged.
Therefore, even though the union has argued that its employment
interest "is more than marginally related to the Control Board's
actions" (see Opp. to Mot. Dism. at 18), it has failed to
demonstrate that its interests are more than marginally related
to the purposes of the statute.  Given the stated interest in
trimming the numbers of personnel, it is inconsistent with
Congressional purposes to allow former employees of a District-
operated facility to contest their firing under the very statute
which contemplates their termination.  Because the union cannot
move past this prudential barrier set up by the zone of interests
test, the defendants' motion to dismiss the union's claims will
be granted.

- 15 -

II.  <u>Alleged ultra vires acts of the Control Board</u>

The Control Board and GSE have also moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6), asserting that plaintiffs have failed to state a valid legal claim.  In a motion to dismiss for failure to state a claim, if "matters outside of the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ."  Fed. R. Civ. P. 12(b).  The Control Board and GSE, in moving to dismiss the ultra vires claim on Rule 12(b)(6) grounds, have relied on matters not excluded by the Court that are outside of the pleadings.[6]  Therefore, the Court will treat the motions as cross-motions for summary judgment on the ultra vires issue.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movants carry the initial burden of identifying evidence demonstrating the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

---

[6] <u>See</u> Mot. to Dism. at 10 (relying on exhibits filed in opposition to the motion for a temporary restraining order that the plaintiffs filed on April 30, 2001).

- 16 -

In plaintiffs' motion for summary judgment, they contend
that the Control Board had no "specific statutory or other
authority to enter into the Privatization Contract, enact the
Privatization Acts, and issue the Privatization Orders."[7]
(Plaintiff's Motion for Summary Judgment ("Mot. for Summ. J.") at
14.)  Plaintiffs claim that in order for the Control Board to
justify its actions, it must point to some statutory authority
which allows it to implement an agreement such as the one at
issue here.  (Id.)  The plaintiffs identify three potential
sources of authority: FRMAA § 207(c), which grants the Control
Board authority to take actions on those recommendations which
the Council has disapproved; FRMAA § 207(d), which grants the
Control Board authority to issue orders to the Mayor and District
agencies; and finally, FRMAA § 103(g), which delineates the
Control Board's authority to contract.  (Id.)  In their motion,
the plaintiffs claim that none of these provisions grants the
necessary authority.   (Id.)  As a preliminary matter, though,
the plaintiffs have claimed that even if these provisions *did*
confer such authority on the Control Board, that power expired on
February 14, 2001, when the Control Board certified under § 221

---

[7] The Privatization Contract refers to the contract between
the city and Greater Southeast. The Privatization Acts are the
pieces of enabling legislation which implemented the
Privatization Contract.  The Privatization Orders repealed the
PBC and eliminated certificate of need requirements.  (See Mot.
for Summ. J. at 7-10.)

- 17 -

of the Act that the District's fiscal emergency had come to an
end.  (See Compl. ¶ 42.)

    A.   <u>Section 221 and the Control Board's Authority to Act</u>

    Plaintiffs argue that while it is undoubtedly clear that
Congress vested unprecedented authority in the Control Board, its
broad powers ceased to exist when the "control period" came to an
end.  Under the Act, a "control period" terminates when the
Control Board certifies that "the District government has
adequate access to both short-term and long-term credit markets
at reasonable interest rates to meet its borrowing needs," and
for four consecutive years, the District maintains a balanced
budget.  FRMAA § 209(b)(1).  On February 14, 2001, the control
period in which the District had been operating came to an end.
(See Pl. Ex. 15.)

    Section 221 of the FRMAA states, "During the period
beginning upon the termination of a control period pursuant to
section 209(b) and ending with the suspension of its activities
pursuant to section 107(a), the Authority shall conduct
[specific] activities. . . ."  FRMAA § 221 (emphasis added).  The
statute then lists the four activities in which the Control Board
must engage when this period ensues: it must review budgets
adopted by the Council; analyze the budget and prepare a report
for Congress; monitor the financial status of the District
government and submit reports to the Mayor, Council, President

- 18 -

and Congress if it determines that a new control period may be triggered; and carry out certain activities with respect to bonds, notes, or other obligations of the Authority.   FRMAA § 221(a)(1)-(4).

Relying on the maxim of statutory interpretation *expressio unius est exclusio alterius* (mention of one thing implies the exclusion of another), plaintiffs claim that § 221 defines the limit of the Control Board's current authority and that the Control Board's vast authority no longer exists.   (See Mot. for Summ. J. at 21.) Plaintiffs are claiming that since the powers described in § 221 essentially mirror some of the authority that the Control Board possessed from the beginning, it would not have been necessary for Congress to repeat itself if Congress intended for the Control Board to retain its full panoply of powers.[8]

---

[8] Section 221 of the FRMAA is entitled, "Duties of Authority During Year Other than Control Year," not "Duties of Authority During Period other than Control Period."   The Act defines a "control year" as "any fiscal year for which a financial plan and budget approved by the Authority under section 202(b) is in effect. . . ."  FRMAA § 305(4).   Currently, the District is in the midst of a control year.   In their attempt to deflect the force of plaintiffs' argument here, defendants have made much of the fact that the section header conflicts with the text of the section.   However, when a header conflicts with the text itself, the language of the text is determinative.   While the Supreme Court has noted that "'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute," Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998)(quoting Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-529 (1947)), it has also noted that section headings "cannot undo or limit that which the text makes plain." Brotherhood of R.R. Trainmen, 331 U.S. at 529.   Moreover, a section heading cannot be

- 19 -

While this principle of statutory interpretation has some utility, the court of appeals has found the maxim often misused, and that its "force in particular situations depends entirely on context." See Shook v. District of Columbia Financial Responsibility and Management Assistance Authority, 132 F.3d 775, 782 (D.C. Cir. 1998). "The difficulty with the doctrine -- and the reason it is not consistently applied -- is that it disregards several other plausible explanations for an omission." Clinchfield Coal Co. v. Federal Mine Safety and Health Review Comm'n, 895 F.2d 773, 779 (D.C. Cir. 1990)(citations omitted). While the *expressio unius* canon may be "a valuable servant," Cheney R.R. Co., Inc. v. Interstate Commerce Comm'n, 902 F.2d 66, 69 (D.C. Cir. 1990) (quoting Ford v. United States, 273 U.S. 593, 612 (1927)) it can also be a "dangerous master." Id. Thus, "the maxim should be used as a starting point in statutory construction -- not as a close-out bid." Shook, 132 F.3d at 782.

Here, it is insufficient to rely solely on the *expressio unius* canon. By plaintiffs' reasoning, Congress would have meant for the Control Board practically to cease its operations immediately upon the termination of the control period. This interpretation of the language, however, is somewhat at odds with

_____

used to create an ambiguity in the statute. See American Trucking Assoc., Inc. v. United States Environmental Protection Agency, 175 F.3d 1027, 1050 (D.C. Cir. 1999) (rev'd on other grounds).

- 20 -

other provisions of the statute itself.  Section 107(a)(1) of the
FRMAA states that the Control Board shall "suspend [its]
activities" carried out under the statute and the terms of its
members shall expire twelve months after it "certifies that all
obligations arising from the issuance by the Authority of bonds,
notes, or other obligations . . . have been discharged, and . . .
all borrowings by or on behalf of the District of Columbia . . .
have been repaid . . . ."  Section 107(a)(2) prohibits the
Control Board from engaging in such a suspension at any time
during a "control year," namely, a fiscal year when a Control
Board-approved budget is in effect.  See FRMAA § 305(4)(defining
control year).  The implication of § 107 is that *prior* to the end
of that twelve month period, the Control Board retains its full
authority.

Thus, ambiguity may arise when this provision is read in
tandem with § 221 because sections 107(a) and 221 potentially
point in opposite directions.  Nothing in § 107(a) serves to
limit the Control Board's authority during the twelve-month
period following certification that all debts have been repaid.
On the other hand, plaintiffs argue that § 221 means that the
Control Board's wide-ranging powers abruptly cease upon the
termination of the control period.  Here, the Control Board
certified that the District had paid its debts prior to
certifying that the control period was at an end, and the latter

- 21 -

certification occurred in the midst of the twelve-month sunset period.  The plaintiffs' interpretation of the two provisions would force the Control Board to abandon much of its work abruptly, leaving it incomplete and half-done.  Such a result might leave District affairs in a precarious position.  Based on the plaintiffs' theory, for instance, if the Control Board had entered into the contract with Greater Southeast one day before certifying that the control period was at an end, § 221 would not have allowed it to pass the enabling legislation for the contract.  This failure may have exposed the District to substantial liability if Greater Southeast later sued for breach of contract.  "Courts can look beyond statutory language when the plain meaning would 'compel an odd result.'"  District of Columbia Fin. Responsibility and Mgmt. Auth. v. Concerned Senior Citizens, 129 F. Supp. 2d 13, 16 (D.D.C. 2000) (quoting Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 454 (1989)).  Plaintiffs' reading of the statute would compel just such an odd result.  Suggesting that Congress intended it stretches reason.

Instead, those two provisions can be reconciled by noting that § 221 has the effect of "mak[ing] assurance double sure." See Shook, 132 F.3d at 782.  Even though § 221 may appear repetitive, it does not state that those enumerated duties are the exclusive activities in which the Control Board may engage.

- 22 -

Rather, the provisions of § 221 describe the tasks which, at a
minimum, the Control Board must perform as its time in existence
comes to an end.  The Control Board may not simply "run out the
clock" as it enters its sunset period.  It has an obligation to
continue working on behalf of the District, and §§ 107(a) and 221
ensure that this is precisely what it will do.

Therefore, when the Control Board entered into the contract
with GSE, it still retained its powers under §§ 207 and 103 of
the FRMAA.  The only remaining question is whether either of
these provisions allowed this agreement to be made.  Because
§ 207(c) did allow the agreement to be made, it will be
unnecessary to determine whether §§ 103 and 207(d) would have
done so as well.

B.    Authority Under Section 207

Section 207 of the FRMAA is the source of the Control
Board's greatest powers under the Act.  This section allows the
Control Board to issue recommendations to the Mayor, Council,
President, and Congress regarding actions that will ensure the
continued financial stability of the District.  See FRMAA
§ 207(a).  If the Control Board submits a recommendation to the
Council, the Council has 90 days from the date of receipt to
indicate whether or not it plans to accept the recommendation.
Id. at § 207(b)(1).  If the Council rejects any recommendation
made by the Control Board -- which may be communicated either

- 23 -

explicitly or by a simple failure to act -- the Control Board may "take such action concerning the recommendation as it deems appropriate." Id. at § 207(c)(1). During floor debate on the FRMAA, Senator Cohen[9] observed that this power would include implementing the recommendation itself. See, e.g., 141 Cong. Rec. 10986 (1995) ("Any recommendation made by the Authority to the District government which either the Mayor or the Council has the authority to adopt, may itself be adopted by the Financial Responsibility and Management Assistance Authority . . . .") (statement of Sen. Cohen). In fact, Senator Cohen viewed § 207 as granting the Control Board "the authority to enact local legislation" if its recommendations were rejected by the Council. Id. Beyond that, it was also contemplated that the Control Board would have the power to implement structural reforms to the District government -- changes that would include abolishing the PBC. "[The Control Board's § 207 powers stretch to] such matters as personnel actions and structural reforms to the District government." Id. In short, legislative history of the FRMAA evinces a Congressional intent to create a governmental composite of legislative, executive, and administrative powers that were co-extensive with those of the Mayor and the Council, while simultaneously attempting to preserve home rule.

_____

[9] At the time of the passage of the FRMAA, Senator Cohen was the Chairman of the Subcommittee on Oversight of Government Management and the District of Columbia. See 1995 Congressional Staff Directory/1 289 (Ann L. Brownson ed., 43rd ed. 1995).

- 24 -

The D.C. Circuit has acknowledged the extensive authority
that the Control Board has been given to implement
recommendations rejected by the D.C. Council.  In Shook, the
court of appeals said that, "the Control Board, after
consultation with Congress, [may] implement *any* of its own
recommendations to ensure compliance with the District's
financial plan *or to improve the delivery of public services over
the objection of the Council.*" Shook, 132 F.3d at 779 n.2
(emphasis added).  Though the Control Board's power to act "is
bounded by the parameters set forth in its enabling Act and
subsequent legislation," University of the District of Columbia
Faculty Ass'n v. District of Columbia Financial Responsibility
and Management Assistance Authority, 163 F.3d 616, 621 (D.C. Cir.
1998), there is no question that those parameters were broadly
conceived and flexibly designed.

While there are no specific references in § 207 to the
Control Board's power to contract, the language of the statute
and the manner in which it has been interpreted leave little
doubt that this provision encompasses the power to implement the
Privatization Contract with Greater Southeast.  This conclusion,
moreover, is consistent with both the language of § 207 and the
legislative history itself.  If the Control Board has the power
to *enact legislation*, it has the authority to enter into a

- 25 -

contract which has the same practical effect.[10]  The defendants'
motion for summary judgment on the ultra vires claim therefore
will be granted, and the plaintiffs' motion on that claim will be
denied.

    III. <u>Constitutional Issues</u>

    Plaintiffs Chavous and Catania have claimed that by entering
into this contract, the Control Board violated their First and
Fifth Amendment[11] rights to cast unimpeded votes on matters of
public importance.  (<u>See</u> Mot. for Summ. J. at 36-37.)  In
addition, plaintiffs claim that the defendants' actions violated
principles of separation of powers.  (<u>Id</u>. at 37.)  The Control
Board and GSE moved under Rule 12(b)(6) to dismiss these claims
as not being legally cognizable.

    A court may dismiss under that rule only if the plaintiffs
are unable to prove any set of facts that would entitle them to
relief.  <u>See</u> <u>Kowal v. MCI Communications Corp.</u>, 16 F.3d 1271,
1276 (D.C. Cir. 1994); <u>see also</u> <u>Alexis v. District of Columbia</u>,

_____

        [10] The court also attaches some importance to the fact that
Congress reviewed the Control Board's plan and subsequently
approved it.  (<u>See</u> Def. Attach. 1 at 3.)  "[T]he ultimate
legislature the Constitution envisions for the District [of
Columbia] is . . . Congress itself."  <u>Adams v. Clinton</u>, 90 F.
Supp. 2d 35, 48 (D.D.C. 2000).  As the ultimate legislative
authority for the District, Congress could have rejected the plan
if it believed that it exceeded the Control Board's authority or
was otherwise inappropriate.  It is telling that in the exercise
of governance, Congress declined to do so.

        [11] Plaintiffs have cited the Fifth Amendment but have set
forth no separate Fifth Amendment argument.

- 26 -

44 F. Supp. 2d 331, 336 (D.D.C. 1999).  To that end, the court

must accept as true all well-pleaded facts alleged by the

plaintiffs, and must give the plaintiffs the benefit of all

inferences that can be derived in their favor.  See Coleman v.

Pension Benefit Guar. Corp., 94 F. Supp. 2d 18, 21 (D.D.C. 2000);

see also Alexis, 44 F. Supp. 2d at 336.  In order to determine

whether the facts alleged by the plaintiffs state a claim, the

court may consider the facts in the complaint and any attached

documents incorporated in it.  See E.E.O.C. v. St. Francis Xavier

Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).  The court

need not, however, accept as true the legal conclusions drawn by

the plaintiffs.  See Papasan v. Allain, 478 U.S. 265, 286 (1986).

    Even if the court accepts as true all of the well-pleaded

facts in the complaint,[12] this claim can survive the motion to

dismiss in only two circumstances: (1) if the Control Board lost

its wide-ranging authority to act when the control period ended,

or (2) even if the Control Board retained its authority, its

actions as a matter of law violated the plaintiffs'

constitutional rights.  The court has already found that the

Control Board did not lose its wide-ranging authority when the

control period ended.  Thus, the court must determine whether the

_____

    [12] The critical facts here are that the Control Board
entered into the contract with Greater Southeast and it passed
the enabling legislation necessary to implement the contract.
The court will accept these facts as true.

- 27 -

Control Board's actions violated the plaintiffs' rights to cast
unimpeded votes or constituted a separation of powers violation.

     A.   Right to Cast Unimpeded Vote

     In Brewer v. District of Columbia Financial Responsibility
and Management Assistance Authority, 953 F. Supp. 406, 408
(D.D.C. 1997), former members of the D.C. Lottery Board sought an
injunction against the D.C. Council after the Council introduced
two bills that would have abolished the Lottery Board.  The
district court dismissed the claim against the Council, noting
that, "Council members have a constitutionally protected right to
cast unimpeded votes on issues of public importance."  Id.
Plaintiffs had also challenged a Control Board order directing
the Lottery Board to reinstate the Lottery Board's executive
director whom the Lottery Board had fired.  Id.  The Court, in
dictum, opined that even Lottery Board members' votes benefit
from First Amendment protections.  See id. at 409-10.  Brewer
relied upon Clarke v. United States, 886 F.2d 404, 405 (D.C. Cir.
1989), vacated as moot, 915 F.2d 699 (D.C. Cir. 1990) (en banc),
in which the D.C. Circuit held that Congress's attempt to compel
members of the D.C. Council to enact a particular piece of
legislation was a violation of the First Amendment.  Congress was
attempting to coerce the votes of the Council, and in so doing,
was attempting to coerce the "speech" of each legislator.
Clarke, 886 F.2d at 406.

- 28 -

Clarke, however, can be distinguished from the events that
occurred here.  The members of the Council were not prevented
from casting an unimpeded vote.  In fact, they cast their votes
and unanimously decided that they would reject the contract
proposed by GSE.  The Control Board merely implemented its
recommendation in the face of Council opposition which had been
previously expressed.  As is discussed above, the power to act in
such a manner has been conveyed by Congress.[13]  Taking the facts
alleged in the complaint as true, they fail to state a violation
of the First Amendment rights of plaintiffs Chavous and Catania.
Defendants' motion to dismiss the First Amendment claim will be
granted.[14]

_____

[13] This Court has previously noted that Congress, as the
ultimate legislature for the District of Columbia, has the
authority to set up and create various governments which
themselves have authority over District affairs.  See Adams v.
Clinton, 90 F. Supp. 2d 27, 34-35 (D.D.C. 2000).

[14] The plaintiffs also moved for summary judgment because of
alleged violations of the open meetings law, because the December
Recommendations allegedly constituted illegal orders to the
Council, and because D.C. Code § 1-1130 permits only the Council
to approve contracts in excess of $1,000,000 during a 12-month
period.  None of these arguments merits much discussion.  It is
undisputed that the Control Board complied with its obligation to
open its initial meeting to the public.  It had no obligation,
though, to continue its meeting in a location filled with
spectators whose persistent chanting interrupted the meeting.
Nor did the Control Board have to issue a pro forma warning to
the crowd before disbanding and reconvening in an alternate
location that was publicly identified and where members of the
press and public were in attendance.  Secondly, this court will
decline plaintiffs' invitation to engage in a debate over
semantics.  Regardless of their tone, the December
Recommendations carried no more force than what they were called
and were not illegal orders.  Lastly, the only provisions of

B.  <u>Separation of Powers Claim</u>

The Control Board and GSE have also moved to dismiss the
plaintiffs' claim that the Control Board's actions were a
violation of the separation of powers doctrine.  Plaintiffs have
claimed that since the members of the Control Board are inferior
officers appointed by the President without the advice and
consent of the Senate, they are executive officers whose actions
here impermissibly interfered with the activities of the
legislative branch.  (<u>See</u> Mot. for Summ. J. at 37.)

"The doctrine [of separation of powers] [may] provide[] a
self-executing safeguard against the encroachment or
aggrandizement of one of the three coequal branches of Government
at the expense of another," <u>Clinton v. Jones</u>, 520 U.S. 681, 682
(1997).  Before a court may find that there has been a violation
of the principle of separation of powers, it must first identify
the respective branches whose powers are allegedly in tension.

Here, the plaintiffs have claimed that the Control Board is
an executive body whose actions usurped the legislative authority
of the D.C. Council.  That argument fails.  Congress is the
ultimate legislative authority for the District.[15]  As it carries

District of Columbia law which constrain Control Board action are
D.C. Code § 1-1504, §§ 1-1521 through 1-1526, and § 1-1461.  <u>See</u>
FRMAA § 108(a).  Therefore, the Control Board is not constrained
by D.C. Code § 1-1130.

[15] "The Congress shall have power . . . [t]o exercise
exclusive Legislation in all Cases whatsoever, over such District
. . . as may, by Cession of particular States, and the Acceptance

Case 1:01-cv-00921-RWR   Document 38   Filed 08/03/01   Page 30 of 33


- 30 -

out its lawmaking powers, Congress has the right to devise the
mechanism by which its authority will be exercised, and the
Control Board is simply the most recent of these mechanisms.  To
the degree, then, that the Control Board's actions comport with
the specific authority delineated by the FRMAA, the Control Board
acts in furtherance of Congressional purpose and design and
exercises only that power which Congress has the authority to
give.[16]

Plaintiffs have cited no authority which supports the notion
that merely because Control Board members are appointed --
through Congressional design -- by the President, that this
action by the Control Board constitutes an encroachment by one
co-equal branch of the national government into the powers of
another.  Since the Control Board's power to act devolves from,
and cannot exceed, Congress' own power to act, it is legislative
power rather than executive power that has affected the Council's
own authority here.  The Council's grievance highlights no clash
between two co-equal branches of the government.  Therefore, the
defendants' motion to dismiss the separation of powers claim will
be granted as well.

_____

of Congress, become the Seat of the Government of the United
States . . . ."  U.S. Const. art. I, § 8, cl. 17.

[16] As is noted above, I have already found that the Control
Board's actions were within the scope of its statutory authority.

IV.  Motion to Dismiss the District of Columbia

The District of Columbia has moved to dismiss the claim
against it also, arguing that the plaintiffs have failed to
articulate any claims against it which merit some form of
relief.[17]  Indeed, the plaintiffs do not claim that the District
engaged in illegal activity.  Instead, they note that they will
be unable to get complete relief unless the District of Columbia
is also a party to the suit.  The court of appeals spoke to this
issue in Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 366
(D.C. Cir. 1999), which affirmed a district court decision
denying an application for a preliminary injunction.  In that
case, union members brought suit against their union and their
employer, Northwest Airlines, despite the fact that there was no
express cause of action lodged against Northwest in the
complaint.  Davenport, 166 F.3d at 365.  Though the court
liberally construed the complaint to assert all causes of action
against Northwest, it found that those claims failed to state a

---

[17] The plaintiffs have mentioned the District of Columbia
government only four times in the complaint: Mayor Williams
received a copy of the proposed contract with Greater Southeast
on April 13, 2001; he received a letter from Alice Rivlin, the
Chairperson of the Control Board, regarding the contract on
April 18, 2001; he sent a copy of the contract to the D.C.
Council on April 23, 2001; and on that same day, he proposed
legislation which provided for the abolition of the PBC and
granted the Mayor the authority to enter into contracts regarding
the delivery of healthcare services for the uninsured residents
of the District.  (See Compl. ¶¶ 25-27.)  The plaintiffs have
failed to demonstrate how any of these actions taken by the Mayor
constitute illegal or ultra vires actions.

- 32 -

claim for relief.  Id.  More importantly, however, the plaintiffs

argued that Northwest was a necessary party under Rule 19 because

they could not obtain complete relief without Northwest's

presence.  Id. at 366.  The court noted that Rule 19 simply

governs the court's ability to join a party; it does not create a

cause of action against any parties who are joined.  Thus, "It is

not enough that plaintiffs 'need' an injunction against Northwest

in order to obtain full relief.  They must also have a right to

such an injunction . . . ."  Id.

    Plaintiffs have characterized the District's participation

in such a way as to fit the parameters of Rule 19.  However, none

of the facts asserted in the complaint constitutes the basis for

a claim of relief against the District.  The plaintiffs may need

an injunction against the District, but they have failed to

demonstrate that they have a right to such action.[18]

Accordingly, the District of Columbia's motion to dismiss the

claims against it will be granted.

_____

    [18] In any event, plaintiffs have made no showing that
complete relief could not be achieved by a direction to the
Control Board to reverse its orders and to take measures to
return the health care delivery system to the status quo ante.
Nor did plaintiffs refute the District's argument that it cannot
expend appropriated funds on unauthorized procurements without
exposing itself and its employees personally to serious
liability. In any event, since plaintiffs have joined the
District as a defendant simply to be able to obtain complete
relief rather than because they have a cause of action against
the District, the District's motion is effectively mooted since
plaintiffs' claims in Counts I and II no longer survive.

- 33 -

CONCLUSION

Councilmembers Chavous and Catania have standing to maintain this action, but the Committee of Interns and Residents does not. Defendants are entitled to judgment as a matter of law on the remaining plaintiffs' ultra vires claim.  In addition, the plaintiffs' constitutional claims and claim against the defendant District of Columbia must be dismissed for failure to state a valid cause of action.  The plaintiffs' motion for summary judgment will be denied on all counts.  An order consistent with this opinion will be issued.

SIGNED this _____ **3rd** day of _____, 2001.

_____
RICHARD W. ROBERTS
United States District Judge